# EXHIBIT "B"

## AMENDED AND RESTATED LICENSE AGREEMENT

THIS AGREEMENT (this "Agreement") made as of this 10th day of October 2013 and AMENDED AND RESTATED LICENSE this 18th day of June 2013, between Heartland Energy Group, Ltd. (the "Licensor") and Fluid Energy Group Ltd., a Limited company duly organized under the laws of Alberta, Canada, and having its principal place of business at #140,214- 11Th Avenue Calgary, Canada T2G 0X8   (the "Licensee").

### WITNESSETH:

WHEREAS, the Licensor claims that it has been granted the assignment rights from John MacDonald, who is the sole and exclusive owner of, and has the sole and exclusive right to grant licenses under the U.S. Patents identified in Exhibit A to this Agreement and specifically known as **The "231B1" Technology**, including all reissuances, supplementary protection certificates, extensions and re-examinations thereof (collectively, the "Patents"), as well as any underlying technology or know-how owned by the Licensor and related thereto or any improvements thereon (the "Technology"). Copies of the issuing papers from the U.S. Patent and Trademark Office ("USPTO") identifying the Patents shall remain on file for inspection at the offices of the Licensor; and

WHEREAS, for commercial purposes, the Licensee wishes to acquire the EXCLUSIVE right and license to manufacture, have manufactured, sell, offer to sell and use apparatuses or processes embodying, employing, or otherwise covered by the Patents and the Technology throughout the Territory.

NOW THEREFORE, in consideration of the mutual covenants and promises of the parties hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency, of which is hereby acknowledged by the parties hereto agree as follows:

1.   Grant of License. The Licensor grants to the Licensee the EXCLUSIVE right and license to manufacture, have manufactured, sell, offer to sell and use apparatuses or processes embodying, employing, or otherwise covered by the Patents and the Technology (the "Patent License"), throughout the Territory, to the full end of the Term (as hereinafter defined), unless this Agreement is terminated prior to the end of the Term, as provided below. The Licensee may not manufacture, sell and use apparatus embodying, employing and containing the Products in any country other than those specified in the Territory without first receiving written approval, or approval by electronic means, such as electronic mail, from the Licensor. In the event the Licensee fails to obtain such approval, the Licensor retains the right to Royalties (as defined in Section 5 of this Agreement) of any sales in such other countries, but shall not be held liable due to actual or alleged infringement by the Products supplied hereunder of any patent copyright, trade secrets, trademark, mask work right or other proprietary right(s) of a third party in such country.

2. <u>Representations of Licensor</u>.

   A. <u>Ownership of Patents</u>. The Licensor represents and warrants that it is the assignee of the entire right, title and interest in and to the Patents, the assignment being granted from John MacDonald, and that it has the right to grant the EXCLUSIVE right, license and privilege granted in this Agreement; that it has executed no agreement in conflict with this Agreement; and that it has not granted to any other person, firm or corporation any right, license, or privilege granted under this Agreement in the TERRITORY.

   B. <u>Validity and Enforceability of Patents</u>. The Licensor represents and warrants that all filings and fees have been made and paid to the relevant authorities to maintain the validity and enforceability of the Patents and, to the Licensor's knowledge, the Patents are valid and enforceable.

3. <u>Responsibilities</u>. The parties shall be responsible for the following:

   A. The Licensee shall work directly with the manufacturer(s) to order all product displays; freight to and out, deals, discounts, returns, and allowances; all selling expenses, trade advertising, printing of collateral material, all expenses for sales meetings and conventions, sales person commissions, incentives, bonuses or other such payments, mailings and samples of the Products. The Licensee shall also be responsible for all administrative duties such as order entry, shipping and billing, and website administration on any of its websites.

   B. The Licensor shall be responsible for the prosecution of the Patents and any other patent application claiming priority based on the Patents, and shall prosecute the foregoing diligently and in accordance with the applicable law.

4. <u>Term and Termination</u>.

   A. Unless sooner terminated in accordance with this Agreement, the Patent License granted hereunder shall commence on October 13, 2013 (the "Effective Date"), and shall continue in effect for a period of twenty three (23) years (the "Term"); provided, however, that so long as the Licensee sells at least two million gallons of the Products during each year of the Term (and any Renewal Term), this Agreement shall renew automatically for one (1) year terms in perpetuity unless one party gives the other party written notice of nonrenewal at least sixty (60) days prior to December 31st of each subsequent year (each one (1) year period subsequent to the Term shall be a "Renewal Term").

   B. Upon termination or expiration of the licenses granted under this Agreement, by operation of law or otherwise, all rights, privileges and obligations arising from this Agreement (except the obligations or limitations set forth in Section 8 of this Agreement) shall cease to exist. Upon termination or expiration of this Agreement, the Licensee shall cease from all use of the Patents; provided, however, nothing in this Agreement prevents the Licensee from practicing any methods or selling, offering for sale, manufacturing, having manufactured or using any apparatuses covered by any claims of the Patents that have expired or been found invalid.



C. In the event of a significant breach of this Agreement by either party, the other party may terminate the licenses and rights granted to the breaching party under this Agreement by giving written notice to such breaching party of termination and the basis for such termination; provided, however, that if such written notice is properly delivered as set forth in Section 12 of this Agreement, the licenses and rights granted under this Agreement shall terminate thirty (30) days after service of the written notice to the other party, unless the specified breach is cured within such thirty (30) day period. A significant breach of this Agreement shall be defined as either party's violation of its material obligations under this Agreement, except for the making of Royalty payments by the Licensee.

D. The Licensor may, on written notice to the Licensee, which notice is properly delivered as set forth in Section 12 of this Agreement, forthwith terminate the license and rights granted under this Agreement to the Licensee to use the Patents, upon the Licensee's failure to make timely payment of Royalties, Guaranteed Royalty Payment or submissions of Royalty statements when due for two (2) or more consecutive months during the Term, unless such breach is cured within ten (10) days from the service of the written notice upon the Licensee.

E. <u>Closeouts And Post-Term Sales and Royalties</u>. All Products unsold by the Licensee (i) at the end of the Term, (ii) at the end of any Renewal Term, or (iii) upon the termination of this Agreement, whichever is sooner, may continue to be sold by the Licensee as closeouts for One Hundred Eighty (180) days thereafter. All Products remaining with the Licensee after One Hundred Eighty (180) days from the expiration of this Agreement may be sold by the Licensee to the Licensor at fair market value or destroyed by the Licensee if the Licensor declines to buy such Product within thirty (30) days thereafter. Closeout sales of Products which have been previously approved in writing by the Licensor shall be subject to fifteen (15%) percent royalty to the Licensor. Closeouts which have not been previously approved by the Licensor in writing or which the Licensee has not previously sought approval for, shall be subject to the Royalties set forth in Section 5 of this Agreement.

5. <u>Royalties and Sales</u>.

A. <u>Rate of Royalty and Guaranteed Royalty Payment</u>. During the Term, the Licensee agrees to pay the Licensor, as more fully set forth in this Section 5 of the Agreement, royalties on Products which are manufactured and sold by the Licensee. The rate of royalty to be paid by the Licensees hereunder shall be per U.S. gallon, in U.S. Dollars for each gallon manufactured of the Products, which amount shall be computed on a monthly basis and paid quarterly at the following rate(s) (the "Royalty"); $0.98 up to 1 million gallons, $0.88 for greater than or equal to 1 million but less than 3 million gallons, $0.79 for greater than or equal to 3 million but less than 7 million gallons, $0.71 for greater than or equal to 7 million but less than 15 million gallons, and $0.64 for greater than or equal to 15 million gallons. Once 15 million gallons have been achieved, the Royalty shall be locked at and remain $0.64; provided that it is agreed that the minimum guaranteed monthly royalty paid to the Licensor under this Agreement and the Amended and Restated License Agreement between Fluid Energy Group Ltd. and Licensor, dated 06/18/2013, (the "Group License Agreement") during the Term shall be Twenty Thousand ($20,000.00) U.S. Dollars (the "Guaranteed Royalty Payment"). The first Guaranteed Royalty Payment shall be paid to the Licensor on April 1, 2013. Except as set forth in Section 5C(iii) of



this Agreement, the Licensor shall not, after the first payment under this Section 5A, in any one month during the continuance of this Agreement, receive less than the Guaranteed Royalty Payment, which amount shall be included in any Royalty paid to the Licensor if the Royalty amount is greater than the Guaranteed Royalty Payment.

B.  **Minimum Sales and Exclusivity.**

(i)  if, by December 31, 2014, the Licensee has not sold a minimum of One Million (1,000,000) U.S. gallons of Products (the "Sales Minimum"), the Licensor shall have the right to cancel the exclusive right granted to the Licensee pursuant to the Patent License; provided, however, that the Licensee shall be granted a non-exclusive license to distribute the Products with royalty rates equal to the rates as described in this Section 5 and the right to purchase the product from the Licensor at manufacturer's cost plus normal and customary profits, unless the Licensee elects to pay the Licensor any Royalty shortfall to make whole the Sales Minimum. The right to cancel the exclusive license under this paragraph "C" of this Section 5 shall be delivered in writing to the Licensee on or before January 10, 2014. If the Licensor does not cancel the exclusive right granted to the Licensee as set forth in this paragraph "C" of this Section 5, the Licensee shall continue to have the exclusive rights granted pursuant to this Agreement for an additional twelve (12) month period. For each successive twelve (12) month term, the Licensee's sales must exceed the Sales Minimum to maintain the exclusive rights granted pursuant to this Agreement.

(ii)  If the Licensor exercises its right to cancel the exclusive license under this paragraph "C" of this Section 5, the Licensor shall not directly interfere with existing accounts of the Licensee. Nothing herein provided prohibits the Licensor from granting further nonexclusive licenses to other distributors and such distributors shall be restricted from interfering with the Licensee's current accounts at time of cancellation of the exclusive License.

(iii)  If the Licensor exercises its right to cancel the exclusive license under this paragraph "C" of this Section 5, the Licensee is not obligated to render to the Licensor the Guaranteed Royalty Payment under the aforementioned Paragraph 5A. However, if the Licensee is unable to provide Royalties to the Licensor of at least an average of Twenty Thousand ($20,000) US Dollars per month over the next twelve (12) months following cancellation of the exclusive right, the non-exclusive License will be terminated. The right to cancel the nonexclusive License under this paragraph "C" of this Section 5 shall be delivered in writing to the Licensee on or prior to thirty (30) days from the end of the twelve (12) month term.

D.  **Duty to Exploit.** The Licensor expressly agrees that the Licensee shall not have any implied obligation beyond that expressly stated in this Agreement to market or exploit the Patents or Technology to use any level of efforts in the marketing or exploiting of such Patents or Technology. In addition, the Licensor agrees that the Guaranteed Royalty Payment satisfies all consideration necessary to meet any implied obligation of the Licensee to exploit the Patents or Technology licensed exclusively hereunder as well as the rights granted by the Licensor under the Manufacturing Agreement and the Group License Agreement.



6. <u>Statement of Sales and Payment of Royalty</u>.

A. The Licensee, within fifteen (15) days after the last day of each month during the Term, agrees to furnish to the Licensor written statements, under oath, specifying the total number of apparatus embodying and containing the Products sold by the Licensee during the preceding month. The first statement shall be rendered not later than the fifteenth (15th) day of January 2013, and shall cover the period from the Effective Date to January 31, 2013.

B. <u>Payment Term</u>. The Licensee shall make Royalty payments to the Licensor no later than forty-five (45) days after the first quarter in which Royalties are due and then quarterly each quarter thereafter by check or bank wire. If any of the Patents expire, (i) the Licensee will have no obligation to pay any Royalties for the sale of Products previously covered by such Patents, (ii) the Royalty that would have been applicable to the sale of such Products will be included in the amount required to meet the Guaranteed Royalty Payment, and (iii) the sale of such Products will be included in the amount of Products required to meet the Sales Minimum.

C. The Licensee shall keep accurate records of gross U.S. gallons for a period of not less than two (2) years after the expiration or earlier termination of this Agreement, unless in dispute, in which event they shall be kept until said dispute is settled and such records shall be open during reasonable business hours at the place where such records are customarily kept for examination by an independent accountant selected by the Licensor and reasonably acceptable to the Licensee, for the purpose of verifying the accuracy of such gross sales reported to the Licensor and Royalties due thereon. Said accountant shall not disclose any information that he may thereby obtain other than that necessary for the purpose of enabling the Licensor to determine the accuracy of such reports and Royalty payments made in connection therewith.

If any such examination reveals Royalties due the Licensor in excess of five percent (5%) more than Royalties paid to the Licensor for the period covered by such examination, all audit fees, costs, and appraisals shall be borne by the Licensee, in addition to which interest shall be added to the amount discovered to be due from the first dollar more than the Royalties actually paid, in the amount of four (4) percentage points above the prime rate as established by Bank of America, NA; provided that such payment of interest is not in excess of the maximum rate of interest legally permissible.

In the event that an auditor representing the Licensee shall disagree with the Licensor as to whether the amount owed exceeds the above-described five (5%) percent, then the auditor representing the Licensee and the auditor representing the Licensor shall jointly select a third auditor whose determination of the amount owed shall be final and binding upon the Licensee and the Licensor.

The receipt and deposit of monies by the Licensor shall not prevent or limit the Licensor's right to contest the accuracy and/or correctness of any statement in respect of such monies.

Such books of account shall at all times be maintained at an office of the Licensee and shall be open to the inspection and examination by the Licensor or the Licensor's representative,



at reasonable intervals, but not more than once every six (6) months, upon reasonable notice and at reasonable hours of the business day for any purpose reasonably related to this Agreement.

    D.    The Licensee shall throughout the term of this Agreement and, where applicable, thereafter render statements to the Licensor on a monthly basis and within fifteen (15) days after each applicable month and with such monthly statement remit payments to the Licensor; such statement shall include:

    (i)    Copies of all purchase orders;
    (ii)    Copies of all QC reports and gallons produced;
    (iii)    Voice listings setting forth the:
        a.    Names and addresses of customers;
        b.    Price paid by each customer;
        c.    Goods returned and the reasons therefore.

7.    Infringement. In the event the Licensee shall become aware of any infringement by any third party of any right licensed under this Agreement, it shall promptly notify the Licensor in writing of such infringement or use, and shall do such acts and assist and supply such information as are reasonably necessary or desirable in relation thereto. The Licensor shall take only those steps which, in its sole discretion, are necessary to enforce its rights, including the engagement of legal counsel of its own choosing. The Licensor's obligation to defend the rights of this Agreement hereunder shall be made at its sole and exclusive discretion; provided however, if the Licensor elects not to enforce the Patents licensed hereunder within thirty (30) days of notice of such infringement or use, (i) the Licensor hereby assigns all rights in such cause of action to the Licensee, (ii) the Licensee may take those steps which, in its sole discretion, are necessary to enforce its right, and (iii) the Licensor shall do such acts and assist and supply such information as are reasonably necessary or desirable in relation thereto. Regardless of the party enforcing the Patents, (a) the Licensee shall be entitled to all damages related to any infringement of the Patents in the Territory, less the cost of procecution paid by Licensor along with royalty fees related to the infrindging sales and (b) the Licensee may elect to engage legal counsel of its own choosing, at the Licensee's sole expense.

8.    Indemnity.

    A.    The Licensor shall defend, indemnify, and hold harmless the Licensee and the Licensee's officers, employees, agents and direct or indirect customers, from and against any claims, suits, losses, liabilities, damages, court judgments and/or arbitral awards and the reasonably related costs and expenses (including reasonable attorneys' fees incurred by the other or for which the other is judged liable), incurred because of actual or alleged infringement or misappropriation by (i) the Products, (ii) the Technology, or (iii) the use of the apparatuses and methods claimed in the Patents, of any patent, copyright, trade secret, trademark, mask work right or other proprietary right(s) of a third party which was in effect on or prior to the date which the last to issue of the Patents, including any improvements thereon, was issued by the USPTO. Upon receipt of notice of such claim, suit or action, the Licensee shall promptly tender notice of the same to the Licensor, and thereafter, upon the Licensor's request, the Licensee shall render reasonable assistance to the Licensor for defense of the same. Each party shall execute any and all papers which may be found necessary or desirable in any suit or suits brought under



and pursuant to this Agreement; and the each party further agrees that it will testify in any interference or litigation, whenever requested to do so by the other party.

B. Each party shall maintain, at its own expense, product liability insurance in full force and effect at all times during the Term, with a responsible insurance carrier reasonably acceptable to the other party, of a minimum of One Million ($1,000,000.00) Dollars, with a deductible of no more than Twenty Five Thousand ($25,000.00) Dollars. Product liability insurance shall be for the benefit of each party as an additional insured and each party shall provide for at least ten (10) days prior written notice to the other party of the cancellation or any substantial modification of said policy.

C. The Licensor or the Licensee may, as the case maybe, from time to time, upon reasonable request by the other party, promptly furnish or cause to be furnished to the other party evidence in form and substance satisfactory to the other party, of the maintenance of the insurance required by paragraph "B" of this Section 8 of this Agreement, including, but not limited to, originals or copies of policies, certificates of insurance (with applicable riders and endorsements) and proof of premium payments.

D. If in any action involving either the Patents, Technology, or any other intellectual property under and pursuant to which the exclusive rights and licenses have been granted under this Agreement or the Manufacturing Agreement, results in any Patent, Technology, or other such intellectual property being declared to be invalid by any court or other tribunal or be construed by the court as not to cover the Products, then the Royalties agreed to be paid under this Agreement shall afterwards be waived, and the Licensee shall be immediately released of and from any and all obligations under this Agreement.

9. No Waiver. Except as otherwise provided herein, no waiver of any covenant, condition, or provision of this Agreement shall be deemed to have been made unless expressly in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provisions, covenants, or conditions of this Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment in the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another party shall be construed as a waiver with respect to any other or subsequent breach.

10. Independent Contractors. The Licensee is an independent contractor and not an agent, partner, joint venturer, franchisee, affiliate or employee of the Licensor. No fiduciary or franchise relationship exists between the parties. Neither party shall be liable for any debts, accounts, obligations or other liabilities of the other party, its agents or employees. The Licensee shall have no authority to obligate or bind the Licensor in any manner. The Licensor has no proprietary interest in the Licensee and has no interest in the business of the Licensee, except to the extent set forth in this License Agreement.

11. Further Assurances. Each party agrees to sign any and all other papers which may be



required to effectuate the purpose and intent of this Agreement. Without limiting the foregoing, each party also agrees to execute any and all papers, documents or other instruments which may be found necessary or desirable to effect the exclusive right and license granted to the Licensee hereunder.

12.  **Notice**. Notices permitted or required to be given hereunder shall be deemed sufficient if given by (i) email; (ii) facsimile; or (ii) registered or certified air mail, with postage prepaid, return receipt requested, and addressed to the respective addresses of the parties written below or at such other addresses as the respective parties may designate by like notice from time to time. Notices so given shall be effective upon (a) receipt by the party to which notice is given, or (b) on the next business day, in the case of notice given by email or by facsimile, and on the fourteenth (14th) business day following the date notice was posted by registered or certified air mail, whichever occurs first:

>   If to the Licensor: Heartland Energy Group, Ltd
>   c/o John MacDonald @ jmac@heartlandenergygroup.net
>   OR @ Heartland Energy Group, Ltd.
>   Suite 15, 1st Floor Oliaji Trade Center, Francis Street,
>   Victoria, Mahe, Seychelles

>   If to the Licensee: Fluid Energy Group. LTD.
>   c/o Clay Purdy @ clay@fluidenergygroup.com
>   #140, 214- 11Th Avenue Calgary, Canada T2G 0X8

13.  **Binding Effect**. The parties hereto acknowledge, agree and declare that this License Agreement is a legal, valid and binding agreement enforceable against each party in accordance with its terms and that this Agreement has been duly executed and delivered on behalf of the parties. Each party represents and warrants that it shall use best efforts in good faith to consummate the transaction.

14.  **Successors and Assigns**. The parties hereto acknowledge, agree and declare that this Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

15.  **Severability**. In the event that any of the terms of this Agreement are in conflict with any rule of law or statutory provision or are otherwise unenforceable under the laws or regulations of any government or subdivision thereof, such terms shall be deemed stricken from this Agreement, but such invalidity or unenforceability shall not invalidate any of the other terms of this Agreement and this Agreement shall continue in force, unless the invalidity or unenforceability of any such provisions hereof does substantial violence to, or where the invalid or unenforceable provisions comprise an integral part of, or are otherwise inseparable from, the remainder of this Agreement.

16.  **Captions and Headings; Definitions**. The captions and headings appearing in this Agreement are solely for convenience and do not in any way define, limit or describe the scope



of this Agreement or the intent or content of any provision thereof. Any capitalized terms not defined in this Agreement will have the meanings given to those terms in the Amended and Restated Manufacturing Agreement between the parties, dated 06/18/2013 (the "Manufacturing Agreement").

17.   Gender and Number. Whenever the context of this Agreement requires, the masculine gender includes the feminine and neuter, and the singular number includes the plural and vice versa.

18.   Assignment. Neither party shall have the right to assign or otherwise transfer its rights and obligations under this Agreement except with the prior written consent of the other party, which consent may not be unreasonably withheld; provided, however, the Licensor shall be entitled to assign any or all of its rights and obligations hereunder to any of its subsidiaries, provided that the Licensor shall remain fully liable for the performance of all its obligations hereunder; and further provided that a successor in interest by merger, by operation of law, assignment, purchase, or otherwise of the entire business of either party shall acquire all rights and obligations of such party hereunder without requirement of the consent of the other party. Any prohibited assignment shall be null and void.

19.   Amendment. This Agreement shall not be deemed or construed to be modified, amended, rescinded, cancelled, or waived, in whole or in part, except by written amendment signed by the parties hereto.

20.   Governing Law. This Agreement shall for all purposes be governed by and construed in accordance with the laws of the State of Florida.

21.   Settlement of Disputes. All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC") by three arbitrators appointed in accordance with said rules. Any arbitration administered by the ICC shall be held in the ICC's Florida, USA office, unless otherwise agreed to by the parties hereto. The award of the arbitrators shall be final and binding and may be confirmed and entered in any court, state or federal, having jurisdiction. The arbitration shall be conducted in the English language.

22.   Trade Secrets and Competition. In consideration of the execution of this agreement by the Licensor, the Licensee covenants and agrees that it shall not, during or following the term of this agreement, sell, disseminate, disclose, lecture upon, or publish in any manner any confidential information relating to design or manufacturing techniques employed by the Licensor in the production of its products or confidential information relating to research, development, marketing, or sales of products of the Licensor.

The Licensee further covenants and agrees that for two (2) years following the expiration or termination of this Agreement for any reason other than the Licensor's breach, the Licensee will not engage in selling or manufacturing, whether directly or in association with other persons or firms, of any product, process or service, which competes with any Products covered by the Patents in the Territory.



The Licensor further covenants and agrees that for the Term and for two (2) years following the expiration or termination of this Agreement for any reason other than the Licensee's breach, the Licensor will not engage in selling or manufacturing, whether directly or in association with other persons or firms, of any product, process or service, which competes with any Products covered by the Patents in the Territory, except as permitted by the Manufacturing Agreement.

Any confidential or propriety information disclosed pursuant to this Agreement will be treated as Supplier Information or Manufacture Information, as applicable, and as defined in the Manufacturing Agreement.

23. Ownership. The Licensor shall own all existing and future right, title and interest in the Patents and all other intellectual property rights inherent therein and all tools, molds and equipment related to the Licensor's products. The Licensee shall own all existing and future right, title and interest in all changes and improvements requested or suggested by the Licensee in the support and maintenance of the Patents with no duty to account.

24. Prior Agreements. This Agreement supersedes any and all previous license agreements between the parties, whether written or oral, covering the subject matter of this Agreement. Any such previous agreements are null and void.

25. Force Majeure. If by reason of any act of God, war, strike, walk-out, or other labor trouble, riot, or unavoidable accident, delay of common carrier, embargo, illness of or accident to the principal artists or any of them or senior technicians, or any other causes beyond the parties' control (whether such causes be of a similar or dissimilar nature), the parties or any of the parties' agents or distributors shall be delayed in or prevented from performing any of the provisions of the Agreement, then such delay or failure shall not be deemed to be a breach of this Agreement and no loss or damage shall be claimed by the parties by reason of the delay or failure.

26. Entire Agreement. This Agreement, including Exhibit A attached hereto and incorporated as an integral part of this Agreement, constitutes the entire Agreement of the parties with respect to the subject matter hereof, and supersedes all previous distributorship agreements by and between the Licensor and the Licensee, as well as all proposals, oral or written, and all negotiations, conversations, or discussions heretofore had between the parties related to this Agreement. The Licensee acknowledges that it has not been induced to enter into this Agreement by any representations or statements, oral or written, not expressly contained herein. There may be other signed, written agreements between the parties and those signed, written agreements are not invalidated by this Section.

27. Counterparts. This Agreement may be executed in counterparts and may be delivered by facsimile or electronically scanned form. Each such counterpart shall be deemed an original hereof, and all executed counterparts taken together shall constitute one agreement.

IN WITNESS WHEREOF, The parties have executed this Agreement as of the day and year first above written.

_____
Licensor, John MacDonald
Heartland Energy Group, Ltd.

_____
Licensee, Clay Purdy
Fluid Energy Group, Ltd