# EXHIBIT "D"

## Amended and Restated Manufacturing Agreement

THIS MANUFACTURING AGREEMENT (this "**Agreement**"), made this 10th day of October 2012,and  AMENDED AND RESTATED this 18th day of June 2013, by and between Heartland Energy Group Ltd., an entity duly organized under the laws of Seychelles and having its principal place of business at Suite 15, 1st Floor Oliaji Trade Center, Francis Street, Victoria, **Mahe, Seychelles**, (hereinafter "**SUPPLIER**"), and Fluid Lux S.a.r.J., a Limited company duly organized under the laws of Luxembourg with registration B 169283, and having its principal place of business at #73, Coted'Fich L-1450 Luxembourg (hereinafter "**MANUFACTURER**").

WHEREAS, SUPPLIER manufactures and markets certain Products and desires to increase the sales of such Products (as defined below);

WHEREAS, MANUFACTURER has represented that it possesses the necessary expertise and marketing organization to promote, market, manufacture, and blend such Products; and

WHEREAS, SUPPLIER is willing to appoint MANUFACTURER and MANUFACTURER is willing to accept such appointment as the exclusive manufacturer of the Products in the Territory defined herein;

NOW, THEREFORE, in consideration of the mutual premises and covenants hereinafter set forth, the Parties agree as follows:

### ARTICLE 1
### DEFINITIONS

For purposes of this Agreement, the following words, terms and phrases, where written with an initial capital letter, shall have the meanings assigned to them in this Article I unless the context otherwise requires:

1.1     **Effective Date**. "Effective Date" shall mean the date first above written.

1.2     **Field Test**. "Field Test" shall mean to try-out, experiment with or otherwise test the application and saleability of the Products in jurisdictions outside the Territory, including the Expansion Territory, **for** the purpose of territory expansion.

1.3     **Fiscal and/or Calendar Year**. "Fiscal and/or Calendar Year" shall mean the twelve-month period commencing on January 1st of each year following the Effective Date of this Agreement and each consecutive twelve-month period thereafter.

1.4     **Manufacture**. "Manufacture" shall mean the ability to take raw and/or concentrated materials to create proprietary blends exclusive to MANUFACTURER for the Territory.

1.5     **MANUFACTURER Information**. "MANUFACTURER Information" shall mean all non-public information, other than information in **published** form or expressly

Initials
Clay Purdy
JohnMacDonald

designated by MANUFACTURER as non-confidential, which is directly or indirectly disclosed to SUPPLIER, regardless of the form in which it is disclosed, relating in any way to MANUFACTURER'S markets, customers, products, patents, inventions, procedures, methods, designs, strategies, plans, assets, liabilities, costs, revenues, profits, organization, employees, agents, distributors, or business in general.

1.6     **MANUFACTURER Wholesale Prices.**   "MANUFACTURER Wholesale Prices" shall mean the fixed prices quoted by SUPPLIER for sales of Products to as set forth in Exhibit 0 hereto, which fixed prices may be adjusted by SUPPLIER once per Calendar Year by no more than [2%] upon thirty (30) days' prior written notice to MANUFACTURER and which are deemed confidential and trade secret.

1.7     **New Products.** "New Products" shall mean [any product created, conceived or developed by SUPPLIER after the Effective Date.]

1.8     **Market.** "Market" shall mean to sell and/or promote, advertise, distribute, or market for the purposes of a sale, and "Marketing" shall have a corresponding meaning.

1.9     **Parties.** "Parties" shall mean MANUFACTURER and SUPPLIER, and "Party" shall mean either one of them.

1.10    **Products.** "Products" shall mean those products described in Exhibit A hereto, which will be deemed, as and when applicable, to include New Products, as that term is defined in Section 2.3.

1.11    **Purchase Order.** "Purchase Order" shall mean the document required to process orders for Products under Article 4, which is substantially in the form attached in Exhibit G hereto.

1.12    **Quota.**   "Quota" shall mean the minimum quantities of Products that MANUFACTURER and its subsidiaries shall be expected to purchase from SUPPLIER in accordance with the terms and conditions of Article 5 of this Agreement.

1.13    **SUPPLIER Information.** "SUPPLIER Information" shall mean all non-public information, other than information in published form or expressly designated by SUPPLIER as non-confidential, which is directly or indirectly disclosed to MANUFACTURER or embodied in Products provided hereunder, regardless of the form in which it is disclosed, relating in any way to SUPPLIER'S markets, customers, products, patents, inventions, procedures, methods, designs, strategies, plans, assets, liabilities, costs, revenues, profits, organization, employees, agents, distributors, or business in general.

1.14    **Territory.** "Territory" shall mean the area specifically described in Exhibit B hereto.

Initials:
Clay Purdy
John MacDonald

## ARTICLE 2
## APPOINTMENT

2.1    **Scope.** SUPPLIER hereby appoints MANUFACTURER and any Fluid owned facility, and MANUFACTURER hereby accepts appointment, as exclusive manufacturer of the Products during the term of this Agreement in the Territory. As the exclusive manufacturer, MANUFACTURER shall have the right to **Manufacture** and Market Products in the Territory, under SUPPLIER'S and/or MANUFACTURERS name, logotypes and trademarks, subject to all the terms and conditions of this Agreement, for **oil and gas industry** applications exclusively; and non-exclusively for the following applications (a) industrial and municipal water treatment; (b) mining; (c) agriculture; (d) pulp & paper; (e) retail markets; (f) industrial applications; and (g) food processing. MANUFACTURER agrees not to Manufacture or Market Products for any other application unless approved by SUPPLIER. The term "exclusive" as used in this Section 2.1 means that the rights granted to MANUFACTURER in this Section 2.1 are to the exclusion of all other persons and entities, except SUPPLIER in respect of those customers listed in Exhibit C hereto. SUPPLIER represents and warrants to MANUFACTURER that (i) except for the exclusive appointment granted in this Section 2.1 and the option applicable in Section 2.3, SUPPLIER has not granted any other licence, right or appointment to import and/or Market the Products in the Territory, and (ii) SUPPLIER has not granted, and will not grant, to any other entity any licence, right or appointment to import and/or Market the Products in the Expansion Territory.

2.2    **Prior Agreements.**   This Agreement supersedes any and all previous manufacturing agreements between the Parties, whether written or oral, covering the subject matter of this Agreement.  Any such previous agreements are null and void.

2.3    **New Products.**  MANUFACTURER shall have first right of refusal to the exclusive rights to Manufacture and Market all and any New Products of SUPPLIER and shall exercise such right within 45 days of notice to MANUFACTURER, by SUPPLIER if MANUFACTURER so chooses to obtain said rights.

2.4    **Sub-Distributors.** MANUFACTURER shall have the right to retain and appoint affiliates and/or sub-distributors ("Agents") to Market the Products for use solely within the Territory, and MANUFACTURER shall cause such Agents to perform the applicable obligations of MANUFACTURER under this Agreement or shall otherwise ensure that such obligations are performed by MANUFACTURER. Further, notwithstanding any such appointments, MANUFACTURER shall at all times remain fully liable for the performance of its Agents and MANUFACTURER hereby agrees to indemnify and hold harmless SUPPLIER from all damages, losses, costs, or expenses arising in any manner from any act or omission on the part of its Agents in performing MANUFACTURER'S obligations under this Agreement, excluding the right for agents to manufacturer said Products, so long as MANUFACTURER provided SUPPLIER written notice 45 days prior to appointing such said sub and SUPPLIER granted MANUFACTURER the said rights to MANUFACTURER'S sub, in writing and made a part hereto.

Initials
Clay Purdy
John MacDonald

2.5 **Sales outside the Territory**. MANUFACTURER shall not Market Products outside the Territory without the prior written consent from SUPPLIER, provided however that SUPPLIER'S consent shall not be required by MANUFACTURER in order to Field Test the Products, for a period of not more than six (6) months.

2.6 **Reserved Sales Rights**. Notwithstanding any other provision of this Agreement, SUPPLIER reserves the right to Market Products under SUPPLIER'S name, logotypes and trademarks directly to any of the customers listed, as of the Effective Date, in Exhibit C hereto. No amendment to Exhibit C shall be made without the prior written consent of MANUFACTURER.

SUPPLIER agrees not to knowingly make any direct sale or to Market any Products to any entity based in the Territory that is not listed in Exhibit C, and SUPPLIER will work to prevent channel conflict. However, MANUFACTURER hereby acknowledges that SUPPLIER and its authorized distributors are Marketing, or are or attempting to Market, products other than the Products to entities that conduct business nationally and internationally. Accordingly, SUPPLIER may now, or may in the future, conduct business in the Territory, provided such business does not include Marketing Products to any entities that are not listed as customers in Exhibit C hereto.

2.7 **Unauthorized Marketing**. SUPPLIER shall take all reasonable and prudent actions to ensure that Products do not enter the Territory, and shall include in any contracts with distributors outside the Territory terms and conditions that (i) prohibit the import of Products into the Territory and (ii) prohibit the sale of Products to third parties known to participate in the import into the Territory of competing products ("**Prohibited Sales**"). MANUFACTURER shall have the right to an indemnity claim for damages in the event (i) SUPPLIER does not cure such Prohibited Sales within thirty (30) days of MANUFACTURER'S written notice of the Prohibited Sales, or (ii) that such Prohibited Sales cannot be cured within such thirty (30) day period and SUPPLIER has commenced good faith efforts to cure such Prohibited Sales within such period, the Prohibited Sales are not cured within two (2) months of MANUFACTURER'S written notice of the Prohibited Sales. If SUPPLIER fails to remedy the Prohibited Sales, SUPPLIER shall quantify the volume of Product sales that MANUFACTURER has lost due to such Prohibited Sales (the "**Lost Sales**"), and the quantum of damages that MANUFACTURER is entitled to claim hereunder as indemnity will be equal to the Lost Sales in the Territory multiplied by the difference between the MANUFACTURER Wholesale Price and the average price otherwise paid by customers in the Territory under the Prohibited Sales.

2.8 **Manufacturer Certification**. MANUFACTURER hereby certifies and warrants to SUPPLIER that neither it nor any of its officers, directors, or senior officials have ever been indicted or convicted for violation of any felony criminal law of the Territory, and that it and its officers, directors, and senior officials are or will be eligible to represent SUPPLIER in the Territory and to deal with any agency or instrumentality of the Canadian government and the government of the Territory.

2.9 **SUPPLIER'S Assistance**. SUPPLIER will, at least one time during each twelve-month period if requested by MANUFACTURER, send a representative to MANUFACTURER

Initials:

Clay Purdy
JohnMacDonald

to assist in training MANUFACTURER and/or its employees in regard to the Products, to verify quality control measures and to offer assistance protecting the Manufacturing process through the registration of specific country patents held by either Party.

2.10   **No Unauthorized Testing.**   SUPPLIER hereby agrees that it shall provide necessary test results from third-party laboratories approved by SUPPLIER as deemed necessary by SUPPLIER for the Marketing of the Products. SUPPLIER shall provide this data to MANUFACTURER as needed to perform its duties under this Agreement.

Costs associated with any testing requested by MANUFACTURER and approved by SUPPLIER shall be borne exclusively by MANUFACTURER, unless otherwise agreed to in writing by SUPPLIER. Costs of testing conducted at the instance of SUPPLIER shall be borne exclusively by SUPPLIER.

## ARTICLE 3
## GENERAL OBLIGATIONS OF MANUFACTURER

3.1   **Marketing.**   MANUFACTURER shall have the following obligations with respect to the Marketing of SUPPLIER Products:

(a)   To use commercially reasonable efforts to further the Marketing of Products in the Territory;

(b)   Subject to SUPPLIER'S timely delivery of Products or raw manufacturing products, to maintain an adequate and balanced inventory of Products;

(c)   To promptly respond to all inquiries from customers, including complaints, process all orders, and effect all shipments of Products;

(d)   To diligently investigate all leads with respect to potential customers referred by SUPPLIER;

(e)   Upon prior written notice, to permit SUPPLIER to visit MANUFACTURER'S place of business and inspect its inventories, service records, quality control measures, and other relevant documents during regular hours on regular business days; including but not limited to raw material purchases and/or product sales records.

(f)   To maintain throughout the Territory an adequate sales force to Market SUPPLIER'S Products, as determined solely by MANUFACTURER.

3.2   **Competitive Goods.**   During the term of this Agreement, neither Party shall Manufacture or Market, directly or indirectly, any products within the Territory that are an alternative to, or compete directly or indirectly with, the Products listed in Exhibit A hereto.

3.3   **Expenses.**   Except where otherwise indicated herein, MANUFACTURER assumes full responsibility for all costs and expenses it incurs in carrying out its obligations under this Agreement, including but not limited to all equipment, materials, rentals, salaries,



commissions, advertising, demonstration, samples, travel, and accommodation expenses without the right to reimbursement for any portion thereof from SUPPLIER.

## ARTICLE 4
## ORDERS FOR PRODUCTS

4.1     **Purchase Orders.**  MANUFACTURER shall submit Purchase Orders for the Products to SUPPLIER in writing by mail, email or facsimile. SUPPLIER shall have the right to reject any Purchase Order that is not in a form substantially similar to the form currently in use.

4.2     **Acceptance of Orders.**  All Purchase Orders from MANUFACTURER are subject to acceptance in writing by SUPPLIER at its principal offices in the U.S.A., which acceptance shall be delivered to MANUFACTURER by mail to a regularly established post office, or by email or facsimile. Each Purchase Order shall be deemed to be an offer by MANUFACTURER to purchase the Products pursuant to the terms of this Agreement and, when accepted by SUPPLIER as hereinabove provided, shall give rise to a contract under the terms set forth herein to the exclusion of any additional or contrary terms set forth in the Purchase Order.

4.3     **Delivery Terms.**  MANUFACTURER shall bear all costs and obligations regarding freight, delivery, shipping and logistics responsibilities

4.4     **Modification of Orders.**  No accepted Purchase Order shall be modified or cancelled, except upon the written agreement of both Parties. MANUFACTURER'S Purchase Orders or mutually agreed change orders shall be subject to all of the provisions of this Agreement, whether or not the Purchase Order or change order so states.

4.5     **Product Changes.**  SUPPLIER reserves the right, in its sole discretion and without incurring any liability to MANUFACTURER, to:

(a)     Alter the specifications of any Product;

(b)     Discontinue the development of any New Product, whether or not such product has been announced publicly; or

(c)     Commence the manufacture of New Products having features that make any Product wholly or partially obsolete and if so commenced, MANUFACTURER will be granted rights in respect of such New Products in accordance with Section 2.3 above.

Notwithstanding the above, SUPPLIER shall provide MANUFACTURER with twelve (12) months' prior written notice for discontinued or obsolete products of such decisions and shall fill all accepted Purchase Orders from MANUFACTURER for any such altered Products of which manufacturing and commercial deliveries have commenced (**"Placed Orders"**). In respect of any Placed Orders, MANUFACTURER shall have the option to substitute any New Product for an altered Product, to the extent New Products are available and are appropriate substitutes for any such altered Products. MANUFACTURER may reject any alteration made pursuant to Section 4.5(a) to the extent such alteration results in altered Product

Initials:

Clay Purdy
JohnMacDonald

that is not substantially equivalent to the previous Product or increases MANUFACTURER'S expenses in any way.

## ARTICLE 5
## MINIMUM PURCHASE REQUIREMENTS

5.1 **Achievement of Quota.** MANUFACTURER understands and agrees that the establishment and achievement of the Quota is one of the key terms of this Agreement. MANUFACTURER and its affiliates agree to use reasonable commercial efforts to meet the Quota for each Calendar Year. The Parties agree the Quota for the total Products purchased by MANUFACTURER under this Amended and Restated Manufacturing Agreement between Fluid Lux S.a.r.l.and SUPPLIER, dated 06/18/2013, shall be one million United States dollars (US$1,000,000.00).

5.2 **Failure to Meet Quota.** In the event MANUFACTURER fails to meet the Quota for any Calendar Year, MANUFACTURER may, within forty-five (45) days of the end of such Calendar Year. either (a) make a payment to SUPPLIER equal to the shortfall of such Quota to maintain the exclusive rights with respect to oil and gas industry applications as set forth in Section 2.1 or (b) notify SUPPLIER that MANUFACTURER no longer desires exclusive rights with respect to oil and gas industry applications as set forth in Section 2.1. If MANUFACTURER provides SUPPLIER with such notice, the Quota shall be reduced to zero for the remainder of the term and MANUFACTURER will have non-exclusive rights with respect to oil and gas industry applications as set forth in Section 2.1 for the other non-exclusive applications. If MANUFACTURER fails to make an election within forty-five (45) days of the end of a Calendar Year in which MANUFACTURER has failed to meet the Quota, MANUFACTURER will be deemed to have chosen option (b) set forth in this Section 5.2.

5.3 **Year three (3) and until any related Patents expire or are deemed to be invalid, MANUFACTURER and SUPPLIER will negioate and agree upon the new years annual Quota, within 30 days of the prior years end.**

## ARTICLE 6
## PRICES AND PAYMENTS

6.1 **Prices.** The prices to be paid by MANUFACTURER for Products purchased pursuant to this Agreement shall be MANUFACTURER Wholesale Prices, which are attached hereto as an Exhibit. All MANUFACTURER Wholesale Prices are D.A.T., named place of destination to be determined by MANUFACTURER and include packing in accordance with SUPPLIER'S standard commercial export practices in effect at the time of shipment. Special packing or handling shall be at the sole expense of MANUFACTURER and will be handled pursuant to Exhibit D hereto.

6.2 **Price Changes.** Increases to the MANUFACTURER Wholesale Prices for all Products shall not apply to Placed Orders made prior to the effective date of the MANUFACTURER Wholesale Price increase. Decreases in the MANUFACTURER Wholesale Prices for all Products shall be effective immediately upon written notice thereof to

Initials:

Clay Purdy
JohnMacDonald

MANUFACTURER and such decreases shall be applied to all Placed Orders not yet filled or delivered. SUPPLIER shall give MANUFACTURER thirty (30) days prior written notice of any changes to the MANUFACTURER Wholesale Prices.

6.3    **Payment Terms**. All payments hereunder that are by open account shall be due net thirty (30) days from the date of arrival of the Products; payments in respect of such charges as taxes, duties, interest, or like special charges, shall be due net thirty (30) days from the date of invoice. All payments hereunder shall be payable to the bank or banks specified by SUPPLIER in writing from time to time and shall be made in U.S. dollars. In the event of any dispute arising over any part of an invoice or the total amount due under an invoice, all undisputed amounts shall be promptly paid by MANUFACTURER in accordance with this Section 6.3.

6.4    **Resale Prices**. MANUFACTURER may resell Products at such prices, as MANUFACTURER, in its sole discretion, shall determine.

6.5    **Overdue Payments**. If and for so long as any payment from MANUFACTURER to SUPPLIER under this Agreement shall be overdue, interest at the rate of eight percent (8.0%) per annum shall automatically become due on all overdue balances outstanding.

### ARTICLE 7
### ACCEPTANCE AND WARRANTY

7.1    **Acceptance of Products**. In the event of any shortage, damage, or discrepancy in or to a shipment of Products, MANUFACTURER shall promptly report the same to SUPPLIER and furnish any relevant documents or other evidence that SUPPLIER may deem appropriate. SUPPLIER shall not be liable for any such shortage, damage, or discrepancy unless SUPPLIER has received notice and substantiating evidence thereof from MANUFACTURER within thirty (30) days of MANUFACTURER becoming aware of such shortage, damage or discrepancy. If the substantiating evidence delivered by MANUFACTURER reasonably demonstrates that SUPPLIER is responsible for such shortage, damage or discrepancy, SUPPLIER shall promptly deliver additional Products (or substitute Products of the same type and quality) at no additional cost to MANUFACTURER in accordance with the delivery procedures set forth herein.; provided that in no event shall SUPPLIER be liable for any additional costs, expenses or damages incurred by MANUFACTURER, directly or indirectly, as a result of such shortage, damage or discrempancy in or to a shipment.

7.2    **Product Warranty**. SUPPLIER warrants for a period of six (6) months after the date of delivery in accordance with Section 4.3 hereof (the "**Warranty Period**") that the Products are fit for the use intended, and shall be free from defects in design, material and workmanship, and SUPPLIER shall provide MANUFACTURER with a certificate of analysis report for each delivery of Product. SUPPLIER'S sole obligation in the event of a breach of such warranty shall be to provide, at no charge to MANUFACTURER, replacement Products for all defective Products. SUPPLIER warrants, during the term of this Agreement and for six (6) months thereafter, that the Products and any specifications or instructions provided by SUPPLIER do not infringe or misappropriate the intellectual property of any third party. All costs of shipment of the replacement Products to **MANUFACTURER** shall be borne by

Initials

Clay Purdy
John MacDonald

SUPPLIER. MANUFACTURER shall retain all replaced Products subject to the foregoing warranty for SUPPLIER'S inspection for a period of six (6) months after their replacement. All such replaced Products shall become the property of SUPPLIER upon their replacement and all costs of shipment of the defective Products back to SUPPLIER shall be borne by SUPPLIER.

7.3     **Notice.** Warranty claims hereunder must: (i) be made promptly and in writing; (ii) must recite the nature and details of the claim, the date the cause of the claim was first observed and the serial number of the Product concerned; and (iii) must be received by SUPPLIER no later than fifteen (15) days after the expiration of the Warranty Period provided for in Section 7.2 above. Provided the warranty claim complies with the provisions of this Section 7.3, such warranty claim can be made by MANUFACTURER via email correspondence to SUPPLIER.

7.4     **Excluded Claims.** SUPPLIER shall have no obligation under Section 7.2 above in the event that:

(a)     Repair or replacement of Products shall have been required through normal wear and tear or necessitated in whole or in part by force majeure as defined in Section 15.1 below, or by the fault or negligence of MANUFACTURER or its customers; or

(b)     The Products (i) have not been properly used, maintained or repaired in accordance with SUPPLIER'S applicable operating and/or maintenance manuals, whether by MANUFACTURER or its customers, or (ii) have been modified in any manner without the prior written consent of SUPPLIER and such modification is the sole cause of the defect that is the subject of the warranty claim.

(c)     All and any raw materials purchases by MANUFACTURER, and all and any products manufactured by MANUFACTURER.

7.5     **Limited Warranty.** The warranties set forth in this Article 7 are intended solely for the benefit of MANUFACTURER or any permitted assignees. All claims hereunder shall be made by MANUFACTURER and may not be made by MANUFACTURER'S customers. THE WARRANTIES SET FORTH ABOVE ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, UNDER COMMON LAW OR STATUTE, WHICH ARE HEREBY DISCLAIMED AND EXCLUDED BY SUPPLIER, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE AND ALL OBLIGATIONS OR LIABILITIES ON THE PART OF SUPPLIER FOR DAMAGES ARISING OUT OF OR IN CONJUNCTION WITH THE USE, REPAIR, OR PERFORMANCE OF THE PRODUCTS.

7.6     **International Sale of Goods.** Notwithstanding any other term or condition of this Agreement, the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

Initials:
Clay Purdy
John MacDonald

## ARTICLE 8
## LIMITATION OF REMEDIES

MANUFACTURER understands and agrees as follows:

8.1     **Delay**.  SUPPLIER shall not be liable for any loss or damage caused by delay in furnishing Products and services or any other performance under or pursuant to this Agreement, except to the extent any loss or damage is due to SUPPLIER'S gross negligence or willful misconduct.

8.2     **Sole Remedies**.  The sole and exclusive remedies for breach of any and all warranties and the sole remedies for SUPPLIER'S liability of any kind (including liability for negligence) with respect to the Products covered by this Agreement and all other performance by SUPPLIER under or pursuant to this Agreement shall be limited to the remedies provided in Section 7.2, Product Warranty.

8.3     **Consequential Damages**.  In no event shall either Party's liability of any kind include any punitive and exemplary damages and any special, indirect, incidental, or consequential losses or damages, even if a Party shall have been advised of the possibility of such potential loss or damage.

## ARTICLE 9
## CUSTOMS & GOVERNMENTAL APPROVALS

9.1     **Duties**.  Notwithstanding any provision to the contrary in this Agreement, MANUFACTURER shall bear and pay directly to the relevant authorities any customs duties, tariffs, import taxes, or other charges, expenses or fees (including any interest or penalties, fines, fees resulting from MANUFACTURER'S failure to report or file any necessary documentation with the appropriate governmental authorities) relating in whole or in part to the importation of the Products.

9.2     **Compliance with Customs Regulations and Procedures**.  SUPPLIER, as the exporter of record, shall strictly comply with all applicable requirements and procedures of any governmental authorities, including relevant customs authorities, to obtain customs clearance for the exportation of the Products. SUPPLIER shall also, and without any extra cost, support MANUFACTURER with (including but not limited to) completing any necessary documentation and liaising with customs authorities as required to obtain customs clearance for the import of the Products into the Territory.

9.3     **Import and Export Licence Requirements**.  MANUFACTURER shall be, or, if MANUFACTURER appoints a customs broker or agent then Manufacturer shall cause such customs broker or agent to be, responsible for identifying and obtaining in its own name any import licences required. SUPPLIER shall, as and where necessary, support and assist MANUFACTURER by providing any information required to complete and obtain such licences. SUPPLIER shall be responsible for clearing the Products for export, including obtaining all export licences as may be required.

Initials:
Clay Purdy
JohnMacDonald

9.4    **Customs Clearance into Territory**.   MANUFACTURER shall be, or, if MANUFACTURER appoints a customs broker or agent then MANUFACTURER shall cause such customs broker or agent to be, responsible for preparing and issuing the documents required for the importation of the Products and customs clearance therefor and shall submit in due time to customs authorities any documents so required.

9.5    **Co-ordination and Interface with Customs Authorities**.   As and where necessary, and without any extra cost, SUPPLIER shall assist MANUFACTURER with any requirements of customs authorities in order to complete the importation of the Products in the most efficient manner, and SUPPLIER shall make available to MANUFACTURER the country of origin or manufacture of foreign inputs included or to be included in the Products.

**ARTICLE 10**
**CONFIDENTIALITY**

MANUFACTURER acknowledges and agrees that all SUPPLIER Information is confidential and proprietary to SUPPLIER. MANUFACTURER agrees not to use any of such SUPPLIER Information during the term of this Agreement and for a period of twenty (20) years thereafter for any purpose other than as permitted or required for performance by MANUFACTURER hereunder.

Except in respect of disclosure made to a *bona fide* transferee or financier of MANUFACTURER, MANUFACTURER further agrees not to disclose or provide any of such SUPPLIER Information to any third party and to take all necessary measures to prevent any such disclosure by its employees, agents, contractors, or consultants during the term hereof and for a period of twenty (20) years thereafter. In the event MANUFACTURER is required to disclose SUPPLIER Information to a *bona fide* transferee or financier, MANUFACTURER shall cause such *bona fide* transferee or financier to execute a non-disclosure agreement, and receive prior written approval from SUPPLIER, the terms of which substantially comply with this Article **10**. Nothing herein shall prevent MANUFACTURER from using, disclosing, or authorizing the disclosure of any SUPPLIER Information that is, or hereafter becomes, part of the public domain or where such disclosure is required by applicable law or the rules of an applicable stock exchange.

SUPPLIER acknowledges and agrees that all MANUFACTURER Information is confidential and proprietary to MANUFACTURER. SUPPLIER agrees not to use any of such MANUFACTURER Information during the term of this Agreement and for a period of twenty (20) years thereafter for any purpose other than as permitted or required for performance by SUPPLIER hereunder or where such disclosure is required by applicable law or the rules of an applicable stock exchange.

Except in respect of disclosure made to a *bona fide* transferee or financier of SUPPLIER, SUPPLIER further agrees not to disclose or provide any of such MANUFACTURER Information to any third party and to take all necessary measures to prevent any such disclosure by its employees, agents, contractors, or consultants during the term hereof and for a period of twenty (20) years thereafter. In the event SUPPLIER is required to disclose MANUFACTURER

Initials:
Clay Purdy
JohnMacDonald

Information to a *bona fide* transferee or financier, SUPPLIER shall cause such *bona fide* transferee or financier to execute a non-disclosure agreement, and receive prior written approval from MANUFACTURER, the terms of which substantially comply with this Article 10. Nothing herein shall prevent SUPPLIER from using, disclosing, or authorizing the disclosure of any MANUFACTURER Information that is, or hereafter becomes, part of the public domain or where such disclosure is required by applicable law or the rules of an applicable stock exchange.

Notwithstanding anything to the contrary in this Agreement, the obligations set forth in this Article 10 do not apply to any information that (a) was publicly available, or that subsequently becomes publicly available, except by the wrongful disclosure by the receiving party; (b) was in the receiving party's possession prior to receipt of such information pursuant to this Agreement; (c) was received from a third party who was not known by the receiving party to be under any obligation of confidentiality with respect to such information; (d) has been independently developed by the receiving party; (e) is furnished by the disclosing party to a third party without restriction on the third party's right of disclosure; (f) is approved in writing for release by the disclosing party; or (g) is required to be disclosed by law. This Article 10 shall survive any termination of this Agreement.

## ARTICLE 11
## INTELLECTUAL PROPERTY

11.1    **Use of Intellectual Property**. SUPPLIER hereby grants to MANUFACTURER (and any approved Agent) an exclusive (in respect of the Territory), non-transferable, and royalty-free right and license to use SUPPLIER'S trademarks, trade names, designs, logos, and copyrights that relate to the Products in connection with the Marketing and maintenance of the Products for so long as they are used by MANUFACTURER in accordance with SUPPLIER'S standards, specifications, and instructions, but in no event beyond the term of this Agreement.

Upon five (5) days' prior written notice, which notice may be made by email correspondence, MANUFACTURER shall afford SUPPLIER reasonable opportunities during the term hereof to inspect and monitor the activities of MANUFACTURER in order to ensure MANUFACTURER'S use of the trademarks, trade names, designs, logos, and copyrights are in accordance with SUPPLIER'S standards and instructions. MANUFACTURER shall acquire no right, title, or interest in SUPPLIER'S trademarks, trade names, designs, logos, and copyrights other than the limited license granted in this Section 11.1, and MANUFACTURER shall not use any of SUPPLIER'S trademarks, trade names, designs, logos, and copyrights as part of MANUFACTURER'S corporate or trade name or permit any third party to do so without the prior written consent of SUPPLIER

11.2    **Patent(s)/Technology**. SUPPLIER shall attach hereto as Exhibit D and marked as ***HIGHLY CONFIDENTIAL***, an Amended and Restated License Agreement pursuant to which SUPPLIER licenses certain patents and technology to MANUFACTURER (the "**License Agreement**"). The License Agreement shall be bound by the Territories contained herein and that may be attached hereto as an Exhibit. MANUFACTURER and SUPPLIER agree that due to the Highly Confidential nature of the contents of the License Agreement, Exhibit D shall be held in the **Highest Confidential** nature and shall not be provided to, discussed in whole or part with

Initials:
Clay Purdy
John MacDonald

any persons, entity, or party to this Agreement except for those direct officers of MANUFACTURER and SUPPLIER as initially set forth in Exhibit D and that may be amended, from time to time, in writing and agreed to by both MANUFACTURER and SUPPLIER.

11.3 **Registration**. SUPPLIER shall use its best efforts to register its trademarks, trade names, designs, logos, patents, and copyrights in such jurisdictions within the Territory in which SUPPLIER determines that registration is necessary or useful to the successful distribution or proprietary protection of the Products. In addition, in the event SUPPLIER believes that it is advisable to affect any filing or obtain any governmental approval or sanction for the use by MANUFACTURER of any of SUPPLIER'S trademarks, trade names, designs, logos, patents, and copyrights pursuant to this Agreement, the Parties shall fully cooperate in order to do so. All expenses relating to the registration of SUPPLIER'S trademarks, trade names, designs, logos, patents, and copyrights in the Territory, as well as the making of any filing or obtaining any governmental approvals for the use by MANUFACTURER of SUPPLIER'S trademarks, trade names, designs, logos, patents, and copyrights shall be borne by SUPPLIER.

11.4 **Infringements**. MANUFACTURER shall promptly notify SUPPLIER of any use of which it becomes aware, by any third party (which does not include any approved Agent) of SUPPLIER'S trademarks, trade names, designs, logos, patents, and copyrights or any use by such third parties of similar marks which may constitute an infringement or passing off of SUPPLIER'S trademarks, trade names, designs, logos, patents, and copyrights. SUPPLIER reserves the right, in its sole discretion, to institute any proceedings against such third party infringers and MANUFACTURER shall refrain from doing so; provided, however, if SUPPLIER elects not to institute such proceedings within thirty (30) days of notice of such infringement or use, (i) SUPPLIER hereby assigns all rights in such cause of action to MANUFACTURER; (ii) MANUFACTURER may take those steps which, in its sole discretion, are necessary to enforce its right; and (iii) SUPPLIER shall do such acts and assist and supply such information as are reasonably necessary or desirable in relation thereto. Regardless of the party instituting such proceeding, (a) MANUFACTURER shall be entitled to all damages related to any infringement of such intellectual property in the Territory, less the cost of procecution paid by Licensor along with royalty fees related to the infrindging sales and (b) MANUFACTURER may elect to engage legal counsel of its own choosing, at MANUFACTURER'S sole expense. Each Party agrees to cooperate fully with the Party that has taken action or instituted a proceeding against such third parties, provided that all expenses of such action shall be borne by the Party instituting the proceeding.

## ARTICLE 12
## PATENTS

SUPPLIER shall have no liability whatsoever to MANUFACTURER with respect to any patent infringement or claim thereof which is based upon or arises out of: (i) the use of any Product in combination with an apparatus or device not manufactured or supplied by SUPPLIER, if such combination causes or contributes to the infringement; (ii) the use of any Product in a manner for which it was neither designed nor contemplated; or (iii) any modification of any Product by MANUFACTURER or any third party which causes the Product to become infringing. This Article 12 shall survive the termination of this Agreement. The patent owner (s)

Initials:
Clay Purdy
JohnMacDonald

will take all appropriate action against any infringements brought to its attention by MANUFACTURER to protect MANUFACTURER'S Territory and interests under this Agreement to the best of its ability.

## ARTICLE 13
### TAXES

MANUFACTURER shall be solely responsible for and shall pay for all taxes, duties, import deposits, assessments, and other governmental charges, however designated, which are now or hereafter imposed under or by any governmental authority or agency, that relate to the import and sale of the Products in the Territory in accordance with then prevailing local laws or regulations of the Territory.

Each Party shall be liable for and shall indemnify and hold the other Party harmless from and against: (i) any and all taxes on income, profits or gain imposed by any governmental or taxing authority in respect of this Agreement; and (ii) any and all claims (including payment of taxes, interest and penalties) that may be brought against or suffered by a Party or that a Party may sustain, pay or incur in conjunction with the foregoing as a result of the failure by the other Party to pay any and all taxes imposed as stated herein.

All payments to be made by MANUFACTURER to SUPPLIER pursuant to this Agreement represent gross amounts SUPPLIER is entitled to receive and may be subject to required governmental deductions. In the event any payments owed to SUPPLIER under this Agreement become subject to withholding for taxes, duties, assessments, or fees of whatever kind or nature levied outside the United States, MANUFACTURER shall have the right to make such withholding and to pay SUPPLIER the net amounts without application of a gross up.

## ARTICLE 14
### TERM AND TERMINATION

14.1   **Term**.  This Agreement shall be for a twenty three (23) year term beginning on the date listed in the first line of this Agreement. The Parties may, by mutual agreement in writing, agree to renew this Agreement at the end of its term.

14.2   **Termination**.   Notwithstanding  the  provisions  of  Section  14.1  above,  this Agreement may be terminated in accordance with the following provisions:

(a)   Either Party hereto may terminate this Agreement at any time by giving notice in writing to the other Party, which notice shall be effective upon dispatch, should the other Party file a petition of any type as to its bankruptcy, be declared bankrupt by a court of competent jurisdiction, become insolvent, make an assignment for the benefit of its creditors, go into liquidation or receivership, or otherwise lose legal control of its business, or should the other Party or a substantial part of its business come under the control of any third party receiver (each such event hereinafter a "**Bankruptcy Event**");

Initials
Clay Purdy
John MacDonald

(b)     Either Party may terminate this Agreement by giving notice in writing to the other Party should an event of Force Majeure, as provided in Section 15.5 below, continue for more than six (6) consecutive months;

(c)     Either Party may terminate this Agreement by giving notice in writing to the other Party in the event the other Party is in material breach of this Agreement and shall have failed to cure such breach within thirty (30) days of receipt of written notice thereof from the notifying Party;

14.3   **Partial Termination**.  In the event (i) MANUFACTURER shall have the right pursuant to Section 14.2(a) above or (ii) either Party shall have the right pursuant to Sections 14.2(b) or 14.2(c) above, to terminate this Agreement in its entirety, such terminating Party may elect to terminate this Agreement solely as it applies to any specific country or countries within the Territory upon providing the other Party with the notice required by the applicable termination provision or **30 days** prior written notice, whichever is greater.

14.4   **Termination for a Bankruptcy Event**.  In the event MANUFACTURER terminates this Agreement under Section 14.2(a) above due to a Bankruptcy Event of SUPPLIER, MANUFACTURER shall be entitled, at its option, to either or both of the following rights:

(a)     MANUFACTURER shall, to the extent permitted by law, have the first right and option to purchase any or all of the trademarks, trade names, designs, logos, patents, and copyrights related to the Products at fair market value;

(b)     MANUFACTURER shall have the right to continue to use and benefit from the license granted by SUPPLIER under Section 11.1 of this Agreement, which right shall continue in accordance with the terms of this Agreement and shall not otherwise be affected by any Bankruptcy Event proceeding against SUPPLIER.

14.5   **General Rights and Obligations on Termination**. In the event of termination of this Agreement, the Parties shall have the following rights and obligations:

(a)     Termination of this Agreement shall not release either Party from any obligations then due;

(b)     SUPPLIER shall have the right, at its option, to (i) cancel any or all accepted Purchase Orders which provide for delivery after the effective date of termination, and/or (ii) repurchase any part or all of MANUFACTURER'S inventory of Products in MANUFACTURER'S possession as of the termination date at SUPPLIER'S invoiced price to MANUFACTURER for such Products, plus freight to the original D.A.T. named place of destination. SUPPLIER shall exercise its option under this subsection by notifying MANUFACTURER in writing no later than thirty (30) days after the effective termination date. Any and all inventory of Products that SUPPLIER does not elect to repurchase upon termination shall remain property of MANUFACTURER and MANUFACTURER shall have the right to

Initials:
Clay Purdy
John MacDonald

Manufacture and Market such Products. For clarity, such Product inventory may be sold after the effective date of Termination;

    (c)    MANUFACTURER'S obligations pursuant to Article 9 shall survive termination of this Agreement, as shall SUPPLIER'S obligations pursuant to Section 7.2 in respect of all Product, including Product that it does not elect to repurchase in accordance with Section 14.5(b) above;

    (d)    The obligations and rights of both Parties as provided in Section 18.9 below shall survive termination of this Agreement; and

    (e)    Upon termination, MANUFACTURER and SUPPLIER shall at their own expense use reasonable commercial efforts to ensure that the continuity of customer care is not disrupted. MANUFACTURER will remain responsible to any of its customers for Product sold after termination of this Agreement, subject to any warranty claim MANUFACTURER may be entitled to make per Section 7.2 above.

14.6    **No Compensation.**  In the event either Party terminates this Agreement for any reason in accordance with the terms hereof, the Parties hereby agree that, subject to the provisions of Section 14.5(a) hereof and without prejudice to any other remedies which either Party may have in respect of any breach of this Agreement, neither Party shall be entitled to any compensation or like payment from the other as a result of such termination, with the exception of any outstanding invoices and or royalty fees; provided, however, if SUPPLIER terminates this Agreement in whole or in part, for any reason other than the default or bankruptcy of MANUFACTURER, then SUPPLIER shall pay MANUFACTURER all fees related to issued Purchase Orders.

## ARTICLE 15
## FORCE MAJEURE

15.1    **Definition.**  Force Majeure shall mean any event or condition, not existing as of the date of signature of this Agreement, not reasonably foreseeable as of such date and not reasonably within the control of either Party, which prevents in whole or in material part the performance by one or both of the Parties of its obligations hereunder or which renders the performance of such obligations so difficult or costly as to make such performance commercially unreasonable. Without limiting the foregoing, the following shall constitute events or conditions of Force Majeure: Acts of State or governmental action, riots, war, strikes, lockouts, prolonged shortage of energy supplies, epidemics, fire, flood, hurricane, typhoon, earthquake, lightning, radiation, and explosion. In particular, it is expressly agreed that any refusal or failure of any governmental authority to grant any export/import license legally required for the fulfillment by SUPPLIER or MANUFACTURER of its obligations hereunder shall constitute an event of Force Majeure.

15.2    **Notice.**  Upon giving written notice to the other Party, a Party affected by an event of Force Majeure shall be released without any liability on its part from the performance of its obligations under this Agreement, except for the obligation to pay any amounts due and

Initials:
Clay Purdy
John MacDonald

owing hereunder, but only to the extent and only for the period that its performance of such obligations is prevented by the event of Force Majeure. Such notice shall include a description of the nature of the event of Force Majeure and its cause and possible consequences.

15.3   **Confirmation.**   The Party invoking Force Majeure shall provide to the other Party confirmation of the existence of the circumstances constituting Force Majeure. Such evidence may consist of a statement or certificate of an appropriate governmental department or agency where available, or a statement describing in detail the facts claimed to constitute Force Majeure. The Party claiming Force Majeure shall take all reasonable steps to remove or avoid or overcome such event of Force Majeure and shall take commercially reasonable efforts to continue performance hereunder with reasonable dispatch when such causes are removed or overcome.

15.4   **Suspension of Performance.**   During the period that the performance by one of the Parties of its obligations under this Agreement has been suspended by reason of an event of Force Majeure, the other Party may likewise suspend the performance of all or part of its obligations hereunder to the extent that such suspension is commercially reasonable.

15.5   **Termination.**   Should the period of Force Majeure continue for more than six (6) consecutive months, either Party may terminate this Agreement, for the specific jurisdiction affected only, without liability to the other Party, except for payments due and owed to such date, upon giving fifteen (15) days' prior written notice to the other Party. If this Agreement is terminated by either Party in accordance with this Section 15.5, SUPPLIER shall immediately refund all amounts paid by MANUFACTURER pursuant to Article 6 for Purchase Orders that have not been filled or delivered at the time of such termination.

## ARTICLE 16
## ARBITRATION

16.1   **Disputes.**   All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC") by three arbitrators appointed in accordance with said rules. Any arbitration administered by the ICC shall be held in the ICC's Florida, USA office, unless otherwise agreed to by the Parties hereto. The award of the arbitrators shall be final and binding and may be confirmed and entered in any court, state or federal, having jurisdiction. The arbitration shall be conducted in the English language.

16.2   [**Indemnification.** This Article 16 provides the sole recourse for the settlement of any dispute arising under or in connection with this Agreement. MANUFACTURER shall and hereby agrees to indemnify SUPPLIER, and SUPPLIER shall and hereby agrees to indemnify MANUFACTURER against any award or judgment, which relates to this Agreement, made by any arbitral panel of any kind, in any jurisdiction, except as provided in this Article 16.]

16.3   **Governing Law.** This Agreement shall for all purposes be governed by and construed in accordance with the laws of the State of Florida.

Initials:
Clay Purdy
JohnMacDonald

## ARTICLE 17
## TRANSITION PERIOD

17.1   **Transition Period**. Transition period is hereby waived

## ARTICLE 18
## MISCELLANEOUS

18.1   **Independent Contractors**. MANUFACTURER is an independent contractor and not an agent, partner, joint venturer, franchisee, affiliate or employee of SUPPLIER. No fiduciary or franchise relationship exists between the Parties. Neither Party shall be liable for any debts, accounts, obligations or other liabilities of the other Party, its agents or employees. MANUFACTURER shall have no authority to obligate or bind SUPPLIER in any manner. SUPPLIER has no proprietary interest in MANUFACTURER and has no interest in the business of MANUFACTURER, except to the extent set forth in this Agreement.

18.2   **Assignment**. Neither Party shall have the right to assign or otherwise transfer its rights and obligations under this Agreement except with the prior written consent of the other Party, which consent may not be unreasonably withheld; provided, however, SUPPLIER shall be entitled to assign any or all of its rights and obligations hereunder to any of its subsidiaries, provided that SUPPLIER shall remain fully liable for the performance of all its obligations hereunder; and further provided that a successor in interest by merger, by operation of law, assignment, purchase, or otherwise of the entire business of either Party shall acquire all rights and obligations of such Party hereunder without requirement of the consent of the other Party. Any prohibited assignment shall be null and void.

18.3   **Notices.** Notices permitted or required to be given hereunder shall be deemed sufficient if given by (i) email; (ii) facsimile; or (iii) registered or certified air mail, with postage prepaid, return receipt requested, and addressed to the respective addresses of the Parties as first above written or at such other addresses as the respective Parties may designate by like notice from time to time. Notices so given shall be effective upon (a) receipt by the Party to which notice is given; or (b) on the next business day, in the case of notice given by email or by facsimile and on the fourteenth (14th) business day following the date notice was posted by registered or certified air mail, whichever occurs first.

18.4   **Entire Agreement**. This Agreement, including Exhibits A through 0 attached hereto and incorporated as an integral part of this Agreement, constitutes the entire Agreement of the Parties with respect to the subject matter hereof, and supersedes all previous distributorship agreements by and between SUPPLIER and MANUFACTURER as well as all proposals, oral or written, and all negotiations, conversations, or discussions heretofore had between the Parties related to this Agreement. MANUFACTURER acknowledges that it has not been induced to enter into this Agreement by any representations or statements, oral or written, not expressly contained herein. There may be other signed, written agreements between the Parties and those signed; written agreements are not invalidated by this Section.

Initials:
Clay Purdy
John MacDonald

18.5   **Amendment**. This Agreement shall not be deemed or construed to be modified, amended, rescinded, cancelled, or waived, in whole or in part, except by written amendment signed by the Parties hereto.

18.6   **Publicity**. This Agreement is confidential and neither Party shall issue press releases or engage in other types of publicity of any nature (including interviews) dealing with the commercial and legal details of this Agreement without the other Party's prior written approval, which approval shall not be unreasonably withheld. However, approval of such disclosure shall be deemed to be given to the extent such disclosure is required to comply with governmental laws, rules, regulations, or other governmental requirements. In such event, the publishing Party shall furnish a written copy of such disclosure to the other Party prior to making such disclosure.

18.7   **Severability**. In the event that any of the terms of this Agreement are in conflict with any rule of law or statutory provision or are otherwise unenforceable under the laws or regulations of any government or subdivision thereof, such terms shall be deemed stricken from this Agreement, but such invalidity or unenforceability shall not invalidate any of the other terms of this Agreement and this Agreement shall continue in force, unless the invalidity or unenforceability of any such provisions hereof does substantial violence to, or where the invalid or unenforceable provisions comprise an integral part of, or are otherwise inseparable from, the remainder of this Agreement.

18.8   **Counterparts**. This Agreement may be executed in counterparts and may be delivered by facsimile or electronically scanned form. Each such counterpart shall be deemed an original hereof, and all executed counterparts taken together shall constitute one agreement.

18.9   **No Waiver**. Except as otherwise provided herein, no waiver of any covenant, condition, or provision of this Agreement shall be deemed to have been made unless expressly in writing and signed by the Party against whom such waiver is charged; and (i) the failure of any Party to insist in any one or more cases upon the performance of any of the provisions, covenants, or conditions of this Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment in the future of any such provisions, covenants, or conditions; (ii) the acceptance of performance of anything required by this Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure; and (iii) no waiver by any Party of one breach by another Party shall be construed as a waiver with respect to any other or subsequent breach.

18.10  **Compliance with Law**. Each Party represents and warrants that it and its affiliates have not made, offered, or authorized and covenants that it and its affiliates shall not make, offer, or authorize with respect to the matters which are the subject of this Agreement, any payment, gift, promise or other advantage, whether directly or through any other person or entity, to or for the use or benefit of any public official (*i.e.*, any person holding a legislative, administrative or judicial office, including any person employed by or acting on behalf of a public agency, a public enterprise or a public international organization) or any political party or political party official or candidate for office, where such payment, gift, promise or advantage

Initials:

Clay Purdy
JohnMacDonald

would violate (i) applicable law; (ii) the laws of the country of incorporation of such Party; (iii) the *U.S. Foreign Corrupt Practices Act*; or (iv) the principles described in the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, signed in Paris on December 17, 1999, which entered into force on February 15, 1999, and the Convention's Commentaries. Each Party shall defend, indemnify and hold the other Party harmless from and against any and all claims, damages, losses, penalties, costs, and expenses arising from or related to, any breach by such first Party of the covenant made under this Section. Such indemnity obligation shall survive termination or expiration of this Agreement. Each Party shall in good time respond in reasonable detail to any notice from any other Party reasonably connected with the above-stated warranty and furnish applicable documentary support for such response upon request from such other Party.

18.11   **Further Assurances**. Each Party agrees to sign any and all other papers which may be required to effectuate the purpose and intent of this Agreement.

18.12   **Binding Effect**. The Parties hereto acknowledge, agree and declare that this Agreement is a legal, valid and binding agreement enforceable against each Party in accordance with its terms and that this Agreement has been duly executed and delivered on behalf of the Parties. Each Party represents and warrants that it shall use best efforts in good faith to consummate the transaction.

18.13   **Successors and Assigns**. The Parties hereto acknowledge, agree and declare that this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

18.14   **Captions and Headings**. The captions and headings appearing in this Agreement are solely for convenience and do not in any way define, limit or describe the scope of this Agreement or the intent or content of any provision thereof.

18.15   **Gender and Number**. Whenever the context of this Agreement requires, the masculine gender includes the feminine and neuter, and the singular number includes the plural and vice versa.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed on the date first above written.

MANUFACTURER:                          SUPPLIER:
**Fluid Lux S.a.r.l.**                      **Heartland Energy Group, Ltd.**


Signature:                              Signature:
By:      Clay Purdy                     By:      John MacDonald
Title:   Director                       Title:   President

Initials:
Clay Purdy
JohnMacDonald

Initials:

Clay Purdy
JohnMacDonald

**Exhibit A**
**Products**

SUPPLIER shall grant MANUFACTURER the rights as set forth in the Manufacturing Agreement to manufacture-blend, Market and otherwise sell the following Products that SUPPLIER manufacturers, distributes and/or supplies:

The Products consist of:

(a)     raw products: All raw products/materials are deemed **HIGHLY CONFIDENTIAL** and shall be listed in the body of patent/technology agreement

(b)     concentrated products, derived from the reaction and blending of raw products:

- Hydrochloric replacement;

- Sulfuric replacement;

- Hydrofluoric replacement;

- Caustic replacement;

- Associated surfactants & applicable additives;

- Anti-Microbial Replacements; and

(c)     derivatives of any of the above products and any products co-developed at the request of MANUFACTURER *(e.g.,* H2S Scavenger, Friction Reducer, etc.) using the applicable base chemistry, including all and any new future products

SUPPLIER may amend this list from time to time at its sole discretion. SUPPLIER shall give MANUFACTURER six (6) months' prior written notice of any such amendment.

Initials
Clay Purdy
John MacDonald

## Exhibit B

### Territory Definitions

SUPPLIER shall grant to MANUFACTURER the **EXCLUSIVE TERRITORY** as set forth:

Middle East countries, including GCC (Iraq & Afghanistan) and Europe beginning the effective date of this Agreement

Provided all MANUFACTURER'S obligations are met under this Agreement and the License Agreement, SUPPLIER shall grant the following expanded non exclusive territory (the "Expanded Territory") to MANUFACTURER on January 1st, 2014: the countries Australia and Brazil.

The **EXCLUSIVE TERRITORY** includes the products listed in Exhibit A

Initials:
Clay Purdy
John MacDonald

**Exhibit C**

**Reserved Sales Rights**

SUPPLIER reserves the joint right to sell Products under SUPPLIER'S name, logotypes and trademarks directly to the following but not limited customers located in the Territory:

NONE LISTED

Initials:
Clay Purdy
JohnMacDonald

Initials:

Clay Purdy

John MacDonald

## Exhibit D

### License Agreement

*HIGHLY CONFIDENTIAL*   The License Agreement shall be provided under separate cover as **Exhibit "D"**. MANUFACTURER and SUPPLIER agree that due to the **Highly Confidential Nature** of the contents of the License Agreement, Exhibit D shall be held in the **Highest Confidential Nature** and shall not be provided to, discussed in whole or part with any persons, entity, or party to this Agreement except for those officers of MANUFACTURER and SUPPLIER as initially set forth below and that may be amended, from time to time, in writing and agreed to by both MANUFACTURER and SUPPLIER.

**SUPPLIER OFFICERS:**        John MacDonald, President

**MANUFACTURER OFFICERS:**

- Clay Purdy, Director

Initials:
Clay Purdy
JohnMacDonald

## Exhibit E

### Initial Freight & Sample Terms — Policy

*Freight  Terms  —  Policy:* MANUFACTURER  shall  bear  all  costs  and  obligations regarding freight, delivery, and shipping and logistics responsibilities

No discounts will be offered for MANUFACTURER pick-up, nor will drop ship policies apply for SUPPLIER shipped orders. MANUFACTURER understands and agrees that SUPPLIER is not in the freight hauling business, and thus SUPPLIER does not control cost of freight increases; accordingly, SUPPLIER reserves the rights to amend the above freight terms-policy with fifteen (15) days' prior written notice to MANUFACTURER. MANUFACTURER shall also have the right to advise and assist SUPPLIER with the logistics and shipment details so as to ensure the most cost effective and timely process is undertaken.

*Sample Terms - Policy:* SUPPLIER hereby agrees to provide MANUFACTURER with sample Products in accordance with the terms and conditions as stated herein:

Samples will be provided on a case-by-case basis at the mutual agreement of both Parties.

Page 27 of 27

Initials:
Clay Purdy
JohnMacDonald