# EXHIBIT "J"

# BEUSSE WOLTER SANKS & MAIRE, P.A.

JAMES H. BEUSSE
JACKSON O. BROWNLEE
ERICA M. CIPPARONE
AMBER N. DAVIS
JOHN L. DEANGELIS
PATRICK D. HERRON
DAVID G. MAIRE
CHRISTINE Q. MCLEOD
CIAN G. O'BRIEN
FRED M. ROMANO
TERRY M. SANKS
TIMOTHY H. VAN DYKE
KEVIN W. WIMBERLY
ROBERT L. WOLTER

390 N. ORANGE AVENUE, SUITE 2500
ORLANDO, FLORIDA 32801
TELEPHONE (407) 926-7700
FACSIMILE (407) 926-7720
WWW.IPLAWFL.COM

PATENT AGENT
CHRISTOPHER D. BAYNE

WRITER'S DIRECT
DIAL/EMAIL
(407) 926-7716
ADAVIS@IPLAWFL.COM

June 12, 2014

*Via E-Mail*
David Wawro, Esquire
Torys, LLP
1114 Avenue of the Americas
New York, New York 10036-7703

   Re:   *Termination of Manufacturing and License Agreements*

Dear Mr. Wawro:

   As you are aware, this firm represents Environmental Manufacturing Solutions – East Coast, Environmental Manufacturing Solutions, LLC ("EMS") and Heartland Energy Group, Ltd. ("HEG") with respect to their intellectual property and other related matters. This letter will serve as **Termination of the Manufacturing and License Agreements** between HEG and Fluid Energy Group, Ltd. and HEG and Fluid Lux S.a.r.l respectively ("collectively referred to as "FLUID"). Such Agreements were previously attached as Exhibits A-F to my May 6, 2014 letter addressed to you and were also attached to your Request for Arbitration.

   Although the License Agreements state that Notice of Termination must be sent to Clay Purdy directly that would not be appropriate, which is why the letter is being sent to you as their counsel. Based on our previous correspondence as well as the recently filed Request for Arbitration with the ICC, it is our understanding that you represent FLUID in this matter.

   As discussed at length in my May 6, 2014 letter to you, which is attached hereto and incorporated herein, my client denies any and all liability for the alleged fraud in the inducement claimed by your client. Moreover, and as grounds for termination, your client has materially breached several provisions in the Agreements. Such provisions, include, but are not limited to the following:

David Wawro, Esquire
Torys, LLP
June 12, 2014
Page 2 of 3

## License Agreements

- **Paragraph 5 (A)** - failure to pay royalties for the months of January – May of 2014.
- **Paragraph 5(A)** – failure to meet the Sales Minimum by December 31, 2014.
- **Paragraph 6(A)** – failure to furnish Licensor written statements, under oath, specifying the total number of products sold during the preceding month for the months of October 2012-December 2013 and March- May of 2014.
- **Paragraph 6(B)** – failure to make Royalty Payments for the months of January – May of 2014.

## Manufacturing Agreements

- **Paragraph 2.5** – for marketing and selling the Licensed Products outside of FLUID's territory and without written consent of HEG.
- **Paragraph 2.10** - for conducting unauthorized testing from third-party laboratories without the prior approval of HEG.
- **Paragraph 3.2** – for selling competitive goods during the term of the Agreements.
- **Paragraph 5.1** – for failure to meet the quota of $1,000,000 for 2013.
- **Paragraph 5.2** – failure to meet the quota as well as failure to amend its rights to non-exclusive rights as per 5.2(b) for 2014.
- **Paragraph 5.2** – for failure to meet the quota as well as failure to make payment to HEG equal to the shortfall of such quota to maintain exclusive rights as per 5.2(a) for 2014 in the amount of $1,000,000 while representing to investors, customers, dealers and in web presence Fluid maintained said exclusive rights.
- **Paragraph 6.3** – failure to make payments within 30 days of the date of invoice.
- **Paragraph 6.5.** – failure to pay 8.0% interest on all overdue balances outstanding.
- **Paragraph 11.1**- improperly and without authorization obtaining a trademark registration in Canada for ENVIRO-SYN as well as filing trademarks in the U.S. for ENVIRO-SYN.
- **Paragraph 11.2** – improperly telling investors and potential investors that FLUID was the owner of the Patents and Technology as well as attempting to sell and selling such Licensed Products outside of FLUID's licensed territory.

In addition to the above violations of the Agreements, as you are aware, your client has also committed securities and investor fraud, tortiously interfered with my client's business and

David Wawro, Esquire
Torys, LLP
June 12, 2014
Page 3 of 3

will soon be infringing on my client's trademarks (ENVIRO-SYN) and patents (referenced above) if such actions are not stopped.

As per paragraph 4(c) and 4(d) of the License Agreements and 14.2(c) of the Manufacturing Agreements, this termination is effective 30 days from today's date if your client fails to cure such breach. Based on the foregoing and pursuant to Paragraphs 4(b) and 22 of the License Agreement, HEG hereby demands that if FLUID fails to cure such breach within such 30 day period, on July 12, 2014, FLUID shall cease from all use of the Patents and technology claimed therein, including, but not limited to U.S. Patent Nos. 8,580,047, 8,430,971 and PCT Application WO 2012/075091. FLUID shall also cease from selling or manufacturing, whether directly or in association with other persons or firms, of any product, process or service, which competes with any Products covered by the Patents **for a period of 2 years** from July 12, 2014.

As per paragraph 23 of the License Agreements, HEG owns all tools, molds and equipment related to the Licensor's products. Therefore, please provide me with a date and time that representatives from HEG or a third-party can enter onto FLUID's facility to obtain all such tools, molds and equipment.

Finally, we were surprised to see the email dated June 2, 2014 from your colleague Mr. Mike Pedlow to the shareholders for Fluid Energy Group, Ltd. We were even more surprised to see the false statements and misrepresentations made in the Q1 Highlight and the alleged Audited Financials which show no mention of the $1,873.755.67 amount owed to HEG. Based on the foregoing, a copy of this letter will be sent to all shareholders so that the shareholders are aware of HEG's stance on Fluid's alleged termination of their relationship with their U.S. Supplier, who happens to be the owner of all right, title and interest to the Licensed Products, Patent, technology and trademarks, which your client failed to mention to its shareholders.

Please feel free to contact me should you wish to discuss this any further.

Very truly yours,

Amber N. Davis, Esq.

Encls: May 6, 2014 letter
cc:    Client

# BEUSSE WOLTER SANKS MORA & MAIRE, P.A.

JAMES H. BEUSSE
JACKSON O. BROWNLEE
ERICA M. CIPPARONE
AMBER N. DAVIS
JOHN L. DEANGELIS, JR.
PATRICK D. HERRON
DAVID G. MAIRE
CHRISTINE Q. MCLEOD
ENRIQUE J. MORA
CIAN G. O'BRIEN
FRED M. ROMANO
TERRY M. SANKS
TIMOTHY H. VAN DYKE
KEVIN W. WIMBERLY
ROBERT L. WOLTER

390 N. ORANGE AVENUE, SUITE 2500
ORLANDO, FLORIDA 32801
TELEPHONE (407) 926-7700
FACSIMILE (407) 926-7720
WWW.IPLAWFL.COM

WRITER'S DIRECT
DIAL/EMAIL
(407) 926-7716
ADAVIS@IPLAWFL.COM

May 6, 2014

*Via E-Mail*
David Wawro, Esquire
Torys, LLP
1114 Avenue of the Americas
New York, New York 10036-7703

> Re:   *Heartland Energy Group, Ltd. vs. Fluid et. al.*

Dear Mr. Wawro:

As you are aware, this firm represents Environmental Manufacturing Solutions -- East Coast, Environmental Manufacturing Solutions, LLC ("EMS") and Heartland Energy Group, Ltd. ("HEG") with respect to their intellectual property and other related matters.  I have reviewed your letter dated April 11, 2014 and discussed its contents with my client.  This letter will address your client's requested rescission of the Manufacturing and Licensing Agreements between HEG and Fluid Energy Group, Ltd. and HEG and Fluid Lux S.a.r.l respectively ("collectively referred to as "FLUID") as well as the false allegations of fraud against EMS and HEG.  So there is no confusion as to which agreements I am referencing, I have attached copies hereto as Exhibits "A" – "F," will be referred to as "the Agreements."

First, I want to make it clear that HEG does not accept FLUID's rescission of the Agreements for three main reasons: (1) the notice was improper pursuant to the Notice and Termination provisions of the Agreements; (2) the allegations of fraud in the inducement are completely baseless and do not warrant a rescission of the Agreements by FLUID, which will be revealed in this response; and (3) FLUID is in direct violation of multiple provisions of the Agreements as well as a slew of other laws and is the party that actually committed the fraud, which will be discussed in more detail herein.

To begin, I think it is important for you to understand the history between the parties. Before HEG was incorporated there was a company called Heartland Solutions, Inc. ("HSI"). Stephen Rowley was the owner of HSI and had a Distributor Agreement with EMS pertaining to

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -2-

a number of different products relevant to the concrete industry. Beginning in 2009, in addition to targeting the concrete industry, HSI also began targeting the Oil & Gas industry with EMS's Barracuda 10K product. HSI, with the knowledge and permission of EMS re-branded and re-labeled the products as Oil Safe Ar®. Around the same time, John MacDonald incorporated Environment Manufacturing Solutions Oil and Gas Exploration Products, LLC for the purpose of promoting its products to the Oil & Gas industry. At this time, since HSI was utilizing the name Oil Safe Ar®, Mr. MacDonald decided to come up with a new name to brand his patented synthetic replacement for acids and he and Tim Otto came up with the name ENVIRO-SYN® at EMS's offices in Melbourne, Florida. Both Messrs. MacDonald and Otto will swear under penalty of perjury and testify as such. The ENVIRO-SYN® name, as you can see, is a combination of Environmental Manufacturing Solutions' name and their other trademark registration, SYNTECH®. *See* Exhibit "G."

We are aware of your client's trademark registration in Canada and applications in the United States for ENVIRO-SYN and we want to make it very clear that not only do the Agreements between the parties state that HEG is the owner of the ENVIRO-SYN® trademark,[1] but EMS Oil & Gas was the first to use the trademark; EMS Oil & Gas then licensed the trademark to HSI to use; and HSI eventually filed for and received a trademark registration in the U.S. for ENVIRO-SYN®. *See* Exhibit "H." As you can see from the registration, the first use date in the registration is December of 2011, which was when HSI shipped its first product to FLUID, but the first use date could actually be amended to November of 2010 when EMS Oil & Gas first shipped the ENVIRO-SYN products to NMX. A true and correct copy of the NMX Distribution Agreement is attached hereto as Exhibit "I." As you can see from page 14 of the Agreement, the Agreement pertained to the various Enviro-Syn products.

Should your client seek to cancel the ENVIRO-SYN® trademark in the U.S., HEG will vigorously defend its rights. More importantly, it is unclear how or why FLUID believes it has trademark rights based on the fact that (1) FLUID did not come up with the name; (2) FLUID did not use the name first; and (3) FLUID has an agreement which says HEG owns the trademark and FLUID has a license to use the mark. In any event, that is an argument for another day, but should the parties be able to come to a resolution on the Agreements, HEG will expect FLUID to expressly abandon its applications and cease using its ENVIRO-SYN® trademark.

To get back to the timeline, John MacDonald and Mr. Rowley determined that the formula for Barracuda 10K (re-labeled as Oil Safe Ar® and ENVIRO-SYN®) was not strong enough for the Oil & Gas industry and had certain chelating agents that needed to be removed. Darren Thatcher, the current President and COO of FLUID was the V.P. of Operations and Technology for the Optifrac Division of Mud Master and was aware of all of this because Mud Master had a distribution agreement with HSI. Mud Master was, and still is, a valued customer of HEG's. Stephen Rowley and Darren Thatcher worked together on a large frac job in Turner

---

[1] *See* Paragraph 11.1 of the Manufacturing Agreements.

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -3-

---

Valley, Alberta Canada in October of 2011. At the frac site there was a hot oiler truck that heats and transfers the frac fluids on site. Mr. Thatcher and Mr. Rowley both forgot that the original version of Oil Safe AR®, which was Barracuda 10K re-branded, was a truck washing product and the newer version was much more active. Mr. Thatcher and Mr. Rowley proceeded to transfer the Oil Safe AR® into the hot oiler truck and began to notice the aluminum fittings on the truck begin to fail due to corrosion and Mr. Thatcher began to panic. Mr. Thatcher and Mr. Rowley immediately contacted John MacDonald and Mr. MacDonald instructed Mr. Thatcher and Mr. Rowley that chemical doubling takes place with heating and also reminded them that the new version, which was created at Mr. Thatcher continued request, was far more active than the original rebranded Barracuda 10K and that they needed to switch out the fittings to stainless steel and/or to stop using the hot oiler truck and finish the job. Mr. Thatcher and Mr. Rowley chose to complete the job with a vacuum truck that was equipped with stainless fittings. The job was completed without error pumping in excess of 125,000 gallons of Oil Safe AR®.

So, for your client to say that HEG and EMS fraudulently induced FLUID into the contract because they had no idea that the ENVIRO-SYN® products did not work well with aluminum is a complete fabrication. Mr. Thatcher had first-hand knowledge and experience with the problem and most importantly, knew about the issue far before FLUID was ever even incorporated. In fact, after the frac job in Turner Valley, Alberta Canada, HEG and Mud Master (at the behest of Mr. Rowley and Mr. Thatcher jointly) changed its labeling to include a warning regarding Aluminum. A true and correct copy of a label prepared back in 2011 by Mr. Thatcher, which has a warning pertaining to the use of aluminum fittings is attached hereto as Exhibit "J."

FLUID was readily aware of the problem when it first opened its doors because Mr. Thatcher came with this knowledge based on his experience at Mud Master/Optifrac. Additional proof that FLUID was aware of the problem with aluminum from the very beginning is as follows:

(1) FLUID ENVIRO-SYN label wherein it clearly states "WARNING! When pumping this product it is strongly recommended to use manufacturer approved hose couplings and fittings. DO NOT USE ALUMINUM FITTINGS. See Exhibit "K."

(2) A PowerPoint presentation prepared by Darren Thatcher, along with the email correspondence f/Mr. Thatcher on October 24, 2012 including a statement at page 7 of the presentation that certain precautions need to take place when pumping the product because the product will react with certain soft metals such as Aluminum and Magnesium. See Exhibits "L" and "M" respectively.

(3) Email correspondence between Kevin O'Donoghue and John MacDonald from June of 2013 pertaining to labels for ENVIRO-SYN CSR and ENVIRO-SYN HCR, created by FLUID, which include a WARNING regarding Aluminum. See Exhibits "N," "O" and "P" respectively.

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -4-

_____

With respect to the documents attached to your letter, please be advised that the first document attached was falsified by your client. Environmental Manufacturing Solutions, LLC has never sold Oil Safe Ar® and therefore would not have an MSDS sheet for the product. Upon information and belief, this is an MSDS sheet that has been falsified by your client and which was sent along with a product sample to ENOVO, here in the United States, which should be noted, is a clear violation of the Agreements in that FLUID has no right to sell or offer to sell the ENVIRO-SYN® products in the U.S. Correspondence pertaining to this violation of the Agreements is attached hereto as Exhibit "Q."

The literature pertaining to Oil Safe Ar® was not provided to FLUID by EMS or HEG. It was provided to Darren Thatcher by HSI back in 2010 when he was the V.P. of Operations and Technology for the Optifrac Division of Mud Master. Moreover, everything contained in the Oil Safe Ar® literature was completely accurate at the time it was printed and given to Mr. Thatcher. Therefore, it was not EMS and/or HEG who fraudulently induced FLUID into the contract. If there was any fraud, it was committed by Darren Thatcher.

Formula changes began to take place in late 3rd quarter of 2011. As stated, the Barracuda 10K was far less active. It was designed and remains designed and for sale in commerce at the world's leading ready mix truck wash and wax. It contains heavy detergents, surfactants, waxes, emulsifiers, chelating agents, uv deterrents and salt dispersants. All chemicals that are not needed in the fracing process thus we originally took those out and made the formula 30% stronger and it became a stand-alone formula. We continued to increase the strength of the product at the request of Mr. Thatcher.

As to the two testing reports attached to your letter, they are both genuine reports commissioned by HSI and HEG respectively. As I'm sure you are aware, there were some serious cutbacks at NASA in 2012, which resulted in many, if not all, of their testing labs to close, which is why you cannot find the lab on their website. I also think you should know that on or around March 20, 2013, Darren Thatcher, knowing that the ENVIRO-SYN® CSR/MudSafe, product was stronger because of continual requests by Mr. Thatcher and Mr. Purdy, ordered their own tests from Cormetrics, Ltd. to determine the pH and mmpy levels. The test was conducted by Cormetrics and a copy of the results are attached hereto as Exhibit "R" and relabeled as Heartland's MudSafe by Cormetrics at the request of Mr. Thatcher on behalf of HEG. We have contacted Cormetrics for a copy of the report that has FLUID's information on the front of the testing results, but it cannot be released to us without the express permission of FLUID. Your client, however, should have a copy in their records and we would request that you forward a copy to us at your earliest convenience. In any case, as seen in the test results, the mmpy levels were 6.3, which is just above the limit for DOT regulation and which is the lowest level in the oil industry. The only reason the level was above the limit is because your client requested a testing procedure outside the scope of the DOT testing protocol. The test requested by your client was targeted to the oil and gas industry and not to the transportation limits as

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -5-

HEG's corrosion limits clearly quote. This test has nothing to do with transportation on the road. Based on Cormetrics findings, the math would be simple to conclude that had the same tested material been tested as per the DOT protocols, the results would have been well below the 6.25 mmpy.

Furthermore, it was your client that was manufacturing the product outside the prescribed guidelines by increasing the levels of HCL from the prescribed 20 baume to 22 baume in the ENVIRO-SYN® HCR product in addition to using larger volumes of the HCL without HEG's knowledge and consent. True and correct email correspondence wherein Darren admits to adding in HCL, which would increase the corrosiveness of the products, are attached hereto as Exhibit "S." Such actions by your client in modifying the products without HEG's written consent void any warranties my client was required to make as per 7.4 of the Manufacturing Agreements. Additional correspondence where Mr. MacDonald expresses his concerns about the changes being made by FLUID and the corrosive effect of such changes, are attached hereto as Exhibit "T." As seen in the MSDS sheet and Mr. Thatcher's email correspondence, the product is corrosive at about 100° C, which would convert to 212°F, which is way above the acceptable DOT protocol at 55° C/131° F. *See* Exhibit "T".

Therefore, any issues as it relates to an increase in corrosiveness are a result of your client's actions, not HEG or Mr. MacDonald's. The product, as sold to FLUID was always considered Non-DOT regulated and below 6.25 mmpy contrary to your client's allegations, which can be easily substantiated by documentation provided hereto, additional documentation as necessary and sworn testimony if need be.

In the end, it is your client that has committed numerous violations of the Agreement and is simply attempting to claim fraud to try and avoid having to pay all of their outstanding invoices, interest, damages and attorney's fees as a result of their violations. As seen in the Audit Report dated January 22, 2014 and attached hereto as Exhibit "U," FLUID has continually violated the agreements by (1) failing to provide statements within fifteen (15) days after the last day of each month[2]; making late payments and underpayment throughout the 2013 calendar year[3]; failing to meet the minimum production levels for any quarter in the year 2013[4]; and by improperly selling competing goods (Matrix 100[5]).

Additional violations include, but are not limited to:

(1) Falsely stating "**worldwide**" **rights** on the www.fluidenergy.com website, when the Agreements between the parties were only for specified territories, not the entire globe. *See* Exhibit "V."

[2] *See* Paragraph 6(a) of the License Agreements.
[3] *See* Paragraphs 6.3 and 6.5 of the Manufacturing Agreement.
[4] *See* Paragraphs 5.1 and 5.2 of the Manufacturing Agreements.
[5] *See* Paragraph 3.2 of the Manufacturing Agreements.

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -6-

---

(2) Falsely stating that FLUID had rights to the patented technology in the **United States** when no such rights existed. *See* Exhibit "W."

(3) Failing to pay past due invoices in the amount of $222,650.00. USD *See* Exhibit "X."

(4) Attempting to sell the ENVIRO-SYN® patented products outside their territory in the U.S. to ENOVO. *See* Exhibit "Q."

(5) Entering into a Distribution Agreement with a company from Norway pertaining to the ENVIRO-SYN® products, again, which is outside of FLUID's licensed territory. *See* Exhibit "Y."

(6) Falsely labeling products as DfE approved when the labels were never approved and FLUID never asked HEG to obtain approvals on the labels. *See* Exhibits "O" and "P."

(7) Falsely inducing investors to invest in FLUID for an amount close to or around $10 million dollars under the guise of an exclusive worldwide license with HEG for the patented ENVIRO-SYN® products when no such worldwide license existed[6];

(8) Failing to pay HEG royalties in the amount of $340,000.00 USD ;

(9) Falsely stating in a post on the www.globalpetroleum.com website that the ENVIRO-SYN® products were **"developed and patented by Fluid Energy Group"** when the ENVIRO-SYN® products were developed and patented by HEG. *See* Exhibit "Z."

(10)  Admitting in email correspondence that the technology is HEG's and acknowledging that FLUID needed to get permission to send out news releases, but then falsely stating in the proposed news release that FLUID has **"exclusive oil & gas industry manufacturing and distribution rights"** in an attempt to garner more investors under false pretenses. *See* Composite Exhibit "AA[7]."

(11)  Falsely stating on Todem's website that "Enviro-Syn is the trade name of a line of environmentally and HSE friendly acid and caustic replacements, **developed and patented by Fluid Energy Group**." *See* Exhibit "BB."

Based on the foregoing, I would ask that you discuss the contents of this letter and the many exhibits with your client in detail so that we can have a meaningful discussion over the phone sometime next week or the week of May 26 – May 30, 2014 as I will be away on business

---

[6] Upon information and belief, Clay Purdy blatantly misrepresented to investors that FLUID had worldwide rights to the patent HEG technology in order to obtain investments in FLUID.
[7] It should be noted that John MacDonald never authorized FLUID to send out this news release.

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -7-

_____

May 19 – May 23, 2014.  It is my understanding that HEG's accounting department called last week to obtain statements for this past quarter and Mr. Purdy refused to provide such statements claiming that the Agreements were rescinded.  Please advise your client that the Agreements have not been rescinded and that any continued offers for sale or sale of the ENVIRO-SYN® products by FLUID are not only a violation of the Agreements, but also constitute patent and trademark infringement and will not be taken lightly.

My client views this matter as serious and will take all steps necessary to protect their rights with respect to these and other legal issues surrounding their patent, trademark and other contractual rights.  We expect your assurances, that no later than (10) business days from receipt of this letter you will either call or respond to this letter in writing setting up a time for us to discuss the issues raised herein.  If you fail to do so by this date, we shall, without further notice to you, take such further action as we deem advisable to assert our clients statutory rights to obtain an injunction, recover damages, and to otherwise protect our client's interests.

I look forward to hearing from you.

Very truly yours,

Amber N. Davis, Esq.

Encls:  Exhibits A-BB
cc:     Client
        James T. Swanson, Esquire