# EXHIBIT "K"

**IN THE MATTER OF THE**
**ARBITRATION BETWEEN:**

-----------------------------------------------------------

**FLUID ENERGY GROUP LTD. and FLUID**  )
**LUX S.A.R.L.,**  )
  )
      **Claimants,**  )
**v.**  )
  )
**HEARTLAND ENERGY GROUP, LTD,**  )
**JOHN MACDONALD**  )
**and STEPHEN ROWLEY**  )
  )
      **Respondents.**  )
  )

**ICC Case No. 20282/RD**

-----------------------------------------------------------

**HEARTLAND ENERGY GROUP, LTD.**  )
  )
      **Counter-Claimant,**  )
  )
**v.**  )
  )
**FLUID ENERGY GROUP, LTD., FLUID LUX** )
**S.A.R.L., DARREN THATCHER and**  )
**CLAY PURDY**  )
  )
      **Counterclaim Respondents.**  )
  )

## RESPONDENT HEARTLAND ENERGY GROUP, LTD'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Respondent, HEARTLAND ENERGY GROUP, LTD ("HEG" or "Respondent"), by and through its undersigned counsel, hereby files its Answer, Affirmative Defenses and Counterclaim to Claimants', FLUID ENERGY GROUP, LTD. ("FLUID ENERGY") and FLUID LUX S.A.R.L.'s ("FLUID LUX") (collectively referred to as "Claimants") Request for Arbitration.

## PRELIMINARY MATTERS

Pursuant to Article 5 of the ICC's Rules of Arbitration, Respondents provide the

following required information to the Secretariat:

### (1) Respondents' Contact Information:

Heartland Energy Group, Ltd.
c/o Amber N. Davis, Esq.
Beusse Wolter Sanks & Maire, P.A.
390 N. Orange Ave., Suite 2500
Orlando, Florida 32801
Phone: (407) 926-7716
Fax: (407) 926-7720
Email: adavis@iplawfl.com

-And-

John MacDonald[1]
c/o Amber N. Davis, Esq.
Beusse Wolter Sanks & Maire, P.A.
390 N. Orange Ave., Suite 2500
Orlando, Florida 32801
Phone: (407) 926-7716
Fax: (407) 926-7720
Email: adavis@iplawfl.com

-And-

Stephen Rowley[2]
c/o Amber N. Davis, Esq.
Beusse Wolter Sanks & Maire, P.A.
390 N. Orange Ave., Suite 2500
Orlando, Florida 32801
Phone: (407) 926-7716
Fax: (407) 926-7720

---

[1] *See* Motion to Dismiss John MacDonald and Stephen Rowley individually for Mr. MacDonald's response to the Request for Arbitration.

[2] *See* Motion to Dismiss John MacDonald and Stephen Rowley individually for Mr. Rowley's response to the Request for Arbitration.

Email: adavis@iplawfl.com

**(2) Respondents' Authorized Representative's Contact Information:**

Amber N. Davis, Esq.
Beusse Wolter Sanks & Maire, P.A.
390 N. Orange Ave., Suite 2500
Orlando, Florida 32801
Phone: (407) 926-7716
Fax: (407) 926-7720
Email: adavis@iplawfl.com

-And-

Kevin W. Wimberly, Esq.
Beusse Wolter Sanks & Maire, P.A.
390 N. Orange Ave., Suite 2500
Orlando, Florida 32801
Phone: (407) 926-7713
Fax: (407) 926-7720
Email: kwimberly@iplawfl.com

**(3) Comments as to the Nature and Circumstances of the Dispute Giving Rise to the Claims and the Basis upon Which the Claims are made:**

*See* Respondent HEG's Answer, Affirmative Defenses and Counterclaim *infra* and Respondents John MacDonald's and Stephen Rowley's Motion to Dismiss filed concurrently herewith.

**(4) Response to the Relief Sought:**

*See* Respondent HEG's Answer, Affirmative Defenses and Counterclaim *infra* and Respondents John MacDonald's and Stephen Rowley's Motion to Dismiss filed concurrently herewith.

**(5) Number of Arbitrators**

Respondents attempted to obtain Claimants' approval of utilizing only one arbitrator to save both parties fees and costs, but Claimants preferred utilizing three arbitrators. Therefore, the parties will be utilizing three arbitrators, and Respondents have jointly selected Jim Etscorn from the law firm of Baker & Hostettler as their arbitrator.

3

**(6) Place of Arbitration**

As per the email correspondence received by the ICC on Monday, July 14, 2014, the parties have agreed to Orlando, Florida as the place of arbitration. Also, per the email correspondence received by Respondents on Monday, July 21, 2014, the parties agreed to allow the two appointed arbitrators to select the third arbitrator that will act as the President of the proceeding.

## ANSWER

### THE PARTIES

1.   Admitted.

2.   Admitted

3.   Denied that HEG "claims" to be a legal entity formed under the laws of the

Republic of Seychelles. All other allegations in paragraph 3 are admitted.

4.   Admitted.

5.   Admitted.

## FORUM AND GOVERNING LAW

1.   Admitted that the parties entered into the Manufacturing Agreement attached as

Exhibit "A" to the Request for Arbitration and that the document speaks for itself. Denied that

the parties are currently party to such agreement in that it was terminated on June 12, 2014.

2.   Admitted.

3.   Admitted that the parties entered into the two licensing agreements attached as

Exhibits "B" and "C" to the Request for Arbitration and that the documents speak for

4

themselves. Denied that the parties are currently party to such agreements in that they were terminated on June 12, 2014.

4.     Admitted that HEG and FLUID LUX entered into similar manufacturing and license agreements which were attached as Exhibits "D," "E" and "F" to the Request for Arbitration and that the documents speak for themselves. Denied that the parties are currently party to such agreements in that they were terminated on June 12, 2014.

## FACTUAL BACKGROUND

5.     Admitted.

6.     Admitted that under the license agreements, HEG licensed patented technology to FLUID ENERGY and FLUID LUX, including, but not limited to U.S. Patent No. 8,163,102 and admitted that the specification of the '102 patent discusses the items addressed in paragraph six (6) of the Request for Arbitration. Denied that the Licensed Products or this case have anything to do with "cleaning methods" and/or "compositions for industrial and commercial cleaning" and/or DOT transportation. If not specifically referenced herein, all other allegations in paragraph six (6) are denied.

7.     Admitted that paragraph 2.1 of the Manufacturing Agreement speaks for itself. All other allegations, if not specifically referenced herein are denied.

8.     Admitted that FLUID ENERGY was granted rights to manufacture and sell products covered under the patented technology in Canada as per Exhibit B to Exhibit A of Claimants' Request for Arbitration.    Admitted that FLUID LUX was granted rights to manufacture and sell products covered under the patented technology in Europe, Iraq and

5

Afghanistan as per Exhibit B to Exhibit D of Claimants' Request for Arbitration. All other allegations, if not specifically referenced herein are denied.

9.      Denied and Respondent demands strict proof thereof.

10.     Denied that any such conversation took place or that any of the documents referred to in paragraph ten (10) were provided to FLUID ENERGY and/or FLUID LUX by Mr. MacDonald, Mr. Rowley or HEG as an inducement to enter into the Agreements referenced herein. All other allegations, if not specifically referenced herein are denied and Respondent demands strict proof thereof.

11.     Denied that Mr. MacDonald or Mr. Rowley made such representations. Without knowledge as to the remainder of the paragraph and therefore denied.

12.     Denied that any such representations were made. Without knowledge as to the remainder of the paragraph and therefore denied.

13.     Denied that any representations made by Respondents to Claimants were false. Without knowledge as to testing conducted by Claimants and therefore denied. All other allegations, if not specifically referenced herein are denied and Respondent demands strict proof thereof.

14.     Without knowledge as to whether Fluid commissioned third party corrosion tests or what the results were and therefore denied. All other allegations, if not specifically referenced herein are denied and Respondent demands strict proof thereof.

15.     Denied. All such tests are true and accurate tests, which will be verified in this case. All other allegations, if not specifically referenced herein are denied and Respondent demands strict proof thereof.

6

16.     Admitted that such letter was received by Respondent, but denied that any of the allegations or claims made in the letter has any merit. All other allegations, if not specifically referenced herein are denied.

17.     Admitted that HEG refused to rescind the Agreements because rescission was not warranted in the instant case as there was absolutely no fraud on the part of Respondents. All other allegations, if not specifically referenced herein are denied.

## **CLAIM FOR RELIEF**

18.     Denied.

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

## **STATEMENT OF RELIEF**

23.     Denied that Claimants are entitled to any form of relief:

   a.     Denied that Claimants are entitled to rescission of the Agreements.

   b.     Denied that Claimants are entitled to any sort of restitution.

   c.     Denied that Claimants have been damaged in any way by Respondents'

conduct and denied that Respondents owe anything to Claimants.

   d.     Denied that punitive damages are warranted in this case.

   e.     Denied that pre-award and post-judgment interest is warranted in this case.

   f.     Denied that Claimants are entitled to attorney's fees.

7

g.    Denied that Claimants are entitled to any costs from Respondents.

h.    Denied that Claimants are entitled to any form of relief.

## AFFIRMATIVE DEFENSES

1.    Claimants' claim is barred in whole or in part because Claimants have failed to state a claim upon which relief can be granted.

2.    Claimants' claim is barred in whole or in part because Claimants have failed to mitigate their damages.

3.    Claimants' claim is barred in whole or in part because Claimants were aware of the corrosiveness of the Licensed Products on steel and aluminum prior to entering into business with Respondent and prior to even incorporating Fluid Energy Group, Ltd. and Fluid Lux S.A.R.L.

4.    Claimants' claim is barred in whole or in part under Florida's economic loss rule.

5.    Claimants' claim is barred in whole or in part under the doctrine of estoppel.

6.    Claimants' claim is barred in whole or in part under the doctrine of laches.

7.    Claimants' claim is barred in whole or in part under the doctrine of unclean hands.

8.    Claimants' claim is barred in whole or in part because Claimants failed to plead fraud with particularity as required by Fla. R. Civ. P. 1.120(b).

9.    Claimants' claim is barred in whole or in part because of the numerous breaches by Claimants expressed herein in Respondent's Counterclaim more than set off any alleged damages suffered by the alleged breach by Respondent.

8

10.     Claimants' claim is barred in whole or in part under the parol evidence rule.

11.     Claimants' claim is barred in whole or in part because of Claimants' prevention of performance.

12.     Claimants' claim is barred in whole or in part because it was Claimants' alteration of the Licensed Products that resulted in the test results referenced in paragraph 14 of the Request for Arbitration, not any conduct on the part of Respondents.

13.     Claimants' claim is barred in whole or in part based on the fact that if Claimants have any damages, such damages were the result of unrelated, pre-existing, or subsequent conditions unrelated to Respondents' conduct.

14.     Claimants' claim for attorneys' fees is not permissible in the instant case.

15.     Claimants' claim for punitive damages is not permissible in the instant case.

16.     Claimants' claim is barred in whole or in part based on the fact that even if such alleged statements were made (which they were not), there was no reliance on the part of Claimants.

17.     Claimants not only have failed to mitigate their damages, but in fact have no damages in that the corrosiveness of the product on aluminum and/or steel and the products being Non-DOT regulated has nothing to do with Claimants' business in that Claimants are not licensed to sell or transport the products in the United States and such claims are only viable in the United States.

18.     Claimants not only have failed to mitigate their damages, but in fact have no damages in that the Licensed Products are used "downhole" where aluminum is not present. Moreover, the Licensed Products are non-corrosive to 1020 carbon steel and while it is admitted

9

that steel is used downhole the claims of Non-DOT regulation (which are true) were based on transportation of the product to and from the end user and had nothing to do with the use of the product downhole. Moreover, the Licensed Products are supposed to react with other minerals and elements downhole as that is what makes the products effective and Darren Thatcher was well aware of this with his previous relationship at Mud Master.

19.    Claimants not only have failed to mitigate their damages, but in fact have no damages in that prior to any of the Licensed Products being used by every single end user, the end user has to test the product in their own lab environment for their own downhole conditions and only approves it once they deem it safe. Upon information and belief, none of Claimants' customers have ever refused to use the Licensed Products because of the corrosiveness of the product. Thus, it has hindered no sales.

20.    Claimants' claim is barred under the doctrine of waiver.

21.    Claimants' claim is barred under UCC §2-607 in that Claimants accepted the goods for a period of two (2) years without any notice to Respondent of the alleged non-conformity.

## COUNTERCLAIM

Respondent/Counter-Claimant, HEARTLAND ENERGY GROUP, LTD. ("HEG" or "Respondent"), by and through its undersigned counsel, hereby files this Counterclaim against Claimants/Counter-Respondents, FLUID ENERGY GROUP, LTD. ("FLUID ENERGY"). FLUID LUX S.A.R.L. ("FLUID LUX"), CLAY PURDY ("Mr. Purdy") and DARREN

10

THATCHER ("Mr. Thatcher") (collective referred to as "Claimants") and state the following as grounds:

## THE PARTIES

1.     HEARTLAND ENERGY GROUP, LTD. is a corporation formed under the laws of the Republic of Seychelles with an office located at Suite 15, 1st Floor Oliaji Trade Center, Francis Street, Victoria, Mahe, Seychelles.

2.     FLUID ENERGY GROUP, LTD. is a corporation formed under the laws of Alberta, Canada with an office located at 214 11th Avenue SE, Calgary, Canada T2G 0X8.

3.     FLUID LUX S.A.R.L. is a limited liability company formed under the laws of Luxembourg with an office located at 73 Cote d'Eich, L-1450 Luxembourg.

4.     CLAY PURDY ("Mr. Purdy") is an individual and officer of FLUID ENERGY and FLUID LUX who personally participated in, directed, controlled and financially benefitted from the unlawful conduct alleged herein.

5.     DARREN THATCHER ("Mr. Thatcher") is an individual and officer of FLUID ENERGY and FLUID LUX who personally participated in, directed, controlled and financially benefitted from the unlawful conduct alleged herein.

## FORUM AND GOVERNING LAW

6.     HEG and FLUID ENERGY were parties to a Manufacturing Agreement which was originally dated October 12, 2012 and was then amended and restated on June 18, 2013 ("Fluid Energy Manufacturing Agreement"). *See* Exhibit A to Request for Arbitration.

11

7.     The Fluid Energy Manufacturing Agreement includes an arbitration clause which calls for arbitration with the International Chamber of Commerce ("ICC") to be held in ICC's Florida, USA office. *See* Exhibit A to Request for Arbitration at §16.1.

8.     HEG and FLUID ENERGY were also parties to two license agreements originally dated October 10, 2012[3] and then amended and restated on June 18, 2013 ("Fluid Energy License Agreements"). *See* Exhibits B and C to Request for Arbitration.

9.     The Fluid Energy License Agreements likewise contain an arbitration and governing law clause identical to the clause in the Fluid Energy Manufacturing Agreement[4].

10.    HEG and FLUID LUX were also parties to a similar manufacturing agreement dated October 10, 2012 and amended and restated on June 18, 2013 ("Fluid Lux Manufacturing Agreement"). *See* Exhibit D to Request for Arbitration.

11.    HEG and FLUID LUX were also parties to two license agreements originally dated October 10, 2012[5]and then amended and restated on June 18, 2013 ("Fluid Lux license Agreements"). *See* Exhibit E and F to Request for Arbitration.

12.    The Fluid Lux Manufacturing and License Agreements all contain an arbitration and governing law clause identical to the clauses in the Fluid Energy Manufacturing and License Agreements. For ease of reference, the license and manufacturing agreements between HEG and

---

[3] Although Exhibit B has a date of October 10, 2013, this was a typographical error. The original agreement was entered into on October 10, 2012.

[4] *See* Exhibit A to Request for Arbitration at §16.1; Exhibit B to Request for Arbitration at §§20-21; and Exhibit C to Request for Arbitration at §§20-21.

[5] Although Exhibit E has a date of October 10, 2013, this was a typographical error. The original agreement was entered into on October 10, 2012.

12

FLUID ENERGY on the one hand and HEG and FLUID LUX on the other hand will be referred to as "the Agreements" throughout unless referencing a specific agreement.

13. This case also arises, in part, under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 154(d), 271, 281, 283, 284, 285and 294 and under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, including 15 U.S.C. §§ 1116, 1117, and 1125(a).

14. This Court has subject matter jurisdiction over both the patent infringement and trademark infringement claims in this case in that they both arise out of the Agreements entered into between the parties.

15. Mr. Purdy and Mr. Thatcher are proper Counterclaim Respondents[6] to HEG's Counterclaims for patent and trademark infringement in that Mr. Purdy and Mr. Thatcher both personally participated in, directed, controlled and financially benefitted from the unlawful infringement of HEG's patents and trademarks as discussed herein.

## FACTUAL BACKGROUND

16. This case and the relationship between the parties goes back long before HEG and FLUID ENERGY and/or FLUID LUX entered into the Agreements referenced above.

---

[6] Note that unlike Claimants' contract claim against Mr. MacDonald and Mr. Rowley individually, Respondent HEG's counterclaims for patent and trademark infringement properly include Mr. Thatcher and Mr. Purdy in their individual capacities. This is due to the nature of such intellectual property claims. *See, e.g., Mayo Clinic Jacksonville v. Alzheimer's Inst. of Am., Inc.*, 683 F. Supp. 2d 1292, 1299 (M.D. Fla. 2009) (citing *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1578-79 (Fed. Cir. 1986) for the proposition that it is not necessary to pierce the corporate veil before holding a corporate officer personally liable for patent infringement); *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477-78 (11th Cir. 1991) (stating that "[n]atural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act" and finding corporate defendant's CEO personally liable for corporate defendant's infringement).

13

17.     Before HEG was incorporated, there was a company with the name Heartland Solutions, Inc. ("HSI"). Respondent Stephen Rowley ("Mr. Rowley") was the owner of HSI, and HSI had a Distributor Agreement with Environmental Manufacturing Solutions, LLC ("EMS") pertaining to a number of different products relevant to the concrete industry.

18.     EMS is a chemical company based out of Melbourne, Florida that specializes in providing safe solutions to replace harsh and dangerous acids, solvents and caustics used so prevalently across many different industries. Respondent John MacDonald ("Mr. MacDonald") is the owner of EMS.

19.     Beginning in 2009, in addition to targeting the concrete industry, HSI also began targeting the Oil & Gas industry with EMS's Barracuda 10K product. HSI, with the knowledge and permission of EMS, re-branded and re-labeled the products as Oil Safe Ar®.

20.     Around the same time, Mr. MacDonald incorporated Environmental Manufacturing Solutions Oil and Gas Exploration Products, LLC for the purpose of promoting its products to the Oil & Gas industry. At this time, since HSI was utilizing the name Oil Safe Ar®, Mr. MacDonald decided to come up with a new name to brand his patented synthetic replacements for acids, which is where the name ENVIRO-SYN® came from.

21.     Mr. MacDonald and other EMS agents came up with the name at EMS's offices in Melbourne, Florida. The ENVIRO-SYN® name is a combination of Environmental Manufacturing Solutions' name and their other trademark registration, SYNTECH®. A true and correct copy of the Trademark Registrations for ENVIRO-SYN® and SYNTECH® are attached hereto as Exhibits "A" and "B" respectively.

14

22.     HEG was incorporated on June 21, 2012 for the purpose of manufacturing, distributing and licensing its ENVIRO-SYN® and Oil Safe Ar® products around the world. HEG is the owner of the entire right, title and interest of United States Trademark Registration No. 4,224,628 on the Principal Register for the mark ENVIRO-SYN® for "synthetic replacement for acids, namely, hydrochloric, phosphoric, hydrofluoric, sulfuric, acetic, and formic acids used in dissolving and removing mineral deposits" in Class 001. *See* Exhibit "A" attached hereto and incorporated herein by reference.

23.     Although the ENVIRO-SYN® trademark registration indicates a first use in commerce date of December 2, 2012 in the trademark registration, HEG shipped its first shipment of ENVIRO-SYN® across state lines in November of 2010 and has been using the trademark ever since.

24.     As part of testing the Barracuda 10K formula (re-labeled as Oil Safe Ar® and ENVIRO-SYN®) for use in the Oil & Gas industry, Mr. MacDonald and Mr. Rowley determined that the formula was not strong enough and that it had certain chelating agents that needed to be removed to increase the effectiveness of the product downhole.

25.     During this same time, Mr. Thatcher, the current President and COO of FLUID ENERGY and FLUID LUX, was the V.P. of Operations and Technology for the Optifrac Division of Mud Master Drilling Fluid Service ("Mud Master").

26.     Mud Master was a distributor for HSI wherein HSI sold to Mud Master Oil Safe Ar®, and Mud Master, as a distributor, then sold the product to end users.

27.    Mr. Rowley, the owner of HSI at the time, and Mr. Thatcher, the V.P. of Mud Master, worked together on a large "frac" job in Turner Valley, Alberta Canada in October of 2011 utilizing the Oil Safe Ar® product for the job.

28.    At the frac site there was a hot oiler truck that heats and transfers the frac fluids on site. Mr. Thatcher and Mr. Rowley transferred theOil Safe Ar® into the hot oiler truck and began to notice the aluminum fittings fail due to corrosion. Mr. Thatcher began to panic. Mr. Thatcher and Mr. Rowley immediately contacted Mr. MacDonald, and Mr. MacDonald instructed Mr. Thatcher and Mr. Rowley that chemical doubling takes place with heating and also reminded them that the new version of Oil Safe Ar®, which was created at Mr. Thatcher's continued request, was far more active than the original rebranded Barracuda 10K and that they needed to switch out the fittings to stainless steel and/or to stop using the hot oiler truck and finish the job.

29.    Mr. Thatcher and Mr. Rowley chose to complete the job with a vacuum truck that was equipped with stainless fittings. The job was completed without error, pumping in excess of 125,000 gallons of Oil Safe AR®.

30.    Mr. Thatcher had first-hand knowledge and experience with the fact that Oil Safe Ar®, which was eventually re-branded ENVIRO-SYN®, would corrode aluminum and soft steel back in October of 2011, one year prior to entering into the Agreements referenced herein and prior to FLUID ENERGY and FLUID LUX's incorporation.

31.    FLUID ENERGY and FLUID LUX, through Mr. Thatcher, were readily aware that ENVIRO-SYN® would corrode aluminum and soft steel when they first opened their doors because Mr. Thatcher went to those companies armed with this knowledge he acquired through

16

his experience at Mud Master/Optifrac. Additional proof that FLUID was aware of corrosive

effect on aluminum and soft steel from the very beginning is as follows:

> i. FLUID's own ENVIRO-SYN label wherein it clearly states "WARNING! When pumping this product it is strongly recommended to use manufacturer approved hose couplings and fittings. DO NOT USE ALUMINUM FITTINGS. *See* Exhibit "C" attached hereto.
>
> ii. A PowerPoint presentation prepared by Darren Thatcher, along with the email correspondence from Mr. Thatcher on October 24, 2012 including a statement at page 7 of the presentation that certain precautions need to take place when pumping the product because the product will react with certain soft metals such as Aluminum and Magnesium. *See* Exhibit "D" attached hereto.
>
> iii. Email correspondence between Kevin O 'Donoghue and John MacDonald from June of 2013 pertaining to labels for ENVIRO-SYN CSR and ENVIRO-SYN HCR, created by FLUID, which include a WARNING regarding Aluminum. *See* Exhibit "E" attached hereto.

32.     More importantly, Claimants claim that Respondents fraudulently induced

Claimants into the Agreements by repeatedly assuring Claimants that the patented technology

was non-corrosive on steel and aluminum is not only false, but is a complete fabrication on the

part of Claimants solely done to try and rescind the Agreements.

33.     Although it is true that the Licensed Products are non-DOT regulated, this is only

relevant in the United States and has absolutely nothing to do with any of the Countries for

which Claimants were licensed to sell the Licensed Products.

34.     Moreover, each piece of literature attached to the Request for Arbitration as

Exhibits H-K are documents that were either falsified by Claimants (Exhibit H) or documents

pertaining to Oil Safe Ar® that were never provided to FLUID by any of the Respondents

(Exhibits I-K) as alleged by Claimants.

17

35.     In fact, such documents were never reviewed, discussed or even mentioned during any negotiations between Claimants and Respondents and in fact are only being used by Claimants as a way to rescind the agreements.

36.     Claimants also claim in their Request for Arbitration that the two testing reports attached as Exhibits L and M are fraudulent.  As seen in the Mutual Confidentiality and Non-Disclosure Agreement, which is attached hereto as Exhibit "F," EMS did in fact hire Del Tech Laboratory Services to perform the tests as well as NASA Support Labs, which will also be proven through the testimony of Ms. Alicea, the Director of both labs.

37.     Furthermore, any claims about ENVIRO-SYN® being corrosive are the direct result of Claimants' own actions in increasing the levels of HCL from the prescribed 20 baume to 22 baume without HEG's knowledge and consent.  True and correct email correspondence wherein Mr. Thatcher admits to adding in HCL, which would increase the corrosiveness of the products are attached hereto as Exhibit "G."

38.     Upon information and belief the inhibitor that Claimants are adding to the Licensed Products without HEG's authorization is identified as NALCO® ASP560.  A true and correct copy of the Material Safety Data Sheet ("MSDS") for NALCO® ASP560 is attached hereto as Exhibit "H."

39.     As seen in Exhibit "H" under Section 10, NALCO® ASP560 should not be combined or come into contact with products that contain strong alkalies like "ammonia and its solutions."  Claimants should be well aware of the fact that the urea that is in the Licensed Products is high in ammonia.

18

40. Likewise, under Section 14 of the MSDS it states that NALCO® ASP560 is DOT corrosive for transportation purposes. Therefore, any concern on the part of Counterclaim Respondents that its products are now DOT corrosive is a result of their own deliberate actions, not the actions of HEG, Mr. MacDonald or Mr. Rowley. *See* Exhibit "H."

41. Upon information and belief, the only reason the alleged third party tests referenced at paragraph 14 of the Request for Arbitration came back with a mmpy higher than 6.25 is because Claimants are adding products like NALCO® ASP560 to the Licensed Products without the authorization of HEG and are therefore increasing the corrosive nature of the product as well as causing the product to be DOT corrosive and DOT regulated.

42. Mr. MacDonald expressed his concerns about the changes being made by FLUID LUX and FLUID ENERGY and the corrosive effect of such changes and also made it very clear that HEG would not accept any legal liability for their actions. A true and correct copy of such email correspondence is attached hereto as Exhibit "I."

43. At the beginning of the relationship between the parties, HEG would manufacture the Licensed Products and provide such products to FLUID LUX and FLUID ENERGY for sale.

44. The Licensed Products as sold to Claimants by Respondent HEG were always considered Non-DOT regulated and below 6.25 mmpy. Therefore, any issues as it relates to an increase in corrosiveness of the product being DOT regulated are a direct result of Claimants' actions, not Respondents'.

45. From December 10, 2012 through December 12, 2012, Mr. MacDonald and Mr. Rowley, as officers of HEG, trained Mr. Purdy and Mr. Thatcher on how to create their own manufacturing facility, what reactors they needed to purchase, what pumps they needed to

19

purchase and exactly how to formulate the Licensed Products using methods that are covered by HEG's patented technology and the Agreements. All such training occurred at HEG's manufacturing facility in Grain Valley, MO.

46.     From February 17, 2013 through February 19, 2013, Mr. Purdy and Mr. Thatcher visited HEG's manufacturing facility to learn the ins and outs of the process by which the Licensed Products are manufactured and in particular how to react batches.

47.     From April 1, 2013 through April 4, 2013, Mr. Rowley and Mr. Stan Lucas (HEG's Operations Manager) flew to Calgary, Canada to assist Counterclaim Respondents with the set up and installation of their tanks and reactors. Mr. Rowley and Mr. Lucas worked closely with Mr. Thatcher and Mr. Rowley throughout the process.

48.     From April 14, 2013 through April 17, 2013, Mr. Rowley and Mr. Lucas returned to Calgary, Canada to finalize the installation of the system and to complete the oversight of their first batch of Licensed Product produced at their facility. This was done to ensure that Counterclaim Respondents knew exactly how to produce the batches as per the methods contained in HEG's patents and the Agreements between the parties.

49.     From August 18, 2013 through August 20, 2013, Mr. Rowley and Mr. MacDonald visited FLUID ENERGY to inspect the facility to ensure that everything was being done as instructed.

50.     Over the past year, Claimants have committed numerous violations of the Agreements as well as committed other actions, such as investor fraud and breach of fiduciary duty, which are not part of this proceeding, but are relevant nonetheless. Claimants are now

attempting to claim fraud in the inducement as a way to avoid having to pay all that is owed to HEG and as a way to save face with their shareholders and investors.

51. As seen in the Audit Report dated January 22, 2014 and attached hereto as Exhibit "J" FLUID has continually violated the Agreements by (1) failing to provide statements within fifteen (15) days after the last day of each month[7]; making late payments and underpayment throughout the 2013 calendar year[8]; failing to meet the minimum production levels for any quarter in the year 2013[9]; and by improperly selling competing goods (Matrix 100[10]).

52. Additional violations include, but are not limited to:

(a) Falsely stating "**worldwide" rights** on the www.fluidenergy.com website, when the Agreements between the parties were only for specified territories, not worldwide. *See* Exhibit "K."

(b) Falsely stating that FLUID had rights to the patented technology in the **United States** when no such rights existed. *See* Exhibit "L."

(c) Failing to pay past due invoices in the amount of $222,650.00 USD. *See* Exhibit "M."

(d) Offering for sale and selling the ENVIRO-SYN® patented products outside their territory to ENOVO and North American Chemical, companies in the U.S. *See* Exhibit "N."

(e) Falsely labeling the Licensed Products as DfE approved when the labels were never approved and FLUID never asked HEG to obtain approvals on the labels. *See* Exhibit "O."

(f) Falsely inducing investors to invest in FLUID for an amount close to or around $10 million dollars under the guise of an exclusive worldwide license with HEG for the patented ENVIRO-SYN® products when no such worldwide license existed[11];

(g) Failing to pay HEG royalties in the amount of $648,810.00 USD ;

---

[7] *See* Paragraph 6(a) of the License Agreements.

[8] *See* Paragraphs 6.3 and 6.5 of the Manufacturing Agreement.

[9] *See* Paragraphs 5.1 and 5.2 of the Manufacturing Agreements.

[10] *See* Paragraph 3.2 of the Manufacturing Agreements.

[11] Upon information and belief, Clay Purdy blatantly misrepresented to investors that FLUID had worldwide rights to the patented HEG technology in order to obtain investments in FLUID.

(h)     Falsely stating in a post on the www.globalpetroleum.com website that the ENVIRO-SYN® products were "**developed and patented by Fluid Energy Group**" when the ENVIRO-SYN® products were developed and patented by HEG. *See* Exhibit "P."

(i)     Admitting in email correspondence that the technology is HEG's and acknowledging that FLUID needed to get permission to send out news releases, but then falsely stating in the proposed news release that FLUID has "**exclusive oil & gas industry manufacturing and distribution rights**" in an attempt to garner more investors under false pretenses. *See* Composite Exhibit "Q[12]."

(j)     Falsely stating on Todnem's website that "Enviro-Syn is the trade name of a line of environmentally and HSE friendly acid and caustic replacements **developed and patented by Fluid Energy Group**." *See* Exhibit "R."

53.     Claimants sent Respondents a letter attempting to rescind the Agreements on April 11, 2014 on an allegation on fraud in the inducement. A true and correct copy of the letter is attached hereto as Exhibit "S."

54.     Respondent, through the undersigned responded to the letter refuting the allegations of fraud in the inducement and alleging many of the violations addressed above. A true and correct copy of the letter is attached hereto as Exhibit "T."

55.     Claimants are trying to pull the wool over this Panel's eyes by falsely claiming fraud in the inducement because it is the only way Claimants can get out of the Agreements that they have repeatedly violated.

56.     After trying to resolve the serious breaches by Claimants to no avail, and after receiving a copy of the Request for Arbitration, on June 12, 2014, Respondents through the undersigned attorney served a Notice of Termination on counsel for Claimants. A true and correct copy of the Notice of Termination is attached hereto as Exhibit "U."

---

[12] It should be noted that John MacDonald never authorized FLUID to send out this news release.

57.     As per paragraphs 4(c) and 4(d) of the License Agreements and paragraph 14.2(c) of the Manufacturing Agreements, the termination is effective 30 days from June 12, 2014 if Claimants failed to cure such breach.

58.     Claimants failed to respond to the Termination Letter or cure any of the breaches addressed in the letter.

59.     As per paragraphs 4(b) and 22 of the License Agreements, any manufacture, sale or offer for sale of the Licensed Products after July 12, 2014 is not only considered patent infringement, but is breach of the covenant not to compete, which includes a two year non-compete provision.

60.     As admitted to by Claimants and as seen in the Agreements, Respondent HEG agreed to license certain patented technology knows as the "231B1" and "102B1" technologies.

61.     The "231B1" and "102B1" technologies refer to several patents either owned or exclusively licensed by HEG.

62.     The patents are relevant to this case in that they were licensed to Claimants and are currently being infringed by Claimants, Mr. Purdy and Mr. Thatcher. These patents include, but are not limited to, U.S. Patent Nos. 8,580,047, 8,430,971 and 8,784,573.

63.     HEG is the exclusive licensee to U.S. Patent No. 8,850,047 ("the '047 Patent") titled "Methods for using improved urea hydrochloride compositions." A true and correct copy of the exclusive license and the '047 Patent are attached hereto and incorporated herein as Exhibits "V" and "W" respectively.

64.     HEG is the exclusive licensee to U.S. Patent No. 8,430,971 ("the '971 Patent") titled "Composition for treatment of drilling fluid and associated methods." A true and correct

23

copy of the exclusive license and the '971 Patent are attached hereto and incorporated herein as Exhibits "X" and "Y" respectively.

65.     HEG is the exclusive licensee to U.S. Patent No. 8,784,573 ("the '573 Patent") titled "Methods for using improved urea hydrochloride compositions" A true and correct copy of the exclusive license and the '573 Patent are attached hereto and incorporated herein as Exhibits "Z" and "AA" respectively.

66.     Claimants, through the direction, control, with the financial benefit and with the actual knowledge of Mr. Thatcher, are manufacturing, offering for sale and selling products covered under the '047, '971 and '573 Patents to customers throughout the United States, which infringe one or more of the claims of the '047, '971 and '573 Patents literally and/or through the doctrine of equivalents.

67.     Claimants, through the direction, control, with the financial benefit and with the actual knowledge of Mr. Purdy are manufacturing, offering for sale and selling products covered under the '047, '971 and '573 Patents to customers throughout the United States, which infringe one or more of the claims of the '047, '971 and '573 Patents literally and/or through the doctrine of equivalents.

68.     Claimants, through the direction and control, and with the financial benefit and actual knowledge of Mr. Purdy and Mr. Thatcher are using, manufacturing, offering for sale and selling products under HEG's trademarked name ENVIRO-SYN® and have in fact filed for trademark registrations for ENVIRO-SYN in the United States. True and correct copies of Claimants' unauthorized use of the ENVIRO-SYN® mark and trademark applications are attached hereto as Composite Exhibit "BB."

24

69.     Claimants, through the direction and control, and with the financial benefit and actual knowledge of Mr. Purdy and Mr. Thatcher are also continuing to utilize certain videos on their website at the following link http://www.fluidenergygroup.com/about-us/video-gallery/, which were created during the licensed period utilizing the Licensed Products. Such videos are now false and misleading in that Claimants are attempting to pass off their products as genuine HEG products when in fact they are not.

70.     FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's use of the ENVIRO-SYN® mark in association with the sale of infringing products is not authorized or licensed.

71.     Respondent has been damaged as a result of Claimants' activities described herein.

72.     Respondent has performed all conditions precedent to be performed by Respondent or the conditions have occurred. Respondent has been forced to retain the law firm of Beusse Wolter Sanks & Maire, P.A. for representation in this action.

## CLAIM I
## BREACH OF CONTRACT
## (Against FLUID ENERGY)

73.     HEG hereby adopts and re-alleges paragraphs 1-12, 16-20, 24-59, 68-72 above as fully and completely as if set forth herein.

74.     HEG and FLUID ENERGY entered into one Manufacturing Agreement and two License Agreements pertaining to the manufacture and sale of certain Licensed Products.

25

75.    FLUID ENERGY, as described in more detail above, breached the following provisions of the Fluid Energy Manufacturing Agreement:

      a. Section 2.5- FLUID ENERGY breached Section 2.5 of the Manufacturing Agreement by marketing and selling the Licensed Products outside of FLUID ENERGY's territory without the written consent of HEG and during the term of the Agreement.

      b. Section 2.10- FLUID ENERGY breached Section 2.10 of the Manufacturing Agreement by conducting unauthorized testing from a third-party laboratory without prior approval from HEG.

      c. Section 3.2- FLUID ENERGY breached Section 3.2 of the Manufacturing Agreement by selling competitive goods during the term of the Agreements.

      d. Section 5.1- FLUID ENERGY breached Section 5.1 of the Manufacturing Agreement by failing to meet the quota of $1,000,000 worth of Licensed Products sold for the year 2013.

      e. Section 5.2- FLUID ENERGY breached Section 5.2 of the Manufacturing Agreement by failing to meet the quotas, failing to amend its rights to non-exclusive rights as per 5.2(b) for 2014, failing to make payment equal to the shortfall of such quota to maintain exclusive rights as per 5.2(a) for 2014, while at the same time representing to investors, customers, dealers and via the web that FLUID ENERGY maintained exclusive rights.

      f. Section 6.3- FLUID ENERGY breached Section 6.3 of the Manufacturing Agreement by failing to make payments within 30 days of the date of invoice.

26

g.  Section 6.5 FLUID ENERGY breached Section 6.5 of the Manufacturing Agreement by failing to pay 8.0% interest on all overdue balances outstanding.

h.  Section 11.1 FLUID ENERGY breached Section 11.1 of the Manufacturing Agreement by improperly and without authorization obtaining a trademark registration in Canada for ENVIRO-SYN as well as filing trademark applications in the U.S. for ENVIRO-SYN.

i.  Section 11.2 FLUID ENERGY breached Section 11.2 of the Manufacturing Agreement by improperly telling investors and potential investors that FLUID ENERGY was the owner of the Patents and Licensed Technology as well as attempting to sell such Licensed Products outside of FLUID ENERGY's licensed territory.

76.  FLUID ENERGY, as described in more detail above breached the following provisions of the Fluid Energy License Agreements:

a.  Section 4(B) and 22 – FLUID ENERGY breached Sections 4(B) and 22 by making, using, selling and offering to sell the Licensed Products after July 12, 2014 in breach of the two year non-compete provision.

b.  Section 5(A) FLUID ENERGY breached Section 5(A) of the License Agreements by failing to pay royalties for the months of January – June, 2014 and failing to meet the sales minimum by the deadline of December 31, 2013.

c.  Section 6(A) FLUID ENERGY breached Section 6(A) of the License Agreements by failing to furnish HEG written statements under oath

27

specifying the total number of products sold during the preceding month for the months of October 2012-December 2013 and March-June of 2014.

d. Section 6(B) FLUID ENERGY breached Section 6(B) of the License Agreements by failing to make royalty payments for the months of January – June, 2014.

77. HEG has performed all conditions precedent to bring this cause of action or all of the conditions have occurred.

78. As a direct and proximate result of FLUID ENERGY's breach of the provisions outlined above, HEG has suffered loss and damage.

79. HEG has been damaged in an amount that is at least equal to $1,873,755.67 which takes into account the four (4) invoices totaling $224,945.67[13], unpaid royalties to date amounting $648,810.00 and the unpaid exclusivity fee of $1,000,000.00.

WHEREFORE, HEG prays for the following relief against FLUID ENERGY:

a. That FLUID ENERGY be required to pay HEG the actual damages suffered as a result of the breach, including, but not limited to, all royalties due and owing, all payments for products received, the unpaid exclusivity fee and any other damages as a result of Claimants' conduct.

b. That HEG recover its costs associated with this proceeding, including the arbitrators' fees, costs of any experts or any other assistance required by the tribunal and fees and expenses of the administrator as per Article 37(4).

---

[13] True and correct copies of the invoices are attached hereto as Exhibit BB.

28

c.    That HEG recover pre-award and post-judgment interest at the amount allowed under the Agreements (8.0%).

d.    That HEG be provided such further and other relief as this tribunal deems just and proper.

## CLAIM II
## BREACH OF CONTRACT
## (Against FLUID LUX)

80.    HEG hereby adopts and re-alleges paragraphs 1-12, 16-20, 24-59, 68-72 above as fully and completely as if set forth herein.

81.    HEG and FLUID LUX entered into one Manufacturing Agreement and two License Agreements pertaining to the manufacture and sale of certain Licensed Products.

82.    FLUID LUX, as described in more detail above breached the following provisions of the Fluid Lux Manufacturing Agreement:

> a.  Section 2.5- FLUID LUX breached Section 2.5 of the Manufacturing Agreement by marketing and selling the Licensed Products outside of FLUID LUX's territory without the written consent of HEG and during the term of the Agreement.

> b.  Section 2.10- FLUID LUX breached Section 2.10 of the Manufacturing Agreement by conducting unauthorized testing from a third-party laboratory without prior approval from HEG.

> c.  Section 3.2- FLUID LUX breached Section 3.2 of the Manufacturing Agreement by selling competitive goods during the term of the Agreements.

29

    d. Section 5.1- FLUID LUX breached Section 5.1 of the Manufacturing Agreement by failing to meet the quota of $1,000,000 worth of Licensed Products sold for the year 2013.

    e. Section 5.2- FLUID LUX breached Section 5.2 of the Manufacturing Agreement by failing to meet the quotas, failing to amend its rights to non-exclusive rights as per 5.2(b) for 2014, failing to make payment equal to the shortfall of such quota to maintain exclusive rights as per 5.2(a) for 2014, while at the same time representing to investors, customers, dealers and via the web that FLUID LUX maintained exclusive rights.

    f. Section 6.3- FLUID LUX breached Section 6.3 of the Manufacturing Agreement by failing to make payments within 30 days of the date of invoice.

    g. Section 6.5 FLUID LUX breached Section 6.5 of the Manufacturing Agreement by failing to pay 8.0% interest on all overdue balances outstanding.

    h. Section 11.2 FLUID LUX breached Section 11.2 of the Manufacturing Agreement by improperly telling investors and potential investors that FLUID LUX was the owner of the Patents and Licensed Technology as well as attempting to sell such Licensed Products outside of FLUID LUX's licensed territory.

83.    FLUID LUX, as described in more detail above breached the following provisions of the Fluid Lux License Agreements:

a. Section 4(B) and 22 – FLUID LUX breached Sections 4(B) and 22 by making, using, selling and offering to sell the Licensed Products after July 12, 2014 in breach of the two year non-compete provision.

b. Section 5(A) FLUID LUX breached Section 5(A) of the License Agreements by failing to pay royalties for the months of January – June, 2014 and failing to meet the sales minimum by the deadline of December 31, 2013.

c. Section 6(A) FLUID LUX breached Section 6(A) of the License Agreements by failing to furnish HEG written statements under oath specifying the total number of products sold during the preceding month for the months of October 2012-December 2013 and March-June of 2014.

d. Section 6(B) FLUID LUX breached Section 6(B) of the License Agreements by failing to make royalty payments for the months of January – June, 2014.

84.   HEG has performed all conditions precedent to bring this cause of action or all of the conditions have occurred.

85.   As a direct and proximate result of FLUID LUX's breach of the provisions outlined above, HEG has suffered loss and damage.

86.   HEG has been damaged in amount that is at least equal to $1,873,755.67 which takes into account the 4 invoices totaling $224,945.67[14], unpaid royalties to date amounting $648,810.00 and the unpaid exclusivity fee of $1,000,000.00.

WHEREFORE, HEG prays for the following relief against FLUID LUX:

---

[14] True and correct copies of the invoices are attached hereto as Exhibit BB.

a. That FLUID LUX be required to pay HEG the actual damages suffered as a result of the breach, including, but not limited to, all royalties due and owing, all payments for products received, the unpaid exclusivity fee and any other damages as a result of Claimants' conduct.

b. That HEG recover its costs associated with this proceeding, including the arbitrators' fees, costs of any experts or any other assistance required by the tribunal and fees and expenses of the administrator as per Article 37(4).

c. That HEG recover pre-award and post-judgment interest at the amount allowed under the Agreements (8.0%).

d. That HEG be provided such further and other relief as this tribunal deems just and proper.

## CLAIM III
## PATENT INFRINGEMENT (the '047 PATENT)
## (Against FLUID ENERGY, FLUID LUX, MR. PURDY and MR. THATCHER)

87. HEG hereby adopts and re-alleges paragraphs 1-15, 37-72 above as fully and completely as if set forth herein.

88. HEG is the exclusive licensee to United States Patent No. 8,580,047 ("the '047 Patent") at all times material hereto. *See* Exhibit "W."

89. The '047 Patent covers methods for improved urea hydrochloride compositions.

90. Claimants, FLUID LUX and FLUID ENERGY, through the participation, direction, control and with the financial benefit and actual knowledge of Mr. Purdy and Mr. Thatcher are making, using, selling and offering for sale products that are produced using

32

methods disclosed and claimed in the '047 Patent, without the authorization of HEG, in violation of 35 U.S.C. §§271(a) and (g).

91.     FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's aforesaid activities have been without authority and/or license from HEG and are considered intentional and willful.

92.     HEG is entitled to recover from the FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher the damages sustained by HEG as a result of the wrongful acts alleged herein in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this tribunal under 35 U.S.C. § 284.

93.     FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's infringement of HEG's exclusive rights under the '047 Patent will continue to damage HEG, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this tribunal.

WHEREFORE, HEG respectfully requests the following relief against Counterclaim Respondents.

a.     That Counterclaim Respondents and all employees, independent contractors, agents or those acting in concert be preliminarily and permanently enjoined from:

> i. Making, using, offering for sale or selling synthetic acid replacements utilizing the methods claimed in the '047 Patent;
>
> ii. Otherwise infringing on the '047 Patent.

b.     That Counterclaim Respondents be ordered to pay compensatory damages to HEG pursuant to 35 U.S.C. §284.

33

c. That HEG be entitled to enhancement of damages against Counterclaim

Respondents pursuant to 35 U.S.C. §284.

d. That HEG be awarded its reasonable attorneys' fees and costs pursuant to

35 U.S.C. §285 and Federal Rule of Civil Procedure 54(d).

e. That HEG be awarded prejudgment and post judgment interest.

f. That this tribunal provides such other and further relief that it deems

necessary and reasonable.

## CLAIM IV
## PATENT INFRINGEMENT (the '971 PATENT)
## (Against FLUID ENERGY, FLUID LUX, MR. PURDY and MR. THATCHER)

94. HEG hereby adopts and re-alleges paragraphs 1-15, 37-72 above as fully and completely as if set forth herein.

95. HEG is the exclusive licensee to United States Patent No. 8,430,971 ("the '971 Patent") at all times material hereto. *See* Exhibit "Y."

96. The '971 Patent covers compositions for treatment of a drilling fluid and associated methods therewith.

97. Claimants, FLUID LUX and FLUID ENERGY, through the participation, direction, control and with the financial benefit and actual knowledge of Mr. Purdy and Mr. Thatcher are making, using, selling and offering for sale products that are produced using methods disclosed and claimed in the '971 Patent, without the authorization of HEG, in violation of 35 U.S.C. §§271(a) and (g).

98.   FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's aforesaid activities have been without authority and/or license from HEG and are considered intentional and willful.

99.   HEG is entitled to recover from the FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher the damages sustained by HEG as a result of the wrongful acts alleged herein in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this tribunal under 35 U.S.C. § 284.

100.   FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's infringement of HEG's exclusive rights under the '971 Patent will continue to damage HEG, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this tribunal.

WHEREFORE, HEG respectfully requests the following relief against Counterclaim Respondents.

a.   That Counterclaim Respondents and all employees, independent contractors, agents or those acting in concert be preliminarily and permanently enjoined from:

> i. Making, using, offering for sale or selling synthetic acid replacements utilizing the methods claimed in the '971 Patent;
>
> ii. Otherwise infringing on the '971 Patent.

b.   That Counterclaim Respondents be ordered to pay compensatory damages to HEG pursuant to 35 U.S.C. §284.

c.   That HEG be entitled to enhancement of damages against Counterclaim Respondents pursuant to 35 U.S.C. §284.

35

d. That HEG be awarded its reasonable attorneys' fees and costs pursuant to

35 U.S.C. §285 and Federal Rule of Civil Procedure 54(d).

e. That HEG be awarded prejudgment and post judgment interest.

f. That this tribunal provides such other and further relief that it deems necessary and reasonable.

## CLAIM V
## PATENT INFRINGEMENT (the '573 PATENT)
## (Against FLUID ENERGY, FLUID LUX, MR. PURDY and MR. THATCHER)

101. HEG hereby adopts and re-alleges paragraphs 1-15, 37-72 above as fully and completely as if set forth herein.

102. HEG is the exclusive licensee to United States Patent No. 8,784,573 ("the '573 Patent") at all times material hereto. *See* Exhibit "AA."

103. The '573 Patent covers methods for using improved urea hydrochloride compositions.

104. Claimants, FLUID LUX and FLUID ENERGY, through the participation, direction, control and with the financial benefit and actual knowledge of Mr. Purdy and Mr. Thatcher are making, using, selling and offering for sale products that are produced using methods disclosed and claimed in the '573 Patent, without the authorization of HEG, in violation of 35 U.S.C. §§271(a) and (g).

105. FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's aforesaid activities have been without authority and/or license from HEG and are considered intentional and willful.

36

106.  HEG is entitled to recover from the FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher the damages sustained by HEG as a result of the wrongful acts alleged herein in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this tribunal under 35 U.S.C. § 284.

107.  FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's infringement of HEG's exclusive rights under the '573 Patent will continue to damage HEG, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this tribunal.

WHEREFORE, HEG respectfully requests the following relief against Counterclaim Respondents.

a.  That Counterclaim Respondents and all employees, independent contractors, agents or those acting in concert be preliminarily and permanently enjoined from:

> i.  Making, using, offering for sale or selling synthetic acid replacements utilizing the methods claimed in the '573 Patent;
>
> ii.  Otherwise infringing on the '573 Patent.

b.  That Counterclaim Respondents be ordered to pay compensatory damages to HEG pursuant to 35 U.S.C. §284.

c.  That HEG be entitled to enhancement of damages against Counterclaim Respondents pursuant to 35 U.S.C. §284.

d.  That HEG be awarded its reasonable attorneys' fees and costs pursuant to 35 U.S.C. §285 and Federal Rule of Civil Procedure 54(d).

e.  That HEG be awarded prejudgment and post judgment interest.

37

f.      That this tribunal provides such other and further relief that it deems necessary and reasonable.

## CLAIM VI
## TRADEMARK INFRINGEMENT UNDER 15 U.S.C. §1114
## (Against FLUID ENERGY, FLUID LUX, MR. PURDY and MR. THATCHER)

108.    HEG hereby adopts and re-alleges paragraphs 1-15, 19-24, 68-72 above as fully and completely as if set forth herein.

109.    Respondent HEG is the owner of all right, title, and interest in U.S. Trademark Reg. No. 4,224,628 for ENVIRO-SYN®.

110.    Claimants were previously licensed to use the mark ENVIRO-SYN® mark in connection with the promotion, advertising, sale, and offering of the Licensed Products for sale, but such license was revoked on June 12, 2014 as found in the Termination Letter attached hereto as Exhibit "U."

111.    Claimants' use in commerce of the identical mark ENVIRO-SYN® in association with identical goods is likely to cause confusion among consumers and has in fact already caused confusion in that customers believe they are receiving the true ENVIRO-SYN® licensed products when in fact this is not true.

112.    Claimants' use of the mark has been at the direction, control and financial benefit of Mr. Purdy and Mr. Thatcher.

113.    As a direct and proximate result of Claimants' infringing use of the ENVIRO-SYN® mark, Claimants have caused Respondent to lose profits, and to lose goodwill associated with the ENVIRO-SYN® mark.

114. Respondent HEG will be irreparably damaged by continued loss of profits, loss of goodwill and loss of control over the reputation of the ENVIRO-SYN® mark unless FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy are prevented from continuing to promote, advertise, sell or to offer the no longer Licensed Products with the identical ENVIRO-SYN mark.

115. FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy have thereby created a likelihood of confusion in the market place that will continue and increase if FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy are permitted to continue their unauthorized use and misappropriation of Respondent's ENVIRO-SYN® trademark.

116. FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy continued to use the ENVIRO-SYN® trademark after such license was terminated and have thereby infringed Respondent's mark willfully and with wanton disregard of Respondent's rights, and will continue to do so unless enjoined.

117. Once FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's infringing conduct was brought to their attention by HEG; FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy refused to stop using the ENVIRO-SYN® mark and made a deliberate decision to continue using the ENVIRO-SYN® mark to advertise, promote, offer for sale, and sell their infringing goods.

118. FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's use and continued use of the ENVIRO-SYN mark is willful, wanton, and shows a reckless disregard for HEG's rights.

119.    HEG has been damaged and is likely to be further damaged by FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's infringing acts, and that damage will be irreparable unless Claimants' conduct is enjoined.

WHEREFORE, HEG respectfully requests the following relief against Counterclaim Respondents.

a.    That Counterclaim Respondents and all employees, independent contractors, agents or those acting in concert be preliminarily and permanently enjoined from:

> i. Using the ENVIRO-SYN® mark or any mark that is confusingly similar thereto in association with the advertising, promotion, offering for sale or sale of synthetic acid replacements or any products similar thereto;
>
> ii. Otherwise infringing on the ENVIRO-SYN® mark.

b.    That Counterclaim Respondents be ordered to pay all profits received by Counterclaim Respondents as a result of the infringing activity and compensate HEG for any damages sustained pursuant to 15 U.S.C. §1117.

c.    That the tribunal award HEG treble damages because of the intentional and willful acts set forth herein pursuant to 15 U.S.C. §1117(a).

d.    That this case be deemed exceptional and Counterclaim Respondents be ordered to pay HEG reasonable attorney's fees pursuant to 15 U.S.C. §1117(a).

e.    That this tribunal provides such other and further relief that it deems necessary and reasonable.

## COUNT VII
### (TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION UNDER 15 U.S.C. §1125(a))

120. Respondent HEG re-alleges each and every allegation set forth in 1-15, 19-24, 50-72 above, as if fully set forth herein.

121. Respondent HEG has used the ENVIRO-SYN® mark in interstate commerce to advertise, promote, and distinctly identify its synthetic acid goods since at least as early as November of 2011.

122. FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's continued to use the ENVIRO-SYN® mark to promote their infringing goods after the license was revoked on June 12, 2014 constitutes trademark infringement and unfair competition.

123. Respondent's use of the ENVIRO-SYN® mark in interstate commerce pre-dates FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's adoption and use of the ENVIRO-SYN® mark.

124. FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's unauthorized use of the ENVIRO-SYN® mark is likely to cause confusion, mistake, or to deceive customers as to Respondent's affiliation, connection, association, sponsorship, or approval of FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's goods.

125. Respondent has been damaged and is likely to be further damaged by FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's infringing acts, and that damage will be irreparable unless such conduct is enjoined.

126. Once FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's infringing conduct was brought to their attention by HEG, FLUID LUX, FLUID ENERGY, Mr. Thatcher

41

and Mr. Purdy refused to stop using the ENVIRO-SYN® mark and made a deliberate decision to continue using the ENVIRO-SYN® mark to advertise, promote, offer for sale, and sell their infringing goods.

127.    FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's use and continued use of the ENVIRO-SYN® mark is willful, wanton, and shows a reckless disregard for Respondent's rights.

WHEREFORE, HEG respectfully requests the following relief against Counterclaim Respondents.

a.      That Counterclaim Respondents and all employees, independent contractors, agents or those acting in concert be preliminarily and permanently enjoined from:

> i. Using the ENVIRO-SYN® mark or any mark that is confusingly similar thereto in association with the advertising, promotion, offering for sale or sale of synthetic acid replacements or any products similar thereto;
>
> ii. Otherwise infringing on the ENVIRO-SYN® mark.

b.      That Counterclaim Respondents be ordered to pay all profits received by Counterclaim Respondents as a result of the infringing activity and compensate HEG for any damages sustained pursuant to 15 U.S.C. §1117.

c.      That the tribunal award HEG treble damages because of the intentional and willful acts set forth herein pursuant to 15 U.S.C. §1117(a).

d.      That this case be deemed exceptional and Counterclaim Respondents be ordered to pay HEG reasonable attorney's fees pursuant to 15 U.S.C. §1117(a).

42

**IN THE MATTER OF THE**
**ARBITRATION BETWEEN:**
--------------------------------------------------------------

| | |
|---|---|
| **FLUID ENERGY GROUP LTD. and FLUID LUX S.A.R.L.,** | ) ) |
| | ) |
| **Claimants,** | ) |
| **v.** | ) |
| | ) |
| **HEARTLAND ENERGY GROUP, LTD,** | ) |
| **JOHN MACDONALD** | ) |
| **and STEPHEN ROWLEY** | ) |
| | ) |
| **Respondents.** | ) |
| | ) |

**ICC Case No. 20282/RD**

--------------------------------------------------------------

| | |
|---|---|
| **HEARTLAND ENERGY GROUP, LTD.** | ) |
| | ) |
| **Counter-Claimant,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **FLUID ENERGY GROUP, LTD., FLUID LUX** | ) |
| **S.A.R.L., DARREN THATCHER and** | ) |
| **CLAY PURDY** | ) |
| | ) |
| **Counterclaim Respondents.** | ) |
| | ) |
| | ) |

## RESPONDENT HEARTLAND ENERGY GROUP, LTD'S
## AMENDED COUNTERCLAIM

Respondent/Counter-Claimant, HEARTLAND ENERGY GROUP, LTD. ("HEG" or

"Respondent" or "Counterclaimant"), by and through its undersigned counsel, hereby files this

Amended Counterclaim against Claimants/Counter-Respondents, FLUID ENERGY GROUP,

LTD. ("FLUID ENERGY"). FLUID LUX S.A.R.L. ("FLUID LUX"), CLAY PURDY ("Mr.

Purdy") and DARREN THATCHER ("Mr. Thatcher") (collective referred to as "Claimants") and state the following as grounds:

## THE PARTIES

1.　　HEARTLAND ENERGY GROUP, LTD. is a corporation formed under the laws of the Republic of Seychelles with an office located at Suite 15, 1st Floor Oliaji Trade Center, Francis Street, Victoria, Mahe, Seychelles.

2.　　FLUID ENERGY GROUP, LTD. is a corporation formed under the laws of Alberta, Canada with an office located at 214 11th Avenue SE, Calgary, Canada T2G 0X8.

3.　　FLUID LUX S.A.R.L. is a limited liability company formed under the laws of Luxembourg with an office located at 73 Cote d'Eich, L-1450 Luxembourg.

4.　　CLAY PURDY ("Mr. Purdy") is an individual and officer of FLUID ENERGY and FLUID LUX who personally participated in, induced, directed, controlled and financially benefitted from the unlawful conduct alleged herein.

5.　　DARREN THATCHER ("Mr. Thatcher") is an individual and officer of FLUID ENERGY and FLUID LUX who personally participated in, induced, directed, controlled and financially benefitted from the unlawful conduct alleged herein.

## FORUM AND GOVERNING LAW

6.　　HEG and FLUID ENERGY were parties to a Manufacturing Agreement which was originally dated October 12, 2012 and was then amended and restated on June 18, 2013 ("Fluid Energy Manufacturing Agreement"). *See* Exhibit A to Request for Arbitration.

7. The Fluid Energy Manufacturing Agreement includes an arbitration clause which calls for arbitration with the International Chamber of Commerce ("ICC") to be held in ICC's Florida, USA office.  *See* Exhibit A to Request for Arbitration at §16.1.

8. HEG and FLUID ENERGY were also parties to two license agreements originally dated October 10, 2012[1] and then amended and restated on June 18, 2013 ("Fluid Energy License Agreements").  *See* Exhibits B and C to Request for Arbitration.

9. The Fluid Energy License Agreements likewise contain an arbitration and governing law clause identical to the clause in the Fluid Energy Manufacturing Agreement[2].

10. HEG and FLUID LUX were also parties to a similar manufacturing agreement dated October 10, 2012 and amended and restated on June 18, 2013 ("Fluid Lux Manufacturing Agreement").  *See* Exhibit D to Request for Arbitration.

11. HEG and FLUID LUX were also parties to two license agreements originally dated October 10, 2012[3]and then amended and restated on June 18, 2013 ("Fluid Lux license Agreements").  *See* Exhibit E and F to Request for Arbitration.

12. The Fluid Lux Manufacturing and License Agreements all contain an arbitration and governing law clause identical to the clauses in the Fluid Energy Manufacturing and License Agreements.  For ease of reference, the license and manufacturing agreements between HEG and

---

[1] Although Exhibit B has a date of October 10, 2013, this was a typographical error.  The original agreement was entered into on October 10, 2012.
[2] *See* Exhibit A to Request for Arbitration at §16.1; Exhibit B to Request for Arbitration at §§20-21; and Exhibit C to Request for Arbitration at §§20-21.
[3] Although Exhibit E has a date of October 10, 2013, this was a typographical error.  The original agreement was entered into on October 10, 2012.

FLUID ENERGY on the one hand and HEG and FLUID LUX on the other hand will be referred to as "the Agreements" throughout unless referencing a specific agreement.

13.     This case also arises, in part, under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 154(d), 271, 281, 283, 284, 285and 294 and under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, including 15 U.S.C. §§ 1116, 1117, and 1125(a).

14.     This Court has subject matter jurisdiction over both the patent infringement and trademark infringement claims in this case in that they both arise out of the Agreements entered into between the parties.

15.     Mr. Purdy and Mr. Thatcher are proper Counterclaim Respondents[4] to HEG's Counterclaims for patent and trademark infringement in that Mr. Purdy and Mr. Thatcher both personally participated in, directed, controlled and financially benefitted from the unlawful infringement of HEG's patents and trademarks as discussed herein.

## **FACTUAL BACKGROUND**

16.     This case and the relationship between the parties goes back long before HEG and FLUID ENERGY and/or FLUID LUX entered into the Agreements referenced above.

---

[4] Note that unlike Claimants' contract claim against Mr. MacDonald and Mr. Rowley individually, Respondent HEG's counterclaims for patent and trademark infringement properly include Mr. Thatcher and Mr. Purdy in their individual capacities. This is due to the nature of such intellectual property claims. *See, e.g., Mayo Clinic Jacksonville v. Alzheimer's Inst. of Am., Inc.*, 683 F. Supp. 2d 1292, 1299 (M.D. Fla. 2009) (citing *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1578-79 (Fed. Cir. 1986) for the proposition that it is not necessary to pierce the corporate veil before holding a corporate officer personally liable for patent infringement); *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477-78 (11th Cir. 1991) (stating that "[n]atural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act" and finding corporate defendant's CEO personally liable for corporate defendant's infringement).

17.     Before HEG was incorporated, there was a company with the name Heartland Solutions, Inc. ("HSI").  Respondent Stephen Rowley ("Mr. Rowley") was the owner of HSI, and HSI had a Distributor Agreement with Environmental Manufacturing Solutions, LLC ("EMS") pertaining to a number of different products relevant to the concrete industry.

18.     EMS is a chemical company based out of Melbourne, Florida that specializes in providing safe solutions to replace harsh and dangerous acids, solvents and caustics used so prevalently across many different industries.  Respondent John MacDonald ("Mr. MacDonald") is the owner of EMS.

19.     Beginning in 2009, in addition to targeting the concrete industry, HSI also began targeting the Oil & Gas industry with EMS's Barracuda 10K product.  HSI, with the knowledge and permission of EMS, re-branded and re-labeled the products as Oil Safe Ar®.

20.     Around the same time, Mr. MacDonald incorporated Environmental Manufacturing Solutions Oil and Gas Exploration Products, LLC for the purpose of promoting its products to the Oil & Gas industry.  At this time, since HSI was utilizing the name Oil Safe Ar®, Mr. MacDonald decided to come up with a new name to brand his patented synthetic replacements for acids, which is where the name ENVIRO-SYN® came from.

21.     Mr. MacDonald and other EMS agents came up with the name at EMS's offices in Melbourne, Florida. The ENVIRO-SYN® name is a combination of Environmental Manufacturing Solutions' name and their other trademark registration, SYNTECH®.  A true and correct copy of the Trademark Registrations for ENVIRO-SYN® and SYNTECH® are attached hereto as Exhibits "A" and "B" respectively.

22.    HEG was incorporated on June 21, 2012 for the purpose of manufacturing, distributing and licensing its ENVIRO-SYN® and Oil Safe Ar® products around the world. HEG is the owner of the entire right, title and interest of United States Trademark Registration No. 4,224,628 on the Principal Register for the mark ENVIRO-SYN® for "synthetic replacement for acids, namely, hydrochloric, phosphoric, hydrofluoric, sulfuric, acetic, and formic acids used in dissolving and removing mineral deposits" in Class 001.  *See* Exhibit "A" attached hereto and incorporated herein by reference.

23.    Although the ENVIRO-SYN® trademark registration indicates a first use in commerce date of December 2, 2011 in the trademark registration, HEG shipped its first shipment of ENVIRO-SYN® across state lines in November of 2010 and has been using the trademark ever since. In any event, HEG's first use of the mark, as well as HEG's trademark application filing date for the mark, pre-date the Agreements at issue.

24.    As part of testing the Barracuda 10K formula (re-labeled as Oil Safe Ar® and ENVIRO-SYN®) for use in the Oil & Gas industry, Mr. MacDonald and Mr. Rowley determined that the formula  was not strong enough and that it had certain chelating agents that needed to be removed to increase the effectiveness of the product downhole.

25.    During this same time, Mr. Thatcher, the current President and COO of FLUID ENERGY and FLUID LUX, was the V.P. of Operations and Technology for the Optifrac Division of Mud Master Drilling Fluid Service ("Mud Master").

26.    Mud Master was a distributor for HSI wherein HSI sold to Mud Master Oil Safe Ar®, and Mud Master, as a distributor, then sold the product to end users.

27.     Mr. Rowley, the owner of HSI at the time, and Mr. Thatcher, the V.P. of Mud Master, worked together on a large "frac" job in Turner Valley, Alberta Canada in October of 2011 utilizing the Oil Safe Ar® product for the job.

28.     At the frac site there was a hot oiler truck that heats and transfers the frac fluids on site.  Mr. Thatcher and Mr. Rowley transferred theOil Safe Ar® into the hot oiler truck and began to notice the aluminum fittings fail due to corrosion.   Mr. Thatcher began to panic.  Mr. Thatcher and Mr. Rowley immediately contacted Mr. MacDonald, and Mr. MacDonald instructed Mr. Thatcher and Mr. Rowley that chemical doubling takes place with heating and also reminded them that the new version of Oil Safe Ar®, which was created at Mr. Thatcher's continued request, was far more active than the original rebranded Barracuda 10K and that they needed to switch out the fittings to stainless steel and/or to stop using the hot oiler truck and finish the job.

29.     Mr. Thatcher and Mr. Rowley chose to complete the job with a vacuum truck that was equipped with stainless fittings. The job was completed without error, pumping in excess of 125,000 gallons of Oil Safe AR®.

30.     Mr. Thatcher had first-hand knowledge and experience with the fact that Oil Safe Ar®, which was also branded ENVIRO-SYN®, would corrode aluminum and soft steel back in October of 2011, one year prior to entering into the Agreements referenced herein and prior to FLUID ENERGY and FLUID LUX's incorporation.

31.     FLUID ENERGY and FLUID LUX, through Mr. Thatcher, were readily aware that ENVIRO-SYN® would corrode aluminum and soft steel when they first opened their doors because Mr. Thatcher went to those companies armed with this knowledge he acquired through

his experience at Mud Master/Optifrac.  Additional proof that FLUID was aware of corrosive effect on aluminum and soft steel from the very beginning is as follows:

i.     FLUID's own ENVIRO-SYN label wherein it clearly states "WARNING! When pumping this product it is strongly recommended to use manufacturer approved hose couplings and fittings.  DO NOT USE ALUMINUM FITTINGS.  *See* Exhibit "C" attached hereto.

ii.    A PowerPoint presentation prepared by Darren Thatcher, along with the email correspondence from Mr. Thatcher on October 24, 2012 including a statement at page 7 of the presentation that certain precautions need to take place when pumping the product because the product will react with certain soft metals such as Aluminum and Magnesium.  *See* Exhibit "D" attached hereto.

iii.   Email correspondence between Kevin O 'Donoghue and John MacDonald from June of 2013 pertaining to labels for ENVIRO-SYN CSR and ENVIRO-SYN HCR, created by FLUID, which include a WARNING regarding Aluminum.  *See* Exhibit "E" attached hereto.

32.    More importantly, Claimants claim that Respondents fraudulently induced Claimants into the Agreements by repeatedly assuring Claimants that the patented technology was non-corrosive on steel and aluminum is not only false, but is a complete fabrication on the part of Claimants solely done to try and rescind the Agreements.

33.    Although it is true that the Licensed Products are non-DOT regulated, this is only relevant in the United States and has absolutely nothing to do with any of the Countries for which Claimants were licensed to sell the Licensed Products.

34.    Moreover, each piece of literature attached to the Request for Arbitration as Exhibits H-K are documents that were either falsified by Claimants (Exhibit H) or documents pertaining to Oil Safe Ar® that were <u>never provided</u> to FLUID by any of the Respondents (Exhibits I-K) as alleged by Claimants.

35.     In fact, such documents were never reviewed, discussed or even mentioned during any negotiations between Claimants and Respondents and in fact are only being used by Claimants as a way to rescind the Agreements.

36.     Claimants also claim in their Request for Arbitration that the two testing reports attached as Exhibits L and M are fraudulent.   As seen in the Mutual Confidentiality and Non-Disclosure Agreement, which is attached hereto as Exhibit "F," EMS did in fact hire Del Tech Laboratory Services to perform the tests as well as NASA Support Labs, which will also be proven through the testimony of Ms. Alicea, the Director of both labs.

37.     Furthermore, any claims about ENVIRO-SYN® being corrosive are the direct result of Claimants' own actions in increasing the levels of HCL from the prescribed 20 baume to 22 baume without HEG's knowledge and consent.   True and correct email correspondence wherein Mr. Thatcher admits to adding in HCL, which would increase the corrosiveness of the products are attached hereto as Exhibit "G."

38.     Upon information and belief the inhibitor that Claimants are adding to the Licensed Products without HEG's authorization is identified as NALCO® ASP560.   A true and correct copy of the Material Safety Data Sheet ("MSDS") for NALCO® ASP560 is attached hereto as Exhibit "H."

39.     As seen in Exhibit "H" under Section 10, NALCO® ASP560 should not be combined or come into contact with products that contain strong alkalies like "ammonia and its solutions."   Claimants should be well aware of the fact that the urea that is in the Licensed Products is high in ammonia.

40.     Likewise, under Section 14 of the MSDS it states that NALCO® ASP560 is <u>DOT corrosive</u> for transportation purposes.   Therefore, any concern on the part of Counterclaim Respondents that its products are now DOT corrosive is a result of their own deliberate actions, not the actions of HEG, Mr. MacDonald or Mr. Rowley.  *See* Exhibit "H."

41.     Upon information and belief, the only reason the alleged third party tests referenced at paragraph 14 of the Request for Arbitration came back with a mmpy higher than 6.25 is because Claimants are <u>adding products</u> like NALCO® ASP560 to the Licensed Products without the authorization of HEG and are therefore increasing the corrosive nature of the product as well as causing the product to be DOT corrosive and DOT regulated.

42.     Mr. MacDonald expressed his concerns about the changes being made by FLUID LUX and FLUID ENERGY and the corrosive effect of such changes and also made it very clear that HEG would not accept any legal liability for their actions.  A true and correct copy of such email correspondence is attached hereto as Exhibit "I."

43.     At the beginning of the relationship between the parties, HEG would manufacture the Licensed Products and provide such products to FLUID LUX and FLUID ENERGY for sale.

44.     The Licensed Products as sold to Claimants by Respondent HEG were always considered Non-DOT regulated and below 6.25 mmpy.  Therefore, any issues as it relates to an increase in corrosiveness of the product being DOT regulated are a direct result of Claimants' actions, not Respondents'.

45.     From December 10, 2012 through December 12, 2012, Mr. MacDonald and Mr. Rowley, as officers of HEG, trained Mr. Purdy and Mr. Thatcher on how to create their own manufacturing facility, what reactors they needed to purchase, what pumps they needed to

purchase and exactly how to formulate the Licensed Products using methods that are covered by HEG's patented technology and the Agreements. All such training occurred at HEG's manufacturing facility in Grain Valley, MO, and no FLUID employees other than Mr. Purdy and Mr. Thatcher were present.

46.     From February 17, 2013 through February 19, 2013, Mr. Purdy and Mr. Thatcher visited HEG's manufacturing facility to learn the ins and outs of the process by which the Licensed Products are manufactured and in particular how to react batches.

47.     From April 1, 2013 through April 4, 2013, Mr. Rowley and Mr. Stan Lucas (HEG's Operations Manager) flew to Calgary, Canada to assist Counterclaim Respondents with the set up and installation of their tanks and reactors.  Mr. Rowley and Mr. Lucas worked closely with Mr. Thatcher and Mr. Purdy throughout the process.

48.     From April 14, 2013 through April 17, 2013, Mr. Rowley and Mr. Lucas returned to Calgary, Canada to finalize the installation of the system and to complete the oversight of Counterclaim Respondents' first batch of Licensed Product produced at their facility.  This was done to ensure that Counterclaim Respondents knew exactly how to produce the batches as per the methods contained in HEG's patents and the Agreements between the parties.

49.     From August 18, 2013 through August 20, 2013, Mr. Rowley and Mr. MacDonald visited FLUID ENERGY to inspect the facility to ensure that everything was being done as instructed.

50.     Over the past year, Claimants have committed numerous violations of the Agreements as well as committed other actions, such as investor fraud and breach of fiduciary duty, which are not part of this proceeding, but are relevant nonetheless.  Claimants are now

attempting to claim fraud in the inducement as a way to avoid having to pay all that is owed to HEG and as a way to save face with their shareholders and investors.

51.     As seen in the Audit Report dated January 22, 2014 and attached hereto as Exhibit "J" FLUID has continually violated the Agreements by (1) failing to provide statements within fifteen (15) days after the last day of each month[5]; making late payments and underpayment throughout the 2013 calendar year[6]; failing to meet the minimum production levels for <u>any</u> quarter in the year 2013[7]; and by improperly selling competing goods (Matrix 100[8]).

52.     Additional violations include, but are not limited to:

(a)     Falsely stating "**worldwide" rights** on the <u>www.fluidenergy.com</u> website, when the Agreements between the parties were only for specified territories, not worldwide. *See* Exhibit "K."

(b)     Falsely stating that FLUID had rights to the patented technology in the **United States** when no such rights existed. *See* Exhibit "L."

(c)     Failing to pay past due invoices in the amount of $222,650.00 USD. *See* Exhibit "M."

(d)     Offering for sale and selling the ENVIRO-SYN® patented products outside their territory to ENOVO and North American Chemical, companies in the U.S. *See* Exhibit "N."

(e)     Falsely labeling the Licensed Products as DfE approved when the labels were never approved and FLUID never asked HEG to obtain approvals on the labels. *See* Exhibit "O."

(f)     Falsely inducing investors to invest in FLUID for an amount close to or around $10 million dollars under the guise of an exclusive worldwide license with HEG for the patented ENVIRO-SYN® products when no such worldwide license existed[9];

(g)     Failing to pay HEG royalties in the amount of $648,810.00 USD ;

---

[5] *See* Paragraph 6(a) of the License Agreements.
[6] *See* Paragraphs 6.3 and 6.5 of the Manufacturing Agreement.
[7] *See* Paragraphs 5.1 and 5.2 of the Manufacturing Agreements.
[8] *See* Paragraph 3.2 of the Manufacturing Agreements.
[9] Upon information and belief, Clay Purdy blatantly misrepresented to investors that FLUID had worldwide rights to the patented HEG technology in order to obtain investments in FLUID.

(h)     Falsely stating in a post on the [www.globalpetroleum.com](www.globalpetroleum.com) website that the ENVIRO-SYN® products were "**developed and patented by Fluid Energy Group**" when the ENVIRO-SYN® products were developed and patented by HEG.  *See* Exhibit "P."

(i)     Admitting in email correspondence that the technology is HEG's and acknowledging that FLUID needed to get permission to send out news releases, but then falsely stating in the proposed news release that FLUID has "**exclusive oil & gas industry manufacturing and distribution rights**" in an attempt to garner more investors under false pretenses.  *See* Composite Exhibit "Q[10]."

(j)     Falsely stating on Todnem's website that "Enviro-Syn is the trade name of a line of environmentally and HSE friendly acid and caustic replacements **developed and patented by Fluid Energy Group**."  *See* Exhibit "R."

53.     The FLUID Claimants sent Respondents a letter attempting to rescind the Agreements on April 11, 2014 on an allegation on fraud in the inducement.  A true and correct copy of the letter is attached hereto as Exhibit "S."

54.     Respondent, through the undersigned, responded to the letter refuting the allegations of fraud in the inducement and alleging many of the violations addressed above.  A true and correct copy of the letter is attached hereto as Exhibit "T."

55.     Claimants are trying to pull the wool over this Panel's eyes by falsely claiming fraud in the inducement because it is the only way Claimants can get out of the Agreements that they have repeatedly violated.

56.     After trying to resolve the serious breaches by Claimants to no avail, and after receiving a copy of the Request for Arbitration, on June 12, 2014, Respondents through the undersigned attorney served a Notice of Termination on counsel for Claimants.  A true and correct copy of the Notice of Termination is attached hereto as Exhibit "U."

---

[10] It should be noted that John MacDonald never authorized FLUID to send out this news release.

57.     As per paragraphs 4(c) and 4(d) of the License Agreements and paragraph 14.2(c) of the Manufacturing Agreements, the termination is effective 30 days from June 12, 2014 if Claimants failed to cure such breach.

58.     Claimants failed to respond to the Termination Letter or cure any of the breaches addressed in the letter.

59.     As per paragraphs 4(b) and 22 of the License Agreements, any manufacture, sale or offer for sale of the Licensed Products after July 12, 2014 is not only considered patent infringement, but is breach of the covenant not to compete, which includes a two year non-compete provision.   To the extent that the manufacture and sale also includes the ENVIRO-SYN® mark, it is also trademark infringement.

60.     As admitted to by Claimants and as seen in the Agreements, Respondent HEG agreed to license certain patented technology knows as the "231B1" and "102B1" technologies.

61.     The "231B1" and "102B1" technologies refer to several patents either owned or exclusively licensed by HEG.

62.     The patents are relevant to this case in that they were licensed to Claimants and, since the termination of the Agreements, are currently being infringed by Claimants, Mr. Purdy and Mr. Thatcher through use, sales and offers for sale in the United States.   These patents include, but are not limited to, U.S. Patent Nos. 8,580,047, 8,430,971 and 8,784,573.

63.     HEG is the exclusive licensee to U.S. Patent No. 8,850,047 ("the '047 Patent") titled "Methods for using improved urea hydrochloride compositions."   A true and correct copy of the exclusive license and the '047 Patent are attached hereto and incorporated herein as Exhibits "V" and "W" respectively.

64.     HEG is the exclusive licensee to U.S. Patent No. 8,430,971 ("the '971 Patent") titled "Composition for treatment of drilling fluid and associated methods."   A true and correct copy of the exclusive license and the '971 Patent are attached hereto and incorporated herein as Exhibits "X" and "Y" respectively.

65.     HEG is the exclusive licensee to U.S. Patent No. 8,784,573 ("the '573 Patent") titled "Methods for using improved urea hydrochloride compositions"   A true and correct copy of the exclusive license and the '573 Patent are attached hereto and incorporated herein as Exhibits "Z" and "AA" respectively.

66.     Claimants, through the direction, control, with the financial benefit and with the actual knowledge of Mr. Thatcher, are manufacturing, offering for sale and selling products covered under the '047, '971 and '573 Patents to customers throughout the United States, which infringe one or more of the claims of the '047, '971 and '573 Patents literally and/or through the doctrine of equivalents.

67.     Mr. Thatcher has further induced the Claimants to infringe the '047, '971 and '573 Patents by actively and knowingly aiding and abetting Claimants' infringement.  In light of Mr. Thatcher's conduct alleged herein, Mr. Thatcher was faced with not having a license to use the Licensed Products, yet, in an attempt to prevent the FLUID companies from going under, he induced the companies to infringe the Patents by continuing to manufacture, offer for sale and sell products covered under the '047, '971 and '573 Patents to customers throughout the United States.

68.     Claimants, through the direction, control, with the financial benefit and with the actual knowledge of Mr. Purdy are manufacturing, offering for sale and selling products covered

under the '047, '971 and '573 Patents to customers throughout the United States, which infringe one or more of the claims of the '047, '971 and '573 Patents literally and/or through the doctrine of equivalents.

69.     Mr. Purdy has further induced the Claimants to infringe the '047, '971 and '573 Patents by actively and knowingly aiding and abetting Claimants' infringement.  In light of Mr. Purdy's conduct alleged herein, Mr. Purdy was faced with not having a license to use the Licensed Products, yet, in an attempt to prevent the FLUID companies from going under, he induced the companies to infringe the Patents by continuing to manufacture, offer for sale and sell products covered under the '047, '971 and '573 Patents to customers throughout the United States.

70.     Claimants, through the direction and control, and with the financial benefit and actual knowledge of Mr. Purdy and Mr. Thatcher are using, manufacturing, offering for sale and selling products under HEG's trademarked name ENVIRO-SYN® and have in fact filed for trademark registrations for ENVIRO-SYN in the United States.  Mr. Purdy and Mr. Thatcher were the moving force behind the infringing use of the mark.  True and correct copies of Claimants' unauthorized use of the ENVIRO-SYN® mark and trademark applications are attached hereto as Composite Exhibit "BB."   Note that Mr. Purdy signed both applications and falsely declared that "no other person, firm, corporation, or association has the right to use the mark in commerce […]," knowing full well that HEG owned the ENVIRO-SYN® mark and had actually licensed it for Claimants' use.

71.     Claimants, through the direction and control, and with the financial benefit and actual knowledge of Mr. Purdy and Mr. Thatcher are also continuing to utilize certain videos on

their website at the following link http://www.fluidenergygroup.com/about-us/video-gallery/, which were created during the licensed period utilizing the Licensed Products.  Such videos are now false and misleading in that Claimants are attempting to pass off their products as genuine HEG products when in fact they are not.

72.      FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's use of the ENVIRO-SYN® mark in association with the sale of infringing products is not authorized or licensed.

73.      Respondent has been damaged as a result of Claimants' activities described herein.

74.      Respondent has performed all conditions precedent to be performed by Respondent or the conditions have occurred.  Respondent has been forced to retain the law firm of Beusse Wolter Sanks & Maire, P.A. for representation in this action.

## CLAIM I
## BREACH OF CONTRACT
## (Against FLUID ENERGY)

75.      HEG hereby adopts and re-alleges paragraphs 1-12, 16-20, 24-59, 66-74 above as fully and completely as if set forth herein.

76.      HEG and FLUID ENERGY entered into one Manufacturing Agreement and two License Agreements pertaining to the manufacture and sale of certain Licensed Products.

77.      FLUID ENERGY, as described in more detail above, breached the following provisions of the Fluid Energy Manufacturing Agreement:

a.  Section 2.5- FLUID ENERGY breached Section 2.5 of the Manufacturing Agreement by marketing and selling the Licensed Products outside of FLUID

ENERGY's territory without the written consent of HEG and during the term of the Agreement.

b. <u>Section 2.10-</u>   FLUID ENERGY breached Section 2.10 of the Manufacturing Agreement by conducting unauthorized testing from a third-party laboratory without prior approval from HEG.

c. <u>Section 3.2-</u>   FLUID ENERGY breached Section 3.2 of the Manufacturing Agreement by selling competitive goods during the term of the Agreements.

d. <u>Section 5.1-</u>   FLUID ENERGY breached Section 5.1 of the Manufacturing Agreement by failing to meet the quota of $1,000,000 worth of Licensed Products sold for the year 2013.

e. <u>Section 5.2-</u> FLUID ENERGY breached Section 5.2 of the Manufacturing Agreement by failing to meet the quotas, failing to amend its rights to non-exclusive rights as per 5.2(b) for 2014, failing to make payment equal to the shortfall of such quota to maintain exclusive rights as per 5.2(a) for 2014, while at the same time representing to investors, customers, dealers and via the web that FLUID ENERGY maintained exclusive rights.

f. <u>Section 6.3-</u> FLUID ENERGY breached Section 6.3 of the Manufacturing Agreement by failing to make payments within 30 days of the date of invoice.

g. <u>Section 6.5</u> FLUID ENERGY breached Section 6.5 of the Manufacturing Agreement by failing to pay 8.0% interest on all overdue balances outstanding.

h.  Section 11.1 FLUID ENERGY breached Section 11.1 of the Manufacturing Agreement by improperly and without authorization obtaining a trademark registration in Canada for ENVIRO-SYN as well as filing trademark applications in the U.S. for ENVIRO-SYN.

i.  Section 11.2 FLUID ENERGY breached Section 11.2 of the Manufacturing Agreement by improperly telling investors and potential investors that FLUID ENERGY was the owner of the Patents and Licensed Technology as well as attempting to sell such Licensed Products outside of FLUID ENERGY's licensed territory.

78.  FLUID ENERGY, as described in more detail above breached the following provisions of the Fluid Energy License Agreements:

a.  Section 4(B) and 22 – FLUID ENERGY breached Sections 4(B) and 22 by making, using, selling and offering to sell the Licensed Products after July 12, 2014 in breach of the two year non-compete provision.

b.  Section 5(A) FLUID ENERGY breached Section 5(A) of the License Agreements by failing to pay royalties for the months of January – June, 2014 and failing to meet the sales minimum by the deadline of December 31, 2013.

c.  Section 6(A) FLUID ENERGY breached Section 6(A) of the License Agreements by failing to furnish HEG written statements under oath specifying the total number of products sold during the preceding month for the months of October 2012-December 2013 and March-June of 2014.

d. <u>Section 6(B)</u> FLUID ENERGY breached Section 6(B) of the License Agreements by failing to make royalty payments for the months of January – June, 2014.

79.     HEG has performed all conditions precedent to bring this cause of action or all of the conditions have occurred.

80.     As a direct and proximate result of FLUID ENERGY's breach of the provisions outlined above, HEG has suffered loss and damage.

81.     HEG has been damaged in an amount that is at least equal to $1,873,755.67 which takes into account the four (4) invoices totaling $224,945.67[11], unpaid royalties to date amounting $648,810.00 and the unpaid exclusivity fee of $1,000,000.00.

WHEREFORE, HEG prays for the following relief against FLUID ENERGY:

a.     That FLUID ENERGY be required to pay HEG the actual damages suffered as a result of the breach, including, but not limited to, all royalties due and owing, all payments for products received, the unpaid exclusivity fee and any other damages as a result of Claimants' conduct.

b.     That HEG recover its costs associated with this proceeding, including the arbitrators' fees, costs of any experts or any other assistance required by the tribunal and fees and expenses of the administrator as per Article 37(4).

c.     That HEG recover pre-award and post-judgment interest at the amount allowed under the Agreements (8.0%).

---

[11] True and correct copies of the invoices are attached hereto as Exhibit CC.

d.      That HEG be provided such further and other relief as this tribunal deems just and proper.

**CLAIM II**
**BREACH OF CONTRACT**
**(Against FLUID LUX)**

82.     HEG hereby adopts and re-alleges paragraphs 1-12, 16-20, 24-59, 66-74 above as fully and completely as if set forth herein.

83.     HEG and FLUID LUX entered into one Manufacturing Agreement and two License Agreements pertaining to the manufacture and sale of certain Licensed Products.

84.     FLUID LUX, as described in more detail above breached the following provisions of the Fluid Lux Manufacturing Agreement:

a.      Section 2.5- FLUID LUX breached Section 2.5 of the Manufacturing Agreement by marketing and selling the Licensed Products outside of FLUID LUX's territory without the written consent of HEG and during the term of the Agreement.

b.      Section 2.10- FLUID LUX breached Section 2.10 of the Manufacturing Agreement by conducting unauthorized testing from a third-party laboratory without prior approval from HEG.

c.      Section 3.2- FLUID LUX breached Section 3.2 of the Manufacturing Agreement by selling competitive goods during the term of the Agreements.

d.      Section 5.1- FLUID LUX breached Section 5.1 of the Manufacturing Agreement by failing to meet the quota of $1,000,000 worth of Licensed Products sold for the year 2013.

21

e. <u>Section 5.2-</u> FLUID LUX breached Section 5.2 of the Manufacturing Agreement by failing to meet the quotas, failing to amend its rights to non-exclusive rights as per 5.2(b) for 2014, failing to make payment equal to the shortfall of such quota to maintain exclusive rights as per 5.2(a) for 2014, while at the same time representing to investors, customers, dealers and via the web that FLUID LUX maintained exclusive rights.

f. <u>Section 6.3-</u> FLUID LUX breached Section 6.3 of the Manufacturing Agreement by failing to make payments within 30 days of the date of invoice.

g. <u>Section 6.5</u> FLUID LUX breached Section 6.5 of the Manufacturing Agreement by failing to pay 8.0% interest on all overdue balances outstanding.

h. <u>Section 11.2</u> FLUID LUX breached Section 11.2 of the Manufacturing Agreement by improperly telling investors and potential investors that FLUID LUX was the owner of the Patents and Licensed Technology as well as attempting to sell such Licensed Products outside of FLUID LUX's licensed territory.

85.    FLUID LUX, as described in more detail above breached the following provisions of the Fluid Lux License Agreements:

a. <u>Section 4(B) and 22 –</u> FLUID LUX breached Sections 4(B) and 22 by making, using, selling and offering to sell the Licensed Products after July 12, 2014 in breach of the two year non-compete provision.

     b.   <u>Section 5(A)</u> FLUID LUX breached Section 5(A) of the License Agreements by failing to pay royalties for the months of January – June, 2014 and failing to meet the sales minimum by the deadline of December 31, 2013.

     c.   <u>Section 6(A)</u> FLUID LUX breached Section 6(A) of the License Agreements by failing to furnish HEG written statements under oath specifying the total number of products sold during the preceding month for the months of October 2012-December 2013 and March-June of 2014.

     d.   <u>Section 6(B)</u> FLUID LUX breached Section 6(B) of the License Agreements by failing to make royalty payments for the months of January – June, 2014.

86.    HEG has performed all conditions precedent to bring this cause of action or all of the conditions have occurred.

87.    As a direct and proximate result of FLUID LUX's breach of the provisions outlined above, HEG has suffered loss and damage.

88.    HEG has been damaged in amount that is at least equal to $1,873,755.67 which takes into account the 4 invoices totaling $224,945.67[12], unpaid royalties to date amounting $648,810.00 and the unpaid exclusivity fee of $1,000,000.00.

WHEREFORE, HEG prays for the following relief against FLUID LUX:

     a.   That FLUID LUX be required to pay HEG the actual damages suffered as a result of the breach, including, but not limited to, all royalties due and owing, all payments for products received, the unpaid exclusivity fee and any other damages as a result of Claimants' conduct.

---

[12] True and correct copies of the invoices are attached hereto as Exhibit CC.

b.      That HEG recover its costs associated with this proceeding, including the arbitrators' fees, costs of any experts or any other assistance required by the tribunal and fees and expenses of the administrator as per Article 37(4).

c.      That HEG recover pre-award and post-judgment interest at the amount allowed under the Agreements (8.0%).

d.      That HEG be provided such further and other relief as this tribunal deems just and proper.

## CLAIM III
## PATENT INFRINGEMENT (the '047 PATENT)
## (Against FLUID ENERGY, FLUID LUX, MR. PURDY and MR. THATCHER)

89.      HEG hereby adopts and re-alleges paragraphs 1-15, 37-74 above as fully and completely as if set forth herein.

90.      HEG is the exclusive licensee to United States Patent No. 8,580,047 ("the '047 Patent") at all times material hereto.   *See* Exhibit "W."

91.      The '047 Patent covers methods for improved urea hydrochloride compositions.

92.      Claimants, FLUID LUX and FLUID ENERGY, through the participation, direction, control and with the financial benefit and actual knowledge of Mr. Purdy and Mr. Thatcher are making, using, selling and offering for sale products that are produced using methods disclosed and claimed in the '047 Patent, without the authorization of HEG, in violation of 35 U.S.C. §§271(a), (b), and (g).

93.      Mr. Purdy and Mr. Thatcher actively and knowingly induced the infringement alleged in Paragraph 92 by aiding and abetting FLUID LUX's and FLUID ENERGY's infringement.

94.     FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's aforesaid activities have been without authority and/or license from HEG and are considered intentional and willful.

95.     HEG is entitled to recover from the FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher the damages sustained by HEG as a result of the wrongful acts alleged herein in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this tribunal under 35 U.S.C. § 284.

96.     FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's infringement of HEG's exclusive rights under the '047 Patent will continue to damage HEG, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this tribunal.

WHEREFORE, HEG respectfully requests the following relief against Counterclaim Respondents.

a.     That Counterclaim Respondents and all employees, independent contractors, agents or those acting in concert be preliminarily and permanently enjoined from:

i.  Making, using, offering for sale or selling synthetic acid replacements utilizing the methods claimed in the '047 Patent;

ii.  Otherwise infringing on the '047 Patent.

b.     That Counterclaim Respondents be ordered to pay compensatory damages to HEG pursuant to 35 U.S.C. §284.

c.     That HEG be entitled to enhancement of damages against Counterclaim Respondents pursuant to 35 U.S.C. §284.

d.      That HEG be awarded its reasonable attorneys' fees and costs pursuant to 35 U.S.C. §285 and Federal Rule of Civil Procedure 54(d).

e.      That HEG be awarded prejudgment and post judgment interest.

f.      That this tribunal provides such other and further relief that it deems necessary and reasonable.

**CLAIM IV**
**PATENT INFRINGEMENT (the '971 PATENT)**
**(Against FLUID ENERGY, FLUID LUX, MR. PURDY and MR. THATCHER)**

97.      HEG hereby adopts and re-alleges paragraphs 1-15, 37-74 above as fully and completely as if set forth herein.

98.      HEG is the exclusive licensee to United States Patent No. 8,430,971 ("the '971 Patent") at all times material hereto.  *See* Exhibit "Y."

99.      The '971 Patent covers compositions for treatment of a drilling fluid and associated methods therewith.

100.      Claimants, FLUID LUX and FLUID ENERGY, through the participation, direction, control and with the financial benefit and actual knowledge of Mr. Purdy and Mr. Thatcher are making, using, selling and offering for sale products that are produced using methods disclosed and claimed in the '971 Patent, without the authorization of HEG, in violation of 35 U.S.C. §§271(a), (b), and (g).

101.      Mr. Purdy and Mr. Thatcher actively and knowingly induced the infringement alleged in Paragraph 100 by aiding and abetting FLUID LUX's and FLUID ENERGY's infringement.

102.    FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's aforesaid activities have been without authority and/or license from HEG and are considered intentional and willful.

103.    HEG is entitled to recover from the FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher the damages sustained by HEG as a result of the wrongful acts alleged herein in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this tribunal under 35 U.S.C. § 284.

104.    FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's infringement of HEG's exclusive rights under the '971 Patent will continue to damage HEG, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this tribunal.

WHEREFORE, HEG respectfully requests the following relief against Counterclaim Respondents.

a.    That Counterclaim Respondents and all employees, independent contractors, agents or those acting in concert be preliminarily and permanently enjoined from:

i.   Making, using, offering for sale or selling synthetic acid replacements utilizing the methods claimed in the '971 Patent;

ii.   Otherwise infringing on the '971 Patent.

b.    That Counterclaim Respondents be ordered to pay compensatory damages to HEG pursuant to 35 U.S.C. §284.

c.    That HEG be entitled to enhancement of damages against Counterclaim Respondents pursuant to 35 U.S.C. §284.

      d.      That HEG be awarded its reasonable attorneys' fees and costs pursuant to 35 U.S.C. §285 and Federal Rule of Civil Procedure 54(d).

      e.      That HEG be awarded prejudgment and post judgment interest.

      f.      That this tribunal provides such other and further relief that it deems necessary and reasonable.

**CLAIM V**
**PATENT INFRINGEMENT (the '573 PATENT)**
**(Against FLUID ENERGY, FLUID LUX, MR. PURDY and MR. THATCHER)**

105.    HEG hereby adopts and re-alleges paragraphs 1-15, 37-74 above as fully and completely as if set forth herein.

106.    HEG is the exclusive licensee to United States Patent No. 8,784,573 ("the '573 Patent") at all times material hereto. *See* Exhibit "AA."

107.    The '573 Patent covers methods for using improved urea hydrochloride compositions.

108.    Claimants, FLUID LUX and FLUID ENERGY, through the participation, direction, control and with the financial benefit and actual knowledge of Mr. Purdy and Mr. Thatcher are making, using, selling and offering for sale products that are produced using methods disclosed and claimed in the '573 Patent, without the authorization of HEG, in violation of 35 U.S.C. §§271(a), (b), and (g).

109.    Mr. Purdy and Mr. Thatcher actively and knowingly induced the infringement alleged in Paragraph 108 by aiding and abetting FLUID LUX's and FLUID ENERGY's infringement.

110.    FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's aforesaid activities have been without authority and/or license from HEG and are considered intentional and willful.

111.    HEG is entitled to recover from the FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher the damages sustained by HEG as a result of the wrongful acts alleged herein in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this tribunal under 35 U.S.C. § 284.

112.    FLUID LUX, FLUID ENERGY, Mr. Purdy and Mr. Thatcher's infringement of HEG's exclusive rights under the '573 Patent will continue to damage HEG, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this tribunal.

WHEREFORE, HEG respectfully requests the following relief against Counterclaim Respondents.

a.    That Counterclaim Respondents and all employees, independent contractors, agents or those acting in concert be preliminarily and permanently enjoined from:

    i.   Making, using, offering for sale or selling synthetic acid replacements utilizing the methods claimed in the '573 Patent;

    ii.  Otherwise infringing on the '573 Patent.

b.    That Counterclaim Respondents be ordered to pay compensatory damages to HEG pursuant to 35 U.S.C. §284.

c.    That HEG be entitled to enhancement of damages against Counterclaim Respondents pursuant to 35 U.S.C. §284.

d.      That HEG be awarded its reasonable attorneys' fees and costs pursuant to

35 U.S.C. §285 and Federal Rule of Civil Procedure 54(d).

e.      That HEG be awarded prejudgment and post judgment interest.

f.      That this tribunal provides such other and further relief that it deems

necessary and reasonable.

**CLAIM VI**
**TRADEMARK INFRINGEMENT UNDER 15 U.S.C. §1114**
**(Against FLUID ENERGY, FLUID LUX, MR. PURDY and MR. THATCHER)**

113.    HEG hereby adopts and re-alleges paragraphs 1-15, 19-24, 66-74 above as fully

and completely as if set forth herein.

114.    Respondent HEG is the owner of all right, title, and interest in U.S. Trademark

Reg. No. 4,224,628 for ENVIRO-SYN®.

115.    Claimants were previously licensed to use the mark ENVIRO-SYN® mark in

connection with the promotion, advertising, sale, and offering of the Licensed Products for sale,

but such license was revoked on June 12, 2014 as found in the Termination Letter attached

hereto as Exhibit "U."

116.    Claimants' use in commerce of the identical mark ENVIRO-SYN® in association

with identical goods is likely to cause confusion among consumers and has in fact already caused

confusion in that customers believe they are receiving the true ENVIRO-SYN® licensed

products when in fact this is not true.

117.    Claimants' use of the mark has been at the direction, control and financial benefit

of Mr. Purdy and Mr. Thatcher, and they were the moving force behind the infringing use of the

mark.

118.    As a direct and proximate result of Claimants' infringing use of the ENVIRO-SYN® mark, Claimants have caused Respondent to lose profits, and to lose goodwill associated with the ENVIRO-SYN® mark.

119.    Respondent HEG will be irreparably damaged by continued loss of profits, loss of goodwill and loss of control over the reputation of the ENVIRO-SYN® mark unless FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy are prevented from continuing to promote, advertise, sell or to offer the no longer Licensed Products with the identical ENVIRO-SYN mark.

120.    FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy have thereby created a likelihood of confusion in the market place that will continue and increase if FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy are permitted to continue their unauthorized use and misappropriation of Respondent's ENVIRO-SYN® trademark.

121.    FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy continued to use the ENVIRO-SYN® trademark after such license was terminated and have thereby infringed Respondent's mark willfully and with wanton disregard of Respondent's rights, and will continue to do so unless enjoined.

122.    Once FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's infringing conduct was brought to their attention by HEG; FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy refused to stop using the ENVIRO-SYN® mark and made a deliberate decision to continue using the ENVIRO-SYN® mark to advertise, promote, offer for sale, and sell their infringing goods.

123.   FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's use and continued use of the ENVIRO-SYN mark is willful, wanton, and shows a reckless disregard for HEG's rights.

124.   HEG has been damaged and is likely to be further damaged by FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's infringing acts, and that damage will be irreparable unless Claimants' conduct is enjoined.

WHEREFORE, HEG respectfully requests the following relief against Counterclaim Respondents.

a.   That Counterclaim Respondents and all employees, independent contractors, agents or those acting in concert be preliminarily and permanently enjoined from:

   i.   Using the ENVIRO-SYN® mark or any mark that is confusingly similar thereto in association with the advertising, promotion, offering for sale or sale of synthetic acid replacements or any products similar thereto;

   ii.   Otherwise infringing on the ENVIRO-SYN® mark.

b.   That Counterclaim Respondents be ordered to pay all profits received by Counterclaim Respondents as a result of the infringing activity and compensate HEG for any damages sustained pursuant to 15 U.S.C. §1117.

c.   That the tribunal award HEG treble damages because of the intentional and willful acts set forth herein pursuant to 15 U.S.C. §1117(a).

d.   That this case be deemed exceptional and Counterclaim Respondents be ordered to pay HEG reasonable attorney's fees pursuant to 15 U.S.C. §1117(a).

e.      That this tribunal provides such other and further relief that it deems necessary and reasonable.

## COUNT VII
## (TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION UNDER 15 U.S.C. §1125(a))

125.    Respondent HEG re-alleges each and every allegation set forth in 1-15, 19-24, 50-74 above, as if fully set forth herein.

126.    Respondent HEG has used the ENVIRO-SYN® mark in interstate commerce to advertise, promote, and distinctly identify its synthetic acid goods since at least as early as November of 2010.

127.    FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's continued to use the ENVIRO-SYN® mark to promote their infringing goods after the license was revoked on June 12, 2014 constitutes trademark infringement and unfair competition, and such use of the mark has been at the direction, control and financial benefit of Mr. Purdy and Mr. Thatcher, who were the moving force behind the infringing use of the mark.

128.    Respondent's use of the ENVIRO-SYN® mark in interstate commerce pre-dates FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's adoption and use of the ENVIRO-SYN® mark.

129.    FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's  unauthorized use of the ENVIRO-SYN® mark is likely to cause confusion, mistake, or to deceive customers as to Respondent's affiliation, connection, association, sponsorship, or approval of FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's goods.

130.    Respondent has been damaged and is likely to be further damaged by FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's infringing acts, and that damage will be irreparable unless such conduct is enjoined.

131.    Once FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's infringing conduct was brought to their attention by HEG, FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy refused to stop using the ENVIRO-SYN® mark and made a deliberate decision to continue using the ENVIRO-SYN® mark to advertise, promote, offer for sale, and sell their infringing goods.

132.    FLUID LUX, FLUID ENERGY, Mr. Thatcher and Mr. Purdy's use and continued use of the ENVIRO-SYN® mark is willful, wanton, and shows a reckless disregard for Respondent's rights.

WHEREFORE, HEG respectfully requests the following relief against Counterclaim Respondents.

a.    That Counterclaim Respondents and all employees, independent contractors, agents or those acting in concert be preliminarily and permanently enjoined from:

i.   Using the ENVIRO-SYN® mark or any mark that is confusingly similar thereto in association with the advertising, promotion, offering for sale or sale of synthetic acid replacements or any products similar thereto;

ii.  Otherwise infringing on the ENVIRO-SYN® mark.

b. That Counterclaim Respondents be ordered to pay all profits received by Counterclaim Respondents as a result of the infringing activity and compensate HEG for any damages sustained pursuant to 15 U.S.C. §1117.

c. That the tribunal award HEG treble damages because of the intentional and willful acts set forth herein pursuant to 15 U.S.C. §1117(a).

d. That this case be deemed exceptional and Counterclaim Respondents be ordered to pay HEG reasonable attorney's fees pursuant to 15 U.S.C. §1117(a).

e. That this tribunal provides such other and further relief that it deems necessary and reasonable.

DATED this 8th day of August, 2014.

Respectfully submitted,

BEUSSE WOLTER SANKS & MAIRE, P.A.
390 North Orange Avenue, Suite 2500
Orlando, Florida 32801
Telephone: (407)  926-7700
Facsimile: (407)  926-7720
Email:  adavis@iplawfl.com
Email:  kwimberly@iplawfl.com
Attorneys for Respondents

By: /s/ Amber N. Davis
   Amber N. Davis
   Florida Bar No.: 26628
   Kevin W. Wimberly
   Florida Bar No.  57977

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been mailed and emailed to Torys, LLP c/o David Wawro, Esq. (dwawro@torys.com) and Jaclyn Leader

(jleader@torys.com) 1114 Avenue of the Americas, 23rd Floor, New York, NY 10036 and five

(5) hard copies have been mailed to the International Chamber of Commerce (ICC) c/o Sicana,

Inc., 1212 Avenue of the Americas, New York, NY 10036 and emailed to ica9@iccwbo.org

this 8th day of August, 2014.

/s/ Amber N. Davis
Attorney

# EXHIBIT "A"



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu May 1 03:22:34 EDT 2014*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
|---|---|---|---|---|---|---|---|---|---|

| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |
|---|---|---|---|---|

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [         ] OR | Jump | to record: [         ]    **Record 3 out of 3**

TSDR | ASSIGN Status | TTAB Status    *( Use the "Back" button of the Internet Browser to return to TESS)*

# ENVIRO-SYN

| Word Mark | **ENVIRO-SYN** |
|---|---|
| Goods and Services | IC 001. US 001 005 006 010 026 046. G & S: Synthetic replacement for acids, namely, hydrochloric, phosphoric, hydrofluoric, sulfuric, acetic, and formic acids used in dissolving and removing mineral deposits. FIRST USE: 20111202. FIRST USE IN COMMERCE: 20111202 |
| Standard Characters Claimed | |
| Mark Drawing Code | (4) STANDARD CHARACTER MARK |
| Serial Number | 85500596 |
| Filing Date | December 21, 2011 |
| Current Basis | 1A |
| Original Filing Basis | 1A |
| Published for Opposition | July 31, 2012 |
| Registration Number | 4224628 |
| Registration Date | October 16, 2012 |
| Owner | (REGISTRANT) Heartland Solutions, Inc. CORPORATION MISSOURI P.O. Box 543 Grain Valley MISSOURI 64029 |
| | (LAST LISTED OWNER) HEARTLAND ENERGY GROUP, LTD. CORPORATION SEYCHELLES OLIAJI TRADE CENTER, FRANCIS RACHEL STREET SUITE 15, 1ST FLOOR VICTORIA, MAHE SEYCHELLES |

| Assignment Recorded | ASSIGNMENT RECORDED |
|---|---|
| Attorney of Record | Timothy D. Steffens |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |



# EXHIBIT "B"



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu May 1 03:22:34 EDT 2014*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |

| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [       ] OR | Jump | to record: [       ] **Record 8 out of 35**

TSDR | ASSIGN Status | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# syntech

**Word Mark** **SYNTECH**

**Goods and Services** IC 001. US 001 005 006 010 026 046. G & S: synthetic acid in the nature of chemicals for use in the preparation of food, namely, chemical additives for use in the manufacture of food, chemical preparations for cleaning purposes in the food and food processing industries, chemical products for the fresh-keeping and preserving of food; synthetic acid in the nature of chemicals for use in the manufacture of fruit and vegetable peeling solutions; synthetic fatty acids for use as a food additive; synthetic hydrochloric acid for use in industry, namely, for use in the mining industry, oil drilling and processing industry, concrete and cement industry, aviation industry, waste management industry, and construction industry; synthetic mineral acids for use in industry, namely, synthetic phosphoric acid, synthetic iodic acid, synthetic carbonic acid, synthetic chlorosuphonic acid, synthetic chlorinated acids, synthetic methacrylic acid, all for use in the mining industry, oil drilling and processing industry, aviation industry, waste management industry, concrete and cement industry, and construction industry; waste management products, namely, chemicals for treating hazardous waste, and waste water treatment chemicals for industrial use; marine products, namely, chemical agents used in treating marine bilge water; aviation products, namely, adhesives for use in industrial use in the field of aviation excluding floor, wood, wood working, windows and building construction; construction products, namely, soil stabilizers for use in road construction, and waterproofing membranes in liquid chemical form for use in construction. water treatment products, namely, phosphates for potable water treatment, water treatment chemicals in the nature of sizing agents, waste water treatment chemicals for industrial use; building maintenance products, namely, chemical sealants used for building which penetrate through walls, floors, and ceilings for fire prevention; cleaning products, namely, surface coating removal chemicals and tank surface and media cleaning chemicals for municipal water systems, fabric protectant for commercial dry cleaning use. FIRST USE: 20010101. FIRST USE IN COMMERCE: 20010101

IC 002. US 006 011 016. G & S: construction products, namely, water based fire retardant coatings for building construction materials excluding floor coatings; wood preservatives for fences. FIRST USE: 20010101. FIRST USE IN COMMERCE: 20010101

IC 005. US 006 018 044 046 051 052. G & S: Waste management products, namely, microbiocides for industrial and institutional manufacturing processes and wastewater applications. FIRST USE: 20010101. FIRST USE IN COMMERCE: 20010101

| | |
|---|---|
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 77687903 |
| **Filing Date** | February 11, 2009 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | April 26, 2011 |
| **Registration Number** | 4166119 |
| **Registration Date** | July 3, 2012 |
| **Owner** | (REGISTRANT) Environmental Manufacturing Solutions, LLC LIMITED LIABILITY COMPANY FLORIDA 7705 Progress Circle Melbourne FLORIDA 32904 |
| | (LAST LISTED OWNER) GREEN PRODUCTS & TECHNOLOGIES, LLC LIMITED LIABILITY COMPANY FLORIDA 7705 PROGRESS CIRCLE MELBOURNE FLORIDA 32904 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Amber N. Davis, Esq. |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |



# EXHIBIT "C"

# *Enviro-Syn HCR 1050- CONCENTRATE KIT*

## Blending Directions:

Recommended Ratio for Acid Fracing: 1:1

Add 1.0 m³ of $H_2O$ and 1.0 m³ of Enviro-Syn HCR 1050 into an approved tank. Mix product thoroughly for approximately 30 minutes using an air diaphragm style or centrifugal pump.

Each concentrated kit will yield ~ 2.0 m³.

Blending ratios may vary based on specific applications and recommendations from your consultants at Fluid Energy Group Ltd.

**BATCH BLEND ONLY; NOT FOR RESALE**

**WARNING!**
When pumping this product it is strongly recommend to use manufacturer approved hose couplings or fittings. DO NOT USE ALUMINUM FITTINGS.

**Net Contents : BULK LOAD**

## Description:

Enviro-Syn HCR 1050 is part of the environmentally safe synthetic acid replacement product line that has comparable solubilising abilities of Hydrochloric acid, without the extremely hazardous properties. Enviro-Syn HCR 1050 contains no conventional acids and will not promote corrosion, yet will effectively attack multiple forms of carbonate based scale/mineral build-up, and formation matrices  Enviro-Syn HCR 1050 is non-regulated for transportation/handling, is non-toxic, non-fuming, and will not corrode or rust metals.  With its' base patented ingredient of SynTech®, Enviro-Syn HCR 1050 is an extremely safe replacement for most Hydrochloric acid blends, and can be enhanced through the addition of synthetic surfactants



ENERGY GROUP LTD.

**Exclusively Distributed By:**
**Fluid Energy Group Ltd**
**1208, 144 – 4th Ave SW**
**Calgary, Alberta T2P 3N4**
**P: 403-999-6200**
**www. fluidenergygroup.com**

## First Aid & Guarantee

First Aid

If swallowed, drink two glasses of water. In case of eye contact, flush with water for two minutes. If symptoms persist, seek medical advice. In case of skin contact, wash thoroughly with soapy water. As with all chemicals, keep out of reach of children

**For Commercial and Industrial Use Only**

Guarantee

This product is guaranteed to be free from defects, true to it's contents, free from urea hydrochloride salts, other organic salts, Hydrofluoric acid and other traditional acids.

In case of emergency call 1-800-424-9300

**Health:0, Flammability:0, Reactivity:0**



# EXHIBIT "D"

----- Original Message -----
From: "Darren Thatcher" <d.thatcher@fluidenergygroup.com>
To: <steve@heartland-solutions.com>
Cc: "John MacDonald" <jmac@enviromfg.com>
Sent: Wednesday, October 24, 2012 11:26 AM
Subject: CT Presentation

Steve, here is the CT presentation I did last week.

Darren Thatcher, C.E.T.
President & COO
Fluid Energy Group Ltd.
#104, 214 - 11th Ave SE
Calgary, AB, Canada T2G 0X8
403.999.6200
www.fluidenergygroup.com<http://www.fluidenergygroup.com/>

P Please consider the environment before printing this e-mail
Disclaimer - This email and any files transmitted with it are confidential
and contain privileged or copyright information. You must not present this
message to another party without gaining permission from the sender. If you
are not the intended recipient you must not copy, distribute or use this
email or the information contained in it for any purpose other than to
notify us. If you have received this message in error, please notify the
sender immediately, and delete this email from your system. We do not
guarantee that this material is free from viruses or any other defects
although due care has been taken to minimize the risk.

1



# Benefits of Using an Environmentally Friendly Synthetic Acid in CT Operations

October 18, 2012



ENERGY GROUP LTD.

# The 'Enviro-Syn' Product Line of Synthetic Replacement Chemistries

- EPA - DfE Approved, FDA - GRAS
- Non-Regulated & Non-Hazardous
    - Non-Toxic
    - Non-Corrosive
    - Non-Fuming
- Environmentally Responsible
    - <10 day Biodegradable






# **Enviro-Syn** – Products Overview

- HCR
    - Hydrochloric Acid Replacement
- HSR
    - Sulphuric Acid Replacement
- CSR
    - Caustic Solution Replacement
- HFR
    - Hydrofluoric Acid Replacement
- ACT
    - Active Microbial Agent



## **Enviro-Syn –** Quality Control

- Synthetically Manufactured
  - Accurate process control measures
  - NO by-products or contaminants
  - Consistent strength
  - Titration qualified
- No Supply Constraints
  - No transportation limitations
  - No volume restrictions



# **Enviro-Syn HCR –** FAQ

## Q – What is it?

A – Enviro-Syn HCR is a patented, synthetic (man-made) product that has similar solubilizing properties of Hydrochloric Acid without the extremely high rates of corrosion and reactivity.

## Q – Is it an Acid?

A – HCR is a hybrid solution that falls between how a high strength mineral acid and a low strength organic acid would react. It can be referred to as a Synthetic Acid.

# **Enviro-Syn HCR** – FAQ

## Q – How does it work?

A – Enviro-Syn HCR is basically a super-concentrated solution of Hydrogen ($H^+$). It has a stronger bond to the $H^+$ ion than what a HCl molecule does, and therefore creates a more controlled reaction rate. Not allowing the $H^+$ ion to easily react in the presence of Carbonates ($CaCO_3$) or Iron (Fe) is what generates the slower spend and extremely low corrosion properties.

# **Enviro-Syn HCR –** FAQ

Q – What precautions (if any) should be taken with pumping the product?

A – HCR is a very low pH chemical that is designed to clean metal surfaces, dissolve carbonate, and will react with certain soft metals such as Aluminum and Magnesium. Caution should be taken to ensure that when loading, unloading, or pumping that only acid approved hose, pumps, and piping are utilized.

Q – What should the HCR be stored in?

A – Enviro-Syn HCR can be stored in approved plastic/fiberglass containers, fiberglass lined acid tanks, lined steel tanks (short term), or even large scale fluid storage systems.

# **Enviro-Syn HCR –** HS&E Properties

- Environmentally Safe
  - 100% Biodegradable
    - COD = 11,000 mg/L
      - » *Citric Acid > 2,000,000 mg/L*
    - BOD 150 mg/L at 5 days
  - Non-Toxic
    - LC50 of >700 mg/L
      - » *HCl acid ±4 mg/L*
    - LD50 of 1973 mg/kg
      - » *HCl acid ±90 mg/kg*
  - Not Mutagenic

# **Enviro-Syn HCR –** HS&E Properties

- **Exposure Safe**
  - Non-Fuming
  - Non-Destructive on human skin
    - — Primary Irritation score of 1.7 (very mild irritant)
      - » *HCl acid - moderate to severe irritant*
  - Non-Destructive on eye tissues
    - — Primary Irritation score of 12.3 (practically non-irritating)
      - » *HCl acid - severely irritating/corrosive*

*Note on all HCl MSDS - "Hydrochloric acid is corrosive to the eyes, skin, and mucous membranes"*

# **Enviro-Syn HCR –** Performance Properties

- Effectively and immediately attacks carbonate based scales, minerals, and formation matrices
- Inherent methodical spending nature
    - Extended placement time through coil
    - Deeper formation penetration
    - Less precipitate/solids formation
- Particularly low corrosion rates



# Penetration Ability @ 60°C



## Penetration Ability @ 85°C

# **Enviro-Syn HCR –** Dissolving Properties

| Acid Type | % Dissolved of Conglomerate $CaCO_3$ | % Dissolved of Conglomerate $MgCO_3$ |
|---|---|---|
| Enviro-Syn HCR | 100% | 21% |
| 50% Enviro-Syn HCR | 97% | 26% |
| 30% Enviro-Syn HCR | 54% | 20% |
| 15% HCl Acid Blend | 87% | 24% |
| 15% Acetic Acid | 63% | 7% |

Each test above was conducted with 1 cubic inch of material placed in 50 ml of solution and allowed to soak for 8 hours at 40°C  (100°F)



# Filter Cake Removal – polymer deposited for 2 hours



Enzyme product after 16 hrs



15% HCR after 16 hrs



20% HCR after 16 hrs

# **Enviro-Syn HCR –** Corrosion Properties

- Excellent high temperature corrosion resistance
  - Less required corrosion inhibition
- Superior long term corrosion control (w/o inhibitor)
- Non-regulated for transportation & handling
  - Well below 6.25 mm/year limit at 55°C (130°F)

# **Enviro-Syn HCR** – NACE Corrosion Testing



**Test:** Immersion Corrosion Testing of Metal

**Applicable Standard:** ASTM G31-72 and NACE Standard TM0169-76

- Each container held a volume of 1170 g of Enviro-Syn HCR
- The temperature of the solution was maintained at 55°C for the duration
- The test was conducted For a period of 72 hours

**Results of SAE C1020 Steel & 7075-T6 non-clad Aluminum:**

- Neither sample exhibited discoloration, and no pitting was observed
- The corrosion rate based on the 72 hour interval, averaged:
  - 0.27 mm/yr on Steel
  - 1.30 mm/yr on non-clad Aluminum



ICoTA Canada Roundtable



# Coiled Tubing Corrosion



10/18/2012

# 3 Days at Room Temperature






# 21 Days at Room Temperature





# 28 Days Total at Room Temperature

| Weight (g) | 70 Grade | 80 Grade | 90 Grade |
|---|---|---|---|
| Initial | 148.9 | 157.8 | 120.2 |
| 3 days | 148.6 | 157.5 | 120.1 |
| % Loss Initial | 0.2% | 0.2% | 0.1% |
| 10 Days | 148.3 | 157.2 | 120.0 |
| 21 Days | 148.0 | 157.1 | 119.9 |
| 28 Days | 147.6 | 156.7 | 119.6 |
| % Loss Total | 0.9% | 0.7% | 0.5% |

## 3 Days at Room Temperature – 15% HCl Acid





| Weight (g)   | 80 Grade |
|--------------|----------|
| Initial      | 149.4    |
| 3 days       | 136.3    |
| % Loss Total | 8.8%     |

# Coiled Tubing Economics Example

- CT string cost - $150,000
- Average CT string use with acid – 25%
- Average string life reduction from acid use – 33%
- Total life lost to acid - $12,500

- Liability due to CT failure from acid pitting – Pricele$$

# **Enviro-Syn HCR** – Fluid Compatibility

- Enhanced with Non-Hazardous Chemistries
    - Iron Control
    - Corrosion Inhibitor
    - Water Wetting Agent
    - Non-Emulsifier
- Miscible Weighting Agents
    - $CaCl_2$, NaCl, KCl, NaBr
- Gelling Agents
    - HEC, Cationic PA, Low pH Compatible Polymers

# **Enviro-Syn HCR** – Elastomer Compatibility

| **Elastomer** | **% Solution Swell** | **Hardness Change** | **Tensile % Retention** | **Elongation % Retention** |
|---|---|---|---|---|
| Sealast HNBR | 1 | +3 | 105 | 107 |
| HSN | 1 | +1 | 93 | 92 |
| Aflas 600-9 | 1 | +2 | 95 | 122 |
| Aflas 7182D | 1 | +1 | 94 | 119 |
| CL180 EPDM | 1 | +1 | 99 | 118 |

Test Parameters:
    Elastomer samples exposed to the above fluid at 24°C (75°F) for 27 days.

Results:
    All of the compounds revealed excellent compatibility with low swell, and high physical
    property retention observed with all of the elastomers evaluated.

# **Enviro-Syn HCR –** Comparison to HCl Acid

|  | **HCl Acid** | **Enviro-Syn HCR** |
|---|---|---|
| **Immediately Active** | YES | YES |
| pH | 0 | 0 |
| **Reaction Rate** | Very Quick | Moderate |
| Exothermic | Highly | Mildly |
| Biodegradable | NO | YES |
| **Health Rating** | 3 – Severe (poison) | 0 |
| **Reactivity Rating** | 2 – Moderate (corrosive) | 0 |
| **Transportation/Handling Rating** | Corrosive | NONE |



# Current Applications & Case Histories of Enviro-Syn HCR

# Acid Fracturing

- Turner Valley (Rundle) Formation (medium crystalline dolomite)
  - 10 completed treatments to date at 300 m³ average volume ($\pm$2000 bbl)

  *"The first Rundle horizontal light oil well in a multi-well drilling program in the Turner Valley area has been completed with a multi-stage acid fracture stimulation. Its current production rate is in excess of 225 boe per day. The well has been on production for over three weeks and while still recovering load fluid, has demonstrated strong fluid production rates and continually improving water cuts."*

- Pekisko Formation (coarse limestone)
  - 2 completed treatments to date at 550 m³ (3500bbl)
    - Flowed +45 m³ (285 bbl) fluid back initially
    - Swab rate of +100 m³/day (630 bbl) @ +50% oil cut

# Coiled Tubing Treatments

- Turner Valley (Rundle) Formation
  - 11 completed treatments to date at 150 m³ average volume

  *"At Turner Valley, the first five Rundle light oil horizontal wells had 90 day average production rates of 120 boe per day per well, and a number of the wells continue to demonstrate decreasing water cuts and increasing oil rates, as expected. In particular, one wells production rate continues to increase after being on production for more than four months. Current production from this well is approximately 270 boe per day, a dramatic increase from the well's 30 day initial rate of approximately 120 boe per day. This increasing production profile provides encouragement for similar results from other Turner Valley horizontal wells."*

- Estevan, SK - Red River Carbonate

# **Enviro-Syn HCR –** Squeezes, Washes & Spearheads

- Injection/Disposal Wells
    - Midale, SK – Midale Carbonate
    - Elkwater, AB – Sunburst Sandstone
    - Enchant, AB – Livingstone Carbonate, Glauconite
- Squeezes & Soaks
    - Bullhead
        - Enchant, AB – Nisku Carbonate
        - Surface Casing Vent Repairs (cement squeezes)
    - Annular
        - Olds, AB – Viking Sandstone
        - Enchant, AB – Glauconite
        - Rocky Mountain House – Cardium
- Frac Spearheads
    - SW Manitoba – Bakken











ICoTA Canada Roundtable

# **Enviro-Syn –** Value Add Products





Thank You ICoTA Canada

www.fluidenergygroup.com
Darren Thatcher, President & COO

10/18/2012                     ICoTA Canada Roundtable                     39

EXHIBIT "E"

**From:** Kevin ODonoghue [mailto:Kevin@fluidenergygroup.com]
**Sent:** Tuesday, June 11, 2013 2:15 PM
**To:** jmac@enviromfg.com
**Cc:** Clay Purdy; 'Steve Rowley'
**Subject:** RE: FEGL - Labels and MSDS's

Labels were created in Word, the boxes are for when we send out product to the field, they can remain blank for this shipment and yes I can and did remove the DFE logo

Here you go

Thanks

Kevin O'Donoghue
Tel 1.403.GO.FLUID / Cell 1.403.690.1675
www.fluidenergygroup.com

**From:** John Macdonald [mailto:jmac@enviromfg.com]
**Sent:** Tuesday, June 11, 2013 12:04 PM
**To:** Kevin ODonoghue
**Cc:** Clay Purdy; 'Steve Rowley'
**Subject:** RE: FEGL - Labels and MSDS's

Question,

One the labels you show a box for CONCENTRATION and another for BLEND.

What the hell is that?? As I am not filling in those boxes for this shipment so it may be best for you to remove that or you customer may want to know what the hell it was left blank for.

1

Also, I need the DfE (Design for the environment logo) removed from the labels as the formula is approved however, I was never asked by Fluid to have the labels approved. This is an entirely different process and yes I can do this for you but for now it needs removed.

What program did you create these labels in?

Thanks

**From:** Kevin ODonoghue [mailto:Kevin@fluidenergygroup.com]
**Sent:** Tuesday, June 04, 2013 3:11 PM
**To:** President, EMS
**Cc:** Clay Purdy
**Subject:** FEGL - Labels and MSDS's

John, As per Clay's request here is our files for our Fluid MSDS's and labels for the Enviro-Syn HCR and CSR

Let me know if there is any concerns,

Regards,

Kevin O'Donoghue
*Vice President, Operations*
104, 214-11th Ave SE
Calgary, AB Canada T2G 0X8
Tel 1.403.GO.FLUID / Cell 1.403.690.1675
www.fluidenergygroup.com

Please consider the environment before printing this e-mail *Disclaimer - This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system. We do not guarantee that this material is free from viruses or any other defects although due care has been taken to minimize the risk.*

# ENVIRO-SYN
# CSR

## Synthetic Caustic Solution Replacement

Comparable performance properties of liquid caustic solutions, without any of the extremely hazardous properties.

**Enviro-Syn CSR** is part of an environmentally safe synthetic chemical replacement family; that has comparable performance properties of liquid caustic solutions, without the extremely hazardous properties. **Enviro-Syn CSR** contains no conventional hydroxides, but can very effectively maintain or increase the pH level in fluid systems. It is non-regulated for transportation/handling, is non-toxic, non-fuming, and will not cause chemical burns. **Enviro-Syn CSR** is a safe, viable alternative for caustic solution applications such as neutralizing acid gases in drilling/production fluids, increasing the alkalinity of fluid mixtures, or as a cleaning/degreasing agent.

**FIRST AID**

If swallowed, drink two glasses of water. In case of eye contact, flush with water for two minutes. If symptoms persist, seek medical advice. In case of skin contact, wash thoroughly with soapy water. As with all chemicals, keep out of reach of children.

For Commercial and Industrial Use Only.

**IN CASE OF EMERGENCY
CALL 1-800-424-9300**

**GUARANTEE**

This product is guaranteed to be free from defects, true to its contents.

**0-0-0 HMIS (Hazardous Materials Index Score)**

Health:          0
Flammability:  0
Reactivity:      0



ENERGY GROUP LTD.

**Exclusively Distributed By:**
Fluid Energy Group Ltd.
#104, 214 – 11th Ave SE
Calgary, Alberta CANADA T2G 0X8

Phone: 403.GO.FLUID (403.463.5843)
www.fluidenergygroup.com

**BLENDING DIRECTIONS**
Mix product thoroughly.
Blending ratios may vary based on specific applications and recommendations from your consultants at Fluid Energy Group Ltd.

**BATCH BLEND ONLY; NOT FOR RESALE**

**WARNING!**
When pumping this product it is strongly recommended to use manufacturer approved hose couplings or fittings. 316 Stainless Steel is recommended.

**DO NOT USE ALUMINUM FITTINGS.**

  



# ENVIRO-SYN
# HCR

## Synthetic Hydrochloric Acid Replacement

Environmentally safe synthetic acid replacement product that has comparable solubilizing/performance abilities of Hydrochloric acid.



ENERGY GROUP LTD.

**Exclusively Distributed By:**
Fluid Energy Group Ltd.
#104, 214 – 11th Ave SE
Calgary, Alberta CANADA T2G 0X8

Phone: 403.GO.FLUID (403.463.5843)
www.fluidenergygroup.com

**Enviro-Syn HCR** is part of the environmentally safe synthetic acid replacement product line that has comparable solubilizing abilities of Hydrochloric acid, without the extremely hazardous properties. **Enviro-Syn HCR** contains no conventional acids and will not promote excessive corrosion, yet will effectively attack multiple forms of carbonate based scale/mineral build-up, and formation matrices. **Enviro-Syn HCR** is non-regulated for transportation/handling, is non-toxic, non-fuming, and will not corrode or rust metals. **Enviro-Syn HCR** is an extremely safe replacement for most Hydrochloric acid blends, and can be enhanced through the addition of synthetic surfactants.

**BLENDING DIRECTIONS**
Mix product thoroughly.
Blending ratios may vary based on specific applications and recommendations from your consultants at Fluid Energy Group Ltd.

**BATCH BLEND ONLY; NOT FOR RESALE**

**WARNING!**
When pumping this product it is strongly recommended to use manufacturer approved hose couplings or fittings. 316 Stainless Steel is recommended.

**DO NOT USE ALUMINUM FITTINGS.**

**FIRST AID**
If swallowed, drink two glasses of water. In case of eye contact, flush with water for two minutes. If symptoms persist, seek medical advice. In case of skin contact, wash thoroughly with soapy water. As with all chemicals, keep out of reach of children.
For Commercial and Industrial Use Only.

**IN CASE OF EMERGENCY
CALL 1-800-424-9300**

**GUARANTEE**
This product is guaranteed to be free from defects, true to its contents, free from urea hydrochloride salts, other organic salts, Hydrofluoric acid and other traditional acids.

**0-0-0 HMIS (Hazardous Materials Index Score)**
Health:           0
Flammability:   0
Reactivity:       0

  



# EXHIBIT "F"

**Del Tech International Laboratory Services**
**8201 Greensboro Drive,**
**McLean, VA 22102**

# MUTUAL
# CONFIDENTIALITY and NON-DISCLOSURE
# AGREEMENT

This Agreement, with an effective date of February 8 20 **19** between **Del Tech Laboratory Services ("DT"); 8201 Greensboro Drive, McLean, VA 22102,** and **Environmental Manufacturing Solutions, LTD . ("EMS")** with administrative offices at **95 Wilton Road, Suite 3 London, SW1V 1BZ United Kingdom** and sets forth the terms and conditions under which certain information of a confidential nature and/or samples of materials may be disclosed or provided between the parties. In order to maintain confidentiality of information disclosed and/or samples provided, it is hereby agreed as follows:

1. The term "Information" means information of a technical or business nature, including that embodied in samples, provided by either party (the "Disclosing Party") to the other ("Recipient"), relating to EMS and DT's customers, business plans, products, and new product ideas; research and development progress and plans; inventions, processes and trade secrets; methods or processes of manufacture; chemical compositions or formulations; scientific processes or techniques; know how or trade secrets; and other information. This agreement is to facilitate an exchange of EMS and DT's Information.

2. Recipient will hold the Information in confidence; will not disclose it to others without the prior written consent of the Disclosing Party; and will limit dissemination of the Information within its own organization to employees who have a bona fide need to know it for the purpose of this Agreement and are subject to obligations of secrecy and limited use no less stringent than those set forth in this Agreement, including employees of parent and/or controlled or wholly owned subsidiary companies, and/or affiliated institutions, and/or related third parties.

3. The foregoing obligations of confidentiality shall not apply to any portion of the Information Recipient can demonstrate:

(a) Was known to Recipient prior to its receipt under this Agreement;

(b) Was published or generally available to the public prior to its receipt under this Agreement, or thereafter becomes published or generally available to the public through no act or fault of Recipient; or

(c) Is disclosed to Recipient, free of restrictions on use and commitments of confidentiality, by a third party which did not derive the same directly or indirectly from the Disclosing Party and which Recipient believes such third party has the legal right to so disclose the same.

**CONFIDENTIALITY AGREEMENT**

4. Recipient will restrict its use of such Information and/or samples to the purpose of this Agreement, will not analyze for chemical composition any samples submitted, and will not permit any other use of the same without the prior written consent of the Disclosing Party. No other right or license to use the Information or any technology or intellectual property of this Disclosing Party is granted, by implication or otherwise.

5. Neither Party will, without prior written consent of the other, disclose to others the subject matter or terms of this Agreement, any work the other Party carries out pursuant hereto, or the fact that the Information or samples originated with the other Party.

6. Upon written request of the Disclosing Party following completion of any evaluations contemplated by this Agreement, Recipient shall return all Information supplied in written or tangible form, except for one copy which may be retained in a secure file for compliance purposes only, and shall destroy or return all other documents containing such Information and any unused samples.

7. The foregoing commitments, unless extended by written agreement of the Parties, shall apply to Information received within one (1) year from the Effective Date set forth above. The obligations of confidentiality shall be for a term of five (5) years from the date of disclosure by the Disclosing Party.

8. This Agreement constitutes the entire agreement of the Parties and supersedes any prior written or oral agreements between them relating to the Information or samples; may only be amended by a written document duly signed by the Parties; and shall be binding upon the successors and assigns of each of the Parties.

for: Del Tech International Laboratory Services

By: _____ 2/8/11
   Signature                date

Nichelle-Alicea
Printed name

Director of Laboratories
Title

for: Environmental Manufacturing Solutions Ltd.

By: _____ 2-8-11
   Signature                date

John Mac Dal
Printed name

President
Title

2 of 2

# EXHIBIT "G"

**From:** John Macdonald [mailto:jmac@enviromfg.com]
**Sent:** Thursday, January 16, 2014 5:15 PM
**To:** 'Darren Thatcher'
**Cc:** 'Clay Purdy'
**Subject:** RE: Formulations and Products

I was pleased that you were looking.

I told you I knew of this product and also that it was a good product but was not as safe as we need it to be. That did not mean I gave my blessing in any way.

**From:** Darren Thatcher [mailto:d.thatcher@fluidenergygroup.com]
**Sent:** Thursday, January 16, 2014 5:03 PM
**To:** jmac@enviromfg.com
**Cc:** Clay Purdy
**Subject:** RE: Formulations and Products

If you are referring to our CI-2 corrosion inhibitor you already knew about that from your trip in August.
I also thought I sent some samples with you to check for compatibilities?
You were actually very pleased with the situation at the time as well??

The base HCR has an acceptable oilfield corrosion rate up to 65°C then it requires additional chemistry.
This has been requested from Shell, Aramco, Conoco, and many others that have done their own corrosion testing to 100°C.
Without it the product cannot be approved for use.

We chose the attached product due to its low toxicity effect; and have verified the level of reportable chemicals in the DSL.
It is being added at up to 0.5% right now, but is by no means in its final state.

If you have an alternative suggestion to this situation, please provide.
The CorrosX does not provide the appropriate protection, even at elevated concentrations.

All the other products that we presently provide are standalone products that are in no way associated with the HCR.

**From:** John Macdonald [mailto:jmac@enviromfg.com]
**Sent:** Thursday, January 16, 2014 11:56 AM
**To:** Darren Thatcher; Clay Purdy

1

**Subject:** Formulations and Products
**Importance:** High

Daren,

It has come to my attention that Fluid has been purchasing, using, offering for sale and blending other products, additive, and/or ingredients with or in conjunction to the HEG product line.

You must provide me with a full detailed list of these products, the fully formulary summary showing the addition of these products.

As I am sure you are aware, this is outside the scope of our agreements.

In addition, I require 250 ml samples of these blended products.

I expect the samples to be shipped to my attention no later than Friday January 17th, 2014.
Additionally, I expect the above information be forwarded to me via email not later than Friday January 17th 2014.

Regards

*John MacDonald*
EMS
Environmental Manufacturing Solutions
www.enviromfg.com

# EXHIBIT "H"


**NALCO**

### SAFETY DATA SHEET

PRODUCT

**NALCO® ASP560**

EMERGENCY TELEPHONE NUMBER(S)

**(800)463-3216 (24 Hours)**

---

| 1. | CHEMICAL PRODUCT AND COMPANY IDENTIFICATION |

PRODUCT NAME :   **NALCO® ASP560**

APPLICATION :   ACID CORROSION INHIBITOR

SUPPLIER IDENTIFICATION :   Nalco Canada Co.
1055 Truman Street
Burlington, Ontario
L7R 3Y9

**EMERGENCY TELEPHONE NUMBER(S) :**   (800)463-3216 (24 Hours)
For Transportation Emergencies call CANUTEC 613-996-6666
(24 hours)

NFPA 704M/HMIS RATING
HEALTH :   3 / 3*   FLAMMABILITY :   1 / 1   INSTABILITY :   0 / 0   OTHER :
0 = Insignificant   1 = Slight   2 = Moderate   3 = High   4 = Extreme   * = Chronic Health Hazard

Prepared By :  SHE Department; (905) 632-8791
Date issued :  2013/09/16
Version Number :  1.0

---

| 2. | HAZARDS IDENTIFICATION |

---

#### **EMERGENCY OVERVIEW**

**DANGER**
Corrosive.  May cause tissue damage.  May cause sensitization by skin contact.
Do not get in eyes, on skin, on clothing.  Do not take internally.  Use with adequate ventilation.  In case of contact with eyes, rinse immediately with plenty of water and seek medical advice.  After contact with skin, wash immediately with plenty of water.  Use a mild soap if available.
Wear a face shield.  Wear chemical resistant apron, chemical splash goggles, impervious gloves and boots.
Low Fire Hazard; liquids may burn upon heating to temperatures at or above the flash point.  May evolve oxides of carbon (COx) under fire conditions.  May evolve oxides of nitrogen (NOx) under fire conditions.

---

PRIMARY ROUTES OF EXPOSURE :
Eye, Skin, Inhalation

HUMAN HEALTH HAZARDS - ACUTE :

EYE CONTACT :
Corrosive.  Will cause eye burns and permanent tissue damage.

SKIN CONTACT :
Corrosive; causes permanent skin damage.

---

**Nalco Canada Co.** 1055 Truman Street • Burlington, Ontario L7R 3Y9 • (905)632-8791
For additional copies of an MSDS visit www.nalco.com and request access.

1 / 9



**SAFETY DATA SHEET**

PRODUCT

**NALCO® ASP560**

**EMERGENCY TELEPHONE NUMBER(S)**

**(800)463-3216 (24 Hours)**

INGESTION :
Corrosive; causes chemical burns to the mouth, throat and stomach.

INHALATION :
Elevated temperatures or mechanical action may form vapors, mists or fumes which may be irritating to the eyes, nose, throat and lungs.

AGGRAVATION OF EXISTING CONDITIONS :
Skin contact may aggravate an existing dermatitis condition.

HUMAN HEALTH HAZARDS - CHRONIC :
Repeated or prolonged contact may cause sensitization in some individuals.

## 3.    COMPOSITION/INFORMATION ON INGREDIENTS

One or more of the substances are being claimed as proprietary.  Our hazard evaluation has identified the following chemical substance(s) as hazardous.  A claim has been submitted to the Hazardous Materials Information Review Commission (HMIRC).  Refer to Section 15 for more information.

| Hazardous Substance(s) | CAS NO | % (w/w) | LD50's and LC50's Route & Species |
|---|---|---|---|
| Formic Acid | 64-18-6 | 30 - 60 | No data available. |
| Propylene Glycol | 57-55-6 | 10 - 30 | No data available. |
| Aromatic aldehyde | Proprietary | 10 - 30 | Oral LD50(Rat):1,600 mg/kg |
| Substituted aromatic amide | Proprietary | 1.0 - 5.0 | No data available. |
| Substituted pyridinium salt | Proprietary | 5.0 - 10.0 | No data available. |
| Oxyalkylated alcohol | Proprietary | 5.0 - 10.0 | No data available. |

## 4.    FIRST AID MEASURES

EYE CONTACT :
PROMPT ACTION IS ESSENTIAL IN CASE OF CONTACT.  Immediately flush eye with water for at least 30 minutes while holding eyelids open.  If only one eye is affected be sure to use care not to contaminate the other eye with the run-off.  Get immediate medical attention.

SKIN CONTACT :
Immediately flush with plenty of water for at least 30 minutes or until the material is removed.  Use a mild soap if available.  For a large splash, flood body under a shower.  Get immediate medical attention.  Contaminated clothing, shoes, and leather goods must be discarded or cleaned before re-use.

INGESTION :
Get immediate medical attention.  DO NOT INDUCE VOMITING.  Never give anything by mouth if victim is rapidly losing consciousness, is unconscious or convulsing.

INHALATION :
Remove to fresh air, treat symptomatically.  Get immediate medical attention.

NOTE TO PHYSICIAN :
Probable mucosal damage may contraindicate the use of gastric lavage.  Based on the individual reactions of the patient, the physician's judgement should be used to control symptoms and clinical condition.



**SAFETY DATA SHEET**

PRODUCT

# NALCO® ASP560

**EMERGENCY TELEPHONE NUMBER(S)**

**(800)463-3216 (24 Hours)**

| 5. | FIRE FIGHTING MEASURES |

Flash Point :                        Not applicable
LOWER EXPLOSION LIMIT :      No data available.
UPPER EXPLOSION LIMIT :      No data available.

AUTOIGNITION TEMPERATURE :    No data available.

EXTINGUISHING MEDIA :
Foam, Carbon dioxide, Dry powder, Other extinguishing agent suitable for Class B fires, For large fires, use water spray or fog, thoroughly drenching the burning material.
Water mist may be used to cool closed containers.

UNSUITABLE EXTINGUISHING MEDIA :
Do not use water unless flooding amounts are available.

FIRE AND EXPLOSION HAZARD :
Low Fire Hazard; liquids may burn upon heating to temperatures at or above the flash point.  May evolve oxides of carbon (COx) under fire conditions.  May evolve oxides of nitrogen (NOx) under fire conditions.

SPECIAL PROTECTIVE EQUIPMENT FOR FIRE FIGHTING :
In case of fire, wear a full face positive-pressure self contained breathing apparatus and protective suit.

SENSITIVITY TO MECHANICAL IMPACT :
Not expected to be sensitive to mechanical impact.

SENSITIVITY TO STATIC DISCHARGE :
Not expected to be sensitive to static discharge.

| 6. | ACCIDENTAL RELEASE MEASURES |

PERSONAL PRECAUTIONS :
Restrict access to area as appropriate until clean-up operations are complete.  Use personal protective equipment recommended in Section 8 (Exposure Controls/Personal Protection).  Keep people away from and upwind of spill/leak. Stop or reduce any leaks if it is safe to do so.  Ventilate spill area if possible.  Ensure clean-up is conducted by trained personnel only.  Do not touch spilled material.  Have emergency equipment (for fires, spills, leaks, etc.) readily available.  Notify appropriate government, occupational health and safety and environmental authorities.

METHODS FOR CLEANING UP :
SMALL SPILLS:  Soak up spill with absorbent material.  Place residues in a suitable, covered, properly labeled container.  Wash affected area.  LARGE SPILLS:  Contain liquid using absorbent material, by digging trenches or by diking.  Reclaim into recovery or salvage drums or tank truck for proper disposal.  Clean contaminated surfaces with water or aqueous cleaning agents.  Contact an approved waste hauler for disposal of contaminated recovered material.  Dispose of material in compliance with regulations indicated in Section 13 (Disposal Considerations).

ENVIRONMENTAL PRECAUTIONS :
Prevent material from entering sewers or waterways.



**SAFETY DATA SHEET**

PRODUCT

**NALCO® ASP560**

EMERGENCY TELEPHONE NUMBER(S)
(800)463-3216 (24 Hours)

| 7. | HANDLING AND STORAGE |

HANDLING :
Do not get in eyes, on skin, on clothing. Do not take internally. Use with adequate ventilation. Do not breathe vapors/gases/dust. Keep the containers closed when not in use. Have emergency equipment (for fires, spills, leaks, etc.) readily available. Ensure all containers are labeled. Do not mix with acids.

STORAGE CONDITIONS :
Store in suitable labeled containers. Store the containers tightly closed. Store separately from oxidizers. Store separately from acids. Amine and sulphite products should not be stored within close proximity or resulting vapors may form visible airborne particles.

SUITABLE CONSTRUCTION MATERIAL :
Shipping and long term storage compatibility with construction materials can vary; we therefore recommend that compatibility is tested prior to use.

| 8. | EXPOSURE CONTROLS/PERSONAL PROTECTION |

OCCUPATIONAL EXPOSURE LIMITS :
Exposure guidelines have not been established for this product. Available exposure limits for the substance(s) are shown below.

| Substance(s) | Basis | ppm | mg/m3 | Non-Standard Unit |
|---|---|---|---|---|
| Formic Acid | ACGIH/TWA | 5 | | |
| | ACGIH/STEL | 10 | | |
| | NIOSH REL/TWA | 5 | 9 | |
| | OSHA Z1/TWA | 5 | 9 | |
| Propylene Glycol | WEEL/TWA | | 10 | |

* A skin notation refers to the potential significant contribution to overall exposure by the cutaneous route, including mucous membranes and the eyes.

ENGINEERING MEASURES :
General ventilation is recommended. Use local exhaust ventilation if necessary to control airborne mist and vapor.

RESPIRATORY PROTECTION :
Where concentrations in air may exceed the limits given in this section, the use of a half face filter mask or air supplied breathing apparatus is recommended. A suitable filter material depends on the amount and type of chemicals being handled. Consider the use of filter type: Multi-contaminant cartridge. with a Particulate pre-filter. In event of emergency or planned entry into unknown concentrations a positive pressure, full-facepiece SCBA should be used. If respiratory protection is required, institute a complete respiratory protection program including selection, fit testing, training, maintenance and inspection.

HAND PROTECTION :
When handling this product, the use of chemical gauntlets is recommended. The choice of work glove depends on work conditions and what chemicals are handled, but we have positive experience under light handling conditions using gloves made from Neoprene . Gloves should be replaced immediately if signs of degradation are observed. Breakthrough time not determined as preparation, consult PPE manufacturers.



**SAFETY DATA SHEET**

PRODUCT

# NALCO® ASP560

EMERGENCY TELEPHONE NUMBER(S)

**(800)463-3216 (24 Hours)**

SKIN PROTECTION :
Wear chemical resistant apron, chemical splash goggles, impervious gloves and boots.  A full slicker suit is recommended if gross exposure is possible.

EYE PROTECTION :
Wear a face shield with chemical splash goggles.

HYGIENE RECOMMENDATIONS :
Use good work and personal hygiene practices to avoid exposure.  Eye wash station and safety shower are necessary. If clothing is contaminated, remove clothing and thoroughly wash the affected area.  Launder contaminated clothing before reuse. Always wash thoroughly after handling chemicals. When handling this product never eat, drink or smoke.

HUMAN EXPOSURE CHARACTERIZATION :
Based on our recommended product application and personal protective equipment, the potential human exposure is: Low

| 9. | PHYSICAL AND CHEMICAL PROPERTIES |
|----|----------------------------------|

PHYSICAL STATE                   Liquid

APPEARANCE                       Clear  Amber

ODOR                             Amine

ODOR THRESHOLD                   No data available.
SPECIFIC GRAVITY                 1.132 @ 15.5 °C
SOLUBILITY IN WATER              Dispersible
pH                               No data available.
VISCOSITY                        11.4 cps @ 25.0 °C
POUR POINT                       < -59.4 °C
INITIAL BOILING POINT            103.0 °C
VAPOR PRESSURE                   < 0.68 kPa / < 5.1 mm Hg  @ 37.7 °C
EVAPORATION RATE                 No data available.
VAPOR DENSITY                    No data available.
COEFFICIENT OF WATER/OIL         No data available.
DISTRIBUTION

Note: These physical properties are typical values for this product and are subject to change.

| 10. | STABILITY AND REACTIVITY |
|-----|--------------------------|

STABILITY :
Stable under normal conditions.

HAZARDOUS POLYMERIZATION :
Hazardous polymerization will not occur.



**SAFETY DATA SHEET**

PRODUCT

**NALCO® ASP560**

**EMERGENCY TELEPHONE NUMBER(S)**
**(800)463-3216 (24 Hours)**

CONDITIONS TO AVOID :
Avoid extremes of temperature.

MATERIALS TO AVOID :
Contact with strong oxidizers (e.g. chlorine, peroxides, chromates, nitric acid, perchlorate, concentrated oxygen, permanganate) may generate heat, fires, explosions and/or toxic vapors.  Bases  Contact with strong alkalies (e.g. ammonia and its solutions, carbonates, sodium hydroxide (caustic), potassium hydroxide, calcium hydroxide (lime), cyanide, sulfide, hypochlorites, chlorites) may generate heat, splattering or boiling and toxic vapors.

HAZARDOUS DECOMPOSITION PRODUCTS :
Under fire conditions:          Oxides of carbon, Oxides of nitrogen

| 11. | TOXICOLOGICAL INFORMATION |
|---|---|

No toxicity studies have been conducted on this product.

SENSITIZATION :
Repeated or prolonged contact may cause skin sensitization.

CARCINOGENICITY :
None of the substances in this product are listed as carcinogens by the International Agency for Research on Cancer (IARC), the National Toxicology Program (NTP) or the American Conference of Governmental Industrial Hygienists (ACGIH).

REPRODUCTIVE EFFECTS :
No quantitative data available.

TERATOGENICITY AND EMBRYOTOXICITY :
No quantitative data available.

MUTAGENICITY :
 No quantitative data available.

OTHER TOXICITY INFORMATION :
 Toxicologically Synergistic Products: None known

HUMAN HAZARD CHARACTERIZATION :
Based on our hazard characterization, the potential human hazard is:  High

| 12. | ECOLOGICAL INFORMATION |
|---|---|

ECOTOXICOLOGICAL EFFECTS :

The following results are for the product, unless otherwise indicated.



**SAFETY DATA SHEET**

PRODUCT

**NALCO® ASP560**

**EMERGENCY TELEPHONE NUMBER(S)**

**(800)463-3216 (24 Hours)**

Acute Fish Results :

| Species | Exposure | Test Type | Value | Test Descriptor |
|---|---|---|---|---|
| Sheepshead Minnow | 96 h | LC50 | > 65.06 mg/l | Active Substance |

ACUTE INVERTEBRATE RESULTS :

| Species | Exposure | Test Type | Value | Test Descriptor |
|---|---|---|---|---|
| Acartia tonsa | 48 h | LC50 | 105.19 mg/l | Active Substance |
| Acartia tonsa | 48 h | LC50 | 32 mg/l | Active Substance |
| Corophium volutator | 10 d | LC50 | 6,116.15 mg/l | Active Substance |

AQUATIC PLANT RESULTS :

| Species | Exposure | Test Type | Value | Test Descriptor |
|---|---|---|---|---|
| Marine Algae (Skeletonema costatum) | 72 h | EC50 | 65.06 mg/l | Active Substance |
| Marine Algae (Skeletonema costatum) | 72 h | NOEC | 32 mg/l | Active Substance |

MOBILITY :

The environmental fate was estimated using a level III fugacity model embedded in the EPI (estimation program interface) Suite TM, provided by the US EPA. The model assumes a steady state condition between the total input and output. The level III model does not require equilibrium between the defined media. The information provided is intended to give the user a general estimate of the environmental fate of this product under the defined conditions of the models.

If released into the environment this material is expected to distribute to the air, water and soil/sediment in the approximate respective percentages;

| Air | Water | Soil/Sediment |
|---|---|---|
| <5% | 30 - 50% | 50 - 70% |

The portion in water is expected to be soluble or dispersible.

BIOACCUMULATION POTENTIAL

Component substances have a low potential to bioconcentrate.

ENVIRONMENTAL HAZARD AND EXPOSURE CHARACTERIZATION

Based on our hazard characterization, the potential environmental hazard is: Low

Based on our recommended product application and the product's characteristics, the potential environmental exposure is: Low

| 13. | DISPOSAL CONSIDERATIONS |
|---|---|

In Ontario, the waste class under Regulation 347 is: 263C

Dispose of wastes in an approved incinerator or waste treatment/disposal site, in accordance with all applicable regulations. Do not dispose of wastes in local sewer or with normal garbage.

**Nalco Canada Co.** 1055 Truman Street • Burlington, Ontario L7R 3Y9 • (905)632-8791
For additional copies of an MSDS visit www.nalco.com and request access.

7 / 9



**SAFETY DATA SHEET**

PRODUCT

**NALCO® ASP560**

EMERGENCY TELEPHONE NUMBER(S)
(800)463-3216 (24 Hours)

## 14. TRANSPORT INFORMATION

The information in this section is for reference only and should not take the place of a shipping paper (bill of lading) specific to an order. Please note that the proper Shipping Name / Hazard Class may vary by packaging, properties, and mode of transportation. Typical Proper Shipping Names for this product are as follows.

TRANSPORTATION OF DANGEROUS GOODS (TDG) CLASSIFICATION:

CORROSIVE LIQUID, N.O.S. (FORMIC ACID), Class 8, UN1760, PG III

For Transportation Emergencies call CANUTEC 613-996-6666 (24 hours)

## 15. REGULATORY INFORMATION

This section contains additional information that may have relevance to regulatory compliance. The information in this section is for reference only. It is not exhaustive, and should not be relied upon to take the place of an individualized compliance or hazard assessment. Nalco accepts no liability for the use of this information.

NATIONAL REGULATIONS, CANADA :

WORKPLACE HAZARDOUS MATERIALS INFORMATION SYSTEM (WHMIS) :
This product has been classified according to the hazard criteria of the CPR and the MSDS contains all of the information required by the CPR.Corrosive Material

One or more of the substances are being claimed as proprietary., A claim has been submitted to the Hazardous Materials Information Review Commission (HMIRC)., Refer to Section 3 for the substance(s) declared proprietary.

HMIRC Registry Number : 9019
Filed : 2013/09/13

WHMIS CLASSIFICATION :
E        Corrosive Material

CANADIAN ENVIRONMENTAL PROTECTION ACT (CEPA) :
This product contains substance(s) which are not listed on the Domestic Substances List (DSL) or the Non-Domestic Substances List (NDSL).

NATIONAL POLLUTANT RELEASE INVENTORY (NPRI) :
This product contains the following substance(s) listed in Part 1A (Core Substances) of the NPRI at the level(s) shown. For a complete NPRI listing (Parts 1 - 5) please consult Environment Canada's NPRI web site.

| Hazardous Substance(s) | CAS NO | % (w/w) |
|---|---|---|
| Formic Acid | 64-18-6 | 30 - 60 |

NATIONAL REGULATIONS, USA :

TOXIC SUBSTANCES CONTROL ACT (TSCA) :
The substances in this preparation are included on or exempted from the TSCA 8(b) Inventory (40 CFR 710)



**SAFETY DATA SHEET**

PRODUCT

**NALCO® ASP560**

**EMERGENCY TELEPHONE NUMBER(S)**

**(800)463-3216 (24 Hours)**

| 16. | OTHER INFORMATION |
|---|---|

Due to our commitment to Product Stewardship, we have evaluated the human and environmental hazards and exposures of this product. Based on our recommended use of this product, we have characterized the product's general risk. This information should provide assistance for your own risk management practices. We have evaluated our product's risk as follows:

* The human risk is:  Low

* The environmental risk is:  Low

Any use inconsistent with our recommendations may affect the risk characterization. Our sales representative will assist you to determine if your product application is consistent with our recommendations. Together we can implement an appropriate risk management process.

This product material safety data sheet provides health and safety information. The product is to be used in applications consistent with our product literature. Individuals handling this product should be informed of the recommended safety precautions and should have access to this information. For any other uses, exposures should be evaluated so that appropriate handling practices and training programs can be established to insure safe workplace operations. Please consult your local sales representative for any further information.

# EXHIBIT "I"

## Barbie Mahan

**Subject:**                    FW: Requested HCR Formulary Information

-----Original Message-----
From: John Macdonald [mailto:jmac@enviromfg.com]
Sent: Monday, February 03, 2014 2:35 PM
To: 'Darren Thatcher'
Cc: 'Clay Purdy'
Subject: RE: Requested HCR Formulary Information

Darren,

I discussed this issue with Clay in great detail during our meeting.

Be advised that
1) this is a violation of our agreements
2) all you claims on your labels, website and brochures are FALSE with regards to Fluids toxic claims of which HEG
will not share in the liability of such.

-----Original Message-----
From: Darren Thatcher [mailto:d.thatcher@fluidenergygroup.com]
Sent: Monday, February 03, 2014 2:28 PM
To: jmac@enviromfg.com
Cc: Clay Purdy
Subject: RE: Requested HCR Formulary Information

How can we, without it we are majorly corrosive downhole.
Our customers have requested it, and realize it is regulated with it in.
All testing in Saudi was also completed with CI-2 to pass the corrosion.

Do you have your new inhibitor on the way?

-----Original Message-----
From: John Macdonald [mailto:jmac@enviromfg.com]
Sent: Monday, February 03, 2014 12:20 PM
To: Darren Thatcher
Cc: Clay Purdy
Subject: RE: Requested HCR Formulary Information

Have you ceased the use of CI-2 ?

1

# EXHIBIT "J"

# BRIDGE
# FINANCIAL

43 EAST OCEAN BLVD, STUART, FL 34994
(T) 772.419.8998  (F) 772.419.8997

January 20, 2014

Fluid Energy Group LTD
104,214- 11ᵗʰ Ave SE
Calgary, AB T2G 0X8
Canada

Cc: Heartland Energy Group
7705 Progress Circle
Melbourne, FL 32904

Re: Fluid Energy Group LTD annual records and facility audit

Scope of items audited:
Purchase orders, QC Reports, Customer lists, Volume and production records, Sales records,
Lab/Manufacturing facility reports and inventory.

Description of requirement:
Per Manufacturing and Distribution contracts, accuracy of any and all records related to sales and
production of materials contracted upon.

Audit procedures:
Fluid Energy headquarters and manufacturing facility were visited. Records to be inspected were
provided by both Heartland Energy Group and Fluid Energy Group LTD.

Findings:
Records were up to date and readily available for review. Records provided by Fluid Energy Group (FEG)
are;

- Transaction List by Vendor 01/2013-11/2013
- Vendor Balance Detail 12/31/2012-11/27/2013
- FEG Purchase Orders 02/01/2013-12/30/2013
- FEG Quality Control Batch Report 04/16/2013-12/19/2013
- FEG Raw Material Blend 04/16/2013-12/19/2013
- FEG Customer Contact List
- FEG Customer Purchase Volume
- Enviro-Syn Pricing sheets
- FEG Product Analysis
- FEG NDAS
- Distribution agreements

Investment and Insurance products distributed by Genworth Financial Securities Corp., Member FINRA/SIPC and a licensed insurance agency (dba Genworth Financial Securities and Insurance Services in CA); investment advisory services are offered through Genworth Financial Advisers Corp., an SEC Registered Investment Adviser. Home offices at 200 N. Martingale Rd., Schaumburg, IL 60173; phone 888-528-2987. Bridge Financial is not affiliated with Genworth Financial Securities Corp. or Genworth Financial Advisers Corp.

- FEG manufacturing facility Inventory
- Non-HEG products distributed
- FEG Royalty Payment Schedule

Fluid Energy appeared to have a satisfactory process of maintaining records as required by distribution and manufacturing contracts. Current inventory records were accurate and facility appeared very competent of handling large distribution capacity. 53' container of totes was delivered and received during audit. FEG payment dates did match records held by HEG, however discrepancy in USD values is present. December was missing on financial reports but accounted for with HEG statements. There were also payments made for material unaccounted for in raw material in HEG records.

Violation/Discrepancy/Infractions:

1. No statements were present as required by Paragraph 6 Section A of both 102B1 and 231B1 distribution contracts to be delivered to Licensor "within fifteen (15) days after the last day of each month during the Term". Said statements must be furnished whether or not minimums are met by the MANUFACTURER.

2. Late payments and underpayments were present throughout the 2013 calendar year. Per Manufacturing contract, Article 6 Section 6.3 "All payments hereunder that are by open account shall be due net thirty (30) days". Article 6 Section 6.5 ""If and for so long as any payment from MANUFACTURER to SUPPLIER under this Agreement shall be overdue, interest at the rate of eight percent (8.0%) per annum shall automatically become due on all overdue balances outstanding." In 2013 the payments were made in an average of 35 days late according to the contractual terms.

3. Minimum production levels have not been met for any quarter in the year of 2013. Per manufacturing contract, Article 5 Section 5.1 "MANUFACTURER and its affiliates agree to use reasonable commercial efforts to meet the Quota for each Calendar Year. The Parties agree the Quota for the total Products purchased by Fluid Energy LTD and SUPPLIER, dated 06/18/2013, shall be one million United States dollars (US$1,000,000). Article 5 Section 5.2 "In the event MANUFACTURER fails to meet the Quota for any Calendar Year, MANUFACTURER may, within forty-five (45) days of the end of such Calendar Year, either (a) make a payment to SUPPLIER equal to shortfall of such Quota to maintain exclusive rights with respect to oil and gas industry applications as set forth in Section 2.1"

4. Article 3 Section 3.2 of the manufacturing agreements states, "Competitive Goods. During the term of this Agreement, neither Party shall Manufacture or Market, directly or indirectly, any products within the Territory that are an alternative to, or compete directly or indirectly with, the Products listed in Exhibit A hereto." Upon completion of audit it was determined the product "Matrix 100" produced by UltraFlow Chemical Services Inc and others has been used in combination with HCR for other unknown applications.

Conclusion:

While records were maintained and made readily available there were serious infractions of requirements set forth in both manufacturing and distribution agreements. These infractions must be remedied immediately to maintain validity of such agreements.

Late Payment Schedule

| Invoice Date | Due Date | Date Received | Days late | Amount Received |
|---|---|---|---|---|
| 02/13/2013 | 03/15/2013 | 04/01/2013 | 16 | $53,460.00 |
| 04/04/2013 | 05/04/2013 | 05/30/2013 | 26 | $28,835.00 |
| 04/04/2013 | 05/04/2013 | 05/13/2013 | 11 | $64,600.00 |
| 04/10/2013 | 05/10/2013 | 08/12/2013 | 94 | $9,741.60 |
| 04/08/2013 | 05/08/2013 | 05/13/2013 | 5 | $10,848.60 |
| 04/30/2013 | 05/30/2013 | 07/25/2013 | 55 | $218,021.27 |
| 06/19/2013 | 07/19/2013 | 09/24/2013 | 66 | $47,600.00 |
| 07/11/2013 | 08/10/2013 | 09/24/2013 | 45 | $47,600.00 |
| 08/01/2013 | 08/31/2013 | 10/23/2013 | 53 | $47,600.00 |
| 10/24/2013 | 11/23/2013 | 12/02/2013 | 9 | $66,607.11 |
| 10/31/2013 | 11/30/2013 | 12/24/2013 | 24 | $64,150.00 |
| 11/21/2013 | 12/21/2013 | 01/07/2014 | 15 | $96,960.00 |
| 11/27/2013 | 12/27/2013 | UNPAID | 16 | UNPAID |
| 12/12/2013 | 01/11/2013 | UNPAID | 4 | UNPAID |

**Please note** as of 01/20/2014 the total amount due for late payments in the 2013 calendar is $5,846.94. This does not include any invoices which remain unpaid.

Best Regards,

Sergio Nativi
Financial Consultant



**HEARTLAND SOLUTIONS, INC.**

P O Box 543
Grain Valley, MO 64029

# Invoice

| P.O. Number | Date | Invoice # |
|---|---|---|
| | | 3054 |

**Bill To**

FLUID ENERGY GROUP LTD
104,214- 11TH AVENUE S E
CALGARY, AB T2G 0X8
Canada

**Ship To**

Bay 18, 4200 46th Ave SE
Calgary, AB T2B-3N7
Canada

| Rep | Ship | Via | Terms |
|---|---|---|---|
| HA | 3/29/2013 | | NET30 |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|---|---|---|---|---|---|
| 14 | MISC | H-MSCR-275;Mud Safe CR;275 gallon totes | CS | 1,540.00 | 21,560.00 |
| 14 | MISC | Tote Charge | CS | 150.00 | 2,100.00 |
| 1 | FRT-Drop Ship | Shipping Charges from Manufacturer | | 5,175.00 | 5,175.00 |

| | | | Sales Tax (0.0%) | $0.00 |
|---|---|---|---|---|
| **Phone #** | **Fax #** | **Web Site** | **Total** | $28,835.00 |
| 816.867.2054 | 816.867.2055 | www.heartland-solutions.com | **Balance Due** | $0.00 |

Remit to:
Heartland Solutions, Inc
PO Box 4040
Omaha, NE 68104-0040

3:09 PM
01/07/14

# Fluid Energy Group Ltd.
## Vendor Balance Detail
### All Transactions

| Type | Date | Num | Account | Amount | Balance |
|------|------|-----|---------|--------|---------|
| **Heartland Energy Group Ltd.** | | | | | |
| General Journal | 12/31/2012 | NH | 20000 · Accounts Payable - USD | 40,000.00 | 40,000.00 |
| General Journal | 12/31/2012 | NH | 20000 · Accounts Payable - USD | -40,000.00 | 0.00 |
| General Journal | 12/31/2012 | NH | 20000 · Accounts Payable - USD | 40,000.00 | 40,000.00 |
| General Journal | 02/27/2013 | NH | 20000 · Accounts Payable - USD | 80,000.00 | 100,000.00 |
| Bill Pmt -Cheque | 02/27/2013 | 0010 | 20000 · Accounts Payable - USD | -100,000.00 | 0.00 |
| General Journal | 04/01/2013 | NH | 20000 · Accounts Payable - USD | 59,016.00 | 59,016.00 |
| General Journal | 04/04/2013 | NH | 20000 · Accounts Payable - USD | 60,000.00 | 119,016.00 |
| Bill Pmt -Cheque | 04/04/2013 | Wire | 20000 · Accounts Payable - USD | -60,000.00 | 59,016.00 |
| Bill | 04/04/2013 | 420 | 20000 · Accounts Payable - USD | 65,497.94 | 124,513.94 |
| Bill | 04/04/2013 | 3054 | 20000 · Accounts Payable - USD | 29,235.81 | 153,749.75 |
| Bill | 04/08/2013 | 422 | 20000 · Accounts Payable - USD | 11,063.40 | 164,813.15 |
| Bill | 04/10/2013 | 421 | 20000 · Accounts Payable - USD | 9,887.72 | 174,700.87 |
| Bill | 04/30/2013 | 425 | 20000 · Accounts Payable - USD | 219,591.02 | 394,291.89 |
| General Journal | 05/01/2013 | NH | 20000 · Accounts Payable - USD | 59,502.00 | 453,793.89 |
| Bill Pmt -Cheque | 05/13/2013 | Debit | 20000 · Accounts Payable - USD | -85,429.28 | 368,364.63 |
| Bill Pmt -Cheque | 05/30/2013 | Debit | 20000 · Accounts Payable - USD | -29,235.81 | 339,128.82 |
| General Journal | 06/01/2013 | NH | 20000 · Accounts Payable - USD | 58,032.00 | 397,160.82 |
| Bill | 06/19/2013 | E508 | 20000 · Accounts Payable - USD | 48,490.12 | 445,650.94 |
| General Journal | 07/01/2013 | NH | 20000 · Accounts Payable - USD | 57,078.00 | 502,728.94 |
| Bill | 07/11/2013 | E520 | 20000 · Accounts Payable - USD | 49,451.64 | 552,180.58 |
| Bill Pmt -Cheque | 07/26/2013 | Debit | 20000 · Accounts Payable - USD | -219,591.02 | 332,589.56 |
| Bill | 08/01/2013 | E547 | 20000 · Accounts Payable - USD | 49,208.88 | 381,798.44 |
| General Journal | 08/01/2013 | NH | 20000 · Accounts Payable - USD | 58,038.00 | 439,836.44 |
| Bill Pmt -Cheque | 08/12/2013 | Debit | 20000 · Accounts Payable - USD | -1,019.80 | 438,816.64 |
| Bill Pmt -Cheque | 08/27/2013 | Debit | 20000 · Accounts Payable - USD | -98,180.00 | 340,628.64 |
| General Journal | 08/27/2013 | NH | 20000 · Accounts Payable - USD | -84,024.00 | 256,602.64 |
| General Journal | 09/01/2013 | NH | 20000 · Accounts Payable - USD | 56,856.00 | 313,458.64 |
| Bill Pmt -Cheque | 09/23/2013 | Debit | 20000 · Accounts Payable - USD | -97,941.76 | 215,516.88 |
| General Journal | 10/01/2013 | NH | 20000 · Accounts Payable - USD | 58,068.00 | 273,584.88 |
| Bill Pmt -Cheque | 10/22/2013 | Debit | 20000 · Accounts Payable - USD | -49,208.88 | 224,376.00 |
| Bill | 10/24/2013 | E638 | 20000 · Accounts Payable - USD | 59,417.93 | 293,793.93 |
| Bill Pmt -Cheque | 10/29/2013 | Debit | 20000 · Accounts Payable - USD | -171,972.00 | 121,821.93 |
| Bill | 10/31/2013 | E647 | 20000 · Accounts Payable - USD | 66,902.04 | 188,723.97 |
| General Journal | 11/01/2013 | NH | 20000 · Accounts Payable - USD | 62,658.00 | 251,381.97 |
| Bill | 11/21/2013 | E662 | 20000 · Accounts Payable - USD | 101,866.18 | 353,248.15 |
| Bill Pmt -Cheque | 11/27/2013 | Debit | 20000 · Accounts Payable - USD | -69,417.93 | 283,830.22 |
| Bill | 11/27/2013 | E668 | 20000 · Accounts Payable - USD | 51,364.56 | 335,194.78 |
| **Total Heartland Energy Group Ltd.** | | | | 335,194.78 | 335,194.78 |

**TOTAL**          335,194.78    335,194.78

9:02 AM
01/08/14
Accrual Basis

# Heartland Energy Group Ltd
# Invoices for FLUID ENERGY GROUP LTD.
### January through December 2013

| | Num | Date | Due Date | Aging | Amount | Open Balance | Date Paid |
|---|---|---|---|---|---|---|---|
| **Jan - Dec 13** | | | | | | | |
| | E666 | 12/12/2013 | 01/11/2014 | | 96,320.00 | 96,320.00 | |
| | E666 | 11/27/2013 | 12/27/2013 | 12 | 48,480.00 | 48,480.00 | |
| | E662 | 11/21/2013 | 12/21/2013 | | 96,960.00 | | 12/24/2013 PD 82,560.00 |
| | | | | | | | 1/7/2014 PD 14,400.00 |
| | E647 | 10/31/2013 | 11/30/2013 | | 64,150.00 | | 12/24/2013 PD IN FULL |
| | E638 | 10/24/2013 | 11/23/2013 | | 66,607.11 | | 12/2/2013 PD IN FULL |
| | E547 | 08/01/2013 | 08/31/2013 | | 47,600.00 | | 10/23/2013 PD IN FULL |
| | E520 | 07/11/2013 | 08/10/2013 | | 47,600.00 | | 9/24/2013 PD IN FULL |
| | E506 | 06/19/2013 | 07/19/2013 | | 47,600.00 | | 9/24/2013 PD IN FULL |
| | 425 | 04/30/2013 | 05/30/2013 | | 218,021.27 | | 7/25/2013 PD IN FULL |
| | 422 | 04/08/2013 | 05/08/2013 | | 10,848.60 | | 5/13/2013 PD IN FULL |
| | 421 | 04/10/2013 | 05/10/2013 | | 9,741.80 | | 8/12/2013 PD IN FULL |
| | 420 | 04/04/2013 | 05/04/2013 | | 64,600.00 | | 5/13/2013 PD IN FULL |
| | 3054 | 04/04/2013 | 05/04/2013 | | 28,886.00 | | 5/30/2013 PD IN FULL |
| | 3002 | 02/13/2013 | 03/15/2013 | | 53,480.00 | | 4/1/2013 PD IN FULL |
| **Jan - Dec 13** | | | | | 900,823.58 | 144,800.00 | |

| Reference Number | Company | HCR Conc. | CSR Conc. | Other | Other Val | $/m³ |
|---|---|---|---|---|---|---|
| 13123 | Anterra | | | | | $ 2,500 |
| 13109 | Athabasca | | | M 100 | 0.50 | $ 2,700 |
| 13125 | Baytex | | | M 100 | 0.75 | $ 2,600 |
| 13081 | Ber-Nor (Conoco) | | | | | $ 2,700 |
| 13023 | CalFrac | | | | | $ 1,800 |
| 13134 | Cambrian | | | | | $ 2,350 |
| 13056 | Canalia Consulting Inc. | | | | | |
| 13011 | CanEra | | | | | $ 2,700 |
| 13052 | CES | | | | | |
| 13045 | CNRL | | | | | $ 2,100 |
| 13090 | CNRL | | | | | $ 2,700 |
| 13108 | CNRL | | | M 100 | 2.00 | $ 2,500 |
| | CNRL | | | M 100 | 2.00 | $ 2,600 |
| | CNRL | | | | | $ 2,700 |
| 13083 | Courage Oilfield | | | | | |
| 13004 | Crescent Point | | | | | $ 3,200 |
| 13122 | Crescent Point | | | | | $ 2,700 |
| 13126 | Encore | | | | | $ 2,000 |
| 13006 | Harvest | | | | | $ 3,200 |
| 13032 | Harvest | | | | | $ 2,600 |
| 13079 | Harvest | | | | | $ 2,400 |
| 13087 | Haulin Acid (CNRL) | | | | | $ 2,600 |
| 13088 | Haulin Acid (CPG) | | | | | $ 3,200 |
| 13008 | Husky | | | | | $ 3,200 |
| 13020 | Husky | | | | | $ 2,600 |
| 13057 | Imperial Esso | | | | | $ 2,500 |
| 13069 | Legacy | | | | | $ 2,500 |
| 13117 | Legacy | | | M 100 | 0.30 | $ 2,700 |
| 13012 | Lonepine | | | | | $ 2,400 |
| 13101 | Mustang | | | | | |
| 13050 | NAL | | | | | $ 2,700 |
| | NewAlta | | | | | $ 2,700 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Penn West | | $100 T-Fee | M-100 0.1 | $ | 2,700 |
| 13001 | PennWest | | | | $ | 3,000 |
| 13002 | PennWest | | | | $ | 3,000 |
| 13003 | PennWest | | | | $ | 3,200 |
| 13007 | PennWest | | | | $ | 3,200 |
| 13034 | PennWest | | | | $ | 1,600 |
| 13040 | PennWest | | | | $ | 2,600 |
| 13010 | RonCo | | | | | |
| | Second Wave | | | | $ | 2,700 |
| 13103 | Shell | | | | | |
| 13104 | Shell | | M100 | 0.53 | $ | 2,700 |
| 13105 | Shell | | M100 | 0.27 | $ | 2,700 |
| 13107 | Shell | | M100 | 0.40 | $ | 2,800 |
| 13121 | Shell | | | | $ | 2,250 |
| 13124 | Shell | | | | $ | 2,250 |
| | Shell | | | | $ | 2,250 |
| | Shell | | | | $ | 2,700 |
| 13038 | Starbrite Colony | | | | | |
| 13127 | StimWrx | | | | $ | 2,000 |
| | StimWrx | | | | $ | 2,000 |
| | StimWrx | | 330.0 | | $ | 2,200 |
| | StimWRX | | | | $ | 2,200 |
| | StimWRX | | | | $ | 2,200 |
| 13026 | Synoil Energy | | | | $ | 2,000 |
| 13080 | Torc Oil & Gas | | | | $ | 2,700 |
| 13042 | Tourmaline | | | | | |
| 13111 | Triton | | | | | |
| 13085 | Triton Industrial | | | | | |
| 13033 | Triton Test | | | | | |
| 13059 | Tundra | | | | $ | 2,700 |
| 13061 | WISE Intervention | | | | | |

| Total M3 | | 1091.48 | 116 | | $ 2,485 | |
|---|---|---|---|---|---|---|
| US gallons | | 288,335 | 30,749 | | avg | |





**ULTRAFLOW**
CHEMICAL SERVICES INC.

PO Box 2684, Stony Plain
Alberta, T7Z 1Y2
Phone: 780-814-3086
Email: info@ultraflow.ca

# ULTRAFLOW'S MATRIX 100

## A VERSATILE WELL STIMULATION ADDITIVE

Matrix MATRIX 100 is a unique micellar solvent that may be used in conjunction with stimulation acids or hot water depending upon well conditions. Stimulation fluids aided with MATRIX 100 are capable of treating most types of formation damage. Treated wells are restored to their maximum production or injection capability.

### MATRIX 100 IN STIMULATION ACID SYSTEMS

MATRIX 100, when incorporated into acid stimulation fluids at 10 – 20%, produces a unique micro-emulsion system that converts traditional acid systems into powerful, non-damaging acid/solvent systems.

MATRIX 100 improves acidizing techniques by:

- Removing and preventing emulsion blocks;
- Converting the formation to a completely water wet state;
- Water wetting mineral scales;
- Water wetting iron sulfides;
- Solubilizing light deposits of waxes, asphaltenes and heavy hydrocarbon sludges;
- Exposing acid reaction sites;
- Suspending acid insoluble fines;
- Promoting stimulation fluid penetration.

MATRIX 100 is for use in all acid systems, including organic/mineral acid systems, all strengths of hydrochloric acid and single or double strength mud acids.

Producing oil, gas or water injection or disposal wells stimulated with acids aided with MATRIX 100 have produced far superior results when compared to conventional acid systems. In particular, stimulation acids aided with MATRIX 100 are effective in treating asphaltene coated iron sulfide deposits found in some injection well.



**ULTRAFLOW**
CHEMICAL SERVICES INC.

PO Box 2684, Stony Plain
Alberta, T7Z 1Y2
Phone: 780-814-3086
Email: info@ultraflow.ca

## MATRIX 100 WATER WELL TREATMENTS

MATRIX 100 water well stimulation treatments provide a practical and effective alternative when acids or other stimulation fluids would prove ineffective or result in formation damage.

MATRIX 100 water well treatments improve well productivity or injectivity by:

- Dissolving and emulsifying light deposits of waxes, asphaltenes and heavy hydrocarbon sludges.
- De-oiling solids
- Completely water wetting the formation
- Resolving emulsion blocks
- Removing sludges formed by previous well stimulation treatments
- Removing bacterial slim and membranes

A typical treatments consists of squeezing 10 – 20% micro-emulsion of MATRIX 100 in 3% KCI water heated 5 – 10°C above the melting point of deposited waxes of formation temperature.

### HINTS ON USING MATRIX 100 STIMULATION FLUIDS

The following guidelines will help in attaining the maximum results from MATRIX 100 aided stimulation treatments:

- Choose only those wells that will benefit from a MATRIX 100 aided treatment, ie. waxy or heavy sludges in the near well bore region.

- Use sufficient stimulation fluid volume to reach and extend beyond the damaged segment of the formation -- a common error is to use too little fluid.

- When acidizing with MATRIX 100 acid systems, increase the acid corrosion inhibitor concentration to compensate for the high surfactant properties of MATRIX 100 acid mixtures.

- Wells treated with MATRIX 100 aided stimulation fluids may produce vast amounts of solids on flow back or with initial production.

| Invoice Date | Due Date | Date Received | Days late | Amount Received | Interest Owed |
|---|---|---|---|---|---|
| 2/13/2013 | 3/15/2013 | 4/1/2013 | 16 | $53,460.00 | $187.48 |
| 4/4/2013 | 5/4/2013 | 5/30/2013 | 26 | $28,835.00 | $164.32 |
| 4/4/2013 | 5/4/2013 | 5/13/2013 | 11 | $64,600.00 | $155.75 |
| 4/10/2013 | 5/10/2013 | 8/12/2013 | 94 | $9,741.60 | $200.70 |
| 4/8/2013 | 5/8/2013 | 5/13/2013 | 5 | $10,848.60 | $11.89 |
| 4/30/2013 | 5/30/2013 | 7/25/2013 | 55 | $218,021.27 | $2,628.20 |
| 6/19/2013 | 7/19/2013 | 9/24/2013 | 66 | $47,600.00 | $688.57 |
| 7/11/2013 | 8/10/2013 | 9/24/2013 | 45 | $47,600.00 | $469.48 |
| 8/1/2013 | 8/31/2013 | 10/23/2013 | 53 | $47,600.00 | $552.94 |
| 10/24/2013 | 11/23/2013 | 12/2/2013 | 9 | $66,607.11 | $131.39 |
| 10/31/2013 | 11/30/2013 | 12/24/2013 | 24 | $64,150.00 | $337.45 |
| 11/21/2013 | 12/21/2013 | 1/7/2014 | 15 | $96,960.00 | $318.77 |
| 11/27/2013 | 12/27/2013 | UNPAID | 16 | UNPAID | |
| 12/12/2013 | 1/11/2013 | UNPAID | 4 | UNPAID | |

Total Interest $5,846.94

# EXHIBIT "K"





This is an example of a *HTML* caption with a link.



Fluid Energy Group Ltd. is a privately owned Canadian based company, with a major focus on the promotion and manufacturing of non-hazardous, synthetic replacement chemistries. From Hydrochloric, Sulphuric, and Hydrofluoric acids to liquid Caustic, and surfactant products we offer extremely unique, safe solutions to various industries worldwide. Presently supported by over 100 years of collective oil & gas industry backgrounds, our family of environmentally safe, innovative, patented products has quickly drawn the attention of some of the largest oil & gas producers in the world. With our broad spectrum of worldwide contacts and associations in the upstream, midstream and downstream markets and our aggressive "worldwide" marketing strategy, Fluid Energy Group is poised to become a leader in the environmentally friendly chemical supply and manufacturing industry.

Almost two-thirds of the world's remaining oil reserves are contained in carbonate reservoirs which require acid stimulation. Acids play a key role in boosting production or increasing injectivity in oil and gas fields. Stimulation of carbonate rocks usually involves a reaction between an acid and the minerals calcite ($CaCO_3$) or dolomite $CaMg(CO_3)_2$ that is intended to enhance the flow properties of the formation. Our products are the world's only 100% biodegradable, non-toxic acid replacements, safe for human exposure (DOT & EPA approved).

Search

Search for:
Search

Fluid News



24 captures
15 Mar 12 - 5 Apr 14



Go    JUN  MAY  JUN   Close ✖  with

◄  19  ►   Help ?  algary

2012  2013  2014



stimulation, pH control, fracking, water
treatment. Almost anywhere an acid or base
is applied we have an environmentally
sound, safe option for you.

- Fluid Energy Group Acquires Triton
  Marine Products

- Fluid Energy Group Receives
  Certificate of Recognition

- Fluid Energy Group Celebrates One
  Year!



With the increased awareness of
environmental issues impacting the oil & gas
industry worldwide, Fluid Energy Group Ltd.
has entered into agreements with our
partners in the Middle East to provide our
technology to the entire Gulf Cooperation
Council.









Copyright © Fluid Energy Group Ltd. 2012-2013. All Rights Reserved.

EXHIBIT "L"



ENERGY GROUP LTD.

#104, 214-11ᵗʰ Ave SE
Calgary, Alberta
T2G 0X8, Canada
Tel   403.GO.FLUID

www.fluidenergygroup.com

- Suppressing Calcium & Magnesium in hard waters

- $H_2S/CO_2$ liberation in drilling fluids

- Caustic scrubbers

- Reducing corrosion in plants & pipelines

- Bitumen extraction in Oilsands

- ASP Water Floods

- Crosslinked Borate fracturing systems

- Enhance polymer hydration properties

- Degreaser/Cleaning Agent

- Neutralizing Agent

- pH Adjustment Mechanism

Canada – Saudi Arabia – Netherlands – Norway – Amsterdam – United States

# EXHIBIT "M"