

# Statement

| Date |
|------|
| 2/18/2014 |

Toll-free: 1-877-797-2811

brenda@heartlandenergygroup.net

To:

FLUID ENERGY GROUP LTD
104,214- 11TH AVENUE S E
CALGARY, AB T2G 0X8
Canada

| | Amount Due |
|---|---|
| | $222,560.00 |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 12/31/2013 | Balance forward | | 159,200.00 |
| 01/07/2014 | PMT #Wire. | -14,400.00 | 144,800.00 |
| 01/17/2014 | PMT #wire. | -48,480.00 | 96,320.00 |
| 01/28/2014 | PMT #Wire. | -96,320.00 | 0.00 |
| 02/03/2014 | INV #E718. Due 03/20/2014. | 125,060.84 | 125,060.84 |
| 02/18/2014 | INV #E748. Due 04/04/2014. | 55,040.00 | 180,100.84 |
| 02/26/2014 | INV #E762. Due 04/12/2014. | 55,040.00 | 235,140.84 |
| 02/26/2014 | INV #E769. Due 04/12/2014. | 55,040.00 | 290,180.84 |
| 03/11/2014 | INV #E776. Due 04/25/2014. | 57,440.00 | 347,620.84 |
| 03/20/2014 | PMT #Wire. | -125,060.84 | 222,560.00 |

**Remit to:**
**Heartland Energy Group Ltd**
**PO Box 4040**
**Omaha, NE 68104-0040**

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
|---------|--------------------|--------------------|--------------------|----------------------|------------|
| 0.00 | 0.00 | 222,560.00 | 0.00 | 0.00 | $222,560.00 |

# EXHIBIT "N"

•

**From:** Darren Thatcher [mailto:d.thatcher@fluidenergygroup.com]
**Sent:** Monday, March 24, 2014 3:18 PM
**To:** jmac@enviromfg.com
**Cc:** Clay Purdy
**Subject:** RE: US SALES VIOLATION

1) Looking back through emails we did provide an approximate cost per tote to them, but this was for use and not reselling.

2) No, we shipped a sample with a Fluid Energy, Enviro-Syn HCR label on it.

**From:** John Macdonald [mailto:jmac@enviromfg.com]
**Sent:** Monday, March 24, 2014 12:45 PM
**To:** Darren Thatcher
**Cc:** Clay Purdy
**Subject:** RE: US SALES VIOLATION

Darren,

While I appreciate your response, please address my questions.

1) Did Fluid provide Enovo pricing FOB Calgary Canada to Bakersfield California USA?

2) Did Fluid ship a sample to Enovo with a make shift EMS label affixed to the sample?

**From:** Clay Purdy [mailto:Clay@fluidenergygroup.com]
**Sent:** Monday, March 24, 2014 2:25 PM
**To:** <jmac@enviromfg.com>
**Cc:** Darren Thatcher
**Subject:** Re: US SALES VIOLATION

Darren replied because I do not handle that side of the business John. Darren is COO, and oversees all operations.

Best Regards,
Clay Purdy

On Mar 24, 2014, at 12:18 PM, "John Macdonald" <jmac@enviromfg.com> wrote:

You response was that you were not Clay and I replied that I was simply copying you and then you replied that you had no such distributor and asked the name and I said I would get back with you as I was on vacation thus here we are.

1

It seems that Enovo may be the issue here as Enovo presented a product that shows to have been shipped from Fluid in Calgary "HOWEVER". It has an EMS label on it that was not produced from or by EMS.

Further they state that they were in fact told by a Fluid rep. that they are not "SUPPOSED" to sell in the united states so proceed with caution.

So , what I am hearing is that Fluid did in fact provide Enovo with a sample.  That being said, I HIGHLY doubt Fluid would have labeled it with an EMS label.  So since it clearly had a make shift EMS label on it and Enovo made the statements they made, I would lean towards believing that Enovo is the route to the evil here.

On another note, I addressed this email to Clay so just as you stated you were not Clay in the text message, I need to ask, why you felt inclined to tender a reply to this?

**From:** Darren Thatcher [mailto:d.thatcher@fluidenergygroup.com]
**Sent:** Monday, March 24, 2014 2:02 PM
**To:** jmac@enviromfg.com
**Cc:** Clay Purdy
**Subject:** RE: US SALES VIOLATION

I believe I responded to you by text that we had no such "distributor" set up, and you said you would provide details when back from vacation.

This is the first communication on the topic since that time.

We had discussed our products with Enova (through a Canadian rep), and sent samples for testing on their waterflood scale 5 or 6 months ago.

We are quite confused as well, as Enova just contacted us last week asking if Brenntag was now distributing our product.

A Brenntag rep claimed to have an exclusive distribution agreement for Western USA, and had been selling some already?

We told them we had no such arrangement, and asked for more details.

All they could provide was that the Brenntag rep referred to it as HCR, but pointed to your website for more information?

It appears to me that someone is promoting our HCR through a form of EMS?

I will state it again that Fluid is NOT distributing our product to anyone in the US!

**From:** John Macdonald [mailto:jmac@enviromfg.com]
**Sent:** Monday, March 24, 2014 10:41 AM
**To:** Clay Purdy
**Cc:** Darren Thatcher
**Subject:** US SALES VIOLATION

Clay,

On March 12, 2014 I contacted you regarding the findings of a Fluid distributor offering products for sale in the United Stated and have yet to receive any reply from you on this.. This distributor is Enovo who has in their possession current pricing from Fluid FOB Calgary to Bakersfield California.

After a quick review of Fluids files, we do not find Enovo as a Fluid distributor.

This and the fact that Enovo is offering product for sale, FOB Calgary Canada into the United States in a serious violation.

Furthermore, and quite confusing is that there is a sample that Enovo presents that shows it was clearly shipped from Calgary and to Enovo in Bakersfield California with a makeshift EMS label on it.

This is what would be referred to as "passing off"

We need an immediate explanation of these actions and your assurance that Fluid will cease and desist these and any other such violations.

*John MacDonald*
EMS
Environmental Manufacturing Solutions
www.enviromfg.com

# EXHIBIT "O"

# ENVIRO-SYN
# CSR

## Synthetic Caustic Solution Replacement

Comparable performance properties of liquid caustic solutions, without any of the extremely hazardous properties.



ENERGY GROUP LTD.

**Exclusively Distributed By:**
Fluid Energy Group Ltd.
#104, 214 – 11th Ave SE
Calgary, Alberta CANADA T2G 0X8

Phone: 403.GO.FLUID (403.463.5843)
www.fluidenergygroup.com

**Enviro-Syn CSR** is part of an environmentally safe synthetic chemical replacement family; that has comparable performance properties of liquid caustic solutions, without the extremely hazardous properties. **Enviro-Syn CSR** contains no conventional hydroxides, but can very effectively maintain or increase the pH level in fluid systems. It is non-regulated for transportation/handling, is non-toxic, non-fuming, and will not cause chemical burns. **Enviro-Syn CSR** is a safe, viable alternative for caustic solution applications such as neutralizing acid gases in drilling/production fluids, increasing the alkalinity of fluid mixtures, or as a cleaning/degreasing agent.

## BLENDING DIRECTIONS
Mix product thoroughly.
Blending ratios may vary based on specific applications and recommendations from your consultants at Fluid Energy Group Ltd.

**BATCH BLEND ONLY; NOT FOR RESALE**

## WARNING!
When pumping this product it is strongly recommended to use manufacturer approved hose couplings or fittings. 316 Stainless Steel is recommended.

**DO NOT USE ALUMINUM FITTINGS.**

## FIRST AID
If swallowed, drink two glasses of water. In case of eye contact, flush with water for two minutes. If symptoms persist, seek medical advice. In case of skin contact, wash thoroughly with soapy water. As with all chemicals, keep out of reach of children.
For Commercial and Industrial Use Only.

**IN CASE OF EMERGENCY**
**CALL 1-800-424-9300**

## GUARANTEE
This product is guaranteed to be free from defects, true to its contents.

## 0-0-0 HMIS (Hazardous Materials Index Score)

Health:         0
Flammability:  0
Reactivity:     0

  



# ENVIRO-SYN
# HCR

## Synthetic Hydrochloric Acid Replacement

Environmentally safe synthetic acid replacement product that has comparable solubilizing/performance abilities of Hydrochloric acid.



ENERGY GROUP LTD.

**Exclusively Distributed By:**
Fluid Energy Group Ltd.
#104, 214 – 11th Ave SE
Calgary, Alberta CANADA T2G 0X8

Phone: 403.GO.FLUID (403.463.5843)
www.fluidenergygroup.com

**Enviro-Syn HCR** is part of the environmentally safe synthetic acid replacement product line that has comparable solubilizing abilities of Hydrochloric acid, without the extremely hazardous properties. **Enviro-Syn HCR** contains no conventional acids and will not promote excessive corrosion, yet will effectively attack multiple forms of carbonate based scale/mineral build-up, and formation matrices. **Enviro-Syn HCR** is non-regulated for transportation/handling, is non-toxic, non-fuming, and will not corrode or rust metals. **Enviro-Syn HCR** is an extremely safe replacement for most Hydrochloric acid blends, and can be enhanced through the addition of synthetic surfactants.

**BLENDING DIRECTIONS**
Mix product thoroughly.
Blending ratios may vary based on specific applications and recommendations from your consultants at Fluid Energy Group Ltd.

**BATCH BLEND ONLY; NOT FOR RESALE**

**WARNING!**
When pumping this product it is strongly recommended to use manufacturer approved hose couplings or fittings. 316 Stainless Steel is recommended.

**DO NOT USE ALUMINUM FITTINGS.**

**FIRST AID**
If swallowed, drink two glasses of water. In case of eye contact, flush with water for two minutes. If symptoms persist, seek medical advice. In case of skin contact, wash thoroughly with soapy water. As with all chemicals, keep out of reach of children.
For Commercial and Industrial Use Only.

**IN CASE OF EMERGENCY
CALL 1-800-424-9300**

**GUARANTEE**
This product is guaranteed to be free from defects, true to its contents, free from urea hydrochloride salts, other organic salts, Hydrofluoric acid and other traditional acids.

**0-0-0 HMIS (Hazardous Materials Index Score)**
Health:           0
Flammability:   0
Reactivity:       0

  



EXHIBIT "P"

Menu ▼ ()                    Register (http://globalpetroleumshow.com/pricing/)

EXHIBITOR

# **Fluid Energy Group**

Lower Big Four - Booth 5361


(www.fluidenergygroup.com)
#104, 214 - 11th Ave SE
Calgary, Alberta - Canada - T2G 0X8
P: (Phone) (403) 463-5843
E: (Email) Todd@fluidenergygroup.com (mailto:Todd@fluidenergygroup.com)


# About this Company

Fluid Energy Group Ltd. is a privately owned Canadian based company, with a major focus on the promotion and manufacturing of environmentally friendly, non-hazardous, synthetic replacement chemistries. From Hydrochloric, Sulphuric, and Hydrofluoric acids to liquid Caustic, and surfactant products we offer extremely unique, safe solutions to industries worldwide. Our family of environmentally safe, innovative, patented products has quickly drawn the attention of some of the largest oil & gas producers, commercial and industrial organizations around the world. With a presence in Canada, Saudi Arabia, Luxembourg, Netherlands, and the United Arab Emirates, as well as manufacturing facilities in Canada, Saudi Arabia and the United States we are well positioned to serve your needs.
Our products are applicable to several key industries including; oil & gas, water treatment, marine, mining, pulp & paper, agricultural, food processing, and manufacturing to name a few.
If you would like more information on our company or products please visit our website for technical information.

www.fluidenergygroup.com (http://www.fluidenergygroup.com)

# Browse Exhibitors (http://globalpetroleumshow.com/whos-here#exhibitors)



(http://globalpetroleumshow.com)

Privacy Policy (http://globalpetroleumshow.com/privacy-policy)

Copyright (http://globalpetroleumshow.com/copyright)

Terms & Conditions (http://globalpetroleumshow.com/terms-conditions)

Contact (http://globalpetroleumshow.com/contacts)

**Exhibitor Login (http://globalpetroleumshow.com/wp-login.php)**

Register (http://globalpetroleumshow.com/pricing/)

# EXHIBIT "Q"

-----Original Message-----
From: Clay Purdy [mailto:Clay@fluidenergygroup.com]
Sent: Tuesday, November 26, 2013 3:22 PM
To: John Macdonald
Subject: News Release

John, would you be able to issue a news release (EMS I guess) stating that exclusive oil & gas rights have been issued to Fluid, for our territory's, for your technology. We would like to post it on the website in the news section. We would need your approval to do so, as per 18.6 of the manufacturing agreements. I think it is time to do this formally on your part, and it would be received well by our investors etc. I don't think it needs to be to detailed, just stating the facts? Thoughts?

Best regards,
Clay Purdy
Chief Executive Officer
Fluid Energy Group Ltd.
104-214, 11th Ave SE
Calgary, AB Canada T2G 0X8
Tel: 1-403-Go-Fluid Cell:1-403-548-5149
www.fluidenergygroup.com<http://www.fluidenergygroup.com/>
P  Please consider the environment before printing this e-mail .. .

Disclaimer - This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system. We do not guarantee that this material is free from viruses or any other defects although due care has been taken to minimize the risk.

1



ENERGY GROUP LTD.

#104, 214-11th Ave SE
Calgary, Alberta
T2G 0X8, Canada
Tel 403.GO.FLUID

www.fluidenergygroup.com

NEWS RELEASE:

John Macdonald and EMS are proud to announce that they have granted exclusive oil & gas industry manufacturing & distribution rights to Fluid Energy Group Ltd. Through this association, Fluid Energy Group will supply EMS's unique acid and caustic replacement technology to the oil & gas industry on a global scale.

Fluid brings a wealth of oil & gas expertise and global associations to bear. In operation for almost two years, Fluid has had great success in introducing its line of products to the industry and is in various stages of oil/gas company and government qualifications around the globe.

Enviro-Syn is a globally patented technology that allows operators to replace the hazardous acids and caustics used in the industry with the safe, bio-degradable, non-regulated technology that Fluid manufactures. With a large "hub" facility in Calgary, Alberta and plans for similar facilities around the world in major markets, Fluid is poised to become a global leader in "green chemical" technology.

Management of both companies looks forward to a long and fruitful relationship and continues to develop new and exciting replacement chemical options for the industry.

Canada – Saudi Arabia – Netherlands – Norway – Amsterdam – United States

# EXHIBIT "R"



English
简体中文 {Chinese (Simplified)}

Home ▼    The Company ▼    Products ▼    Manufacturing ▼    Logistics ▼    QHSE ▼    Contact

SEARCH

You are here: **Home** » nyheter » Fluid Energy Group and Todnem AS attending OTD

## Fluid Energy Group and Todnem AS attending OTD

Posted by axel_todnem on October 18, 2013   | No Comments

Our Canadian partners Fluid Energy Group is joining Todnem AS for a mutual presentation of the much anticipated line of Acid and Caustic Replacements.

We encourage everybody to join our stand where you can learn more about this revolutionizing line of products. Enviro Syn is the trade name a of a line of environmentally and HSE friendly acid and caustic replacements, developed and patented by Fluid Energy Group and represented in Northern Europe by Todnem AS.

Replacing hydrochloric and sulphuric based acids among others, the Enviro Syn line is non-hazardous and easy to handle while offering the same or similar characteristics in a range of industrial applications.

Visit us on stand J 5403 for more information

  Visit us (22)-23-24 October in Stavanger!
**www.offshoredays.com**



# Meet us at OTD2013 STAVANGER!

This entry was posted in nyheter  Bookmark the permalink.

# EXHIBIT "S"



1114 Avenue of the Americas
New York, New York
10036-7703
Tel. (212) 880-6000
Fax (212) 682-0200
www.torys.com

April 11, 2014

Heartland Energy Group Ltd.
1042 West End, OBB Grand Bahama
Grand Bahama
Bahamas

Heartland Energy Group Ltd.
c/o John MacDonald at jmac@enviromfg.com

Environmental Manufacturing Solutions LLC
7705 Progress Circle
Melbourne, FL 32904

Mr. John MacDonald
jmac@enviromfg.com

Mr. Stephen Rowley
steve@heartlandenergygroup.com

Re:  Fluid Energy Group

Dear Sirs:

We represent Fluid Energy Group Ltd. and its affiliates (collectively, "Fluid"), which are parties
to licensing and manufacturing agreements with Heartland Energy Group Ltd. ("HEG") dated
October 12, 2012, and amended and restated June 18, 2013, and manufacturing and shipping
agreements with Environmental Manufacturing Solutions LLC and Environmental
Manufacturing Solutions – East Coast (collectively, "EMS") dated November 1, 2012 (the
"Agreements").

Under the Agreements, HEG licenses certain patented technology to Fluid and authorizes Fluid
to manufacture and market products based on the patented technology.  The patents relate to
cleaning methods and compositions that are said to be "non-corrosive to metals" and to have
been "shown to reduce corrosion levels to well below [U.S. Department of Transportation]
corrosion limits of 6.25 mmpy." (U.S. Patent No. 8,163,102.)

John MacDonald, who is a Director of HEG, and Manager of EMS and Stephen Rowley, who is
President of HEG, repeatedly assured Fluid before the Agreements were signed that the patented

- 2 -

technology was not corrosive to steel or aluminum and was not regulated for purposes of domestic and international transportation. Those assurances were made orally and in writing, including in the following documents that MacDonald and Rowley provided to Fluid (copies of which are enclosed herewith):

●   The label for a product called Oil Safe AR, which MacDonald and Rowley represented was a commercial embodiment of the patented technology. This label bears the logos of EMS and Heartland Solutions Inc. (Heartland Solutions"), of which Rowley is the registered agent. It states that the product is non-D.O.T. regulated. . . and will not corrode or rust metals" and "will not harm oil field equipment or promote corrosion."

●   An EMS Material Safety Data Sheet dated March 13, 2009, for Oil Safe AR – Non Regulated Material, which states that the product is "not regulated as hazardous" by the U.S. Department of Transportation, Transport Canada (under the Transportation of Dangerous Goods Act) or international maritime and air transport agencies.

●   A description of Oil Safe AR bearing the logos of EMS and Heartland Solutions, which states that the product "is 20 times less corrosive than even the 6.25 mmpy rating that would classify it as corrosive on a label."

●   A Technical Data Sheet on Oil Safe AR bearing the Heartland Solutions logo, which states that the product's corrosion rates on steel and aluminum are "0.59 mmpy" and "3.96 mmpy," respectively, which is "NON-CORROSIVE."

●   An Oil Safe AR PowerPoint presentation stating that the product is "non-D.O.T. regulated," "will not corrode or rust metals," "[r]equires no additional corrosion inhibitor addition" and "is 20 times less corrosive than even the 6.25 mmpy rating that would classify it as corrosive on a label."

In addition, MacDonald and Rowley provided Fluid with purported independent laboratory reports on the corrosion rates of Oil Safe AR and Mud Safe CR, which they represented was another commercial embodiment of the patented technology. The Oil Safe AR Immersion Corrosion test report is on the letterhead of "NASA Support Labs," and states that the corrosion rate of the product "does not exceed 6.25 millimeters per year" on "SAE C1020 Steel" or "7075-T6 non-clad Aluminum." The Mud Safe CR Immersion Corrosion test report is on the letterhead of "Del Tech Laboratories Ltd." and it likewise states that the corrosion rate of the product does not exceed 6.25 mmpy on steel or aluminum.

The representations by MacDonald and Rowley that the patented technology was non-corrosive and not regulated for transportation purposes were material inducements to Fluid entering into the Agreements. Non-regulated status was crucial to Fluid's ability to market products to customers without incurring significant regulatory costs. In addition, having a non-corrosive and non-regulated product was a significant marketing advantage over competing products in the oil and gas industry.

- 3 -

Fluid relied on those representations and would not have entered into the Agreements without MacDonald's and Rowley's repeated and detailed assurances that the patented technology was non-corrosive and non-regulated.

Since it signed the Agreements, Fluid's customers have done corrosion testing of the patented technology and Fluid has confirmed that the technology does not come close to meeting a corrosion limit of 6.25 mmpy or the specific corrosion results stated in the documents referred to above. It has also learned that products embodying the technology are not exempt from applicable transportation regulations.

Fluid has also concluded that the supposed "NASA" and "Del Tech" laboratory reports are fabrications. There appears to be no "NASA Support Labs" at the address shown on the report or anywhere else; and no such laboratory is shown on NASA's Web site. The persons who supposedly signed the "NASA" report, "Luke Rothenburg" and "Dr. Pam Eglin Ph.D.," cannot be located. There also appears to be no "Del Tech Laboratories Ltd.," although there is a regulatory testing laboratory with a similar name, "Dell Tech Laboratories Ltd.," in London, Ontario. The "Del Tech" report provided to HEG is not signed, but the same report appears in a Heartland Solutions booklet of data bearing the purported signature of "Pam Eglin," the supposed signer of the "NASA" report.

The facts outlined above demonstrate that MacDonald and Rowley, individually and on behalf of HEG, fraudulently induced Fluid to enter into the Agreements. The claims made by MacDonald and Rowley that the patented technology was non-corrosive and non-regulated were false statements of fact; the fabrication of laboratory reports and other circumstances prove that MacDonald and Rowley knew the non-corrosion claims were false; the non-corrosion claims were material inducements to Fluid's entering into the Agreements; and Fluid has incurred significant damages as a result, including royalty payments under the Agreements, costs to develop non-corrosive products and lost profits.

Fluid's remedies for such fraud include:

- Rescission of the Agreements.

- Restitution of all royalty and other payments it has made under the Agreements.

- Damages, including recovery of Fluid's deposit payment to HEG for distribution rights in the U.S., its costs in developing non-corrosive products, and lost profits estimated to be several million dollars.

- Punitive damages.

- Attorneys' fees and other arbitration and court costs that may be incurred.

- Pre-judgment interest on the foregoing amounts.

36310-2001 168980352

- 4 -

Fluid hereby demands (i) that HEG and EMS acknowledge and agree that the Agreements are void and rescinded, and (ii) that HEG repay Fluid all royalties paid under the Agreements in the sum of $700,000 plus $100,000 that Fluid paid as a deposit for U.S. distribution rights.

If HEG and EMS do not comply with these demands by April 25, 2014, Fluid will pursue the remedies outlined above and any other legal or equitable remedies that may be available against HEG, EMS, MacDonald and Rowley.

Fluid also demands that HEG, EMS, MacDonald and Rowley (and all entities affiliated with them) retain without alteration all records, communications, notes, testing data and other recorded information in paper or electronic form that refers or relates to the patented technology or the Agreements. Failure to do so may constitute spoliation of evidence under applicable law.

Finally, if HEG, EMS, MacDonald or Rowley improperly interferes with Fluid's customer relationships, Fluid will vigorously pursue its remedies for such conduct.

Very truly yours,

David Wawro

Tel. (212) 880-6288
dwawro@torys.com

DW/rlf

cc: Mr. Clay Purdy

36310-2001 16B98035.2



## Environmental Manufacturing Solutions LLC
7705 Progress Circle
Melbourne, Florida 32904
800-510-8812

PHONE: (321) 837-0500) or 1-877-424-6979 for MSDS Requests

CHEMTREC (PUBLIC EMERGENCY): 1-800-424-9300 (24 hours)

| HMIS RATING | |
|---|---|
| Health | 0 |
| Flammability | 0 |
| Reactivity | 0 |
| Personal Protection | NA |

---

**1. PRODUCT: OIL SAFE AR - NON REGULATED MATERIAL**

| 2. HAZARDOUS (OR OTHER) INGREDIENTS | CAS NUMBER | OSHA PEL | ACGIH TLV | % RANGE |
|---|---|---|---|---|
| PROPRIETARY TRADE SECRET PERMITTED | NA | NA | NA | |

See Section– Federal Register Vol. 48 No. 228 Nov.

25, 1983 Rules & Regulations

---

**3. HEALTH HAZARD DATA:**

ROUTES OF ENTRY: _____ Inhalation   _X_ Skin   _X_ Eye   _X_ Ingestion

CARCINOGENICITY: _X_ Not Listed   _____ NTP   _____ IARC   _____ OSHA   _____ ACGIH

OVEREXPOSURE: Medical Conditions Aggravated:   **None known**   Potential Effects:   **NA**

**4. EMERGENCY AND FIRST AID PROCEDURES:**   INHALATION: move to fresh air
SKIN CONTACT: Wash with soap and water. EYE CONTACT: Flush with water for 15 minutes. If pain persists
seek medical attention. INGESTION: Drink 2-3 of glasses of water and consult a physician.
DO NOT INDUCE VOMITING.

| 5. FIRE FIGHTING OR EXPLOSION DATA: | Flash Point, °F/°C:   NA (PMCC Method) | Flammability Limits: | LEL, %   NA   UEL, %   NA |
|---|---|---|---|

EXTINGUISHING MEDIA: _____ Water Fog   _____ Alcohol Foam   _____ CO$_2$   _____ Dry Chemical   _____ Other

Unusual Fire and Explosion Hazards:   **None known**       NFPA 704 Rating:   _0_   _0_   _0_   _NA_

Special Fire Fighting Procedures:   **None known**

**6. ACCIDENTAL RELEASE MEASURES:**
IF MATERIAL IS RELEASED OR SPILLED:
Spilled material should be washed away with copious amounts of water. Material neutralizes with water.

**7. PRECAUTIONS FOR SAFE HANDLING AND USE:** STORE AWAY FROM THE REACH OF SMALL CHILDREN.
PERSONAL PRECAUTIONS:   **None known**

STORAGE AND OTHER PRECAUTIONS:   Keep container tightly closed when not in use.

**8. CONTROL AND PROTECTION MEASURES:** COMPLY IF APPLICABLE EXPOSURE LIMITS SHOWN IN SECTION 2 ABOVE.

TLV (ACGIH):NA       PEL (OSHA): NA       TWA: None   STEL: None   Skin Note: NA

VENTILATION: Mechanical:   Not required if used as directed   Local:   Not Required   Special:   Not Required

PERSONAL PROTECTION: Respiratory:   NA       Eyes:   Not required   Skin:   Not Required

Protective Equipment or Clothing: Not required       Work/Hygienic Practice:   Routine personal hygiene

**OIL SAFE AR**

---

### 9. PHYSICAL AND CHEMICAL CHARACTERISTICS

| | | | |
|---|---|---|---|
| Boiling Point, $°F/°C$: | 212 F | Melting Point, $F/°C$: | NA |
| Vapor Pressure (mm Hg): | NA | Specific Gravity ($H_2O$ =1): | 1.12 |
| Vapor Density (Air =1): | NA | Evaporation Rate ($H_2O$ =1): | NA |
| Volatility, % | NA | Viscosity, cps: | water weight |
| Solubility in Water: | 100% | Color/Clarity/Form & Odor: | dark amber color |
| pH | >-0.5 | Form & Odor: | liquid, mild odor |

### 10. STABILITY AND REACTIVITY DATA

Stability:     **Stable**          Hazardous Polymerization:     **None known**     Conditions to Avoid:     **None known**

Incompatibility (Avoid): **Strong chlorinated agents**     Decomposition or By-Products:     **NA**

### 11. TOXICOLOGICAL INFORMATION:
ALSO SEE SECTION 3

NO ACUTE TOXIC EFFECTS EXPECTED BY INHALATION, INGESTION, OR CONTACT DURING ANTICIPATED HANDLING AND USAGE. NO LONG TERM CHRONIC EFFECTS.

Irritant:     **Not a primary irritant**          Sensitization:     **None known**     Synergism:     **None known**

Skin LD50:     **NE**          Oral LD50:     **NE**          Inhalation LC50:     **NE**

### 12. ECOLOGICAL INFORMATION:
NOT EXPECTED TO CAUSE ADVERSE ENVIRONMENTAL EFFECTS. NOT CONSIDERED ENVIRONMENTALLY HARMFUL FROM NORMAL DILUTION, EXPECTED USAGE AND TYPICAL DRAINAGE TO SEWERS, SEPTIC SYSTEMS, AND TREATMENT PLANTS.

POTENTIAL: Biodegradation: **ND**          Oxygen Depletion: **ND**          Bioconcentration: **No**

AFFECTS:     Aquatic Organisms: **ND**          Waste Plant Microbes: **ND**          BOD: **NE** COD: **NE**

### 13. DISPOSAL GUIDELINES:
DISPOSE ACCORDING TO LOCAL, STATE/PROVINCE, FEDERAL & INTERNATIONAL REGULATIONS. NOT A CHARACTERISTIC HAZARDOUS OR LISTED WASTE BY USEPA & RCRA (40CFR PART 261).

### 14. TRANSPORT REGULATIONS:     NOT HAZARDOUS BY DOT, HM-181, TDG, IATA, & IMO REGULATIONS.

Shipping Class:     **Not regulated as hazardous**          Label:     **NA**          UN/NA/PIN:     **NA**

### 15. REGULATORY CONSIDERATIONS:
NOT REGULATED BY DOT, OSHA, WHMIS, TSCA, SARA, OR STATES.

TSCA, DSL, EINECS:     **Components of the product are listed, exempted or excluded from these requirements.**

SARA TITLE III: Sec. 302 EHS, TPQ:     **NA**     Sec. 304 EHS, RQ:     **NA**     Sec. 311/312:     **NA**     Sec. 313:     **NA**

USA STATE REGULATIONS: Reportable substances present at notification quantities:     **NA and None known**

INTERNATIONAL HAZARD CLASS: Canada (WHMIS or TDG):     **Not a Controlled Product**     EEC:     **Not Regulated**

### 16. OTHER RELEVANT INFORMATION:     NO DATA AVAILABLE UNLESS SPECIFICALLY INDICATED BELOW.

DATE:          13 Mar 2009                              SUPERSEDES:          6 Aug 2007

NOTICE: THE INFORMATION HEREIN IS BASED ON DATA CONSIDERED TO BE ACCURATE AS OF THE DATE OF PREPARATION OF THIS MATERIAL SAFETY DATA SHEET. HOWEVER, NO WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED, IS MADE AS TO THE ACCURACY OR COMPLETENESS OF THE FOREGOING DATA AND SAFETY INFORMATION. THE USER ASSUMES ALL LIABILITY FOR ANY DAMAGE OR INJURY RESULTING FROM ABNORMAL USE FROM ANY FAILURE TO ADHERE TO RECOMMENDED PRACTICES OR FROM ANY HAZARDS INHERENT IN THE NATURE OF THE PRODUCT.

NA=NOT APPLICABLE, ND=NO DATA, NE=NOT ESTABLISHED.  FORM COMPLIES WITH OSHA FORM 174, EEC, & DRAFT ANSI FORMATS.



OVERVIEW of OIL SAFE AR®:

Oil Safe AR® is a patented acid replacement technology made exclusively by EMS for formulations listed under the registered trademarks of Heartland Solutions, Inc. Oil Safe AR® is distributed exclusively by Heartland Solutions, Inc. and its' authorized distributors into the Oil and Gas Industry.

TECHNOLOGY & PATENT DESCRIPTION:

The heavy hydrogen dose in Oil Safe AR® is due to a proprietary process which "mines" hydrogen ions from the world's greatest solvent; water. Our patented process allows us to pack such extreme amounts of hydrogen into the formulas that the resulting parts hydrogen (pH) of Oil Safe AR® formulations are often between -0.5 to 0.0.

Conventional thinking would lead one to label a liquid with a pH of 0.0 as a corrosive substance. However, we have letters from the EPA, DOT and local OSHA organizations stating exactly the opposite.

Because we only choose the hydrogen with particular properties and characteristics, the hydrogen does not act like hydrogen found in common mineral or organic acids. A large quantity of hydrogen in organic or mineral acids will form corrosion sites at weak locations of the metal or other vulnerable surfaces. The hydrogen in Oil Safe AR®, while plentiful, does not organize in such a fashion.

The result is that raw Oil Safe AR® is 20 times less corrosive than even the 6.25mmpy rating that would classify it as a corrosive on a label. It is recognized safe on steel, aluminum, chrome, painted surfaces, glass, rubber and other surfaces that are easily damaged by traditional acids.

What's more, its' safety on metal translates to personal and environmental safety. All Oil Safe AR® formulations carry a triple zero HMIS score, are certified for direct release by the EPA's Design for Environment Program and require no glove, goggles or other personal protective gear for their safe use.






## Oil Safe AR™
**Synthetic Acid Replacement**

Oil Safe AR™ is the world's only synthetic acid with identical cleaning properties of Muriatic (hydrochloric) acid with nona of the harmful side-effects. Oil Safe AR™ is non-D.O.T. regulated, non-fuming, and will not corrode or rust metals and is 100% OSHA and EPA compliant. Powered by Syntech®, Oil Safe AR™ is a direct replacement for Muriatic acid blends and carries a triple zero Hazardous Material Index Score. Oil Safe AR™ has been improved by the addition of an aggressive blend of detergents and a synthetic anti-stick agent. Oil Safe AR™ contains no acid and will not harm oil field equipment or promote corrosion. Oil Safe AR™ effectively attacks calcium carbonate, scaling and mineral build-up and will not harm work-over rigs and pumping equipment. It will not rust or corrode pipes. Oil Safe AR™ may be fed in conjunction with NanoDissolve™ to help break loose stubborn paraffin build-ups.

### USE DIRECTIONS
Introduce Oil Safe AR™ into the environment where the removal of mineral deposits is needed.

### DILUTION RATIOS
| | |
|---|---|
| Light Buildup: | Dilute 5:1 |
| Moderate Buildup: | Dilute 3:1 |
| Heavy Buildup: | Dilute 1:1 |
| Severe Buildup: | Use undiluted |

### CONTENTS
☐ 5 GALLONS  ☐ 55 GALLONS
☐ 275 GALLONS  ☐ OTHER _____ GALLONS

Powered by




*Manufactured by EMS exclusively for Heartland Solutions, Inc.*

*Recognized for Safer Chemistry www.epa.gov/dfe*



**For Commercial and Industrial Use Only**

## WARNING

**FIRST AID**
If swallowed, drink two glasses of water. In case of eye contact, flush with water for two minutes. If symptoms persist seek medical advice. In case of skin contact, wash thoroughly with soap and water. As with all chemicals, keep out of reach of children.

**FIRE PRECAUTIONS**
Non flammable

**IN CASE OF SPILL**
Neutralize with water.

**CONTAINS**
Proprietary Patented Blend



**DOT HAZARD CLASS**
Non DOT Regulated

**DOT SHIPPING NAME**
Non DOT Regulated, Cleaning Compound, Liquid, Class 50

**DISCARD**
Rinse empty container with water and discard per federal, state and local regulations.

**FOR INDUSTRIAL USE ONLY**
Before using this product, read the latest material safety data sheet.

IN CASE OF CHEMICAL EMERGENCY
CALL 1-800-424-9300

Heartland Solutions, Inc.
P.O. Box 543
Grain Valley, MO 64029
P:816-867-2054  F:816-867-2055
www.heartland-solutions.com
©2010 Heartland Solutions, Inc. All Rights Reserved.



MADE IN THE U.S.A.

  

**TECHNICAL DATA SHEET**

# Oil Safe AR

**Synthetic Acid Replacement**
Oil Safe AR™ is the world's only synthetic acid with identical cleaning properties of Muriatic (hydrochloric) acid with none of the harmful side-effects. Oil Safe AR™ is non-D.O.T. regulated, non-fuming, and will not corrode or rust metals and is 100% OSHA and EPA compliant. Powered by Syntech®, Oil Safe AR™ is a safer replacement for Muriatic acid blends and carries a triple zero Hazardous Material Index Score. Oil Safe AR™ has been improved by the addition of an aggressive blend of detergents and a synthetic anti-stick agent. Oil Safe AR™ contains no acid and will not harm oil field equipment or promote corrosion. Oil Safe AR™ effectively attacks calcium carbonate, scaling and mineral build-up and will not harm work-over rigs and pumping equipment. It will not rust or corrode pipes. Due to Oil Safe AR's increased ability to penetrate complex calcium carbonate and paraffin based deposits, Oil Safe AR can replace dangerous solvents and save additional steps during the work over process.

## Application

Introduce Oil Safe AR™ into the environment where the removal of mineral deposits is needed.

**DILUTION RATIOS:**

| | |
|---|---|
| Light Buildup: | Dilute 5:1 |
| Moderate Buildup: | Dilute 3:1 |
| Heavy Buildup: | Dilute 1:1 |
| Severe Buildup: | Use undiluted |

## Storage & Handling

Oil Safe AR™ has a storage life of better than one year. Keep container closed when not in use. As with all chemical products and materials, take care as to where you store them. Safety glasses are suggested for use when handling this product. No special gloves or protective equipment are required when handling this product.

## Packaging

Oil Safe AR™ is packaged in 5 gallon, 55 gallon, and 275 gallon containers. Bulk quantities are available upon request.

 

Before          After

Powered by
**Syntech**

## TYPICAL PHYSICAL PROPERTIES

| | |
|---|---|
| Appearance and Color | Light Yellow to Colorless Liquid |
| Cold Stability | -26°F |
| Odor | Mild Soapy Odor |
| Solubility | 100% |
| pH Neat | < 1 |
| Specific Gravity | 1.10 |
| Flash Point | None |
| Boiling Point | 210°F |

## FEATURES AND BENEFITS

- Safe on Piping and Pumping Equipment; Safe on Chrome Pumps
- Non Toxic; Non Fuming; Non Mutagenic
- No Secondary Containment is Required; No Disposal Restrictions
- Eliminates Scale Build Ups
- An Excellent Choice for Work-over Projects
- 100% Biodegradable; 100% Acid Free

## DISSOLVING PROPERTIES

| Acid | % Dissolved |
|---|---|
| Oil Safe AR™ | 27.5% |
| Hydrochloric Acid (Muriatic) | 13.1% |
| Urea HCl | 17.2% |
| Sulfuric | 24.8% |

Calcium Carbonate Dissolving Properties of Acids with 1 hour Exposure

Testing Conditions: 200 Grams of 5% active solution; 1" Calcium Carbonate Cube; 1 hour at 70° Degrees F

Heartland Solutions, Inc.   P.O. Box 543   Grain Valley, MO 64029 • www.heartland-solutions.com
Phone: 1-816-867-2054 • Fax: 1-816-867-2055
©2007 Heartland Solutions, Inc. All Rights Reserved.

 

**TECHNICAL DATA SHEET**

# Oil Safe AR™

## Toxicity Studies

Toxicity Limits: Test Procedure OECD 202, 48 hr.

LC 50 and LD 50 were proven to be NON-TOXIC

Mutagenicity Limits: OECD Guidelines Sec. 471 Chemicals Oil Safe AR™ 200 was found NOT TO BE MUTAGENIC

## Dermal Irritation & Corrosion Test

A modified Draize method was used as described in OECD Guidelines for the Testing of Chemicals Sec. 404 and complies with the requirements of OECD Principles of GLP, Annex revised as of July 1992.

Oil Safe AR™ received a Primary Irritation Score of .09 +/-0.2 and is classified as a "Very Mild Skin Irritant"

## Biodegradation & Aquatic Safety

Test Procedure: Hach Reactor Digestion method for Waste Water and Sea Water. Hach Reactor Digestion Method is a semi-micro adaptation of the Standard Methods.

Test Results Conclude Oil Safe AR™ was found to be 100% Biodegradable

COD = Low Detectable Limits BOD = No Detectable Limits

## Metal Studies

Dept. of Transportation (D.O.T.) Test Protocols as per Section 173.1 54 Exceptions for Class 8 (corrosive materials): The material being tested must be proven to be non-destructive or not to cause irreversible alterations in human skin tissue. Testing was conducted on an albino rabbit.

Conclusion: Oil Safe AR™ was proven to be NON-DESTRUCTIVE on human skin tissue.

Metal Test Limits: D.O.T. Classifies a material to be CORROSIVE if it has a corrosion rate that exceeds 6.25 mmpy on SAE CI 020 carbon steel or 7075-Y6 Aluminum.

Results of Oil Safe AR™

SAE 1020 carbon steel = 0.59 mmpy

7075-Y6 aluminum = 3.96 mmpy

Conclusion: Oil Safe AR™ is NON-CORROSIVE

## Classifications & Approvals

D.O.T., TDG, IMO, IATA, IMDG, SARA 313 311/312, California Prop 65 NON-Regulated

USDA Authorization

A1, A2, A3, A4, A7, A8, C2, G6 & G7

U.S. Coast Guard, U.S. Navy



"Oil Safe AR®"
EPA Approved
"Synthetic Acid"



## What Is Oil Safe AR® ????

Oil Safe AR® is the world's only synthetic acid with identical dissolving properties as hydrochloric acid with none of the harmful side effects.

Oil Safe AR® is non-D.O.T. regulated, non-fuming, and will not corrode or rust metals and is 100% OSHA and EPA compliant.

Oil Safe AR® effectively attacks calcium carbonate, scaling and mineral build-up and will not harm work-over rigs and pumping equipment. It will not rust or corrode pipes.



## What Is Oil Safe AR® ????

Oil Safe AR® has earned a triple zero HMIS score, is non-regulated, non-corrosive, non-flammable, and biodegradable.



## TYPICAL PHYSICAL PROPERTIES

- Appearance and Color Light Yellow to Colorless Liquid
- Cold Stability -26°F
- Odor Mild Soapy Odor – If surfactant is present
- Solubility 100%
- pH Neat < 1
- Specific Gravity $1.12 \pm 0.02$
- Flash Point None
- Boiling Point $212 \pm 5°F$

1

## FEATURES AND BENEFITS

- Safe on Piping and Pumping Equipment;
- Safe on Chrome Pumps
- Non Toxic; Non Fuming; Non Mutagenic
- No Secondary Containment is Required;
- No Disposal Restrictions
- Eliminates Scale Build Ups
- An Excellent Choice for Work-over Projects
- Requires no additional corrosion inhibitor addition
- EPA D/e Formula; Biodegradable in less than 10 days; approved for
- direct discharge; made with Cleangredients approved from the EPA
- 100% Biodegradable; 100% Acid Free

UNIVERSAL                                    gogreen

## How Corrosive Is Oil Safe AR®

The result is that raw Oil Safe AR® is 20 times less corrosive than even the 6.25 mmpy rating that would classify it as a corrosive on a label.

It is recognized safe on steel, aluminum, chrome, painted surfaces, glass, rubber and other surfaces that are easily damaged by traditional acids.

UNIVERSAL                                    gogreen



## Oil Safe AR® -Corrosion Data

Corrosion Coupon Study comparing Oil Safe AR® versus a 10% Acetic Acid solution

Oil Safe AR® corrosion rate summary:

SAE 1020 Carbon Steel = 0.59 mmpy
7075-Y6 Aluminum = 3.96 mmpy



## Oil Safe AR® -Corrosion Data

*NOTE – Corrosion rates greater than 0.05 lb/ft2/day are unacceptable

| Acid Type | Pre-Test Weight (grams) | Post-Test Weight (grams) | Net Weight (grams) | Corrosion (lb/ft2/day) |
|---|---|---|---|---|
| 15 % HCl | 12.8233 | 7.5881 | 5.2352 | 0.4808 |
| 10 % Acetic Acid | 13.7196 | 12.5122 | 0.2042 | 0.0181 |
| 10 % Formic Acid | 13.6247 | 12.5358 | 1.0886 | 0.0996 |
| 30 % Oil Safe | 13.6602 | 13.2647 | 0.5886 | 0.0467 |
| 30 % Oil Safe | 13.7262 | 13.3776 | 0.3487 | 0.0300 |
| 7 % HCl | 13.4727 | 10.3666 | 3.1162 | 0.2437 |
| 7 % HCl + 100gal of Acetic Acid | 13.9267 | 10.7133 | 3.3134 | 0.3000 |

UNIVERSAL

## Oil Safe AR® - ElastomerData

| Type of Elastomer Tested | Oil Safe AR® Compatibility Score |
| --- | --- |
| Sealast | 1 |
| HSN | 1 |
| Aflas500-9 | 1 |
| Aflas7182D | 1 |
| BH0701B | 1 |
| HNBR 105 | 1 |
| CL180 EPDM | 1 |

*The following table rates compatibility from 1-3 with 1 = excellent compatibility, 2 = good compatibility, And 3 = fair compatibility. Oil Safe AR® performed well with all the elastomers in the test.*

UNIVERSAL        gogreen

## Dissolving Properties

| Acid Type | % CaCO₃ Dissolved | % MgCO₃ Dissolved | % Class C Cement Dissolved |
| --- | --- | --- | --- |
| Oil Safe AR® 100% Solution | 100.00% | 23.11% | 15.85% |
| Oil Safe AR® 50% Solution | 96.76% | 25.57% | 18.87% |
| Oil Safe AR® 30% Solution | 54.00% | 20.00% | 15.85% |
| 7 1/2% HCl | 46.48% | 24.12% | 30.03% |
| 15% HCl | 87.39% | 23.95% | 59.57% |
| 7 1/2% HCl + 100 ppt of I-2L | 75.08% | 40.44% | 27.72% |
| 15% HCl + 100 ppt of I-2L | 97.87% | 32.06% | 41.78% |
| 10% Acetic Acid | 21.00% | 8.50% | 20.00% |
| 15% Acetic acid | 63.09% | 7.11% | 21.11% |

*Each test above was conducted with 1 cubic inch of material placed in 60 ml of solution and allowed to soak for 8 hrs at 100°F.*

UNIVERSAL        gogreen

## Non-Emulsifying Tendencies



UNIVERSAL        gogreen

## Cost Comparison



UNIVERSAL        gogreen

3



**NASA SUPPORT LABS**
**8201 Greensboro Drive,**
**McLean, VA 22102**

| | |
|---|---|
| **Customer** | Heartland Solutions |
| **Product** | Oilsafe-AR |
| **NSL Code #** | 11-0103 |
| **Report Date** | November 22, 2011 |

**Test**          Immersion Corrosion Testing of Metal

**Applicable Standard** ASTM G31-72 and NACE Standard TM0169-76

**Procedure**     Two mild steel specimens SAE C1020 (area 18.61cm$^2$, Density 7.87 g/cm$^3$) and two 7075-T6 non-clad Aluminum (area 18.54 cm$^2$, density 2.80 g/cm$^3$) specimens are subjected to Immersion Corrosion Testing as outlined in ASTM G31-72 and NACE Standard TM0169-76. The Aluminum and Steel specimens are immersed Into separate containers of the test substance.

Each container held a volume of 1170 g of test solution. The temperature of the Solution was maintained at 55°C for the entire test duration. The test was conducted For a period of 72 hours.

Metal specimens were circular metal coupons having dimensions of 0.3175 cm Thick, 3.175 cm outer diameter and a 0.9525 cm thru centered mounting hole. The alloys have the following composition.

| 7075-T6 non-clad Aluminum | | SAE C1020 Steel | |
|---|---|---|---|
| Al | 90.030 | Al | 0.040 |
| Cr | 0.190 | C | 0.180 |
| Cu | 1.480 | Cr | 0.040 |
| Fe | 0.210 | Fe | 99.260 |
| Mg | 2.350 | Mn | 0.420 |
| Mn | 0.040 | Mo | 0.020 |
| Si | 0.070 | Ni | 0.020 |
| Ti | 0.030 | P | 0.010 |
| V | 0.020 | S | 0.010 |
| Zn | 5.570 | Si | 0.030 |

**General Standards Board Laboratory Acceptance Program**

This report shall not be reproduced in full, without the written approval of the laboratory

Prior to initial weighing, the coupons were washed with a 50/50 blend of Petroleum ether and methanol and dried at 55°C.

After immersion for the specified time interval the Aluminum specimens were cleaned in a 70% $HNO_3$ solution and scrubbed with a plastic scouring pad to remove corrosion products.

The mild steel specimens were cleaned in concentrated HCL with 50g/L Tin Chloride and 20g/L Antimony Trichloride and scrubbed with a plastic scouring pad. The specimens were allowed to dry and the weight loss, if any, was noted. The corrosion rate is calculated assuming that all weight loss is due to general corrosion and not to localized corrosion. The corrosion rate expressed as millimeters per year (mmpy) is:

$$mmpy = wt\ loss \times 87.6 \div area \div time \div metal\ density$$

where weight loss is in mg, area in $cm^2$ of metal surface exposed and time is hours immersed.

**Results**        **1) SAE 1020 Steel**

Neither sample exhibited discoloration. No pitting was observed.

The corrosion rate based on the 72 hour interval and assuming no localized corrosion is present, averaged 1.21 mm/y.

**Table of Results**

| Specimen # | Immersion Time (hours) | Apparent Corrosion Rate (mm/y) |
|:---:|:---:|:---:|
| 1 | 72 | 0.2604 |
| 2 | 72 | 0.2805 |
| Avg. | 72 | 0.2704 |

**General Standards Board Laboratory Acceptance Program**

This report shall not be reproduced, without the written approval of the laboratory

### 2) 7075-T6 non-clad Aluminum

Both samples were found to be severely and evenly corroded, having lost considerable mass. Noticeable gassing was observed on the coupons for the entire 72 hours. No localized pitting was observed.

The corrosion rate, based on the 72 hour interval and assuming no localized corrosion is present, averaged 129.67mm/y.

#### Table of Results

| Specimen # | Immersion Time (hours) | Apparent Corrosion Rate (mm/y) |
|------------|------------------------|--------------------------------|
| 1 | 72 | 1.306 |
| 2 | 72 | 1.286 |
| Avg. | 72 | 1.296 |

**Conclusion:**   The corrosion rate of Heartland Solutions Oilsafe-AR does not exceed 6.25 millimeters per year on SAE C1020 Steel.

The corrosion rate of Heartland Solutions Oilsafe-AR does not exceed 6.25 millimeters per year on 7075-T6 non-clad Aluminum.

Heartland Solutions Oilsafe-AR is deemed Non-Regulated by the Canadian TDG.
Heartland Solutions Oilsafe-AR is deemed Non-Regulated by the US DOT.

Tested by _____
**Luke Rothenburg**

Approved by _____
**Dr. Pam Eglin PhD**

**General Standards Board Laboratory Acceptance Program**

This report shall not be reproduced, without the written approval of the laboratory

# D E L T E C H   Laboratories Ltd

| Customer: | Heartland Energy Group, Ltd. |
|---|---|
| Product: | Mud Safe CR® |
| Del Tech Code #: | 02-0096 |

**Test:** Immersion Corrosion Testing of Material

**Applicable Standard:** ASTM G31-72 and NACE Standard TM0169-76

**Procedure:** Two mild steel specimens SAE C1020 (area 18.61 cm², density 7.87 g/cm³) and two 7075-T6 non-clad Aluminum (area 18.54 cm², density 2.80 g/cm³) specimens are subjected to Immersion Corrosion Testing as outlined in ASTM G31-72 and NACE. Standard TM0169-76. The Aluminum and Steel specimens are immersed into separate containers of the test substance.

Each container held a volume of 1170g of test solution. The temperature of the solution was maintained at 55°C for the entire test duration. The test was conducted for a period of 72 hours.

Metal specimens were circular metal coupons having dimensions of 0.3175 cm thick, 3.175 cm outer diameter and a 0.9525 cm thru centered mounting hole. The alloys have the following composition.

| 7075-T6 non-clad Aluminum | | SAE C1020 Steel | |
|---|---|---|---|
| Al | 90.030 | Al | 0.040 |
| Cr | 0.190 | C | 0.180 |
| Cu | 1.480 | Cr | 0.040 |
| Fc | 0.210 | Fe | 99.260 |
| Mg | 2.360 | Mn | 0.420 |
| Mn | 0.040 | Mo | 0.020 |
| Si | 0.070 | Ni | 0.020 |
| Ti | 0.030 | P | 0.010 |
| V | 0.020 | S | 0.010 |
| Zn | 5.570 | Si | 0.030 |

Prior to initial weighing, the coupons were washed with a 50/50 blend of petroleum ether and methanol and dried at 55°C.

After immersion for the specific time interval the Aluminum specimens were cleaned in a 70% $HNO_3$ solution and scrubbed with a plastic scouring pad to remove corrosion products.

**General Standards Board Laboratory Acceptance Program**

*This report is Confidential and shall not be reproduced without written approval of the Customer.*

1

The mild steel specimens were cleaned in concentrated HCl with 50 g/L TinChloride and 20g/L Antimony Trichloride and scrubbed with a plastic scouring pad. The specimens were allowed to dry and the weight loss, if any, was noted. The corrosion rate is calculated assuming that all weight loss is due to general corrosion and not to localized corrosion.

The corrosion rate expressed as millimeters per year (mmpy) is:

mmpy= wt loss x 87.6 + area –H time + metal density where weight loss is in mg, area in $cm^2$ of metal surface exposed, and time is hours immersed.

**Results:**

### 1) SAE 1020 Steel

Both samples exhibited no discoloration or tarnishing. No pitting was observed.

The corrosion rate based on the 72 hour interval and assuming no localized corrosion is present, averaged 0.00 mmpy.

**Table of Results**

| Specimen # | Immersion time (hours) | Weight Loss (mg) | Apparent Corrosion rate (mmpy) |
|---|---|---|---|
| 1 | 72 | 0.03 | n/d |
| 2 | 72 | 0.01 | n/d |
| Avg. | 72 | 0.02 | n/d=0.00 |

### 2) 7075-T6 non-clad Aluminum

Both samples exhibited no discoloration or tarnishing. No pitting was observed.

The corrosion rate, based on the 72 hour interval and assuming no localized corrosion is present averaged 0.00 mmpy.

**Table of Results**

| Specimen # | Immersion time (hours) | Weight Loss (mg) | Apparent Corrosion rate (mmpy) |
|---|---|---|---|
| 1 | 72 | 0.07 | n/d |
| 2 | 72 | 0.03 | n/d |
| Avg. | 72 | 0.05 | n/d=0.00 |

**General Standards Board Laboratory Acceptance Program**

*This report is Confidential and shall not be reproduced without written approval of the Customer.*

2

**Conclusion:**

The corrosion rate of Mud Safe CR® does not exceed 6.25 millimeters per year on SAE C1020 Steel.

The corrosion rate of Mud Safe CR® does exceed 6.25 millimeters per year on 7075-T6 non-clad Aluminum.

**General Standards Board Laboratory Acceptance Program**

*This report is Confidential and shall not be reproduced without written approval of the Customer.*

3

# EXHIBIT "T"

# BEUSSE WOLTER SANKS MORA & MAIRE, P.A.

JAMES H. BEUSSE
JACKSON O. BROWNLEE
ERICA M. CIPPARONE
AMBER N. DAVIS
JOHN L. DEANGELIS, JR.
PATRICK D. HERRON
DAVID G. MAIRE
CHRISTINE Q. MCLEOD
ENRIQUE J. MORA
CIAN G. O'BRIEN
FRED M. ROMANO
TERRY M. SANKS
TIMOTHY H. VAN DYKE
KEVIN W. WIMBERLY
ROBERT L. WOLTER

390 N. ORANGE AVENUE, SUITE 2500
ORLANDO, FLORIDA 32801
TELEPHONE (407) 926-7700
FACSIMILE (407) 926-7720
WWW.IPLAWFL.COM

WRITER'S DIRECT
DIAL/EMAIL
(407) 926-7716
ADAVIS@IPLAWFL.COM

May 6, 2014

*Via E-Mail*
David Wawro, Esquire
Torys, LLP
1114 Avenue of the Americas
New York, New York 10036-7703

### Re:     *Heartland Energy Group, Ltd. vs. Fluid et. al.*

Dear Mr. Wawro:

As you are aware, this firm represents Environmental Manufacturing Solutions – East Coast, Environmental Manufacturing Solutions, LLC ("EMS") and Heartland Energy Group, Ltd. ("HEG") with respect to their intellectual property and other related matters. I have reviewed your letter dated April 11, 2014 and discussed its contents with my client. This letter will address your client's requested rescission of the Manufacturing and Licensing Agreements between HEG and Fluid Energy Group, Ltd. and HEG and Fluid Lux S.a.r.l respectively ("collectively referred to as "FLUID") as well as the false allegations of fraud against EMS and HEG. So there is no confusion as to which agreements I am referencing, I have attached copies hereto as Exhibits "A" – "F," will be referred to as "the Agreements."

First, I want to make it clear that HEG does not accept FLUID's rescission of the Agreements for three main reasons: (1) the notice was improper pursuant to the Notice and Termination provisions of the Agreements; (2) the allegations of fraud in the inducement are completely baseless and do not warrant a rescission of the Agreements by FLUID, which will be revealed in this response; and (3) FLUID is in direct violation of multiple provisions of the Agreements as well as a slew of other laws and is the party that actually committed the fraud, which will be discussed in more detail herein.

To begin, I think it is important for you to understand the history between the parties. Before HEG was incorporated there was a company called Heartland Solutions, Inc. ("HSI"). Stephen Rowley was the owner of HSI and had a Distributor Agreement with EMS pertaining to

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -2-

a number of different products relevant to the concrete industry. Beginning in 2009, in addition to targeting the concrete industry, HSI also began targeting the Oil & Gas industry with EMS's Barracuda 10K product. HSI, with the knowledge and permission of EMS re-branded and re-labeled the products as Oil Safe Ar®. Around the same time, John MacDonald incorporated Environment Manufacturing Solutions Oil and Gas Exploration Products, LLC for the purpose of promoting its products to the Oil & Gas industry. At this time, since HSI was utilizing the name Oil Safe Ar®, Mr. MacDonald decided to come up with a new name to brand his patented synthetic replacement for acids and he and Tim Otto came up with the name ENVIRO-SYN® at EMS's offices in Melbourne, Florida. Both Messrs. MacDonald and Otto will swear under penalty of perjury and testify as such. The ENVIRO-SYN® name, as you can see, is a combination of Environmental Manufacturing Solutions' name and their other trademark registration, SYNTECH®. *See* Exhibit "G."

We are aware of your client's trademark registration in Canada and applications in the United States for ENVIRO-SYN and we want to make it very clear that not only do the Agreements between the parties state that HEG is the owner of the ENVIRO-SYN® trademark,[1] but EMS Oil & Gas was the first to use the trademark; EMS Oil & Gas then licensed the trademark to HSI to use; and HSI eventually filed for and received a trademark registration in the U.S. for ENVIRO-SYN®. *See* Exhibit "H." As you can see from the registration, the first use date in the registration is December of 2011, which was when HSI shipped its first product to FLUID, but the first use date could actually be amended to November of 2010 when EMS Oil & Gas first shipped the ENVIRO-SYN products to NMX. A true and correct copy of the NMX Distribution Agreement is attached hereto as Exhibit "I." As you can see from page 14 of the Agreement, the Agreement pertained to the various Enviro-Syn products.

Should your client seek to cancel the ENVIRO-SYN® trademark in the U.S., HEG will vigorously defend its rights. More importantly, it is unclear how or why FLUID believes it has trademark rights based on the fact that (1) FLUID did not come up with the name; (2) FLUID did not use the name first; and (3) FLUID has an agreement which says HEG owns the trademark and FLUID has a license to use the mark. In any event, that is an argument for another day, but should the parties be able to come to a resolution on the Agreements, HEG will expect FLUID to expressly abandon its applications and cease using its ENVIRO-SYN® trademark.

To get back to the timeline, John MacDonald and Mr. Rowley determined that the formula for Barracuda 10K (re-labeled as Oil Safe Ar® and ENVIRO-SYN®) was not strong enough for the Oil & Gas industry and had certain chelating agents that needed to be removed. Darren Thatcher, the current President and COO of FLUID was the V.P. of Operations and Technology for the Optifrac Division of Mud Master and was aware of all of this because Mud Master had a distribution agreement with HSI. Mud Master was, and still is, a valued customer of HEG's. Stephen Rowley and Darren Thatcher worked together on a large frac job in Turner

---

[1] *See* Paragraph 11.1 of the Manufacturing Agreements.

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -3-

Valley, Alberta Canada in October of 2011. At the frac site there was a hot oiler truck that heats
and transfers the frac fluids on site. Mr. Thatcher and Mr. Rowley both forgot that the original
version of Oil Safe AR®, which was Barracuda 10K re-branded, was a truck washing product
and the newer version was much more active. Mr. Thatcher and Mr. Rowley proceeded to
transfer the Oil Safe AR® into the hot oiler truck and began to notice the aluminum fittings on
the truck begin to fail due to corrosion and Mr. Thatcher began to panic. Mr. Thatcher and Mr.
Rowley immediately contacted John MacDonald and Mr. MacDonald instructed Mr. Thatcher
and Mr. Rowley that chemical doubling takes place with heating and also reminded them that the
new version, which was created at Mr. Thatcher continued request, was far more active than the
original rebranded Barracuda 10K and that they needed to switch out the fittings to stainless steel
and/or to stop using the hot oiler truck and finish the job. Mr. Thatcher and Mr. Rowley chose to
complete the job with a vacuum truck that was equipped with stainless fittings. The job was
completed without error pumping in excess of 125,000 gallons of Oil Safe AR®.

So, for your client to say that HEG and EMS fraudulently induced FLUID into the
contract because they had no idea that the ENVIRO-SYN® products did not work well with
aluminum is a complete fabrication. Mr. Thatcher had first-hand knowledge and experience with
the problem and most importantly, knew about the issue far before FLUID was ever even
incorporated. In fact, after the frac job in Turner Valley, Alberta Canada, HEG and Mud Master
(at the behest of Mr. Rowley and Mr. Thatcher jointly) changed its labeling to include a warning
regarding Aluminum. A true and correct copy of a label prepared back in 2011 by Mr. Thatcher,
which has a warning pertaining to the use of aluminum fittings is attached hereto as Exhibit "J."

FLUID was readily aware of the problem when it first opened its doors because Mr.
Thatcher came with this knowledge based on his experience at Mud Master/Optifrac. Additional
proof that FLUID was aware of the problem with aluminum from the very beginning is as
follows:

(1) FLUID ENVIRO-SYN label wherein it clearly states "WARNING! When pumping
this product it is strongly recommended to use manufacturer approved hose couplings
and fittings. DO NOT USE ALUMINUM FITTINGS. *See* Exhibit "K."

(2) A PowerPoint presentation prepared by Darren Thatcher, along with the email
correspondence f/Mr. Thatcher on October 24, 2012 including a statement at page 7
of the presentation that certain precautions need to take place when pumping the
product because the product will react with certain soft metals such as Aluminum and
Magnesium. *See* Exhibits "L" and "M" respectively.

(3) Email correspondence between Kevin O'Donoghue and John MacDonald from June
of 2013 pertaining to labels for ENVIRO-SYN CSR and ENVIRO-SYN HCR,
created by FLUID, which include a WARNING regarding Aluminum. *See* Exhibits
"N," "O" and "P" respectively.

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -4-

With respect to the documents attached to your letter, please be advised that the first document attached was falsified by your client. Environmental Manufacturing Solutions, LLC has never sold Oil Safe Ar® and therefore would not have an MSDS sheet for the product. Upon information and belief, this is an MSDS sheet that has been falsified by your client and which was sent along with a product sample to ENOVO, here in the United States, which should be noted, is a clear violation of the Agreements in that FLUID has no right to sell or offer to sell the ENVIRO-SYN® products in the U.S. Correspondence pertaining to this violation of the Agreements is attached hereto as Exhibit "Q."

The literature pertaining to Oil Safe Ar® was not provided to FLUID by EMS or HEG. It was provided to Darren Thatcher by HSI back in 2010 when he was the V.P. of Operations and Technology for the Optifrac Division of Mud Master. Moreover, everything contained in the Oil Safe Ar® literature was completely accurate at the time it was printed and given to Mr. Thatcher. Therefore, it was not EMS and/or HEG who fraudulently induced FLUID into the contract. If there was any fraud, it was committed by Darren Thatcher.

Formula changes began to take place in late 3rd quarter of 2011. As stated, the Barracuda 10K was far less active. It was designed and remains designed and for sale in commerce at the world's leading ready mix truck wash and wax. It contains heavy detergents, surfactants, waxes, emulsifiers, chelating agents, uv deterrents and salt dispersants. All chemicals that are not needed in the fracing process thus we originally took those out and made the formula 30% stronger and it became a stand-alone formula. We continued to increase the strength of the product at the request of Mr. Thatcher.

As to the two testing reports attached to your letter, they are both genuine reports commissioned by HSI and HEG respectively. As I'm sure you are aware, there were some serious cutbacks at NASA in 2012, which resulted in many, if not all, of their testing labs to close, which is why you cannot find the lab on their website. I also think you should know that on or around March 20, 2013, Darren Thatcher, knowing that the ENVIRO-SYN® CSR/MudSafe, product was stronger because of continual requests by Mr. Thatcher and Mr. Purdy, ordered their own tests from Cormetrics, Ltd. to determine the pH and mmpy levels. The test was conducted by Cormetrics and a copy of the results are attached hereto as Exhibit "R" and relabeled as Heartland's MudSafe by Cormetrics at the request of Mr. Thatcher on behalf of HEG. We have contacted Cormetrics for a copy of the report that has FLUID's information on the front of the testing results, but it cannot be released to us without the express permission of FLUID. Your client, however, should have a copy in their records and we would request that you forward a copy to us at your earliest convenience. In any case, as seen in the test results, the mmpy levels were 6.3, which is just above the limit for DOT regulation and which is the lowest level in the oil industry. The only reason the level was above the limit is because your client requested a testing procedure outside the scope of the DOT testing protocol. The test requested by your client was targeted to the oil and gas industry and not to the transportation limits as

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -5-

HEG's corrosion limits clearly quote. This test has nothing to do with transportation on the road. Based on Cormetrics findings, the math would be simple to conclude that had the same tested material been tested as per the DOT protocols, the results would have been well below the 6.25 mmpy.

Furthermore, it was your client that was manufacturing the product outside the prescribed guidelines by increasing the levels of HCL from the prescribed 20 baume to 22 baume in the ENVIRO-SYN® HCR product in addition to using larger volumes of the HCL without HEG's knowledge and consent. True and correct email correspondence wherein Darren admits to adding in HCL, which would increase the corrosiveness of the products, are attached hereto as Exhibit "S." Such actions by your client in modifying the products without HEG's written consent void any warranties my client was required to make as per 7.4 of the Manufacturing Agreements. Additional correspondence where Mr. MacDonald expresses his concerns about the changes being made by FLUID and the corrosive effect of such changes, are attached hereto as Exhibit "T." As seen in the MSDS sheet and Mr. Thatcher's email correspondence, the product is corrosive at about 100° C, which would convert to 212°F, which is way above the acceptable DOT protocol at 55° C/131° F. *See* Exhibit "T".

Therefore, any issues as it relates to an increase in corrosiveness are a result of your client's actions, not HEG or Mr. MacDonald's. The product, as sold to FLUID was always considered Non-DOT regulated and below 6.25 mmpy contrary to your client's allegations, which can be easily substantiated by documentation provided hereto, additional documentation as necessary and sworn testimony if need be.

In the end, it is your client that has committed numerous violations of the Agreement and is simply attempting to claim fraud to try and avoid having to pay all of their outstanding invoices, interest, damages and attorney's fees as a result of their violations. As seen in the Audit Report dated January 22, 2014 and attached hereto as Exhibit "U," FLUID has continually violated the agreements by (1) failing to provide statements within fifteen (15) days after the last day of each month[2]; making late payments and underpayment throughout the 2013 calendar year[3]; failing to meet the minimum production levels for any quarter in the year 2013[4]; and by improperly selling competing goods (Matrix 100[5]).

Additional violations include, but are not limited to:

(1) Falsely stating **"worldwide" rights** on the www.fluidenergy.com website, when the Agreements between the parties were only for specified territories, not the entire globe. *See* Exhibit "V."

---

[2] *See* Paragraph 6(a) of the License Agreements.
[3] *See* Paragraphs 6.3 and 6.5 of the Manufacturing Agreement.
[4] *See* Paragraphs 5.1 and 5.2 of the Manufacturing Agreements.
[5] *See* Paragraph 3.2 of the Manufacturing Agreements.

_____  _____

(2) Falsely stating that FLUID had rights to the patented technology in the **United States** when no such rights existed. *See* Exhibit "W."

(3) Failing to pay past due invoices in the amount of $222,650.00. USD *See* Exhibit "X."

(4) Attempting to sell the ENVIRO-SYN® patented products outside their territory in the U.S. to ENOVO. *See* Exhibit "Q."

(5) Entering into a Distribution Agreement with a company from Norway pertaining to the ENVIRO-SYN® products, again, which is outside of FLUID's licensed territory. *See* Exhibit "Y."

(6) Falsely labeling products as DfE approved when the labels were never approved and FLUID never asked HEG to obtain approvals on the labels. *See* Exhibits "O" and "P."

(7) Falsely inducing investors to invest in FLUID for an amount close to or around $10 million dollars under the guise of an exclusive worldwide license with HEG for the patented ENVIRO-SYN® products when no such worldwide license existed[6];

(8) Failing to pay HEG royalties in the amount of $340,000.00 USD ;

(9) Falsely stating in a post on the www.globalpetroleum.com website that the ENVIRO-SYN® products were "**developed and patented by Fluid Energy Group**" when the ENVIRO-SYN® products were developed and patented by HEG. *See* Exhibit "Z."

(10)    Admitting in email correspondence that the technology is HEG's and acknowledging that FLUID needed to get permission to send out news releases, but then falsely stating in the proposed news release that FLUID has "**exclusive oil & gas industry manufacturing and distribution rights**" in an attempt to garner more investors under false pretenses. *See* Composite Exhibit "AA[7]."

(11)    Falsely stating on Todem's website that "Enviro-Syn is the trade name of a line of environmentally and HSE friendly acid and caustic replacements, **developed and patented by Fluid Energy Group**." *See* Exhibit "BB."

Based on the foregoing, I would ask that you discuss the contents of this letter and the many exhibits with your client in detail so that we can have a meaningful discussion over the phone sometime next week or the week of May 26 – May 30, 2014 as I will be away on business

_____

[6] Upon information and belief, Clay Purdy blatantly misrepresented to investors that FLUID had worldwide rights to the patent HEG technology in order to obtain investments in FLUID.

[7] It should be noted that John MacDonald never authorized FLUID to send out this news release.

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -7-

May 19 – May 23, 2014. It is my understanding that HEG's accounting department called last week to obtain statements for this past quarter and Mr. Purdy refused to provide such statements claiming that the Agreements were rescinded. Please advise your client that the Agreements have not been rescinded and that any continued offers for sale or sale of the ENVIRO-SYN® products by FLUID are not only a violation of the Agreements, but also constitute patent and trademark infringement and will not be taken lightly.

My client views this matter as serious and will take all steps necessary to protect their rights with respect to these and other legal issues surrounding their patent, trademark and other contractual rights. We expect your assurances, that no later than (10) business days from receipt of this letter you will either call or respond to this letter in writing setting up a time for us to discuss the issues raised herein. If you fail to do so by this date, we shall, without further notice to you, take such further action as we deem advisable to assert our clients statutory rights to obtain an injunction, recover damages, and to otherwise protect our client's interests.

I look forward to hearing from you.

Very truly yours,

Amber N. Davis, Esq.

Encls: Exhibits A-BB
cc:    Client
       James T. Swanson, Esquire

EXHIBIT "U"

# BEUSSE WOLTER SANKS & MAIRE, P.A.

JAMES H. BEUSSE
JACKSON O. BROWNLEE
ERICA M. CIPPARONE
AMBER N. DAVIS
JOHN L. DEANGELIS
PATRICK D. HERRON
DAVID G. MAIRE
CHRISTINE Q. MCLEOD
CIAN G. O'BRIEN
FRED M. ROMANO
TERRY M. SANKS
TIMOTHY H. VAN DYKE
KEVIN W. WIMBERLY
ROBERT L. WOLTER

390 N. ORANGE AVENUE, SUITE 2500
ORLANDO, FLORIDA 32801
TELEPHONE (407) 926-7700
FACSIMILE (407) 926-7720
WWW.IPLAWFL.COM

PATENT AGENT
CHRISTOPHER D. BAYNE

WRITER'S DIRECT
DIAL/EMAIL
(407) 926-7716
ADAVIS@IPLAWFL.COM

June 12, 2014

*Via E-Mail*
David Wawro, Esquire
Torys, LLP
1114 Avenue of the Americas
New York, New York 10036-7703

## Re: Termination of Manufacturing and License Agreements

Dear Mr. Wawro:

As you are aware, this firm represents Environmental Manufacturing Solutions – East Coast, Environmental Manufacturing Solutions, LLC ("EMS") and Heartland Energy Group, Ltd. ("HEG") with respect to their intellectual property and other related matters. This letter will serve as **Termination of the Manufacturing and License Agreements** between HEG and Fluid Energy Group, Ltd. and HEG and Fluid Lux S.a.r.l respectively ("collectively referred to as "FLUID"). Such Agreements were previously attached as Exhibits A-F to my May 6, 2014 letter addressed to you and were also attached to your Request for Arbitration.

Although the License Agreements state that Notice of Termination must be sent to Clay Purdy directly that would not be appropriate, which is why the letter is being sent to you as their counsel. Based on our previous correspondence as well as the recently filed Request for Arbitration with the ICC, it is our understanding that you represent FLUID in this matter.

As discussed at length in my May 6, 2014 letter to you, which is attached hereto and incorporated herein, my client denies any and all liability for the alleged fraud in the inducement claimed by your client. Moreover, and as grounds for termination, your client has materially breached several provisions in the Agreements. Such provisions, include, but are not limited to the following:

David Wawro, Esquire
Torys, LLP
June 12, 2014
Page 2 of 3

**License Agreements**

- **Paragraph 5 (A)** - failure to pay royalties for the months of January – May of 2014.
- **Paragraph 5(A)** – failure to meet the Sales Minimum by December 31, 2014.
- **Paragraph 6(A)** – failure to furnish Licensor written statements, under oath, specifying the total number of products sold during the preceding month for the months of October 2012-December 2013 and March- May of 2014.
- **Paragraph 6(B)** – failure to make Royalty Payments for the months of January – May of 2014.

**Manufacturing Agreements**

- **Paragraph 2.5** – for marketing and selling the Licensed Products outside of FLUID's territory and without written consent of HEG.
- **Paragraph 2.10** - for conducting unauthorized testing from third-party laboratories without the prior approval of HEG.
- **Paragraph 3.2** – for selling competitive goods during the term of the Agreements.
- **Paragraph 5.1** – for failure to meet the quota of $1,000,000 for 2013.
- **Paragraph 5.2** – failure to meet the quota as well as failure to amend its rights to non-exclusive rights as per 5.2(b) for 2014.
- **Paragraph 5.2** – for failure to meet the quota as well as failure to make payment to HEG equal to the shortfall of such quota to maintain exclusive rights as per 5.2(a) for 2014 in the amount of $1,000,000 while representing to investors, customers, dealers and in web presence Fluid maintained said exclusive rights.
- **Paragraph 6.3** – failure to make payments within 30 days of the date of invoice.
- **Paragraph 6.5.** – failure to pay 8.0% interest on all overdue balances outstanding.
- **Paragraph 11.1**- improperly and without authorization obtaining a trademark registration in Canada for ENVIRO-SYN as well as filing trademarks in the U.S. for ENVIRO-SYN.
- **Paragraph 11.2** – improperly telling investors and potential investors that FLUID was the owner of the Patents and Technology as well as attempting to sell and selling such Licensed Products outside of FLUID's licensed territory.

In addition to the above violations of the Agreements, as you are aware, your client has also committed securities and investor fraud, tortiously interfered with my client's business and

David Wawro, Esquire
Torys, LLP
June 12, 2014
Page 3 of 3

will soon be infringing on my client's trademarks (ENVIRO-SYN) and patents (referenced above) if such actions are not stopped.

As per paragraph 4(c) and 4(d) of the License Agreements and 14.2(c) of the Manufacturing Agreements, this termination is effective 30 days from today's date if your client fails to cure such breach. Based on the foregoing and pursuant to Paragraphs 4(b) and 22 of the License Agreement, HEG hereby demands that if FLUID fails to cure such breach within such 30 day period, on July 12, 2014, FLUID shall cease from all use of the Patents and technology claimed therein, including, but not limited to U.S. Patent Nos. 8,580,047, 8,430,971 and PCT Application WO 2012/075091. FLUID shall also cease from selling or manufacturing, whether directly or in association with other persons or firms, of any product, process or service, which competes with any Products covered by the Patents **for a period of 2 years** from July 12, 2014.

As per paragraph 23 of the License Agreements, HEG owns all tools, molds and equipment related to the Licensor's products. Therefore, please provide me with a date and time that representatives from HEG or a third-party can enter onto FLUID's facility to obtain all such tools, molds and equipment.

Finally, we were surprised to see the email dated June 2, 2014 from your colleague Mr. Mike Pedlow to the shareholders for Fluid Energy Group, Ltd. We were even more surprised to see the false statements and misrepresentations made in the Q1 Highlight and the alleged Audited Financials which show no mention of the $1,873.755.67 amount owed to HEG. Based on the foregoing, a copy of this letter will be sent to all shareholders so that the shareholders are aware of HEG's stance on Fluid's alleged termination of their relationship with their U.S. Supplier, who happens to be the owner of all right, title and interest to the Licensed Products, Patent, technology and trademarks, which your client failed to mention to its shareholders.

Please feel free to contact me should you wish to discuss this any further.

Very truly yours,

Amber N. Davis, Esq.

Encls: May 6, 2014 letter
cc:    Client

# EXHIBIT "V"

LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement made as of this 12th day of November 2013, between Green Products & Technologies LLC, having its principal place of business at 7705 Progress Circle Melbourne Florida USA (the Licensor) and Heartland Energy Group LTD, having its principal place of business at Suite 15, 1st Floor Oliaji Trade Center, Francis Street, Victoria, Mahe, Seychelles (the "Licensee").

WITNESSETH:

WHEREAS, the Licensor claims that it has been granted the assignment rights from John T. MacDonald, who is the sole and exclusive Inventor of, and has the sole and exclusive right to grant licenses under the US. Patents issued and Patent Applications and specifically known as, **US 8,580,048 B1** and any improvements thereon (the "Patent").

WHEREAS, for commercial purposes, the Licensee wishes to acquirer the 'EXCLUSIVE RIGHT" and license to manufacture, sell, re-license and use apparatus embodying, employing and containing the Patent.

NOW THEREFORE, in consideration of the mutual covenants and promises of the parties hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency, of which is hereby acknowledged by the parties hereto agree as follows:

1.    Grant of License. The Licensor grants to the Licensee the right and license to manufacture, sell, re-license and use apparatus embodying, employing and containing the Patent (the "Patent"), to the full end of the Term (as hereinafter defined), unless this Agreement is terminated prior to the end of the Term, as provided below.

2.    Representations of Licensor.

A.    Ownership of Patent. The Licensor represents and warrants that it is the assignee of the entire right, title and interest in and to the above-mentioned  patent, the assignment being granted from John T. MacDonald, and that it has the right to grant the right, license and privilege granted in this Agreement; that it has executed no agreement in conflict with this Agreement; and that it has not granted to any other person, firm or corporation any right, license, or privilege granted under this Agreement.

3.    Term and Termination.

A.    Unless sooner terminated in accordance with this Agreement, the Patent License granted hereunder shall commence on November 12th, 2013 (the 'Effective Date"), and. shall continue in effect until the end of the patent term.



B.    Upon termination or expiration of the licenses granted under this Agreement, by operation of law or otherwise, all rights, privileges and obligations arising from this Agreement shall cease to exist. Upon termination or expiration of this Agreement, Licensee shall cease from all use of the Patent.

C.    In the event of a significant breach of this Agreement by either party, the other party may terminate the Licenses and rights granted to the breathing party under this Agreement by giving written notice to such breaching party of termination and the basis for such termination; provided, however, that such written notice is properly delivered as set forth in Section 12 of this Agreement The Licenses and rights granted under this Agreement shall terminate thirty (30) days after service of the written notice to the other party, unless the specified breach is cured within such thirty (30) day period. A significant breach of this Agreement shall be defined as either party's violation of its material obligations under this Agreement.

D.    Licensor may, on written notice to the Licensee, which notice is properly delivered as set forth in Section 12 of this Agreement, forthwith terminate the license and rights granted under this Agreement to Licensee to use the Patent, upon the occurrence of any of the following events, unless such breach is cured within such ten (10) days from the service of the written notice upon the Licensee:

Licensee undergoing a change of control (whether resulting from merger, acquisition, consolidation or otherwise) unless the successor entity acknowledges its obligations hereunder and the Licensor grants successor such prior written approval of transfer of said rights.

4.    Infringement.  In the event the Licensee shall become aware of any infringement by any third party of any right licensed under this Agreement, it shall promptly notify Licensor in writing of such infringement or use, and shall do such acts and assist and supply such information as are reasonably necessary or desirable in relation thereto. Licensor shall take only those steps which in its sole discretion, are necessary to enforce its rights, including the engagement of legal counsel of its own choosing. Licensor's obligation to defend the rights of this license Agreement hereunder shall be made at its sole and exclusive discretion.

5.    Indemnity.

A.    Each party shall defend, indemnify, and hold harmless the other and the other's officers, employees, agents and direct or indirect customers, from and against any claims, suits, losses, liabilities, damages, court judgments and/or await and the reasonably related costs and expenses (including reasonable attorneys' fees incurred by the other or for which the other is judged liable), incurred because of actual or alleged infringement by the Patent supplied hereunder of any patent copyright, trade secret, trademark, mask work right or other proprietary right(s) of a third party which was in effect on or prior to the date which the subject Patent, including any improvements thereon, was registered with the USPTO.



Upon receipt of notice of such claim, suit or action, the notified party shall promptly tender notice of the same to the other party, and thereafter, upon the notified party's request, the other party shall render reasonable assistance to the notified party for defense of the same. Each party shall execute any and all papers which may be found necessary or desirable in any suit or suits brought under and pursuant to this Agreement; and the each party further agrees that it will testify in any interference or litigation, whenever requested to do so by the other party.

B.      Each party shall maintain, at its own expense, product liability insurance in full force and effect at all times during the Term, with a responsible insurance carrier reasonably acceptable to the other party, of a minimum of One Million ($1,000,000.00) Dollars, with a deductible of no more than Twenty Five Thousand ($25,000.00) Dollars. Product liability insurance shall be for the benefit of each party as an additional insured and each party shall provide for at least ten (10) days prior written notice to the other party of the cancellation or any substantial modification of said policy.

C.      Licensor or Licensee may, as the case maybe, from time to time, upon reasonable request by the other party, promptly furnish or cause to be furnished to the other party, evidence in form and substance satisfactory to the other party, of the maintenance of the Insurance required by paragraph "B" of this Section of this Agreement, including, but not limited to, originals or copies of policies, certificates of insurance (with applicable riders and endorsements) and proof of premium payments.

D.      If in any suit involving  the Patent under and pursuant to which the exclusive right and license has been granted hereunder, charging infringement of such right and license, and either the Patent should be declared to be invalid by any court or other tribunal or be construed by the court as not to cover the Licensor's Patent, the Licensee shall be immediately released from any and all obligations under this Agreement

6.      No Waiver. Except as otherwise provided herein, no waiver of any covenant, condition, or provision of this Agreement shall be deemed to have been made unless expressly in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provision, covenants, or conditions of this Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment in the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another Party shall be construed as a waiver with respect to any other or subsequent breach.

7.      Independent Contractors. Licensee is an independent contractor and not an agent, partner, joint venturer, franchisee, affiliate or employee of Licensor. No fiduciary or franchise relationship exists between the parties. Neither party shall be liable for any debts, accounts, obligations or other liabilities of the other party, its agents or employees. Licensee shall have no authority to obligate or bind Licensor in any manner.



Licensor has no proprietary interest in Licensee and has no interest in the business of Licensee, except to the extent set forth in this License Agreement

8.      Further Assurances. Each Party agrees to sign any and all other papers which may be required to effectuate the purpose and intent of this Agreement

9.      Notice. All notices required to be given hereunder shall be given by hand or by overnight courier service, next morning delivery, or made by certified mail, return receipt requested, addressed as follows:

                    If to the Licensor: Green Pproducts & Technologies, LLC
                               c/o John T MacDonald
                               7705 Progress Circle Melbourne Florida 32904, USA

                    If to the Licensee: Heartland Energy Group, LTD
                               c/o John T MacDonald
                               Suite 15, 1st Floor Oliaji Trade Center,
                               Francis Street, Victoria, Mahe, Seychelles

(or in each case to such other address as shall have last been furnished by like notice). Each notice or communication shall be deemed to have 'been given as of the date so mailed or hand delivered as the case may be.

10.     Binding Effect.  The parties hereto acknowledge, agree and declare that this License Agreement is a legal, valid and binding agreement enforceable against each party in accordance with its terms and that this Agreement has been duly executed and delivered on behalf of the parties. Each party represents and warrants that it shall use best efforts in good faith to consummate the transaction.

11.     Successors and Assigns. The parties hereto acknowledge, agree and declare that this Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

12.     Invalid Provisions. If any part of this Agreement is determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having the jurisdiction, to make such determination, then the remainder of this Agreement shall remain in full force and effect.

13.     Captions and Headings.  The captions and headings appearing in this Agreement are solely for convenience and do not in any way define, limit or describe the scope of this Agreement or the intent or content of any provision thereof.



14.   Gender and Number. Whenever the context of this Agreement requires, the masculine gender includes the feminine and neuter, and the singular number includes the plural and vice versa.

15.   Assignment.   Licensee may not assign its rights or delegate its obligations hereunder either in whole or in part, whether by operation of law or otherwise, without the prior written consent of Licensor. Any attempted assignment or delegation without Licensor's written consent will be void. The right and liabilities of the parties under this Agreement will bind and inure to the benefit of the parties' respective successors and permitted assigns. For purposes of this Section, fifty percent (50%) change in control shall constitute an assignment.

16.   Modification or Termination. No change or modification of This Agreement shall be valid unless the same be in writing and signed by the parties.

17.   Governing Law.  This Agreement shall for all purposes be governed by and construed in accordance with the laws of the State of Florida.

18.   Settlement of Disputes. The parties agree that any and all controversies which may arise in connection with any transaction contemplated by this Agreement or the construction, or breach of this Agreement, shall be submitted to arbitration by the American Arbitration Association ('AAA'), which shall appoint one (1) arbitrator in accordance with the American Arbitration Association's Commercial Arbitration Rules then in effect Any arbitration administered by the AAA shall be held in the AAA's Orlando, Florida, office, unless otherwise agreed to by the parties hereto. The award of the arbitrator shall be final and binding and may be confirmed and entered in any court, state or federal, having jurisdiction.

19.   Trade Secrets and Competition. In consideration of the execution of this agreement by Licensor, Licensee covenants and agrees that it shall not, during or following the term of this agreement, sell, disseminate, disclose, lecture upon, or publish in any manner information relating to design or manufacturing techniques employed by Licensor in the production of its products or information relating to research, development, marketing, or sales of products of Licensor.

Licensee further covenants and agrees that for two (2) years following the expiration or termination of this Agreement, Licensee will not engage in selling or manufacturing, whether directly or in association with other persons or firms of any product or development or of any process or service, which resembles or competes with any product, process or service produced, developed by Licensor during the term of this agreement.

20.   Ownership Licensor shall own all existing and future right, title and interest in the Licensed Patent Rights and all other intellectual property rights inherent therein and all tools, molds and equipment related to the Licensor's products, including all changes and improvements requested or suggested by Licensee In the support and maintenance of the Licensed Patent Rights.

21.   Prior Agreements. This Agreement supersedes any and all previous License Agreement, whether written or oral covering the subject matter of this Agreement. Any such previous agreements are null and void.

22.   Execution of Documents. Each party agrees to execute any and all papers, documents or other instruments which may be found necessary or desirable to effect the exclusive right and license granted to the Licensee hereunder.

23.   Entire Agreement. This Agreement shall constitute the entire agreement between the parties. Any prior understanding or representation of any kind preceding the date of this Agreement shall not be binding on either party except to the extent incorporated in this Agreement.

   IN WITNESS WHEREOF, The parties have executed this Agreement as of the day and year first above written.


Licensor, John T. MacDonald
Green Products & Technologies,LLC

Licensee, John T. MacDonald
Heartland Energy Group, LTD



# EXHIBIT "W"

US008580047B1

(12) **United States Patent**
MacDonald

(10) **Patent No.:** **US 8,580,047 B1**
(45) **Date of Patent:** **Nov. 12, 2013**

(54) **METHODS FOR USING IMPROVED UREA HYDROCHLORIDE COMPOSITIONS**

(71) Applicant: **Green Products & Technologies, L.L.C.**, Melbourne, FL (US)

(72) Inventor: **John T. MacDonald**, Grant, FL (US)

(73) Assignee: **Green Products & Technologies, LLC**, Melbourne, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/856,469**

(22) Filed: **Apr. 4, 2013**

**Related U.S. Application Data**

(60) Division of application No. 13/453,871, filed on Apr. 23, 2012, now Pat. No. 8,430,971, which is a division of application No. 13/104,180, filed on May 10, 2011, now Pat. No. 8,163,102, which is a continuation-in-part of application No. 12/419,379, filed on Apr. 7, 2009, now Pat. No. 7,938,912.

(51) **Int. Cl.**
*B08B 3/04* (2006.01)

(52) **U.S. Cl.**
USPC ....... 134/42; 166/307; 166/308.1; 166/308.2; 507/244; 507/248; 507/261; 507/264; 507/266; 507/268; 507/269; 208/14

(58) **Field of Classification Search**
USPC ......... 134/42; 208/14; 166/307, 308.1, 308.2; 507/244, 248, 261, 264, 266, 268, 269
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,250,379 A | 7/1941 | Johnson |
| 2,485,529 A | 10/1949 | Cardwell et al. |
| 3,920,566 A | 11/1975 | Richardson et al. |
| 3,936,316 A | 2/1976 | Gulla |
| 4,372,870 A | 2/1983 | Sayder et al |
| 4,466,893 A | 8/1984 | Dill |
| 4,537,684 A | 8/1985 | Gallup et al |
| 4,673,522 A | 6/1987 | Young |
| 4,699,663 A | 10/1987 | Feeney, III |
| 4,894,169 A | 1/1990 | Delitsky |
| 5,234,466 A | 8/1993 | Sargent et al. |
| 5,492,629 A | 2/1996 | Ludwig et al. |
| 5,672,279 A | 9/1997 | Sargent et al |
| 7,938,912 B1 | 5/2011 | Macdonald |
| 8,132,628 B2 | 3/2012 | Sanders et al. |
| 8,163,102 B1 | 4/2012 | Macdonald |
| 2006/0063689 A1 | 3/2006 | Netherton |
| 2010/0126719 A1* | 5/2010 | Sanders et al. ............... 166/260 |
| 2010/0288909 A1 | 11/2010 | Rosati |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| HU | 195241 | 4/1988 |

* cited by examiner

*Primary Examiner* — Bibi Carrillo
(74) *Attorney, Agent, or Firm* — Carl M. Napolitano; Gray Robinson, P.A.

(57) **ABSTRACT**

A composition including HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone is provided for performing hydraulic fracturing or oil or gas wells, solubilizing calcium carbonate, or lowering salt and bicarbonate levels in irrigation systems.

**1 Claim, No Drawings**

US 8,580,047 B1

1

## METHODS FOR USING IMPROVED UREA HYDROCHLORIDE COMPOSITIONS

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a Divisional Application of U.S. patent application Ser. No. 13/453,871, filed Apr. 23, 2012, now U.S. Pat. No. 8,430,971, issued Apr. 30, 2013, which itself is a Divisional Application of U.S. patent application Ser. No. 13/104,180, filed May 10, 2011, now U.S. Pat. No. 8,163,102, issued Apr. 24, 2012, which itself is a continuation-in-part of patent application Ser. No. 12/419,379, filed Apr. 7, 2009, now issued U.S. Pat. No. 7,938,912, the disclosures of which are herein incorporated by reference in their entirety, and all commonly owned.

### BACKGROUND

The present invention relates to compositions and methods for treating fluids, and, more particularly to such compositions and methods for treating drilling fluids in industrial applications, hydraulic fracturing, solubilizing elements, and lowering salts.

### TECHNICAL FIELD

The removal of water-insoluble cementitious and lime materials from surfaces is known to be a difficult process. Compositions that have been known for use in the past have included acid (e.g., hydrochloric, hydrofluoric, phosphoric, and sulfuric) washes and urea hydrochloride solutions.

However, the solutions known in the art can cause corrosion and flash rusting to metal and metal alloy surfaces, and also can dissolve away surface coatings and underlying metals. Thus, the use of such compositions can decrease the life of a surface and its coating significantly. For example, when used on vehicles and other industrial and construction equipment, such compositions can greatly increase the frequency at which the treated surfaces must be re-painted, re-coated, or re-sealed.

Additionally, many prior known compositions are not environmentally safe, and contain components that are non-OSHA and -EPA compliant. Some jurisdictions have regulations as to materials that can be drained so as to ultimately reach ground water. Resource Conservation and Recovery Act (RCRA) metals are among those substances that are regulated, and include arsenic, barium, cadmium, chromium, lead, mercury, selenium, and silver. As an example, chromium is often used as a lustrous coating on bumpers, mirrors, hydraulic rams, and trim parts on vehicles such as concrete trucks. Since construction equipment is typically washed outdoors, the resulting process water usually drains directly into the ground, and, thus, if the equipment is coated with an RCRA or other undesirable material that can be released with the washing composition, the material will enter the groundwater.

Therefore, it would be beneficial to provide a composition and method of use that are effective at removing cementitious materials from surfaces without causing corrosion or rusting, which can damage the target surface and release harmful substances such as RCRA materials into the environment. Preferably the composition should also include components that are environmentally safe and OSHA- and EPA-compliant.

It would also be beneficial to provide an environmentally safe composition and method of use that are effective in

2

assisting in performing hydraulic fracturing of an oil gas well, adjusting and maintaining the pH of process water and other fluids in industrial applications, and solubilizing calcium carbonate in an aqueous suspension or dispersion thereof.

### SUMMARY

A composition including HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone is provided for performing hydraulic fracturing or oil or gas wells, solubilizing calcium carbonate, or lowering salt and bicarbonate levels in irrigation systems.

A method of using the composition includes applying the composition to a surface to release a cementitious material therefrom and removing the composition and released cementitious material from the surface.

The composition comprises an organic, cationic inhibitor for both corrosion and flash rusting that minimizes pitting and attack on metal and alloy surfaces, such as are common in construction equipment and trucks. As the composition is non-corrosive to metals, it has been deemed non-regulated by the U.S. Department of Transportation (DOT), and is environmentally safe and OSHA- and EPA-compliant. The composition has been shown to reduce corrosion levels to well below the DOT corrosion limits of 6.25 mm/yr.

In an exemplary embodiment, the inhibitor, which is used at a level of approximately 0.5% in the composition, comprises 10-30% surfactant, 10-30% complex substituted keto-amine-hydrochloride, 1-10% 3-methyl butynol, 1-10% isopropyl alcohol, 1-10% methyl vinyl ketone, and <1% acetone. This inhibitor has been shown to substantially eliminate corrosion of target surfaces.

A method is also provided for performing hydraulic fracturing of oil or gas wells. The method comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and inserting the composition into an oil well or a gas well to assist in performing hydraulic fracturing thereof.

A method is further provided for adjusting a pH of a drilling fluid. The method comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to a drilling fluid for a well to assist in adjusting a pH thereof.

A method for adjusting and maintaining a pH of a process fluid comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to a process fluid to adjust and maintain a pH thereof.

A method for solubilizing calcium carbonate in an aqueous suspension or dispersion of calcium carbonate comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; adding the composition to an aqueous suspension or dispersion of calcium carbonate; and permitting the composition to solubilize the aqueous suspension or dispersion of calcium carbonate.

A method for removing a foulant from a fluid-handling element comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; adding the composition to a fouled fluid-handling element; and permitting the composition to solubilize the foulant.

A method for removing a foulant from a surface of a marine vessel comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; applying the composi-

3

tion to a fouled surface of a marine vessel; and permitting the composition to solubilize the foulant.

A method for lowering a salt and bicarbonate level in an irrigation system comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydro-chloride, an alcohol, an ethoxylate, and a ketone; diluting the composition to 5-60% by volume composition in water; adding the composition to a fouled fluid-transporting element of an irrigation system; and permitting the composition to solubilize the foulant.

A method for acidizing turf and for lowering a salt and bicarbonate level in at least one of turf and turf growing medium comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to at least one of turf and turf growing medium.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

In one embodiment according to the teachings of the present invention, a composition comprises HCl, urea, complex substituted keto-amine-hydrochloride, at least one alcohol, an ethoxylate, and a ketone. Preferably, the HCl and the urea are present in a range of: HCl, 40-60 wt %; and urea, 30-45 wt %, and, most preferably, at approximately HCl, 55 wt %, and urea, 42 wt %.

Preferably the alcohol comprises at least one of isopropyl alcohol and propargyl alcohol. In a particular embodiment, the isopropyl alcohol and propargyl alcohol are present at approximately isopropyl alcohol, 0.067 wt %, and propargyl alcohol, 0.022 wt %.

The ethoxylate can comprise ethoxylated nonylphenol, which can be present at approximately 0.022 wt %.

The ketone can comprise methyl vinyl ketone, which can be present at approximately 0.022 wt %.

In a particular embodiment, the composition can comprise: HCl, 55 wt %; urea, 42 wt %; complex substituted keto-amine-hydrochloride, 0.067 wt %; isopropyl alcohol, 0.067 wt %; ethoxylated nonylphenol, 0.022 wt %; propargyl alcohol, 0.022 wt %; methyl vinyl ketone, 0.022 wt %; acetone, 0.022 wt %; and acetophenone, 0.0022 wt %.

The composition can be used as a base for a plurality of dilution levels to be used for different applications. For example, sufficient water can be added to the composition to dilute the base in a range of 1:1 to 6:1 water:base.

A plurality of exemplary compositions using the composition described above can be used as a base for removing cementitious material from a variety of surfaces. For example, concrete can be removed from equipment with a composition comprising: base (25 wt %), nonylphenol 9.5 mole (0.25 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (74.4 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

Another composition for use as concrete removing agent on equipment can comprise: base (35 wt %), nonylphenol 9.5 mole (0.25 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (64.4 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

Yet another composition can be used as an efflorescence remover on cementitious material (concrete block, brick, precast, paver, cement, and masonry). An exemplary formula for this composition is: base (15 wt %), nonylphenol 9.5 mole

4

(0.25 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (84.4 wt %). This formula can be used on, for example, concrete, concrete block, brick, precast, cement, and masonry, although these uses are not intended to be limiting.

A basic composition for use as a concrete removing agent on tools and equipment includes base (25 wt %) and water (75 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

Another composition for use as a concrete removing agent on equipment comprises base (60.0 wt %), nonylphenol 9.5 mole (0.25 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (39.4 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

A method for performing hydraulic fracturing of an oil or a gas well comprises providing a composition such as that described above and inserting the composition into an oil well or a gas well to assist in performing hydraulic fracturing thereof.

A method for adjusting a pH of a drilling fluid comprises providing a composition such as described above and adding the composition to a drilling fluid for a well to assist in adjusting a pH thereof. The composition can be diluted to 20-90% by volume composition in water.

A method for adjusting and maintaining a pH of a process fluid comprises providing a composition such as described above and adding the composition to a process fluid to adjust and maintain a pH thereof. The process fluid can comprise at least one of a processing fluid for textiles, a processing fluid for paper manufacturing, industrial process water, waste water, industrial discharge water, and industrial recycling water. The composition can be diluted by 10-85% by volume composition in water, for example.

A method for solubilizing calcium carbonate in an aqueous suspension or dispersion of calcium carbonate comprises providing a composition such as described above and adding the composition to an aqueous suspension or dispersion of calcium carbonate. The composition is permitted to solubilize the aqueous suspension or dispersion of calcium carbonate. The composition can be diluted by 10-95% by volume composition in water, for example.

A method for removing a foulant from a fluid-handling element comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; adding the composition to a fouled fluid-handling element; and permitting the composition to solubilize the foulant.

In one sub-embodiment, the fluid-handling element can comprise a waste plumbing system and the foulant can comprise a salt of at least one of calcium and magnesium. In this embodiment the composition can be diluted prior to the adding step to 10-65% by volume composition in water.

In another sub-embodiment, the fluid-handling element can comprise an industrial boiler system and the foulant can comprise a salt of at least one of calcium and magnesium. In this embodiment the composition can be diluted prior to the adding step by 5-70% by volume composition in water.

In a further sub-embodiment, the fluid-handling element can comprise a plumbing element of a marine vessel and the foulant can comprise at least one of a salt of at least one of calcium and magnesium, a marine organism such as arthropods such as cirripedia or crustaceans, and sludge. In this embodiment the composition can be diluted prior to the adding step by 5-80% by volume composition in water. Here the

5

plumbing element can comprises a waste plumbing element, and the diluting can comprise diluting the composition by 10-65% by volume composition in water. The plumbing element can also comprise an internal plumbing element, and the diluting can comprise diluting the composition by 5-50% by volume composition in water. Alternatively, the plumbing element can comprise an element in a propulsion system, such as, but not intended to be limited to, inboard, outboard, inboard/outboard, surface drive, or jet drive propulsion engine systems, and the diluting can comprise diluting the composition by 5-80% by volume composition in water.

A method for removing a foulant from a surface of a marine vessel comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; applying the composition to a fouled surface of a marine vessel; and permitting the composition to solubilize the foulant. The surface can comprise, for example, a marine hull. If desired, the composition can be diluted by 5-95% by volume composition in water. The foulant can comprise at least one of a salt of at least one of calcium and magnesium, a marine organism such as arthropods such as cirripedia or crustaceans, and sludge.

A method for lowering a salt and bicarbonate level in an irrigation system comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; diluting the composition to 5-60% by volume composition in water; adding the composition to a fouled fluid-transporting element of an irrigation system; and permitting the composition to solubilize the foulant.

6

A method for acidizing turf and for lowering a salt and bicarbonate level in at least one of turf and turf growing medium comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to at least one of turf and turf growing medium. The composition can be diluted to 1-35% by volume composition in water.

One of skill in the art will recognize that these compositions and methods of use are not intended to be limiting, and variations in ingredients, proportions, and methods of use can be made without departing from the spirit of the invention.

Having now described the invention and use of preferred embodiments thereof, and the advantageous new and useful results obtained thereby, the new and useful constructions, and reasonable equivalents thereof obvious to those skilled in the art, are set forth in the appended claims.

What is claimed is:

1. A method for performing hydraulic fracturing of an oil well or a gas well comprising:
   providing a composition comprising 55 wt % HCl, 42 wt % urea, 0.067 wt % complex substituted keto-amine-hydrochloride, 0.067 wt % isopropyl alcohol, 0.022 wt % ethoxylated nonylphenol, 0.022 wt % propargyl alcohol, 0.022 wt % methyl vinyl ketone, 0.022 wt % acetone, and 0.0022 wt % acetophenone; and
   inserting the composition into an oil well or a gas well to assist in performing hydraulic fracturing thereof.

* * * * *

# EXHIBIT "X"

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement made as of this 30th day of April 2013, between Green Products & Technologies LLC, having its principal place of business at 7705 Progress Circle Melbourne Florida USA (the Licensor) and Heartland Energy Group LTD, having its principal place of business at Suite 15, 1st Floor Oliaji Trade Center, Francis Street, Victoria, Mahe, Seychelles (the "Licensee").

### WITNESSETH:

WHEREAS, the Licensor claims that it has been granted the assignment rights from John MacDonald, who is the sole and exclusive Inventor of, and has the sole and exclusive right to grant licenses under the US. Patents issued and Patent Applications and specifically known as, **US 8,430,971 B1** and any improvements thereon (the "Patent").

WHEREAS, for commercial purposes, the Licensee wishes to acquirer the 'EXCLUSIVE RIGHT" and license to manufacture, sell, re-license and use apparatus embodying, employing and containing the Patent.

NOW THEREFORE, in consideration of the mutual covenants and promises of the parties hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency, of which is hereby acknowledged by the parties hereto agree as follows:

1.    Grant of License. The Licensor grants to the Licensee the right and license to manufacture, sell, re-license and use apparatus embodying, employing and containing the Patent (the "Patent"), to the full end of the Term (as hereinafter defined), unless this Agreement is terminated prior to the end of the Term, as provided below.

### 2.    Representations of Licensor.

A.    Ownership of Patent. The Licensor represents and warrants that it is the assignee of the entire right, title and interest in and to the above-mentioned patent, the assignment being granted from John MacDonald, and that it has the right to grant the right, license and privilege granted in this Agreement; that it has executed no agreement in conflict with this Agreement; and that it has not granted to any other person, firm or corporation any right, license, or privilege granted under this Agreement

### 3.    Term and Termination.

A.    Unless sooner terminated in accordance with this Agreement, the Patent License granted hereunder shall commence on April 30th, 2013 (the 'Effective Date"), and, shall continue in effect until the end of the patent term.



B.     Upon termination or expiration of the licenses granted under this Agreement, by operation of law or otherwise, all rights, privileges and obligations arising from this Agreement shall cease to exist. Upon termination or expiration of this Agreement, Licensee shall cease from all use of the Patent.

C.     In the event of a significant breach of this Agreement by either party, the other party may terminate the Licenses and rights granted to the breathing party under this Agreement by giving written notice to such breaching party of termination and the basis for such termination; provided, however, that such written notice is properly delivered as set forth in Section 12 of this Agreement The Licenses and rights granted under this Agreement shall terminate thirty (30) days after service of the written notice to the other party, unless the specified breach is cured within such thirty (30) day period. A significant breach of this Agreement shall be defined as either party's violation of its material obligations under this Agreement.

D.     Licensor may, on written notice to the Licensee, which notice is properly delivered as set forth in Section 12 of this Agreement, forthwith terminate the license and rights granted under this Agreement to Licensee to use the Patent, upon the occurrence of any of the following events, unless such breach is cured within such ten (10) days from the service of the written notice upon the Licensee:

Licensee undergoing a change of control (whether resulting from merger, acquisition, consolidation or otherwise) unless the successor entity acknowledges its obligations hereunder and the Licensor grants successor such prior written approval of transfer of said rights.

4.     Infringement. In the event the Licensee shall become aware of any infringement by any third party of any right licensed under this Agreement, it shall promptly notify Licensor in writing of such infringement or use, and shall do such acts and assist and supply such information as are reasonably necessary or desirable in relation thereto. Licensor shall take only those steps which in its sole discretion, are necessary to enforce its rights, including the engagement of legal counsel of its own choosing. Licensor's obligation to defend the rights of this license Agreement hereunder shall be made at its sole and exclusive discretion.

5.     Indemnity.

A     Each party shall defend, indemnify, and hold harmless the other and the other's officers, employees, agents and direct or indirect customers, from and against any claims, suits, losses, liabilities, damages, court judgments and/or await and the reasonably related costs and expenses (including reasonable attorneys' fees incurred by the other or for which the other is judged liable), incurred because of actual or alleged infringement by the Patent supplied hereunder of any patent copyright, trade secret, trademark, mask work right or other proprietary right(s) of a third party which was in effect on or prior to the date which the subject Patent, including any improvements thereon, was registered with the USPTO.



Upon receipt of notice of such claim, suit or action, the notified party shall promptly tender notice of the same to the other party, and thereafter, upon the notified party's request, the other party shall render reasonable assistance to the notified party for defense of the same. Each party shall execute any and all papers which may be found necessary or desirable in any suit or suits brought under and pursuant to this Agreement; and the each party further agrees that it will testify in any interference or litigation, whenever requested to do so by the other party.

B.      Each party shall maintain, at its own expense, product liability insurance in full force and effect at all times during the Term, with a responsible insurance carrier reasonably acceptable to the other party, of a minimum of One Million ($1,000,000.00) Dollars, with a deductible of no more than Twenty Five Thousand ($25,000.00) Dollars. Product liability insurance shall be for the benefit of each party as an additional insured and each party shall provide for at least ten (10) days prior written notice to the other party of the cancellation or any substantial modification of said policy.

C.      Licensor or Licensee may, as the case maybe, from time to time, upon reasonable request by the other party, promptly furnish or cause to be furnished to the other party, evidence in form and substance satisfactory to the other party, of the maintenance of the Insurance required by paragraph "B" of this Section of this Agreement, including, but not limited to, originals or copies of policies, certificates of insurance (with applicable riders and endorsements) and proof of premium payments

D      If in any suit involving the Patent under and pursuant to which the exclusive right and license has been granted hereunder, charging infringement of such right and license, and either the Patent should be declared to be invalid by any court or other tribunal or be construed by the court as not to cover the Licensor's Patent, the Licensee shall be immediately released from any and all obligations under this Agreement

6      No Waiver. Except as otherwise provided herein, no waiver of any covenant, condition, or provision of this Agreement shall be deemed to have been made unless expressly in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provision, covenants, or conditions of this Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment in the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another Party shall be construed as a waiver with respect to any other or subsequent breach.

7      Independent Contractors. Licensee is an independent contractor and not an agent, partner, joint venturer, franchisee, affiliate or employee of Licensor. No fiduciary or franchise relationship exists between the parties. Neither party shall be liable for any debts, accounts, obligations or other liabilities of the other party, its agents or employees. Licensee shall have no authority to obligate or bind Licensor in any manner



Licensor has no proprietary interest in Licensee and has no interest in the business of Licensee, except to the extent set forth in this License Agreement

8. Further Assurances. Each Party agrees to sign any and all other papers which may be required to effectuate the purpose and intent of this Agreement

9. Notice. All notices required to be given hereunder shall be given by hand or by overnight courier service, next morning delivery, or made by certified mail, return receipt requested, addressed as follows:

> If to the Licensor: Green Pproducts & Technologies, LLC
> c/o John MacDonald
> 7705 Progress Circle Melbourne Florida 32904. USA

> If to the Licensee: Heartland Energy Group, LTD
> c/o John MacDonald
> Suite 15, 1st Floor Oliaji Trade Center,
> Francis Street, Victoria, Mahe, Seychelles

(or in each case to such other address as shall have last been furnished by like notice). Each notice or communication shall be deemed to have 'been given as of the date so mailed or hand delivered as the case may be.

10. Binding Effect. The parties hereto acknowledge, agree and declare that this License Agreement is a legal, valid and binding agreement enforceable against each party in accordance with its terms and that this Agreement has been duly executed and delivered on behalf of the parties. Each party represents and warrants that it shall use best efforts in good faith to consummate the transaction.

11. Successors and Assigns. The parties hereto acknowledge, agree and declare that this Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

12. Invalid Provisions. If any part of this Agreement is determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having the jurisdiction. to make such determination, then the remainder of this Agreement shall remain in full force and effect.

13. Captions and Headings. The captions and headings appearing in this Agreement are solely for convenience and do not in any way define, limit or describe the scope of this Agreement or the intent or content of any provision thereof.



14.    Gender and Number. Whenever the context of this Agreement requires, the masculine gender includes the feminine and neuter, and the singular number includes the plural and vice versa.

15.    Assignment. Licensee may not assign its rights or delegate its obligations hereunder either in whole or in part, whether by operation of law or otherwise, without the prior written consent of Licensor. Any attempted assignment or delegation without Licensor's written consent will be void. The right and liabilities of the parties under this Agreement will bind and inure to the benefit of the parties' respective successors and permitted assigns. For purposes of this Section, fifty percent (50%) change in control shall constitute an assignment.

16.    Modification or Termination. No change or modification of This Agreement shall be valid unless the same be in writing and signed by the parties.

17.    Governing Law. This Agreement shall for all purposes be governed by and construed in accordance with the laws of the State of Florida.

18.    Settlement of Disputes. The parties agree that any and all controversies which may arise in connection with any transaction contemplated by this Agreement or the construction, or breach of this Agreement, shall be submitted to arbitration by the American Arbitration Association ('AAA'), which shall appoint one (1) arbitrator in accordance with the American Arbitration Association's Commercial Arbitration Rules then in effect. Any arbitration administered by the AAA shall be held in the AAA's Orlando, Florida, office, unless otherwise agreed to by the parties hereto. The award of the arbitrator shall be final and binding and may be confirmed and entered in any court, state or federal, having jurisdiction.

19.    Trade Secrets and Competition. In consideration of the execution of this agreement by Licensor, Licensee covenants and agrees that it shall not, during or following the term of this agreement, sell, disseminate, disclose, lecture upon, or publish in any manner information relating to design or manufacturing techniques employed by Licensor in the production of its products or information relating to research, development, marketing, or sales of products of Licensor.

Licensee further covenants and agrees that for two (2) years following the expiration or termination of this Agreement, Licensee will not engage in selling or manufacturing, whether directly or in association with other persons or firms of any product or development or of any process or service, which resembles or competes with any product, process or service produced, developed by Licensor during the term of this agreement.



20.    Ownership Licensor shall own all existing and future right, title and interest in the Licensed Patent Rights and all other intellectual property rights inherent therein and all tools, molds and equipment related to the Licensor's products. including all changes and improvements requested or suggested by Licensee In the support and maintenance of the Licensed Patent Rights.

21.    Prior Agreements. This Agreement supersedes any and all previous License Agreement, whether written or oral covering the subject matter of this Agreement. Any such previous agreements are null and void.

22.    Execution of Documents. Each party agrees to execute any and all papers, documents or other instruments which may be found necessary or desirable to effect the exclusive right and license granted to the Licensee hereunder.

23.    Entire Agreement. This Agreement shall constitute the entire agreement between the parties. Any prior understanding or representation of any kind preceding the date of this Agreement shall not be binding on either party except to the extent incorporated in this Agreement.

    IN WITNESS WHEREOF, The parties have executed this Agreement as of the day and year first above written.

Licensor, John MacDonald
Green Products & Technologies,LLC

Licensee. John MacDonald
Heartland Energy Group. LTD

# EXHIBIT "Y"

US008430971B1

(12) **United States Patent**
MacDonald

(10) **Patent No.:** US 8,430,971 B1
(45) **Date of Patent:** Apr. 30, 2013

(54) **COMPOSITION FOR TREATMENT OF A DRILLING FLUID AND ASSOCIATED METHODS**

(75) Inventor: **John MacDonald**, Grant, FL (US)

(73) Assignee: **Green Products & Technologies, L.L.C.**, Melbourne, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/453,871**

(22) Filed: **Apr. 23, 2012**

**Related U.S. Application Data**

(60) Division of application No. 13/104,180, filed on May 10, 2011, now Pat. No. 8,163,102, and a continuation-in-part of application No. 12/419,379, filed on Apr. 7, 2009, now Pat. No. 7,938,912.

(51) **Int. Cl.**
*C11D 3/43* (2006.01)

(52) **U.S. Cl.**
USPC .......... **134/42**; 166/261; 166/279; 166/305.1; 166/308.1; 210/638; 210/639; 210/696; 210/698; 210/700

(58) **Field of Classification Search** .................. 210/638, 210/639, 696, 698, 700, 747.1; 175/65, 66, 175/207; 166/261, 279, 305.1, 308.1; 507/103, 507/129, 140; 134/42
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,250,379 A | 7/1941 | Johnson | |
| 2,485,529 A | 10/1949 | Cardwell | |
| 3,920,566 A | 11/1975 | Richardson et al. | |
| 3,936,316 A | 2/1976 | Gulla | |
| 4,372,870 A | 2/1983 | Snyder et al. | |
| 4,466,893 A | 8/1984 | Dill | |
| 4,537,684 A | 8/1985 | Gallup et al. | |
| 4,673,522 A | 6/1987 | Young | |
| 4,699,663 A | 10/1987 | Feeney, III | |
| 4,894,169 A | 1/1990 | Delitsky | |
| 5,234,466 A | 8/1993 | Sargent et al. | |
| 5,492,629 A | 2/1996 | Ludwig et al. | |
| 5,672,279 A | 9/1997 | Sargent et al. | |
| 7,938,912 B1 * | 5/2011 | MacDonald | .................. 134/42 |
| 8,132,628 B2 * | 3/2012 | Sanders et al. | ............... 166/400 |
| 8,163,102 B1 * | 4/2012 | MacDonald | ................... 134/42 |
| 2006/0063689 A1 | 3/2006 | Netherton | |
| 2010/0288909 A1 | 11/2010 | Rosali | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| HU | 195241 B | 4/1988 |

* cited by examiner

*Primary Examiner* — Bibi Carrillo
(74) *Attorney, Agent, or Firm* — Carl M. Napolitano; GrayRobinson, P.A.

(57) **ABSTRACT**

A composition is provided for lowering a pH of a drilling fluid. The composition includes HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone. A method of using the composition includes adding the composition to a drilling fluid for a well to assist in lowering a pH thereof. Methods are also provided for performing hydraulic fracturing of an oil or a gas well, for adjusting a pH of a drilling fluid, for adjusting and maintaining a pH of a process fluid, for solubilizing calcium carbonate in an aqueous suspension or dispersion of calcium carbonate, for removing a foulant in a fluid-handling element, and for adjusting a pH and lowering a salt level of turf.

**14 Claims, No Drawings**

US 8,430,971 B1

**1**

## COMPOSITION FOR TREATMENT OF A DRILLING FLUID AND ASSOCIATED METHODS

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a Divisional application of U.S. patent application Ser. No. 13/104,180, filed May 10, 2011, which itself is a continuation-in-part of patent application Ser. No. 12/419,379, filed Apr. 7, 2009, now issued U.S. Pat. No. 7,938,912, the disclosures of which are herein incorporated by reference in their entirety, and all commonly owned.

### BACKGROUND

The present invention relates to compositions and methods for treating fluids, and, more particularly to such compositions and methods for treating drilling fluids in industrial applications.

### TECHNICAL FIELD

The removal of water-insoluble cementitious and lime materials from surfaces is known to be a difficult process. Compositions that have been known for use in the past have included acid (e.g., hydrochloric, hydrofluoric, phosphoric, and sulfuric) washes and urea hydrochloride solutions.

However, the solutions known in the art can cause corrosion and flash rusting to metal and metal alloy surfaces, and also can dissolve away surface coatings and underlying metals. Thus, the use of such compositions can decrease the life of a surface and its coating significantly. For example, when used on vehicles and other industrial and construction equipment, such compositions can greatly increase the frequency at which the treated surfaces must be re-painted, re-coated, or re-sealed.

Additionally, many prior known compositions are not environmentally safe, and contain components that are non-OSHA and -EPA compliant. Some jurisdictions have regulations as to materials that can be drained so as to ultimately reach ground water. Resource Conservation and Recovery Act (RCRA) metals are among those substances that are regulated, and include arsenic, barium, cadmium, chromium, lead, mercury, selenium, and silver. As an example, chromium is often used as a lustrous coating on bumpers, mirrors, hydraulic rams, and trim parts on vehicles such as concrete trucks. Since construction equipment is typically washed outdoors, the resulting process water usually drains directly into the ground, and, thus, if the equipment is coated with an RCRA or other undesirable material that can be released with the washing composition, the material will enter the groundwater.

Therefore, it would be beneficial to provide a composition and method of use that are effective at removing cementitious materials from surfaces without causing corrosion or rusting, which can damage the target surface and release harmful substances such as RCRA materials into the environment. Preferably the composition should also include components that are environmentally safe and OSHA- and EPA-compliant.

It would also be beneficial to provide an environmentally safe composition and method of use that are effective in assisting in performing hydraulic fracturing of an oil gas well, adjusting and maintaining the pH of process water and other

**2**

fluids in industrial applications, and solubilizing calcium carbonate in an aqueous suspension or dispersion thereof.

### SUMMARY

A composition is provided for use in cleaning a surface of a cementitious material. The composition comprises HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone.

A method of using the composition includes applying the composition to a surface to release a cementitious material therefrom and removing the composition and released cementitious material from the surface.

The composition comprises an organic, cationic inhibitor for both corrosion and flash rusting that minimizes pitting and attack on metal and alloy surfaces, such as are common in construction equipment and trucks. As the composition is non-corrosive to metals, it has been deemed non-regulated by the U.S. Department of Transportation (DOT), and is environmentally safe and OSHA- and EPA-compliant. The composition has been shown to reduce corrosion levels to well below the DOT corrosion limits of 6.25 mmpy.

In an exemplary embodiment, the inhibitor, which is used at a level of approximately 0.5% in the composition, comprises 10-30% surfactant, 10-30% complex substituted keto-amine-hydrochloride, 1-10% 3-methyl butynol, 1-10% isopropyl alcohol, 1-10% methyl vinyl ketone, and <1% acetone. This inhibitor has been shown to substantially eliminate corrosion of target surfaces.

A method is also provided for performing hydraulic fracturing of oil or gas wells. The method comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and inserting the composition into an oil well or a gas well in performing hydraulic fracturing thereof.

A method is further provided for adjusting a pH of a drilling fluid. The method comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to a drilling fluid for a well to assist in adjusting a pH thereof.

A method for adjusting and maintaining a pH of a process fluid comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to a process fluid to adjust and maintain a pH thereof.

A method for solubilizing calcium carbonate in an aqueous suspension or dispersion of calcium carbonate comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; adding the composition to an aqueous suspension or dispersion of calcium carbonate; and permitting the composition to solubilize the aqueous suspension or dispersion of calcium carbonate.

A method for removing a foulant from a fluid-handling element comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; adding the composition to a fouled fluid-handling element; and permitting the composition to solubilize the foulant.

A method for removing a foulant from a surface of a marine vessel comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; applying the composition to a fouled surface of a marine vessel; and permitting the composition to solubilize the foulant.

3

A method for lowering a salt and bicarbonate level in an irrigation system comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; diluting the composition to 5-60% by volume composition in water; adding the composition to a fouled fluid-transporting element of an irrigation system; and permitting the composition to solubilize the foulant.

A method for acidizing turf and for lowering a salt and bicarbonate level in at least one of turf and turf growing medium comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to at least one of turf and turf growing medium.

#### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

In one preferred embodiment, a composition comprises HCl, urea, complex substituted keto-amine-hydrochloride, at least one alcohol, an ethoxylate, and a ketone. Preferably, the HCl and the urea are present in a range of: HCl, 40-60 wt %, and urea, 30-45 wt %, and, most preferably, at approximately HCl, 55 wt %, and urea, 42 wt %.

Preferably the alcohol comprises at least one of isopropyl alcohol and propargyl alcohol. In a particular embodiment, the isopropyl alcohol and propargyl alcohol are present at approximately isopropyl alcohol, 0.067 wt %, and propargyl alcohol, 0.022 wt %.

The ethoxylate can comprise ethoxylated nonylphenol, which can be present at approximately 0.022 wt %.

The ketone can comprise methyl vinyl ketone, which can present at approximately 0.022 wt %.

In a particular embodiment, the composition can comprise: HCl, 55 wt %; urea, 42 wt %; complex substituted keto-amine-hydrochloride, 0.067 wt %; isopropyl alcohol, 0.067 wt %; ethoxylated nonylphenol, 0.022 wt %; propargyl alcohol, 0.022 wt %; methyl vinyl ketone, 0.022 wt %; acetone, 0.022 wt %; and acetophenone, 0.0022 wt %.

The composition can be used as a base for a plurality of dilution levels to be used for different applications. For example, sufficient water can be added to the composition to dilute the base in a range of 1:1 to 6:1 water:base.

A plurality of exemplary compositions using the composition described above can be used as a base for removing cementitious material from a variety of surfaces. For example, concrete can be removed from equipment with a composition comprising: base (25 wt %), nonylphenol 9.5 mole (0.25 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (74.4 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

Another composition for use as concrete removing agent on equipment can comprise: base (35 wt %), nonylphenol 9.5 mole (0.25 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (64.4 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

Yet another composition can be used as an efflorescence remover on cementitions materials (concrete block, brick, precast, paver, cement, and masonry). An exemplary formula for this composition is: base (15 wt %), nonylphenol 9.5 mole (0.25 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (84.4 wt %). This

4

formula can be used on, for example, concrete block, brick, precast, cement, and masonry, although these uses are not intended to be limiting.

A basic composition for use as a concrete removing agent on tools and equipment includes base (25 wt %) and water (75 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

Another composition for use as a concrete removing agent on equipment comprises base (60.0 wt %), nonylphenol 9.5 mole (0.25 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (39.4 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

A method for performing hydraulic fracturing of an oil or a gas well comprises providing a composition such as that described above and inserting the composition into an oil well or a gas well to assist in performing hydraulic fracturing thereof.

A method for adjusting a pH of a drilling fluid comprises providing a composition such as described above and adding the composition to a drilling fluid for a well to assist in adjusting a pH thereof. The composition can be diluted to 20-90% by volume composition in water.

A method for adjusting and maintaining a pH of a process fluid comprises providing a composition such as described above and adding the composition to a process fluid to adjust and maintain a pH thereof. The process fluid can comprise at least one of a processing fluid for textiles, a processing fluid for paper manufacturing, industrial process water, waste water, industrial discharge water, and industrial recycling water. The composition can be diluted by 10-85% by volume composition in water, for example.

A method for solubilizing calcium carbonate in an aqueous suspension or dispersion of calcium carbonate comprises providing a composition such as described above and adding the composition to an aqueous suspension or dispersion of calcium carbonate. The composition is permitted to solubilize the aqueous suspension or dispersion of calcium carbonate. The composition can be diluted by 10-95% by volume composition in water, for example.

A method for removing a foulant from a fluid-handling element comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; adding the composition to a fouled fluid-handling element; and permitting the composition to solubilize the foulant.

In one sub-embodiment, the fluid-handling element can comprise a waste plumbing system and the foulant can comprise a salt of at least one of calcium and magnesium. In this embodiment the composition can be diluted prior to the adding step to 10-65% by volume composition in water.

In another sub-embodiment, the fluid-handling element can comprise an industrial boiler system and the foulant can comprise a salt of at least one of calcium and magnesium. In this embodiment the composition can be diluted prior to the adding step by 5-70% by volume composition in water.

In a further sub-embodiment, the fluid-handling element can comprise a plumbing element of a marine vessel and the foulant can comprise at least one of a salt of at least one of calcium and magnesium, a marine organism such as arthropods such as cirripedia or crustaceans, and sludge. In this embodiment the composition can be diluted prior to the adding step by 5-80% by volume composition in water. Here the plumbing element can comprises a waste plumbing element, and the diluting can comprise diluting the composition by

US 8,430,971 B1

5

10-65% by volume composition in water. The plumbing element can also comprise an internal plumbing element, and the diluting can comprise diluting the composition by 5-50% by volume composition in water. Alternatively, the plumbing element can comprise an element in a propulsion system, such as, but not intended to be limited to, inboard, outboard, inboard/outboard, surface drive, or jet drive propulsion engine systems, and the diluting can comprise diluting the composition by 5-80% by volume composition in water.

A method for removing a foulant from a surface of a marine vessel comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; applying the composition to a fouled surface of a marine vessel; and permitting the composition to solubilize the foulant. The surface can comprise, for example, a marine hull. If desired, the composition can be diluted by 5-95% by volume composition in water. The foulant can comprise at least one of a salt of at least one of calcium and magnesium, a marine organism such as arthropods such as cirripedia or crustaceans, and sludge.

A method for lowering a salt and bicarbonate level in an irrigation system comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; diluting the composition to 5-60% by volume composition in water; adding the composition to a fouled fluid-transporting element of an irrigation system; and permitting the composition to solubilize the foulant.

A method for acidizing turf and for lowering a salt and bicarbonate level in at least one of turf and turf growing medium comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to at least one of turf and turf growing medium. The composition can be diluted to 1-35% by volume composition in water.

One of skill in the art will recognize that these compositions and methods of use are not intended to be limiting, and variations in ingredients, proportions, and methods of use can be made without departing from the spirit of the invention.

Having now described the invention and use of preferred embodiments thereof, and the advantageous new and useful results obtained thereby, the new and useful constructions, and reasonable equivalents thereof obvious to those skilled in the art, are set forth in the appended claims.

What is claimed is:

1. A method for lowering a pH of a drilling fluid, the method comprising:

providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, and an ethoxylate, and a ketone; and

adding the composition to a drilling fluid for a well to assist in lowering a pH thereof.

2. The method recited in claim 1, wherein the alcohol comprises at least one of isopropyl alcohol and propargyl alcohol.

3. The method recited in claim 1, wherein the ethoxylate comprises ethoxylated nonylphenol.

6

4. The method recited in claim 1, wherein the ketone comprises methyl vinyl ketone.

5. The method recited in claim 1, wherein the composition comprises:

HCl, 55 wt %;

urea, 42 wt %;

complex substituted keto-amine-hydrochloride, 0.067 wt %;

isopropyl alcohol, 0.067 wt %;

ethoxylated nonylphenol, 0.022 wt %;

propargyl alcohol, 0.022 wt %; methyl vinyl ketone, 0.022 wt %;

acetone, 0.022 wt %; and

acetophenone, 0.0022 wt %.

6. The method recited in claim 1, wherein the composition providing step comprises providing the composition during hydraulics fracturing of at least one of an oil well and a gas well.

7. The method recited in claim 5, further comprising diluting the composition to 20-90% by volume composition in water.

8. A method for adjusting and maintaining a pH of a process fluid, the method comprising:

providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and

adding the composition to a process fluid to adjust and maintain a pH thereof.

9. The method recited in claim 8, wherein the alcohol comprises at least one of isopropyl alcohol and propargyl alcohol.

10. The method recited in claim 8, wherein the ethoxylate comprises ethoxylated nonylphenol.

11. The method recited in claim 8, wherein the ketone comprises methyl vinyl ketone.

12. The method recited in claim 8, wherein the composition comprises:

HCl, 55 wt %;

urea, 42 wt %;

complex substituted keto-amine-hydrochloride, 0.067 wt %;

isopropyl alcohol, 0.067 wt %;

ethoxylated nonylphenol, 0.022 wt %;

propargyl alcohol, 0.022 wt %; methyl vinyl ketone, 0.022 wt %;

acetone, 0.022 wt %; and

acetophenone, 0.0022 wt %.

13. The method recited in claim 8, wherein the process fluid comprises at least one of a processing fluid for textiles, a processing fluid for paper manufacturing, industrial process water, waste water, industrial discharge water, and industrial recycling water, and further comprising diluting the composition prior to the adding step by 10-85% composition in water.

14. The method recited in claim 8, wherein the composition providing step comprises providing the composition during a hydraulics fracturing of at least one of an oil well and a gas well.

*   *   *   *   *

# EXHIBIT "Z"

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement made as of this 22th day of July 2014, between Green Products & Technologies LLC, having its principal place of business at 7705 Progress Circle Melbourne Florida USA (the Licensor) and Heartland Energy Group LTD, having its principal place of business at Suite 15, 1st Floor Oliaji Trade Center, Francis Street, Victoria, Mahe, Seychelles (the "Licensee").

### WITNESSETH:

WHEREAS, the Licensor claims that it has been granted the assignment rights from John T. MacDonald, who is the sole and exclusive Inventor of, and has the sole and exclusive right to grant licenses under the US. Patents issued and Patent Applications and specifically known as, **US 8,784,573** and any improvements thereon (the "Patent").

WHEREAS, for commercial purposes, the Licensee wishes to acquirer the 'EXCLUSIVE RIGHT" and license to manufacture, sell, re-license and use apparatus embodying, employing and containing the Patent.

NOW THEREFORE, in consideration of the mutual covenants and promises of the parties hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency, of which is hereby acknowledged by the parties hereto agree as follows:

1.    Grant of License. The Licensor grants to the Licensee the right and license to manufacture, sell, re-license and use apparatus embodying, employing and containing the Patent (the "Patent"), to the full end of the Term (as hereinafter defined), unless this Agreement is terminated prior to the end of the Term, as provided below.

### 2.    Representations of Licensor.

A.    Ownership of Patent. The Licensor represents and warrants that it is the assignee of the entire right, title and interest in and to the above-mentioned  patent, the assignment being granted from John T. MacDonald, and that it has the right to grant the right, license and privilege granted in this Agreement; that it has executed no agreement in conflict with this Agreement; and that it has not granted to any other person, firm or corporation any right, license, or privilege granted under this Agreement.

### 3.    Term and Termination.

A.    Unless sooner terminated in accordance with this Agreement, the Patent License granted hereunder shall commence on July 22, 2014 (the 'Effective Date"), and  shall continue in effect until the end of the patent term.

B.    Upon termination or expiration of the licenses granted under this Agreement, by operation of law or otherwise, all rights, privileges and obligations arising from this Agreement shall cease to exist. Upon termination or expiration of this Agreement, Licensee shall cease from all use of the Patent.

C    In the event of a significant breach of this Agreement by either party, the other party may terminate the Licenses and rights granted to the breathing party under this Agreement by giving written notice to such breaching party of termination and the basis for such termination; provided, however, that such written notice is properly delivered as set forth in Section 12 of this Agreement The Licenses and rights granted under this Agreement shall terminate thirty (30) days after service of the written notice to the other party, unless the specified breach is cured within such thirty (30) day period. A significant breach of this Agreement shall be defined as either party's violation of its material obligations under this Agreement.

D    Licensor may, on written notice to the Licensee, which notice is properly delivered as set forth in Section 12 of this Agreement, forthwith terminate the license and rights granted under this Agreement to Licensee to use the Patent, upon the occurrence of any of the following events, unless such breach is cured within such ten (10) days from the service of the written notice upon the Licensee:

Licensee undergoing a change of control (whether resulting from merger, acquisition, consolidation or otherwise) unless the successor entity acknowledges its obligations hereunder and the Licensor grants successor such prior written approval of transfer of said rights

4.    Infringement. In the event the Licensee shall become aware of any infringement by any third party of any right licensed under this Agreement, it shall promptly notify Licensor in writing of such infringement or use, and shall do such acts and assist and supply such information as are reasonably necessary or desirable in relation thereto. Licensor shall take only those steps which in its sole discretion, are necessary to enforce its rights, including the engagement of legal counsel of its own choosing. Licensor's obligation to defend the rights of this license Agreement hereunder shall be made at its sole and exclusive discretion.

5.    Indemnity

A.    Each party shall defend, indemnify, and hold harmless the other and the other's officers, employees, agents and direct or indirect customers, from and against any claims, suits, losses, liabilities, damages, court judgments and/or await and the reasonably related costs and expenses (including reasonable attorneys' fees incurred by the other or for which the other is judged liable), incurred because of actual or alleged infringement by the Patent supplied hereunder of any patent copyright, trade secret, trademark, mask work right or other proprietary rights) of a third party which was in effect on or prior to the date which the subject Patent, including any improvements thereon, was registered with the USPTO.

Upon receipt of notice of such claim, suit or action, the notified party shall promptly tender notice of the same to the other party, and thereafter, upon the notified party's request, the other party shall render reasonable assistance to the notified party for defense of the same. Each party shall execute any and all papers which may be found necessary or desirable in any suit or suits brought under and pursuant to this Agreement; and the each party further agrees that it will testify in any interference or litigation, whenever requested to do so by the other party.

      B.     Each party shall maintain, at its own expense, product liability insurance in full force and effect at all times during the Term, with a responsible insurance carrier reasonably acceptable to the other party, of a minimum of One Million ($1,000,000.00) Dollars, with a deductible of no more than Twenty Five Thousand ($25,000.00) Dollars. Product liability insurance shall be for the benefit of each party as an additional insured and each party shall provide for at least ten (10) days prior written notice to the other party of the cancellation or any substantial modification of said policy.

      C.     Licensor or Licensee may, as the case maybe, from time to time, upon reasonable request by the other party, promptly furnish or cause to be furnished to the other party, evidence in form and substance satisfactory to the other party, of the maintenance of the Insurance required by paragraph "B" of this Section of this Agreement, including, but not limited to, originals or copies of policies, certificates of insurance (with applicable riders and endorsements) and proof of premium payments

      D.     If in any suit involving the Patent under and pursuant to which the exclusive right and license has been granted hereunder, charging infringement of such right and license, and either the Patent should be declared to be invalid by any court or other tribunal or be construed by the court as not to cover the Licensor's Patent, the Licensee shall be immediately released from any and all obligations under this Agreement

6.     No Waiver. Except as otherwise provided herein, no waiver of any covenant, condition, or provision of this Agreement shall be deemed to have been made unless expressly in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provision, covenants, or conditions of this Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment in the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another Party shall be construed as a waiver with respect to any other or subsequent breach.

7     Independent Contractors. Licensee is an independent contractor and not an agent, partner, joint venturer, franchisee, affiliate or employee of Licensor. No fiduciary or franchise relationship exists between the parties. Neither party shall be liable for any debts, accounts, obligations or other liabilities of the other party, its agents or employees. Licensee shall have no authority to obligate or bind Licensor in any manner.

Licensor has no proprietary interest in Licensee and has no interest in the business of Licensee, except to the extent set forth in this License Agreement

8.      Further Assurances. Each Party agrees to sign any and all other papers which may be required to effectuate the purpose and intent of this Agreement

9.      Notice. All notices required to be given hereunder shall be given by hand or by overnight courier service, next morning delivery, or made by certified mail, return receipt requested, addressed as follows:

> If to the Licensor: Green Pproducts & Technologies, LLC
>                     c/o John T MacDonald
>                      7705 Progress Circle Melbourne Florida 32904, USA

> If to the Licensee: Heartland Energy Group, LTD
>                     c/o John T MacDonald
>                     Suite 15, 1st Floor Oliaji Trade Center,
>                     Francis Street, Victoria, Mahe, Seychelles

(or in each case to such other address as shall have last been furnished by like notice). Each notice or communication shall be deemed to have 'been given as of the date so mailed or hand delivered as the case may be.

10.     Binding Effect. The parties hereto acknowledge, agree and declare that this License Agreement is a legal, valid and binding agreement enforceable against each party in accordance with its terms and that this Agreement has been duly executed and delivered on behalf of the parties. Each party represents and warrants that it shall use best efforts in good faith to consummate the transaction.

11.     Successors and Assigns. The parties hereto acknowledge, agree and declare that this Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

12.     Invalid Provisions. If any part of this Agreement is determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having the jurisdiction, to make such determination, then the remainder of this Agreement shall remain in full force and effect.

13      Captions and Headings. The captions and headings appearing in this Agreement are solely for convenience and do not in any way define, limit or describe the scope of this Agreement or the intent or content of any provision thereof.

14.     Gender and Number. Whenever the context of this Agreement requires, the masculine gender includes the feminine and neuter, and the singular number includes the plural and vice versa.

15.     Assignment. Licensee may not assign its rights or delegate its obligations hereunder either in whole or in part, whether by operation of law or otherwise, without the prior written consent of Licensor. Any attempted assignment or delegation without Licensor's written consent will be void. The right and liabilities of the parties under this Agreement will bind and inure to the benefit of the parties' respective successors and permitted assigns. For purposes of this Section, fifty percent (50%) change in control shall constitute an assignment.

16.     Modification or Termination. No change or modification of This Agreement shall be valid unless the same be in writing and signed by the parties.

17.     Governing Law. This Agreement shall for all purposes be governed by and construed in accordance with the laws of the State of Florida.

18.     Settlement of Disputes. The parties agree that any and all controversies which may arise in connection with any transaction contemplated by this Agreement or the construction, or breach of this Agreement, shall be submitted to arbitration by the American Arbitration Association ("AAA"), which shall appoint one (1) arbitrator in accordance with the American Arbitration Association's Commercial Arbitration Rules then in effect Any arbitration administered by the AAA shall be held in the AAA's Orlando, Florida, office, unless otherwise agreed to by the parties hereto. The award of the arbitrator shall be final and binding and may be confirmed and entered in any court, state or federal, having jurisdiction.

19.     Trade Secrets and Competition. In consideration of the execution of this agreement by Licensor. Licensee covenants and agrees that it shall not, during or following the term of this agreement, sell, disseminate, disclose, lecture upon, or publish in any manner information relating to design or manufacturing techniques employed by Licensor in the production of its products or information relating to research, development, marketing, or sales of products of Licensor.

Licensee further covenants and agrees that for two (2) years following the expiration or termination of this Agreement. Licensee will not engage in selling or manufacturing, whether directly or in association with other persons or firms of any product or development or of any process or service, which resembles or competes with any product, process or service produced, developed by Licensor during the term of this agreement.

20.  Ownership Licensor shall own all existing and future right, title and interest in the Licensed Patent Rights and all other intellectual property rights inherent therein and all tools, molds and equipment related to the Licensor's products, including all changes and improvements requested or suggested by Licensee In the support and maintenance of the Licensed Patent Rights.

21.  Prior Agreements. This Agreement supersedes any and all previous License Agreement, whether written or oral covering the subject matter of this Agreement. Any such previous agreements are null and void.

22.  Execution of Documents. Each party agrees to execute any and all papers, documents or other instruments which may be found necessary or desirable to effect the exclusive right and license granted to the Licensee hereunder.

23.  Entire Agreement. This Agreement shall constitute the entire agreement between the parties. Any prior understanding or representation of any kind preceding the date of this Agreement shall not be binding on either party except to the extent incorporated in this Agreement.

IN WITNESS WHEREOF, The parties have executed this Agreement as of the day and year first above written.

Licensor, John T. MacDonald
Green Products & Technologies, LLC

Licensee, John T. MacDonald
Heartland Energy Group, LTD

# EXHIBIT

# "AA"

US008784573B1

## (12) United States Patent
### MacDonald, III

(10) Patent No.: **US 8,784,573 B1**
(45) Date of Patent: **Jul. 22, 2014**

(54) **METHODS FOR USING IMPROVED UREA HYDROCHLORIDE COMPOSITIONS**

(71) Applicant: **Green Products & Technologies, L.L.C.**, Melbourne, FL (US)

(72) Inventor: **John T. MacDonald, III**, Grant, FL (US)

(73) Assignee: **Green Products & Technologies, LLC**, Melbourne, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/048,559**

(22) Filed: **Oct. 8, 2013**

### Related U.S. Application Data

(60) Division of application No. 13/856,469, filed on Apr. 4, 2013, now Pat. No. 8,580,047, which is a division of application No. 13/453,871, filed on Apr. 23, 2012, now Pat. No. 8,430,971, which is a division of application No. 13/104,180, filed on May 10, 2011, now Pat. No. 8,163,102, which is a continuation-in-part of application No. 12/419,379, filed on Apr. 7, 2009, now Pat. No. 7,938,912.

(51) **Int. Cl.**
*B08B 3/04* (2006.01)

(52) **U.S. Cl.**
USPC ................................ **134/42**; 134/36; 510/240

(58) **Field of Classification Search**
CPC ......... B08B 3/04; B08B 3/00; C11D 11/0052
USPC ....................................... 134/36, 42; 510/240
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,250,379 A | 7/1941 | Carl | |
| 2,485,529 A | 10/1949 | Cardwell et al. | |
| 3,920,566 A | 11/1975 | Richardson et al. | |
| 3,936,316 A | 2/1976 | Gulla | |
| 4,372,870 A | 2/1983 | Snyder et al. | |
| 4,466,893 A | 8/1984 | Dill | |
| 4,537,684 A | 8/1985 | Gallup et al. | |
| 4,673,522 A | 6/1987 | Young | |
| 4,699,663 A | 10/1987 | Feeney, III | |
| 4,894,169 A | 1/1990 | Delitsky | |
| 5,234,466 A | 8/1993 | Sargent et al. | |
| 5,492,629 A | 2/1996 | Ludwig et al. | |
| 5,672,279 A * | 9/1997 | Sargent et al. ............... 210/698 |
| 7,938,912 B1 * | 5/2011 | MacDonald .................... 134/42 |
| 8,132,628 B2 | 3/2012 | Sanders et al. | |
| 8,163,102 B1 * | 4/2012 | MacDonald ................... 134/42 |
| 8,430,971 B1 * | 4/2013 | MacDonald ................... 134/42 |
| 8,580,047 B1 * | 11/2013 | MacDonald ................... 134/42 |
| 2006/0063689 A1 | 3/2006 | Netherton | |
| 2010/0126719 A1 | 5/2010 | Sanders et al. | |
| 2010/0288909 A1 | 11/2010 | Rosati | |

#### FOREIGN PATENT DOCUMENTS

| HU | 195241 | 4/1988 |
|---|---|---|

* cited by examiner

*Primary Examiner* — Bibi Carrillo
(74) *Attorney, Agent, or Firm* — Carl M. Napolitano; GrayRobinson, P.A.

(57) **ABSTRACT**

A composition including, HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone is provided in a method for solubilizing calcium carbonate in an aqueous suspension or dispersion of calcium carbonate.

**5 Claims, No Drawings**

US 8,784,573 B1

1

# METHODS FOR USING IMPROVED UREA HYDROCHLORIDE COMPOSITIONS

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a Divisional of U.S. patent application Ser. No. 13/856,469, filed Apr. 4, 2013, now U.S. Pat. No. 8,580,047 which itself is a Divisional Application of U.S. patent application Ser. No. 13/453,871 filed Apr. 23, 2012, now U.S. Pat. No. 8,430,971 which itself is a Divisional Application of U.S. patent application Ser. No. 13/104,180 filed May 10, 2011, now U.S. Pat. No. 8,163,102 which itself is a continuation-in-part of patent application Ser. No. 12/419,379 filed Apr. 7, 2009, now U.S. Pat. No. 7,938,912, the disclosures of which are herein incorporated by reference in their entirety, and all commonly owned.

### BACKGROUND

The present invention relates to compositions and methods for treating fluids, and, more particularly to such compositions and methods for treating drilling fluids in industrial applications, hydraulic fracturing, solubilizing elements, and lowering salts.

### TECHNICAL FIELD

The removal of water-insoluble cementitious and lime materials from surfaces is known to be a difficult process. Compositions that have been known for use in the past have included acid (e.g., hydrochloric, hydrofluoric, phosphoric, and sulfuric) washes and urea hydrochloride solutions.

However, the solutions known in the art can cause corrosion and flash rusting to metal and metal alloy surfaces, and also can dissolve away surface coatings and underlying metals. Thus, the use of such compositions can decrease the life of a surface and its coating significantly. For example, when used on vehicles and other industrial and construction equipment, such compositions can greatly increase the frequency at which the treated surfaces must be re-painted, re-coated, or re-sealed.

Additionally, many prior known compositions are not environmentally safe, and contain components that are non-OSHA and -EPA compliant. Some jurisdictions have regulations as to materials that can be drained so as to ultimately reach ground water. Resource Conservation and Recovery Act (RCRA) metals are among those substances that are regulated, and include arsenic, barium, cadmium, chromium, lead, mercury, selenium, and silver. As an example, chromium is often used as a lustrous coating on bumpers, mirrors, hydraulic rams, and trim parts on vehicles such as concrete trucks. Since construction equipment is typically washed outdoors, the resulting process water usually drains directly into the ground, and, thus, if the equipment is coated with an RCRA or other undesirable material that can be released with the washing composition, the material will enter the groundwater.

Therefore, it would be beneficial to provide a composition and method of use that are effective at removing cementitious materials from surfaces without causing corrosion or rusting, which can damage the target surface and release harmful substances such as RCRA materials into the environment. Preferably the composition should also include components that are environmentally safe and OSHA- and EPA-compliant.

2

It would also be beneficial to provide an environmentally safe composition and method of use that are effective in assisting in performing hydraulic fracturing of an oil gas well, adjusting and maintaining the pH of process water and other fluids in industrial applications, and solubilizing calcium carbonate in an aqueous suspension or dispersion thereof.

### SUMMARY

A composition including HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone is provided for performing hydraulic fracturing or oil or gas wells, solubilizing calcium carbonate, or lowering salt and bicarbonate levels in irrigation systems.

A method of using the composition includes applying the composition to a surface to release a cementitious material therefrom and removing the composition and released cementitious material from the surface.

The composition comprises an organic, cationic inhibitor for both corrosion and flash rusting that minimizes pitting and attack on metal and alloy surfaces, such as are common in construction equipment and trucks. As the composition is non-corrosive to metals, it has been deemed non-regulated by the U.S. Department of Transportation (DOT), and is environmentally safe and OSHA- and EPA-compliant. The composition has been shown to reduce corrosion levels to well below the DOT corrosion limits of 6.25 mmpy.

In an exemplary embodiment, the inhibitor, which is used at a level of approximately 0.5% in the composition, comprises 10-30% surfactant, 10-30% complex substituted keto-amine-hydrochloride, 1-10% 3-methyl butynol, 1-10% isopropyl alcohol, 1-10% methyl vinyl ketone, and <1% acetone. This inhibitor has been shown to substantially eliminate corrosion of target surfaces.

A method is also provided for performing hydraulic fracturing of oil or gas wells. The method comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and inserting the composition into an oil well or a gas well to assist in performing hydraulic fracturing thereof.

A method is further provided for adjusting a pH of a drilling fluid. The method comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to a drilling fluid for a well to assist in adjusting a pH thereof.

A method for adjusting and maintaining a pH of a process fluid comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to a process fluid to adjust and maintain a pH thereof.

A method for solubilizing calcium carbonate in an aqueous suspension or dispersion of calcium carbonate comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; adding the composition to an aqueous suspension or dispersion of calcium carbonate; and permitting the composition to solubilize the aqueous suspension or dispersion of calcium carbonate.

A method for removing a foulant from a fluid-handling element comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; adding the composition to a fouled fluid-handling element; and permitting the composition to solubilize the foulant.

A method for removing a foulant from a surface of a marine vessel comprises providing a composition comprising HCl,

3

urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; applying the composition to a fouled surface of a marine vessel; and permitting the composition to solubilize the foulant.

A method for lowering a salt and bicarbonate level in an irrigation system comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; diluting the composition to 5-60% by volume composition in water; adding the composition to a fouled fluid-transporting element of an irrigation system; and permitting the composition to solubilize the foulant.

A method for acidizing turf and for lowering a salt and bicarbonate level in at least one of turf and turf growing medium comprises providing a composition comprising HCl, nrea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to at least one of turf and turf growing medium.

## DETAILED DESCRIPTION OF EMBODIMENTS

In one embodiment according to the teachings of the present invention, a composition comprises HCl, urea, complex substituted keto-amine-hydrochloride, at least one alcohol, an ethoxylate, and a ketone. Preferably, the HCl and the urea are present in a range of: HCl, 40-60 wt %, and urea, 30-45 wt %, and, most preferably, at approximately HCl, 55 wt %, and urea, 42 wt %.

Preferably the alcohol comprises at least one of isopropyl alcohol and propargyl alcohol. In a particular embodiment, the isopropyl alcohol and propargyl alcohol are present at approximately isopropyl alcohol, 0.067 wt %, and propargyl alcohol, 0.022 wt %.

The ethoxylate can comprise ethoxylated nonylphenol, which can be present at approximately 0.022 wt %.

The ketone can comprise methyl vinyl ketone, which can present at approximately 0.022 wt %.

In a particular embodiment, the composition can comprise: HCl, 55 wt %; urea, 42 wt %; complex substituted keto-amine-hydrochloride, 0.067 wt %; isopropyl alcohol, 0.067 wt %; ethoxylated nonylphenol, 0.022 wt %; propargyl alcohol, 0.022 wt %; methyl vinyl ketone, 0.022 wt %; acetone, 0.022 wt %; and acetophenone, 0.0022 wt %.

The composition can be used as a base for a plurality of dilution levels to be used for different applications. For example, sufficient water can be added to the composition to dilute the base in a range of 1:1 to 6:1 water:base.

A plurality of exemplary compositions using the composition described above can be used as a base for removing cementitious material from a variety of surfaces. For example, concrete can be removed from equipment with a composition comprising: base (25 wt %), nonylphenol 9.5 mole (0.25 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (74.4 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

Another composition for use as concrete removing agent on equipment can comprise: base (35 wt %), nonylphenol 9.5 mole (0.25 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (64.4 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

Yet another composition can be used as an efflorescence remover on cementitious materials (concrete block, brick, precast, paver, cement, and masonry). An exemplary formula

4

for this composition is: base (15 wt %), nonylphenol 9.5 mole (0.15 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (84.4 wt %). This formula can be used on, for example, concrete block, brick, precast, cement, and masonry, although these uses are not intended to be limiting.

A basic composition for use as a concrete removing agent on tools and equipment includes base (25 wt %) and water (75 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

Another composition for use as a concrete removing agent on equipment comprises base (60.0 wt %), nonylphenol 9.5 mole (0.25 wt %), quaternary ammonium compounds (0.15 wt %), glycol ether EB (0.20 wt %), and water (39.4 wt %). This formula can be used on, for example, ready-mixed concrete, cement, and masonry, although these uses are not intended to be limiting.

A method for performing hydraulic fracturing of an oil or a gas well comprises providing a composition such as that described above and inserting the composition into an oil well or a gas well to assist in performing hydraulic fracturing thereof.

A method for adjusting a pH of a drilling fluid comprises providing a composition such as described above and adding the composition to a drilling fluid for a well to assist in adjusting a pH thereof. The composition can be diluted to 20-90% by volume composition in water.

A method for adjusting and maintaining a pH of a process fluid comprises providing a composition such as described above and adding the composition to a process fluid to adjust and maintain a pH thereof. The process fluid can comprise at least one of a processing fluid for textiles, a processing fluid for paper manufacturing, industrial process water, waste water, industrial discharge water, and industrial recycling water. The composition can be diluted by 10-85% by volume composition in water, for example.

A method for solubilizing calcium carbonate in an aqueous suspension or dispersion of calcium carbonate comprises providing a composition such as described above and adding the composition to an aqueous suspension or dispersion of calcium carbonate. The composition is permitted to solubilize the aqueous suspension or dispersion of calcium carbonate. The composition can be diluted by 10-95% by volume composition in water, for example.

A method for removing a foulant from a fluid-handling element comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; adding the composition to a fouled fluid-handling element; and permitting the composition to solubilize the foulant.

In one sub-embodiment, the fluid-handling element can comprise a waste plumbing system and the foulant can comprise a salt of at least one of calcium and magnesium. In this embodiment the composition can be diluted prior to the adding step to 10-65% by volume composition in water.

In another sub-embodiment, the fluid-handling element can comprise an industrial boiler system and the foulant can comprise a salt of at least one of calcium and magnesium. In this embodiment the composition can be diluted prior to the adding step by 5-70% by volume composition in water.

In a further sub-embodiment, the fluid-handling element can comprise a plumbing element of a marine vessel and the foulant can comprise at least one of a salt of at least one of calcium and magnesium, a marine organism such as arthropods such as cirripedia or crustaceans, and sludge. In this embodiment the composition can be diluted prior to the add-

5

ing step by 5-80% by volume composition in water. Here the plumbing element can comprises a waste plumbing element, and the diluting can comprise diluting the composition by 10-65% by volume composition in water. The plumbing element can also comprise an internal plumbing element, and the diluting can comprise diluting the composition by 5-50% by volume composition in water. Alternatively, the plumbing element can comprise an element in a propulsion system, such as, but not limited to, inboard, outboard, inboard/outboard, surface drive, or jet drive propulsion engine systems, and the diluting can comprise diluting the composition by 5-80% by volume composition in water.

A method for removing a foulant from a surface of a marine vessel comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; applying the composition to a fouled surface of a marine vessel; and permitting the composition to solubilize the foulant. The surface can comprise, for example, a marine hull. If desired, the composition can be diluted by 5-95% by volume composition in water. The foulant can comprise at least one of a salt of at least one of calcium and magnesium, a marine organism such as arthropods such as cirripedia or crustaceans, and sludge.

A method for lowering a salt and bicarbonate level in an irrigation system comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; diluting the composition to 5-60% by volume composition in water; adding the composition to a fouled fluid-transporting element of an irrigation system; and permitting the composition to solubilize the foulant.

A method for acidizing turf and for lowering a salt and bicarbonate level in at least one of turf and turf growing medium comprises providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone; and adding the composition to at least one of turf and turf growing medium. The composition can be diluted to 1-35% by volume composition in water.

6

One of skill in the art will recognize that these compositions and methods of use are not intended to be limiting, and variations in ingredients, proportions, and methods of use can be made without departing from the spirit of the invention.

Having now described the invention and use of preferred embodiments thereof, and the advantageous new and useful results obtained thereby, the new and useful constructions, and reasonable equivalents thereof obvious to those skilled in the art, are set forth in the appended claims.

What is claimed is:

1. A method for solubilizing calcium carbonate in an aqueous suspension or dispersion of calcium carbonate, the method comprising:

    providing a composition comprising HCl, urea, complex substituted keto-amine-hydrochloride, an alcohol, an ethoxylate, and a ketone;

    adding the composition to an aqueous suspension or dispersion of calcium carbonate; and

    permitting the composition to solubilize the aqueous suspension or dispersion of calcium carbonate.

2. The method recited in claim 1, wherein the alcohol comprises at least one of isopropyl alcohol and propargyl alcohol.

3. The method recited in claim 1, wherein the ethoxylate comprises ethoxylated nonylphenol and the ketone comprises methyl vinyl ketone.

4. The method recited in claim 1, further comprising diluting the composition by 10-85% by volume composition in water prior to the composition adding step.

5. The method recited in claim 1, wherein the composition comprises: HCl, 55 wt %; urea, 42 wt %; complex substituted keto-amine-hydrochloride, 0.067 wt %; isopropyl alcohol, 0.067 wt %; ethoxylated nonylphenol, 0.022 wt %; propargyl alcohol, 0.022 wt %; methyl vinyl ketone, 0.022 wt %; acetone, 0.022 wt %; and acetophenone, 0.0022 wt %.

\* \* \* \* \*

# COMPOSITE

# EXHIBIT "BB"

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

### Serial Number: 86238631
### Filing Date: 04/01/2014

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 86238631 |
| **MARK INFORMATION** | |
| *****MARK** | ENVIRO-SYN |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | ENVIRO-SYN |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *****OWNER OF MARK** | FLUID ENERGY GROUP LTD. |
| *****STREET** | 104-214 11TH AVE. SE |
| *****CITY** | CALGARY, ALBERTA |
| *****COUNTRY** | Canada |
| *****ZIP/POSTAL CODE** **(Required for U.S. applicants only)** | T2G0X8 |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | limited company (ltd.) |
| **STATE/COUNTRY WHERE LEGALLY** | Canada |

| ORGANIZED | |
|---|---|

## GOODS AND/OR SERVICES AND BASIS INFORMATION

| INTERNATIONAL CLASS | |
|---|---|
| * IDENTIFICATION | Wholesale and retail sales of chemical preparations for use as oil and gas drilling lubricants and hydraulic fracturing materials |
| FILING BASIS | SECTION 44(e) |
| FOREIGN REGISTRATION NUMBER | TMA846795 |
| FOREIGN REGISTRATION COUNTRY | Canada |
| FOREIGN REGISTRATION DATE | 03/21/2013 |
| FOREIGN REGISTRATION FILE NAME(S) | |
| ORIGINAL PDF FILE | reg-1-9814172179-123141431_._Pages_from_FEGL_Trademarks_20130829_221411__6_.pdf |
| CONVERTED PDF FILE(S) (1 page) | \\TICRS\EXPORT16\IMAGEOUT16\862\386\86238631\xml1\APP0003.JPG |
| STANDARD CHARACTERS OR EQUIVALENT | YES |

## ATTORNEY INFORMATION

| NAME | Benjamin Natter |
|---|---|
| ATTORNEY DOCKET NUMBER | 14-7046 |
| FIRM NAME | Natter & Natter |
| STREET | 501 Fifth Avenue, Suite 808 |
| CITY | New York |
| STATE | New York |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 10017 |
| EMAIL ADDRESS | B.natter@natter-natter.com |
| AUTHORIZED TO | |

| COMMUNICATE VIA EMAIL | Yes |
|---|---|
| OTHER APPOINTED ATTORNEY | Seth Natter; Howard Natter |
| **CORRESPONDENCE INFORMATION** | |
| NAME | Benjamin Natter |
| FIRM NAME | Natter & Natter |
| STREET | 501 Fifth Avenue, Suite 808 |
| CITY | New York |
| STATE | New York |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 10017 |
| EMAIL ADDRESS | B.natter@natter-natter.com;docket@natter-natter.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 325 |
| *TOTAL FEE DUE | 325 |
| *TOTAL FEE PAID | 325 |
| **SIGNATURE INFORMATION** | |
| ORIGINAL PDF FILE | hw_9814172179-142509734_._signed_declaration_0401.pdf |
| CONVERTED PDF FILE(S) (1 page) | \\TICRS\EXPORT16\IMAGEOUT16\862\386\86238631\xml1\APP0004.JPG |
| SIGNATORY'S NAME | Clay Purdy |
| SIGNATORY'S POSITION | CEO |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

### Serial Number: 86238631
### Filing Date: 04/01/2014

## To the Commissioner for Trademarks:

**MARK:** ENVIRO-SYN (Standard Characters, see mark)
The literal element of the mark consists of ENVIRO-SYN.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, FLUID ENERGY GROUP LTD., a limited company (ltd.) legally organized under the laws of Canada, having an address of
    104-214 11TH AVE. SE
    CALGARY, ALBERTA T2G0X8
    Canada

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class _____: Wholesale and retail sales of chemical preparations for use as oil and gas drilling lubricants and hydraulic fracturing materials
Based on Foreign Registration: Applicant has a bona fide intention to use the mark in commerce on or in connection with the identified goods and/or services, and submits a copy of Canada registration number TMA846795, registered 03/21/2013 with a renewal date of _____ and an expiration date of _____, and translation thereof, if appropriate. 15 U. S.C. Section 1126(e), as amended.

**Original PDF file:**
reg-1-9814172179-123141431_._Pages_from_FEGL_Trademarks_20130829_221411__6_.pdf
**Converted PDF file(s)** (1 page)
Foreign Registration-1

The foreign registration that is the basis of the U.S. application under Section 44(e) of the Trademark Act (15 U.S.C. Section 1126(e)) includes a claim of standard characters or the country of origin's standard character equivalent.

The applicant's current Attorney Information:
    Benjamin Natter and Seth Natter; Howard Natter of Natter & Natter
    501 Fifth Avenue, Suite 808
    New York, New York 10017
    United States
The attorney docket/reference number is 14-7046.

The applicant's current Correspondence Information:

Benjamin Natter

Natter & Natter

501 Fifth Avenue, Suite 808

New York, New York 10017

B.natter@natter-natter.com;docket@natter-natter.com (authorized)

A fee payment in the amount of $325 has been submitted with the application, representing payment for 1 class(es).

**Declaration**

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

**Declaration Signature**

Signature: Not Provided    Date: Not Provided
Signatory's Name: Clay Purdy
Signatory's Position: CEO
RAM Sale Number: 86238631
RAM Accounting Date: 04/02/2014

Serial Number: 86238631
Internet Transmission Date: Tue Apr 01 14:26:59 EDT 2014
TEAS Stamp: USPTO/BAS-98.14.172.179-2014040114265913
9420-86238631-500adf8b4ada9a4592cc24cc85
89efafa8a993cd92de378247be22a765c08b3091
-CC-647-20140401142509734668

# ENVIRO-SYN



**Office de la propriété intellectuelle du Canada**

Un organisme d'Industrie Canada

**Canadian Intellectual Property Office**

An Agency of Industry Canada

*Marques de commerce*

*Certificat d'enregistrement*

*Trade-marks*

*Certificate of Registration*

**La présente atteste** que la marque de commerce identifiée dans l'extrait ci-joint, tiré du registre des marques de commerce, a été enregistrée et que ledit extrait est une copie conforme de l'inscription de son enregistrement. Conformément aux dispositions de la *Loi sur les marques de commerce*, cette marque de commerce est renouvelable tous les quinze ans à compter de la date d'enregistrement.

**This is to certify** that the trade-mark, identified in the attached extract from the register of trade-marks, has been registered and that the said extract is a true copy of the record of its registration. In accordance with the provisions of the *Trade-marks Act*, this trade-mark is subject to renewal every 15 years from the registration date.

## ENVIRO-SYN

Numéro d'enregistrement
Registration Number **TMA846,795**

Numéro de dossier
File Number **1564955**



Registraire des marques de commerce
Registrar of Trade-marks

(CIPO 196)12-12

Date d'enregistrement
Registration Date **21 mars/Mar 2013**



### Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

**Signature Section:**

Signature:

Signatory's Name: Clay Purdy
Signatory's Position: CEO

Date Signed: 7/1/12

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 86238639**
**Filing Date: 04/01/2014**

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 86238639 |
| **MARK INFORMATION** | |
| *****MARK** | ENVIRO-SYN |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | ENVIRO-SYN |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *****OWNER OF MARK** | FLUID ENERGY GROUP LTD. |
| *****STREET** | 104-214 11TH AVE. SE |
| *****CITY** | CALGARY, ALBERTA |
| *****COUNTRY** | Canada |
| *****ZIP/POSTAL CODE** (Required for U.S. applicants only) | T2G0X8 |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | limited company (ltd.) |
| **STATE/COUNTRY WHERE LEGALLY** | Canada |

| ORGANIZED | |
|---|---|

## GOODS AND/OR SERVICES AND BASIS INFORMATION

| INTERNATIONAL CLASS | 001 |
|---|---|
| * IDENTIFICATION | Synthetic replacement for acids, namely, hydrochloric, phosphoric, hydrofluoric, sulfuric, acetic, and formic acids used in dissolving calcium carbonate and/or silica formation or build up in oil and gas |
| FILING BASIS | SECTION 1(b) |

## ATTORNEY INFORMATION

| NAME | Benjamin Natter |
|---|---|
| ATTORNEY DOCKET NUMBER | 14-7052 |
| FIRM NAME | Natter & Natter |
| STREET | 501 Fifth Avenue, Suite 808 |
| CITY | New York |
| STATE | New York |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 10017 |
| EMAIL ADDRESS | B.natter@natter-natter.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| OTHER APPOINTED ATTORNEY | Seth Natter; Howard Natter |

## CORRESPONDENCE INFORMATION

| NAME | Benjamin Natter |
|---|---|
| FIRM NAME | Natter & Natter |
| STREET | 501 Fifth Avenue, Suite 808 |
| CITY | New York |
| STATE | New York |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 10017 |

| EMAIL ADDRESS | B.natter@natter-natter.com;docket@natter-natter.com |
|---|---|
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |
| **FEE INFORMATION** | |
| **NUMBER OF CLASSES** | 1 |
| **FEE PER CLASS** | 325 |
| ***TOTAL FEE DUE** | 325 |
| ***TOTAL FEE PAID** | 325 |
| **SIGNATURE INFORMATION** | |
| **ORIGINAL PDF FILE** | hw_9814172179-142824177_._Signed_declaration_0401.pdf |
| **CONVERTED PDF FILE(S) (1 page)** | \\TICRS\EXPORT16\IMAGEOUT16\862\386\86238639\xml1\APP0003.JPG |
| **SIGNATORY'S NAME** | Clay Purdy |
| **SIGNATORY'S POSITION** | CEO |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 86238639**
**Filing Date: 04/01/2014**

## To the Commissioner for Trademarks:

**MARK:** ENVIRO-SYN (Standard Characters, see mark)
The literal element of the mark consists of ENVIRO-SYN.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, FLUID ENERGY GROUP LTD., a limited company (ltd.) legally organized under the laws of Canada, having an address of
    104-214 11TH AVE. SE
    CALGARY, ALBERTA T2G0X8
    Canada

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 001: Synthetic replacement for acids, namely, hydrochloric, phosphoric, hydrofluoric, sulfuric, acetic, and formic acids used in dissolving calcium carbonate and/or silica formation or build up in oil and gas
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

The applicant's current Attorney Information:
    Benjamin Natter and Seth Natter; Howard Natter of Natter & Natter
    501 Fifth Avenue, Suite 808
    New York, New York 10017
    United States
The attorney docket/reference number is 14-7052.
The applicant's current Correspondence Information:
    Benjamin Natter
    Natter & Natter
    501 Fifth Avenue, Suite 808
    New York, New York 10017
    B.natter@natter-natter.com;docket@natter-natter.com (authorized)

A fee payment in the amount of $325 has been submitted with the application, representing payment for 1

class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

**Declaration Signature**

Signature: Not Provided   Date: Not Provided
Signatory's Name: Clay Purdy
Signatory's Position: CEO
RAM Sale Number: 86238639
RAM Accounting Date: 04/02/2014

Serial Number: 86238639
Internet Transmission Date: Tue Apr 01 14:29:52 EDT 2014
TEAS Stamp: USPTO/BAS-98.14.172.179-2014040114295228
9388-86238639-500fe30f6cc75ed7ec779fc54f
a3f47e8619a52a3b582e4d9d281358699aa3d2f-
CC-706-20140401142824177094

# ENVIRO-SYN

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

**Signature Section:**

Signature:_____

Signatory's Name: Clay Purdy

Signatory's Position: CEO

Date Signed:___4/1/14_____



HOME    ABOUT US    PRODUCTS    CAREERS    CONTACT US

**Our Vision**

Manufacturing "Environmentally Responsible, Non-Hazardous and Exposure Safe" acids and caustics.

## Navigation

## Enviro-Syn HCR ® Patent Pending

▸ Products

▸ **Enviro-Syn HCR ®**

Enviro-Syn® HCR is part of the "Environmentally Responsible" synthetic acid replacement product line that has comparable abilities of Hydrochloric acid, without the extremely hazardous exposure and corrosive properties

Enviro-Syn® HCR is a "Non-Hazardous" replacement for all Hydrochloric acid blends, and can be enhanced through the addition of conventional oilfield chemistry

### VALUE ADD/BENEFITS

- Inherently low corrosion effects
- Fewer compatibility issues
- Comprehensive spending nature
- High salinity tolerance
- Less formation face dissolution
- Reduced precipitation
- Reduced transport/storage requirements
- No phase separation

*\*\*\*patent pending\*\*\**
*For technical information please contact us*



**OIL & GAS**
Contact us for more information

**Click Here!**



**MINING**
Contact us for more information

**Click Here!**



**PROCESSING**
Contact us for more information

**Click Here!**

Home ∷ About Us ∷ Products ∷ Careers ∷ Contact Us

Powered by Instalogic Inc.

Fluid Energy Group Ltd.. © 2014

# EXHIBIT "CC"



# Statement

| Date |
|------|
| 2/18/2014 |

Toll-free: 1-877-797-2811

brenda@heartlandenergygroup.net

| To: |
|-----|
| FLUID ENERGY GROUP LTD<br>104,214- 11TH  AVENUE S E<br>CALGARY, AB T2G 0X8<br>Canada |

| Amount Due |
|------------|
| $222,560.00 |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 12/31/2013 | Balance forward | | 159,200.00 |
| 01/07/2014 | PMT #Wire. | -14,400.00 | 144,800.00 |
| 01/17/2014 | PMT #wire. | -48,480.00 | 96,320.00 |
| 01/28/2014 | PMT #Wire. | -96,320.00 | 0.00 |
| 02/03/2014 | INV #E718. Due 03/20/2014. | 125,060.84 | 125,060.84 |
| 02/18/2014 | INV #E748. Due 04/04/2014. | 55,040.00 | 180,100.84 |
| 02/26/2014 | INV #E762. Due 04/12/2014. | 55,040.00 | 235,140.84 |
| 02/26/2014 | INV #E769. Due 04/12/2014. | 55,040.00 | 290,180.84 |
| 03/11/2014 | INV #E776. Due 04/25/2014. | 57,440.00 | 347,620.84 |
| 03/20/2014 | PMT #Wire. | -125,060.84 | 222,560.00 |

**Remit to:**
**Heartland Energy Group Ltd**
**PO Box 4040**
**Omaha, NE  68104-0040**

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
|---------|--------------------|--------------------|--------------------|----------------------|------------|
| 0.00 | 0.00 | 222,560.00 | 0.00 | 0.00 | $222,560.00 |