# EXHIBIT "L"

## Barbie Mahan

| | |
|---|---|
| **Subject:** | FW: Fluid Energy Group v. Heartland Energy Group et al. - Ex Parte Injunction Application |
| **Attachments:** | Davis Letter - August 21, 2014.PDF; Affidavit of Clay Purdy (filed).pdf; Amended Application (filed).pdf |

**From:** Robert Martz [mailto:rmartz@bdplaw.com]
**Sent:** Thursday, August 21, 2014 4:08 PM
**To:** 'adavis@iplawfl.com'
**Subject:** Fluid Energy Group v. Heartland Energy Group et al. - Ex Parte Injunction Application

Please see attached.

**Robert Martz**
**Associate**

# $BD\&P$ BURNET, DUCKWORTH & PALMER LLP Law Firm

**Telephone** 403.260.0393 **Fax** 403.260.0332 **Web** BDPLAW.COM **Address** Suite 2400, 525-8th Ave SW Calgary, AB T2P 1G1

The information transmitted is intended only for the addressee and may contain confidential, proprietary and/or privileged material. Any unauthorized review, distribution or other use of or the taking of any action in reliance upon this information is prohibited. If you received this in error, please contact the sender and delete or destroy this message and any copies.

Burnet,
Duckworth
& Palmer LLP
Law Firm

Reply to: Robert L. Martz
Direct Phone: **(403) 260-0393**
Direct Fax: **(403) 260-0332**
rmartz@bdplaw.com

Assistant: Faye Maguire
Direct Phone: **(403) 806-7864**

**VIA EMAIL**

August 21, 2014

Beusse Wolter Sanks Mora & Maire, P.A.
390 N. Orange Avenue, Suite 2500
Orlando, Florida, 32801

**Attention: Amber N. Davis, Esq.**

Dear Ms. Davis:

Re.   **Fluid Energy Group v. John MacDonald, Stephen Rowley, Heartland Energy Group Ltd.,
Environmental Manufacturing Solutions LLC, and Mud Master Drilling Fluid Services**

*Ex Parte* **Injunction and Service** *Ex Juris* **Application: Friday, August 22, 2014 @ 9:30**

Please find enclosed the following documents filed in Alberta Court of Queen's Bench Action 1401-09170 –
*Fluid Energy Group v. John MacDonald, Stephen Rowley, Heartland Energy Group Ltd., Environmental
Manufacturing Solutions LLC, and Mud Master Drilling Fluid Services*:

1.      Statement of Claim;

2.      Amended *Ex Parte* Injunction and Service *Ex Juris* Application;

3.      Affidavit of Clay Purdy sworn August 20, 2014; and

4.      Brief of Law for *Ex Parte* Injunction and Service *Ex Juris* Application of August 22, 2014.

In your letter of April 30, 2014 to James Swanson, you noted that your firm represents Environmental
Manufacturing Solutions (**EMS**) and Heartland Energy Group (**Heartland**). We have sent you the documents
in order to make Heartland and EMS aware of tomorrow's *ex parte* application. In addition, please indicate if
you will accept service of these materials on behalf of Heartland and EMS.

Yours truly,

BURNET, DUCKWORTH & PALMER LLP

Robert L. Martz

RLM/flm
Encl.

BD&P   2400, 525-8th Avenue SW, Calgary, Alberta, Canada T2P 1G1   Phone: 403-260-0100 Fax: 403-260-0332 **www.bdplaw.com**
Frank L. Burnet Q.C. (1890-1982) | Thomas J. Duckworth Q.C. (1925-2007) | James S. Palmer C.M.,A.O.E.,Q.C.,LL.D.(1928-2013) | The Hon. W. Kenneth Moore C.M.,Q.C.,LL.D., Counsel

**Form 10**
[Rule 3.25]

| | | Clerk's Stamp: |
|---|---|---|

CLERK OF THE COURT
FILED

AUG 2 1 2014

CALGARY, ALBERTA

COURT FILE NUMBER     1401- 09170

COURT     COURT OF QUEEN'S BENCH OF ALBERTA

JUDICIAL CENTRE     CALGARY

PLAINTIFF     FLUID ENERGY GROUP

DEFENDANTS     JOHN MACDONALD, STEPHEN ROWLEY, HEARTLAND ENERGY GROUP LTD., ENVIRONMENTAL MANUFACTURING SOLUTIONS LLC, and MUD MASTER DRILLING FLUID SERVICES

DOCUMENT     **AMENDED APPLICATION FOR INJUNCTION AND SERVICE *EX JURIS***

ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT

**Burnet, Duckworth & Palmer LLP**
2400, 525 – 8 Avenue SW
Calgary, Alberta  T2P 1G1
Lawyer:       James Swanson
Phone Number: (403) 260-5712
Fax Number:    (403) 260-0332
Email Address: jswanson@bdplaw.com
File No.        72515.1

**NOTICE TO RESPONDENT**

This application is made against you.  You are a respondent.

You have the right to state your side of this matter before the judge.

To do so, you must be in Court when the application is heard as shown below:

| | |
|---|---|
| DATE | Friday, August 22, 2014 |
| TIME | 9:30 a.m. |
| WHERE BEFORE WHOM | Calgary Courts Centre |
| | Justice Eidsvik |

Go to the end of this document to see what else you can do and when you must do it.

**Remedy claimed or sought:**

1.      An Order:

(a)      Granting an interim injunction restraining the Defendants from further defaming the Plaintiff or interfering with the Plaintiff's relations with its customers and potential customers.

(b)      Allowing service of the Statement of Claim, Affidavit of Clay Purdy sworn August 20, 2014, the Injunction Application, the Interim Injunction, and all further documents filed in this Action on Heartland Energy Group Ltd. (**Heartland**) at their Corporate and Manufacturing Facility at 626 Valley Ridge Court, Grain Valley, Missouri by registered mail.

(c)      Allowing service of the Statement of Claim, Affidavit of Clay Purdy sworn August 20, 2014, the Injunction Application, the Interim Injunction, and all further documents filed in this Action on Environmental Manufacturing Solutions – East Coast (**EMS**) at their World Headquarters at 7705 Progress Circle, Melbourne, Florida by registered mail.

(d)      Allowing service of the Statement of Claim, Affidavit of Clay Purdy sworn August 20, 2014, the Injunction Application, the Interim Injunction, and all further documents filed in this Action in this action on John MacDonald (**MacDonald**) at 5800 Treasure Lane, Grant, Florida by registered mail.

(e)      Allowing service of the Statement of Claim, Affidavit of Clay Purdy sworn August 20, 2014, the Injunction Application, the Interim Injunction, and all further documents filed in this Action in this action on Stephen Rowley (**Rowley**) at 21321 E 34th St., South Independence, Missouri by registered mail.

**Grounds for making this application:**

**The relationship between the Plaintiff and Defendants**

2.     On November 1, 2012, Fluid entered into a series of agreements with Heartland, which allowed Fluid to exclusively market two products, Oil Safe AR and Mud Safe CR in various markets, including Alberta.  In order to induce Fluid to enter these contracts, Heartland and EMS, through MacDonald and Rowley, assured Fluid that Oil Safe AR and Mud Safe CR were not regulated products for transport anywhere in the world and not corrosive to aluminum above a 6.25 mm/yr rate at 55 degrees Celsius.

3.     In late 2013, Fluid discovered that MacDonald and Rowley's assurances were false and that they had fraudulently misrepresented the properties of Oil Safe AR and Mud Safe CR using, among other things, falsified National Aeronautics and Space Administration (**NASA**) test data. ^ Because of this, Fluid declared the agreements null and void due to the misrepresentations of the Defendants on April 11, 2014.

**Enviro-Syn HCR**

4.     Once Fluid became aware of Heartland's fraud and the deficiencies in Heartland's products, Fluid began to develop its own acid replacement system to service its customers with a product for which all third party data and claims could be verified.  As such, by April 2014, Fluid had developed and was marketing its own product, Enviro-Syn HCR, to the oil and gas industry in Canada.  This product is distinct from any Heartland product and has a patent application pending in Canada.

5.     Fluid only sells Enviro-Syn HCR in Canada and it is not used outside of Canada, but promotes Enviro-Syn internationally and intends to sell this product internationally in the future.

**Letters of July 24, 2014**

6.   In July 2014, Heartland, with the knowledge and assistance of their Alberta distributor – Mud Master – sent letters to at least ten Fluid customers, as well as to other service companies who were potential customers (the **Letters**).  These Letters threatened legal action against Fluid's customers and potential customers should they continue to purchase and use Fluid products and warned them to only do business with the Defendants.

7.   MacDonald wrote these Letters misrepresenting himself as the President of Heartland and he and Heartland sent them to Fluid's customers on or around July 24, 2014.  Heartland and MacDonald sent a second set of Letters to Fluid customers and potential customers on or around August 5, 2014.  Rowley approved the content and sending of these Letters.

8.   On or around July 2014, Mud Master provided Heartland and MacDonald the list of potential customers that Heartland contacted on or about August 5, 2014, intended that this list be used by Heartland to send the Letters to Heartland's potential customers, and knew the content of the Letters.  Heartland had knowledge of Fluid's existing customers from disclosures required by the Agreements.  However, they did not have independent knowledge of Fluid's potential customers.  Mud Master is a competitor to Fluid in Alberta, had knowledge of the potential customers and provided this list of potential customers to Heartland and MacDonald with the intention of destroying potential business for Fluid in order to secure this business for Mud Master.

9.   Mud Master had previously become involved in this dispute on June 12, 2014 when it faxed a copy of a letter to MultiChem's office in Calgary, the letter was originally from Heartland and EMS's Florida counsel to Fluid's counsel.  The letter falsely alleges that Fluid had violated the Agreements and falsely accuses Fluid of committing securities fraud, interfering with Heartland and EMS's business, and infringing on Heartland and EMS's trademarks and patents.

10.  The following Fluid customers are known to have received Letters on or around July 24, 2014:

     (a)   Progress Energy (**Progress**),

    (b)      Shell Canada Limited (**Shell**),

    (c)      MultiChem Production Chemicals (**MultiChem**),

    (d)      Calfrac Well Services (**Calfrac**).

11.      The following Fluid customers and potential customers are known to have received Letters on or around August 5, 2014:

    (a)      All Points Energy Inc. (**All Points**),

    (b)      Crescent Point Energy (**Crescent Point**),

    (c)      Trican Well Service (**Trican**),

    (d)      Centrica Energy Canada (**Centrica**),

    (e)      New Star Energy (**New Star**),

    (f)      TimberRock International (**TimberRock**),

    (g)      Canyon Technical Services (**Canyon**),

    (h)      Haulin' Acid (**Haulin'**),

    (i)      Courage Oilfield Services (**Courage**),

    (j)      Canbriam Energy Inc. (**Canbriam**), and

    (k)      Todnem Chemicals (**Todnem**).

12.      The Letters sent to Fluid's customers are virtually identical. They falsely state that Fluid is legally bound not to promote products in the oil and gas industry for two years and that Fluid is violating multiple Heartland patents by marketing its products in the oil and gas industry. The patents at issue are United States patents under Patent Numbers 8,430,971, 8,580,047, and 8,784,573.

13.      The Letters then provide information for purchasing "original, unadulterated, patented products" from the Defendants and go on to threaten and deceive Fluid's customers by suggesting that companies purchasing Fluid products will be infringing the Defendants' patents and, as a consequence, may be subject to legal action.

**The statements in the Letters are false**

14.   First, there is no binding agreement between Fluid and the Defendants that precludes Fluid from marketing its products in the oil and gas industry for two years. Heartland induced Fluid to enter the Agreements based on the fraudulent misrepresentations of MacDonald and Rowley. As such, the Agreements are void *ab initio*. Furthermore, the fact that that Heartland claims its products are unregulated, while Fluid acknowledges that its product is regulated, means that the products are not in competition.

15.   In addition, Heartland holds no Canadian patents. As sales of Fluid's products currently occur solely in Canada and they cannot infringe on Heartland's patents, which are held exclusively in the United States. Moreover, the composition of Fluid's products is different that Heartland's products and does not infringe on any Heartland patents.

16.   As well, the Letters falsely state that Fluid has violated its contracts with the Defendants and that Heartland cancelled its agreements with Fluid. No such violations have occurred and the cancellation of the Agreements is currently part of the ongoing Arbitration at Fluid's request.

17.   Finally, the letters also suggest that the products Fluid's customers had tested and qualified were actually Heartland products. This is also false. All products that Fluid's customers tested were Fluid's products based on Fluid's own composition and were submitted for testing after Fluid rescinded the Agreements due to Heartland's fraud.

**There is a serious issue to be tried and the Plaintiff has a strong, *prima facie* case.**

18.   The Plaintiff has advanced claims on the torts of defamation against Heartland and Macdonald; inducing breach of contract against Heartland, EMS, MacDonald, and Rowley; and intentional interference with economic relations against Heartland, EMS, MacDonald, and Rowley.

19.   There are serious issues to be tried and the Plaintiff has a strong *prima facie* case regarding these claims. The Defendants have circulated Letters to Fluid's customers and potential customers that with a number of false statements, including that

(a)     Fluid's actions in Canada have violated Heartland's US patents;

(b)     Fluid has breached is Agreements with Heartland;

(c)     Fluid actions are placing its customers and potential customers in legal jeopardy;

(d)     Fluid's products are not original and are adulterated,

(e)     The products provided by Fluid and tested by the third-parties were actually Heartland, not Fluid, products.

20.     The Defendants have made these false statements intentionally in an attempt to destroy Fluid's business.

**Fluid will suffer irreparable harm if this Court does not grant an injunction.**

21.     Fluid seeks an injunction restraining the Defendants from further defaming the Plaintiff or interfering with the Plaintiff's relations with its customers and potential customers.

22.     The Letters and Mud Master's June 12, letter (collectively the **Correspondence**) have and continue to irreparably harm Fluid's relationships with its current and potential customers.  As noted above, the Correspondence has already harmed a number of Fluid's customer relationships and is creating significant difficulties in attracting new business.

23.     These false allegations have seriously tainted Fluid's reputation in the oil and gas industry and it will take significant time and effort for Fluid to repair its reputation and relationships with its customers and the oil and gas industry in general.  The longer the Defendants are permitted to spread these falsehoods, the greater the damage to Fluid and the greater the difficulty in repairing the damage.

24.     The continued publishing of these Letters to Fluid's customers and potential customers in the oil and gas industry will irreparably harm Fluid by destroying its reputation and business to the point that it will be impossible to recover.

**The balance of convenience favours Fluid.**

25.     The Defendants will not be prejudiced should this Court grant the injunction.  They will still be able to market and sell their own products, they simply will be prevented from

sending out letters spreading false allegations about Fluid. Such an injunction would
have no effect on the legitimate conduct of the Defendants' businesses.

26.   In contrast, Fluid will be seriously prejudiced and harmed if the injunction is not granted.
Fluid has already lost a significant amount of business from the Defendants' Letters and it
is expected that these losses would continue as Letters continue to be sent out.

**The Action has a real and substantial connection to Alberta.**

27.   There is a real and substantial connection between Alberta and the facts on which the
claim is based. The torts of defamation, inducing breach of contract, and interference
claims are located in Alberta through the publication of the Letters in Alberta. Fluid and
Mud Master are located in Alberta, and Fluid has suffered damages in Alberta.

**Material or evidence to be relied on:**

28.   The Affidavit of Clay Purdy sworn August 20, 2014.

29.   Such further and other material as the Court will permit.

**Applicable Rules:**

30.   Rules 1.3, 1.4, 11.25 of the Alberta *Rules of Court*.

31.   Section 8 of the *Judicature Act*, R.S.A. 2000, c. J-2.

**How the application is proposed to be heard or considered:**

32.   In person before Justice Eidsvik.

---

**WARNING**

If you do not come to Court either in person or by your lawyer, the Court may give the Applicant
what they want in your absence. You will be bound by any order that the Court makes. If you want
to take part in this application, you or your lawyer must attend in Court on the date and at the time
shown at the beginning of the form. If you intend to rely on an affidavit or other evidence when the
application is heard or considered, you must reply by giving reasonable notice of the material to the
Applicant.

W:\072515\0001\RLM\Amended Injunction and Service Ex Juris Application v2.docx

Form 49
[Rule 13.19]

COURT FILE
NUMBER                    1401- 09170

COURT                     COURT OF QUEEN'S BENCH OF
                          ALBERTA

JUDICIAL CENTRE           CALGARY

PLAINTIFF                 FLUID ENERGY GROUP

DEFENDANTS                JOHN MACDONALD, STEPHEN ROWLEY, HEARTLAND
                          ENERGY GROUP LTD., ENVIRONMENTAL MANUFACTURING
                          SOLUTIONS LLC, and MUD MASTER DRILLING FLUID
                          SERVICES

DOCUMENT                  **AFFIDAVIT**

ADDRESS FOR SERVICE AND
CONTACT INFORMATION OF
PARTY FILING THIS DOCUMENT

**Burnet, Duckworth & Palmer LLP**
2400, 525 – 8 Avenue SW
Calgary, Alberta  T2P 1G1
Lawyer:        James Swanson
Phone Number: (403) 260-5712
Fax Number:    (403) 260-0332
Email Address: jswanson@bdplaw.com
File No.       72515.1

Clerk's Stamp:

CLERK OF THE COURT
FILED

AUG 2 0 2014

CALGARY, ALBERTA

### AFFIDAVIT OF CLAY PURDY

#### Sworn on August 20, 2014

I, Clay Purdy, of the City of Calgary, in the Province of Alberta, SWEAR AND SAY
THAT:

1.   I am the Chief Executive Officer for Fluid Energy Group (**Fluid**) and as such, have
     personal knowledge of the matters set out in my Affidavit, except where I have stated that
     I have relied on the information or belief of others. Where I have relied on the
     information of others, I believe that information to be true.

**The relationship between the Plaintiffs and the Defendants**

2.     The Plaintiff, Fluid, is a company incorporated pursuant to the law of the Province of Alberta and carries on business in Alberta. Fluid is a Calgary based company that focuses on manufacturing environmentally responsible, biodegradable, and non-hazardous replacements for acids and caustics in the oil and gas industry.

3.     The Defendant, Heartland Energy Group Ltd., (**Heartland**), is a company incorporated under the laws of Seychelles and carrying on business internationally. They market green chemistries to the oil and gas industry.

4.     The Defendant, Environmental Manufacturing Solutions LLC (**EMS**), is a company incorporated under the laws of Florida and carrying on business internationally. They market green chemistries to the oil and gas industry, among others. Copies of corporate registration searches for EMS are attached as **Exhibit A.**

5.     The Defendant, Mud Master Drilling Fluid Services, also operating as OptiFrac Chemical Services, (**Mud Master**), is a corporation incorporated in Alberta and doing business in Canada. Copies of corporate registration searches for Mud Master are attached as **Exhibit B**.

6.     The Defendant, John Macdonald (**Macdonald**), is the Director of Heartland and Manager of EMS and resides in Florida.

7.     The Defendant, Stephen Rowley (**Rowley**), is the President of Heartland and resides in Grain Valley, Missouri.

**The Agreements between Fluid, Heartland, and EMS**

8.     On November 1, 2012, Fluid entered into licensing and manufacturing agreements with Heartland (the **Agreements**) to market Oil Safe AR and Mud Safe AR in various markets, including Alberta. In order to induce Fluid to enter these agreements MacDonald, Director of Heartland and Manager of EMS, and Rowley, President of Heartland, assured Fluid that the products were non-regulated throughout the world for the purposes of domestic and international transportation and not corrosive to aluminum

above a rate of 6.25 mm/yr at 55 degrees Celsius (attached as **Exhibit C** are the most recent versions of the Agreements).

9.     In late 2013, Fluid discovered that MacDonald and Rowley's assurances were false and that they had fraudulently misrepresented the properties of Oil Safe AR and Mud Safe CR using, among other things, falsified National Aeronautics and Space Administration (**NASA**) test data.    Because of this Fluid sought to terminate its licensing and manufacturing agreements with Heartland on April 11, 2014 (attached as **Exhibit D** is the letter terminating the Agreements).

10.    On May 28, 2014, Fluid filed for arbitration with the International Court of Arbitration (the **Arbitration**). Fluid has asked the arbitrators to rescind its agreements with Heartland and sought damages against Heartland, MacDonald, and Rowley for fraud. This Action is independent and unrelated to the Arbitration, which is currently proceeding in Florida.

**Enviro-Syn HCR**

11.    When Fluid became aware of Heartland's fraud and the deficiencies in its products, Fluid developed its own acid replacement system in order to service its customers with a product for which all third party data and claims could be verified. By April 2014, Fluid had developed and was marketing its own product, Enviro-Syn HCR, to the oil and gas industry in Canada. This product is distinct from any Heartland product and has a patent application pending in Canada.

12.    Fluid only sells Enviro-Syn HCR in Canada and it is not used outside of Canada. However, Fluid promotes Enviro-Syn internationally and intends to sell this product internationally in the future.

**July 24, 2014, letters.**

13.    In July 2014, Heartland and EMS, with the assistance and knowledge of their Alberta distributor – Mud Master – sent letters to at least ten Fluid clients, as well as to other service companies who were potential clients (the **Letters**).  These Letters threatened

legal action against Fluid's clients and potential clients should they continue to do business with Fluid and warned them to only do business with the Defendants.

14.     While the Letters do not specifically reference Fluid's product: Enviro-Syn HCR, I believe that they are referring to this Fluid product, as it is the only product Fluid currently sells.

15.     MacDonald wrote these Letters, misrepresenting himself as the President of Heartland, and he and Heartland sent them to four Fluid clients on or about July 21, 2014. MacDonald and Heartland sent a second set of letters to Fluid's clients and potential clients on or about August 5, 2014. I believe that Rowley approved the content and sending of these Letters.

16.     I believe that Mud Master provided Heartland and MacDonald the list of potential clients that Heartland contacted on or about August 5, 2014, intended that this list be used by Heartland to send the Letters to Heartland's potential clients, and knew the content of the Letters. Heartland would have had knowledge of Fluid's existing clients from disclosures required by the Agreements. However, they would not have had independent knowledge of Fluid's potential clients. Given that Mud Master is a competitor to Fluid in Alberta, it would have had knowledge of the potential clients and I believe that they provided this list of potential clients to Heartland and MacDonald with the intention of destroying potential business for Fluid in order to secure this business for Mud Master.

17.     Mud Master had previously become involved in this dispute on June 12, 2014 when it faxed a copy of a letter, originally sent by Heartland and EMS's Florida counsel to Fluid's New York counsel, to MultiChem's office in Calgary. The letter falsely alleges that Fluid had violated the Agreements and falsely accuses Fluid of committing securities fraud, interfering with Heartland and EMS's business, and infringing on Heartland and EMS's trademarks and patents. This fax is attached as **Exhibit E**.

18.     Fluid has obtained copies of letters sent to and received by the following clients on or about July 21, 2014. These Letters are attached as **Exhibit F** to this Affidavit:

        (a)     Progress Energy (**Progress**),

    (b)      Shell Canada Limited (**Shell**),

    (c)      MultiChem Chemical Production (**MultiChem**), and

    (d)      Calfrac Well Services (**Calfrac**).

19.    The Letters to Progress, Shell, and Calfrac are addressed to and were received at their Calgary offices. The letter to MultiChem, is addressed to MultiChem's Houston office and was received there. However, it was conveyed internally by MultiChem to its Calgary office.

20.    I also have been informed and believe that the following companies also received Letters on or about August 5, 2014:

    (a)      All Points Energy Inc. (**All Points**),

    (b)      Crescent Point Energy (**Crescent Point**),

    (c)      Trican Well Service (**Trican**),

    (d)      Centrica Energy Canada (**Centrica**),

    (e)      New Star Energy (**New Star**),

    (f)      TimberRock International (**TimberRock**),

    (g)      Canyon Technical Services (**Canyon**),

    (h)      Haulin' Acid (**Haulin'**),

    (i)      Courage Oilfield Services (**Courage**),

    (j)      Canbriam Energy Inc (**Canbriam**), and

    (k)      Todnem Chemicals (**Todnem**).

21.    I have been informed and believe that Crescent Point, Trican, Centrica, New Star, TimberRock, Canyon, Haulin', Courage, and Canbriam received the Letters at their Calgary offices. The Letter to Todnem was received at their international offices. The Letter to All Points is attached as **Exhibit G**.

22.    The Letters that Fluid has reviewed are virtually identical. They falsely state that Fluid is legally bound not to promote products in the oil and gas industry for two years and that Fluid is violating multiple Heartland patents by marketing its products in the oil and gas industry. The patents at issue are United States patents under Patent Numbers 8,430,971, 8,580,047, and 8,784,573.

23.    The Letters then provide information for purchasing "original, unadulterated, patented products" from the Defendants and go on to threaten and deceive Fluid's Clients by

suggesting that companies purchasing Fluid products will be infringing the Defendants' patents and, as a consequence, may be subject to legal action.

**The statements in the Letters are false.**

24.     First, there are no binding agreements between Fluid and the Defendants that preclude Fluid from marketing its products in the oil and gas industry for two years. While Clause 22 of the License Agreement contains a two-year non-competition clause, the Heartland, EMS, MacDonald, and Rowley induced Fluid to enter this Agreement based on the fraudulent misrepresentations of MacDonald and Rowley.     Moreover, the non-competition clause is not triggered by a breach of the Agreement by the licensor, which is what has occurred here.

25.     In addition, sales of Fluid's products currently occur solely in Canada and, therefore, do not violate any US patents. Moreover, the composition of Fluid's products does not infringe any Heartland patents and the Defendants have brought no legal proceedings alleging patent infringement in the United States or Canada. Neither Heartland nor MacDonald hold any Canadian patents (attached as **Exhibit H** are copies of a patent search done by Fluid's counsel).

26.     As well, the Letters falsely state that Fluid has violated its contracts with the Defendants and that Heartland cancelled its agreements with Fluid. No such violations have occurred and the cancellation of the Agreements is currently part of the ongoing Arbitration at the request of Fluid.

27.     Finally, the letters also suggest that the products Fluid's clients had tested and qualified were actually Heartland products. This is also false. All products that Fluid's customers tested were Fluid's products based on Fluid's own composition and submitted for testing after Fluid rescinded the Agreements due to Heartland's fraud.

**The Letters are causing irreparable harm to Fluid**

28.     The Letters are irreparably damaging Fluid's relationships with its current and potential customers.     The Letters have already caused Fluid to lose at least two customers

collectively worth over $2 million and the threat of liability and the false accusations of inferior products are creating significant difficulties for Fluid in attracting new business.

29.    The Letters have caused the following as of Monday, August 18, 2014:

(a)    MultiChem has stopped ordering products from Fluid. These orders were worth approximately $40,000 per month.

(b)    Canbriam has discontinued use of Fluid's products until an indemnity can be granted. This has caused a loss of $300,000 for present project wells and the potential loss of $700,000 for the remaining project wells.

(c)    Shell has discontinued usage pending a legal opinion on the Defendants' allegations. This has caused a loss of $500,000 on present project wells and a potential additional loss of at least $2 million for remaining project wells.

(d)    Calfrac has discontinued usage pending a legal opinion on the Defendants' allegations. This has caused a loss of at least $2 million on pending projects.

(e)    New Star has discontinued usage pending a legal opinion on the Defendants' allegations. This has caused a loss of $750,000 on a single pending project.

(f)    Crescent Point has withdrawn any future consideration of Fluid's products pending a legal opinion on the Defendants' allegations. This has caused a loss of $2 million on a pending project and $600,000 on a pending fracturing operation with potential losses in excess of $5 million.

30.    These are merely the contacts we know about and the discontinuations to date. Even so, they already add up to almost $10 million in potential losses.

**The Defendants will continue to spread falsehoods among Fluid's customers.**

31.    I believe that, without an injunction, the Defendants will continue to send out such Letters to companies in the oil and gas industry in an effort to destroy Fluid's business.

8

32.   These false allegations have seriously tainted Fluid's reputation in the oil and gas industry and it will take significant time and effort for Fluid to repair its reputation and relationships with its clients and the oil and gas industry in general.   The longer the Defendants are permitted to spread these falsehoods, the greater the damage to Fluid and the greater the difficulty in repairing the damage.

33.   The continued publishing of these Letters to Fluid's clients and potential clients in the oil and gas industry will destroy Fluid's reputation and business to the point that it will be impossible to recover.

**The Action has a real and substantial connection to Alberta**

34.   I am advised by counsel and believe that the Action has a real and substantial connection to Alberta because:

(a)   The torts of defamation, inducing breach of contract, and intentional interference with economic relations were committed in Alberta;

(b)   The Plaintiff is located in Alberta;

(c)   The Defendant, Mud Master, is located in Alberta;

(d)   The Plaintiff has suffered damages in Alberta.

35.   I am advised by counsel that the Defendants Heartland and EMS will be served by registered mail to their head offices in the United States.   Rowley and MacDonald will by registered mail to their home addresses.

SWORN BEFORE ME at the City of   )

Calgary, in the Province of Alberta this 20th

day of August, 2014.                              )

                                                              )

_____                    _____

9

_____          _____
A Commissioner for Oaths in and for the  )   CLAY PURDY

Province of Alberta

**HARVEY JAMES BERGER**
Barrister & Solicitor



# FLORIDA DEPARTMENT OF STATE
# DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |
|------|-----------|-------------------|-------------------|-------|------|

Events **No Name**
        **History**

environmental manufacturing solutions LLC

Return to Search Results

## Detail by Entity Name

### Florida Limited Liability Company

ENVIRONMENTAL MANUFACTURING SOLUTIONS, L.L.C.

### Filing Information

| | |
|---|---|
| **Document Number** | L01000000684 |
| **FEI/EIN Number** | 364412396 |
| **Date Filed** | 01/16/2001 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 08/28/2002 |
| **Event Effective Date** | NONE |

### Principal Address

7705 PROGRESS CIRCLE
MELBOURNE, FL 32904

Changed: 07/05/2006

### Mailing Address

7705 PROGRESS CIRCLE
MELBOURNE, FL 32904

Changed: 07/05/2006

### Registered Agent Name & Address

LACEY, STEPHEN J
1901 S. HARBOR CITY BLVD
SUITE 500
MELBOURNE, FL 32901

Name Changed: 04/10/2012

Address Changed: 04/10/2012

### Authorized Person(s) Detail

### Name & Address

THIS IS EXHIBIT ___A___
referred to in the __Affidavit__
__of Clay Purdy__
Sworn before me this ___20th___
day of __August__ / A.D. _2014_

A Commissioner for Oaths in and for the
Province of Alberta

**HARVEY JAMES BERGER**
Barrister & Solicitor

Title MGR

JOHN, MACDONALD
7705 PROGRESS CIR
MELBOURNE, FL 32904

Title MGR

MACDONALD, CHARLENE
7705 PROGRESS CIRCLE
MELBOURNE, FL 32940

## Annual Reports

| Report Year | Filed Date |
|-------------|------------|
| 2012 | 04/10/2012 |
| 2013 | 01/17/2013 |
| 2014 | 03/03/2014 |

## Document Images

| | |
|---|---|
| 03/03/2014 -- ANNUAL REPORT | View image in PDF format |
| 01/17/2013 -- ANNUAL REPORT | View image in PDF format |
| 04/10/2012 -- ANNUAL REPORT | View image in PDF format |
| 02/16/2011 -- ANNUAL REPORT | View image in PDF format |
| 03/02/2010 -- ANNUAL REPORT | View image in PDF format |
| 04/14/2009 -- ANNUAL REPORT | View image in PDF format |
| 03/25/2008 -- ANNUAL REPORT | View image in PDF format |
| 01/03/2007 -- ANNUAL REPORT | View image in PDF format |
| 07/05/2006 -- ANNUAL REPORT | View image in PDF format |
| 03/02/2005 -- ANNUAL REPORT | View image in PDF format |
| 05/24/2004 -- ANNUAL REPORT | View image in PDF format |
| 11/24/2003 -- Reg. Agent Change | View image in PDF format |
| 10/31/2003 -- Reg. Agent Resignation | View image in PDF format |
| 03/26/2003 -- ANNUAL REPORT | View image in PDF format |
| 08/28/2002 – Amendment | View image in PDF format |
| 01/31/2002 -- ANNUAL REPORT | View image in PDF format |
| 01/16/2001 -- Florida Limited Liabilites | View image in PDF format |

Events No Name
History

environmental manufacturing solutions LLC


Return to Search Results.

Copyright © and  Privacy Policies
State of Florida, Department of State

# Government of Alberta ■ Corporation/Non-Profit Search
## Corporate Registration System

| | |
|---|---|
| Date of Search: | 2014/08/18 |
| Time of Search: | 11:11 AM |
| Search provided by: | BURNET DUCKWORTH & PALMER LLP |

| | |
|---|---|
| Service Request Number: | 21923887 |
| Customer Reference Number: | 72515-1 |

| | |
|---|---|
| **Corporate Access Number:** | 202521027 |
| **Legal Entity Name:** | MUD MASTER DRILLING FLUID SERVICES LTD. |

| | |
|---|---|
| **Legal Entity Status:** | Active |
| **Alberta Corporation Type:** | Named Alberta Corporation |
| **Registration Date:** | 1981/02/09 YYYY/MM/DD |

**Registered Office:**

| | |
|---|---|
| **Street:** | 2600, 10180 - 101 STREET NW |
| **City:** | EDMONTON |
| **Province:** | ALBERTA |
| **Postal Code:** | T5J 3Y2 |

**Records Address:**

| | |
|---|---|
| **Street:** | 2600, 10180 - 101 STREET NW |
| **City:** | EDMONTON |
| **Province:** | ALBERTA |
| **Postal Code:** | T5J 3Y2 |

**Directors:**

| | |
|---|---|
| **Last Name:** | NIEUWESTEEG |
| **First Name:** | JERRY |
| **Street/Box Number:** | 3195 BOARDMAN ROAD |
| **City:** | FERNIE |
| **Province:** | BRITISH COLUMBIA |
| **Postal Code:** | V0B 1M1 |

| | |
|---|---|
| **Last Name:** | NIEUWESTEEG |
| **First Name:** | ROBERT |
| **Street/Box Number:** | 6310 BOW CRESCENT NW |
| **City:** | CALGARY |

THIS IS EXHIBIT 𝐵
referred to in the Affidavit
of Clay Purdy
Sworn before me this 20ᵗʰ
day of August, A.D. 2014

A Commissioner for Oaths in and for the
Province of Alberta

HARVEY JAMES BERGER
Barrister & Solicitor

Province:            ALBERTA
Postal Code:         T3B 2B9

**Voting Shareholders:**

Legal Entity Name:          1577594 ALBERTA LTD.
Corporate Access Number: 2015775949
Street:                     1141 SIERRA MORENA COURT SW
City:                       CALGARY
Province:                   ALBERTA
Postal Code:                T3H 3N1
Percent Of Voting Shares:   31.25

Legal Entity Name:          CARMMA CONSULTING SERVICES INC.
Corporate Access Number: 209601301
Street:                     C/O 3195 BOARDMAN ROAD
City:                       FERNIE
Province:                   BRITISH COLUMBIA
Postal Code:                V0B 1M1
Percent Of Voting Shares:   9.375

Last Name:                  LAMACCHIA FAMILY TRUST
Street:                     404, 1015 - 4TH STREET SW
City:                       CALGARY
Province:                   ALBERTA
Postal Code:                T2R 1J4
Percent Of Voting Shares:   6.25

Last Name:                  LEE
First Name:                 PAUL
Middle Name:                BERNARD
Street:                     15 BLUE RIDGE PLACE NW
City:                       CALGARY
Province:                   ALBERTA
Postal Code:                T3L 2N5
Percent Of Voting Shares:   12.5

Last Name:                  NIEUWESTEEG
First Name:                 ROBERT
Street:                     6310 BOW CRESCENT NW
City:                       CALGARY
Province:                   ALBERTA
Postal Code:                T3B 2B9
Percent Of Voting Shares:   40.625

**Associated Registrations under the Partnership Act:**

| Trade Partner Name | Registration Number |
|---|---|
| BELARI CHEMICALS | TN18123125 |
| OPTIFRAC CHEMICAL SERVICES | TN16072100 |

## Other Information:

**Last Annual Return Filed:**

| File Year | Date Filed (YYYY/MM/DD) |
|---|---|
| 2013 | 2013/06/24 |

**Outstanding Returns:**

Annual returns are outstanding for the 2014 file year(s).

**Continued Under the Business Corporations Act on:** 1983/01/05 YYYY/MM/DD

**Filing History:**

| List Date (YYYY/MM/DD) | Type of Filing |
|---|---|
| 2011/05/17 | Change Address |
| 2011/08/17 | Change Director / Shareholder |
| 2011/09/01 | Capture Microfilm/Electronic Attachments |
| 2013/06/24 | Enter Annual Returns for Alberta and Extra-Provincial Corp. |

**Attachments:**

| Attachment Type | Microfilm Bar Code | Date Recorded (YYYY/MM/DD) |
|---|---|---|
| Amended Annual Return | 10000707111186300 | 2011/09/01 |

This is to certify that, as of this date, the above information is an accurate reproduction of data contained within the official records of the Corporate Registry.



## AMENDED AND RESTATED LICENSE AGREEMENT

THIS LICENSE AGREEMENT (this "Agreement") made as of this 10th day of October 2012, and AMENDED AND RESTATED this 18th day of June 2013, between Heartland Energy Group, Ltd. (the "Licensor") and Fluid Energy Group Ltd., a Limited company duly organized under the laws of Alberta, Canada, and having its principal place of business at #140,214- 11Th Avenue Calgary, Canada T2G 0X8    (the "Licensee").

### WITNESSETH:

WHEREAS, the Licensor claims that it has been granted the assignment rights from John MacDonald, who is the sole and exclusive owner of, and has the sole and exclusive right to grant licenses under the U.S. Patents identified in Exhibit A to this Agreement and specifically known as **The "102B1" Technology**, including all reissuance, supplementary protection certificates, extensions and re-examinations thereof (collectively, the "Patents"), as well as any underlying technology or know-how owned by the Licensor and related thereto or any improvements thereon (the "Technology"). Copies of the issuing papers from the U.S. Patent and Trademark Office ("USPTO") identifying the Patents shall remain on file for inspection at the offices of the Licensor; and

WHEREAS, for commercial purposes, the Licensee wishes to acquire the EXCLUSIVE right and license to manufacture, have manufactured, sell, offer to sell and use apparatuses or processes embodying, employing, or otherwise covered by the Patents and the Technology throughout the Territory.

NOW THEREFORE, in consideration of the mutual covenants and promises of the parties hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency, of which is hereby acknowledged by the parties hereto agree as follows:

1.    Grant of License. The Licensor grants to the Licensee the EXCLUSIVE right and license to manufacture, have manufactured, sell, offer to sell and use apparatuses or processes embodying, employing, or otherwise covered by the Patents and the Technology (the "Patent License"), throughout the Territory, to the full end of the Term (as hereinafter defined), unless this Agreement is terminated prior to the end of the Term, as provided below. The Licensee may not manufacture, sell and use apparatus embodying, employing and containing the Products in any country other than those specified in the Territory without first receiving written approval, or approval by electronic means, such as electronic mail, from the Licensor. In the event the Licensee fails to obtain such approval, the Licensor retains the right to Royalties (as defined in Section 5 of this Agreement) of any sales in such other countries, but shall not be held liable due to actual or alleged infringement by the Products supplied hereunder of any patent copyright, trade secrets, trademark, mask work right or other proprietary right(s) of a third party in such country.

THIS IS EXHIBIT _____ C _____
referred to in the Affidavit
Of Clay Purdy
Sworn before me this _____ 20th
day of August _____ A.D. 2014

A Commissioner for Oaths in and for the
Province of Alberta

HARVEY JAMES BERGER
Barrister & Solicitor

2.    Representations of Licensor.

A.    Ownership of Patents. The Licensor represents and warrants that it is the assignee of the entire right, title and interest in and to the Patents, the assignment being granted from John MacDonald, and that it has the right to grant the EXCLUSIVE right, license and privilege granted in this Agreement; that it has executed no agreement in conflict with this Agreement; and that it has not granted to any other person, firm or corporation any right, license, or privilege granted under this Agreement in the TERRITORY.

B.    Validity and Enforceability of Patents. The Licensor represents and warrants that all filings and fees have been made and paid to the relevant authorities to maintain the validity and enforceability of the Patents and, to the Licensor's knowledge, the Patents are valid and enforceable.

3.    Responsibilities. The parties shall be responsible for the following:

A.    The Licensee shall work directly with the manufacturer(s) to order all product displays; freight to and out, deals, discounts, returns, and allowances; all selling expenses, trade advertising, printing of collateral material, all expenses for sales meetings and conventions, sales person commissions, incentives, bonuses or other such payments, mailings and samples of the Products. The Licensee shall also be responsible for all administrative duties such as order entry, shipping and billing, and website administration on any of its websites.

B.    The Licensor shall be responsible for the prosecution of the Patents and any other patent application claiming priority based on the Patents, and shall prosecute the foregoing diligently and in accordance with the applicable law.

4.    Term and Termination.

A.    Unless sooner terminated in accordance with this Agreement, the Patent License granted hereunder shall commence on October 10, 2012 (the "Effective Date"), and shall continue in effect for a period of twenty three (23) years (the "Term"); provided, however, that so long as the Licensee sells at least two million gallons of the Products during each year of the Term (and any Renewal Term), this Agreement shall renew automatically for one (1) year terms in perpetuity unless one party gives the other party written notice of nonrenewal at least sixty (60) days prior to December 31st of each subsequent year (each one (1) year period subsequent to the Term shall be a "Renewal Term").

B.    Upon termination or expiration of the licenses granted under this Agreement, by operation of law or otherwise, all rights, privileges and obligations arising from this Agreement (except the obligations or limitations set forth in Section 8 of this Agreement) shall cease to exist. Upon termination or expiration of this Agreement, the Licensee shall cease from all use of the Patents; provided, however, nothing in this Agreement prevents the Licensee from practicing any methods or selling, offering for sale, manufacturing, having manufactured or using any apparatuses covered by any claims of the Patents that have expired or been found invalid.



C.     In the event of a significant breach of this Agreement by either party, the other party may terminate the licenses and rights granted to the breaching party under this Agreement by giving written notice to such breaching party of termination and the basis for such termination; provided, however, that if such written notice is properly delivered as set forth in Section 12 of this Agreement, the licenses and rights granted under this Agreement shall terminate thirty (30) days after service of the written notice to the other party, unless the specified breach is cured within such thirty (30) day period. A significant breach of this Agreement shall be defined as either party's violation of its material obligations under this Agreement, except for the making of Royalty payments by the Licensee.

D.     The Licensor may, on written notice to the Licensee, which notice is properly delivered as set forth in Section 12 of this Agreement, forthwith terminate the license and rights granted under this Agreement to the Licensee to use the Patents, upon the Licensee's failure to make timely payment of Royalties, Guaranteed Royalty Payment or submissions of Royalty statements when due for two (2) or more consecutive months during the Term, unless such breach is cured within ten (10) days from the service of the written notice upon the Licensee.

E. Closeouts and Post-Term Sales and Royalties. All Products unsold by the Licensee (i) at the end of the Term, (ii) at the end of any Renewal Term, or (iii) upon the termination of this Agreement, whichever is sooner, may continue to be sold by the Licensee as closeouts for One Hundred Eighty (180) days thereafter. All Products remaining with the Licensee after One Hundred Eighty (180) days from the expiration of this Agreement may be sold by the Licensee to the Licensor at fair market value or destroyed by the Licensee if the Licensor declines to buy such Product within thirty (30) days thereafter. Closeout sales of Products which have been previously approved in writing by the Licensor shall be subject to fifteen (15%) percent royalty to the Licensor. Closeouts which have not been previously approved by the Licensor in writing or which the Licensee has not previously sought approval for, shall be subject to the Royalties set forth in Section 5 of this Agreement.

5.     Royalties and Sales.

A.     Rate of Royalty and Guaranteed Royalty Payment. During the Term, the Licensee agrees to pay the Licensor, as more fully set forth in this Section 5 of the Agreement, royalties on Products which are manufactured sold by the Licensee. The rate of royalty to be paid by the Licensees hereunder shall be per U.S. gallon, in U.S. Dollars for each gallon manufactured of the Products, which amount shall be computed on a monthly basis and paid quarterly at the following rate(s) (the "Royalty"); $1.10 up to 1 million gallons, $1.00 for greater than or equal to 1 million but less than 3 million gallons, $0.91 for greater than or equal to 3 million but less than 7 million gallons, $0.83 for greater than or equal to 7 million but less than 15 million gallons, and $0.76 for greater than or equal to 15 million gallons. Once 15 million gallons have been achieved, the Royalty shall be locked at and remain $0.76; provided that it is agreed that the minimum guaranteed monthly royalty paid to the Licensor under this Agreement and the Amended and Restated License Agreement between Fluid Energy Group Ltd. and Licensor, dated 06/18/2013, (the "Group License Agreement") during the Term shall be Twenty Thousand ($20,000.00) U.S. Dollars (the "Guaranteed Royalty Payment"). The first Guaranteed Royalty Payment shall be paid to the Licensor on January 1, 2013. Except as set forth in Section 5C (iii)



of this Agreement, the Licensor shall not, after the first payment under this Section 5A, in any one month during the continuance of this Agreement, receive less than the Guaranteed Royalty Payment, which amount shall be included in any Royalty paid to the Licensor if the Royalty amount is greater than the Guaranteed Royalty Payment.

       Minimum Sales and Exclusivity.

          (i)    if, by December 31, 2014, the Licensee has not sold a minimum of One Million (1,000,000) U.S. gallons of Products (the "Sales Minimum"), the Licensor shall have the right to cancel the exclusive right granted to the Licensee pursuant to the Patent License; provided, however, that the Licensee shall be granted a non-exclusive license to distribute the Products with royalty rates equal to the rates as described in this Section 5 and the right to purchase the product from the Licensor at manufacturer's cost plus normal and customary profits, unless the Licensee elects to pay the Licensor any Royalty shortfall to make whole the Sales Minimum. The right to cancel the exclusive license under this paragraph "C" of this Section 5 shall be delivered in writing to the Licensee on or before January 10, 2014. If the Licensor does not cancel the exclusive right granted to the Licensee as set forth in this paragraph "C" of this Section 5, the Licensee shall continue to have the exclusive rights granted pursuant to this Agreement for an additional twelve (12) month period. For each successive twelve (12) month term, the Licensee's sales must exceed the Sales Minimum to maintain the exclusive rights granted pursuant to this Agreement.

          (ii)    If the Licensor exercises its right to cancel the exclusive license under this paragraph "C" of this Section 5, the Licensor shall not directly interfere with existing accounts of the Licensee. Nothing herein provided prohibits the Licensor from granting further nonexclusive licenses to other distributors and such distributors shall be restricted from interfering with the Licensee's current accounts at time of cancellation of the exclusive License.

          (iii)   If the Licensor exercises its right to cancel the exclusive license under this paragraph "C" of this Section 5, the Licensee is not obligated to render to the Licensor the Guaranteed Royalty Payment under the aforementioned Paragraph 5A. However, if the Licensee is unable to provide Royalties to the Licensor of at least an average of Twenty Thousand ($20,000) US Dollars per month over the next twelve (12) months following cancellation of the exclusive right, the non-exclusive License will be terminated. The right to cancel the nonexclusive License under this paragraph "C" of this Section 5 shall be delivered in writing to the Licensee on or prior to thirty (30) days from the end of the twelve (12) month term.

       D.    Duty to Exploit. The Licensor expressly agrees that the Licensee shall not have any implied obligation beyond that expressly stated in this Agreement to market or exploit the Patents or Technology to use any level of efforts in the marketing or exploiting of such Patents or Technology. In addition, the Licensor agrees that the Guaranteed Royalty Payment satisfies all consideration necessary to meet any implied obligation of the Licensee to exploit the Patents or Technology licensed exclusively hereunder as well as the rights granted by the Licensor under the Manufacturing Agreement and the Group License Agreement.



6.     Statement of Sales and Payment of Royalty.

A. The Licensee, within fifteen (15) days after the last day of each month during the Term, agrees to furnish to the Licensor written statements, under oath, specifying the total number of apparatus embodying and containing the Products sold by the Licensee during the preceding month. The first statement shall be rendered not later than the fifteenth (15th) day of January 2013, and shall cover the period from the Effective Date to January 31, 2013.

B. Payment Term. The Licensee shall make Royalty payments to the Licensor no later than forty-five (45) days after the first quarter in which Royalties are due and then quarterly each quarter thereafter by check or bank wire. If any of the Patents expire, (i) the Licensee will have no obligation to pay any Royalties for the sale of Products previously covered by such Patents, (ii) the Royalty that would have been applicable to the sale of such Products will be included in the amount required to meet the Guaranteed Royalty Payment, and (iii) the sale of such Products will be included in the amount of Products required to meet the Sales Minimum.

C.     The Licensee shall keep accurate records of gross U.S. gallons for a period of not less than two (2) years after the expiration or earlier termination of this Agreement, unless in dispute, in which event they shall be kept until said dispute is settled. Such records shall be open for inspection during reasonable business hours at the place where such records are customarily kept for examination by an independent accountant selected by the Licensor and reasonably acceptable to and paid for by the Licensee, for the purpose of verifying the accuracy of such gross sales reported to the Licensor and Royalties due thereon. Said accountant shall not disclose any information that he may thereby obtain other than that necessary for the purpose of enabling the Licensor to determine the accuracy of such reports and Royalty payments made in connection therewith.

If any such examination reveals Royalties due the Licensor in excess of five percent (5%) more than Royalties paid to the Licensor for the period covered by such examination, all audit fees, costs, and appraisals shall be borne by the Licensee, in addition to which interest shall be added to the amount discovered to be due from the first dollar more than the Royalties actually paid, in the amount of four (4) percentage points above the prime rate as established by Bank of America, NA; provided that such payment of interest is not in excess of the maximum rate of interest legally permissible.

In the event that an auditor representing the Licensee shall disagree with the Licensor as to whether the amount owed exceeds the above-described five (5%) percent, then the auditor representing the Licensee and the auditor representing the Licensor shall jointly select a third auditor whose determination of the amount owed shall be final and binding upon the Licensee and the Licensor.

The receipt and deposit of monies by the Licensor shall not prevent or limit the Licensor's right to contest the accuracy and/or correctness of any statement in respect of such monies.

Such books of account shall at all times be maintained at an office of the Licensee and

shall be open to the inspection and examination by the Licensor or the Licensor's representative, at reasonable intervals, but not more than once every six (6) months, upon reasonable notice and at reasonable hours of the business day for any purpose reasonably related to this Agreement.

D.    The Licensee shall throughout the term of this Agreement and, where applicable, thereafter render statements to the Licensor on a monthly basis and within fifteen (15) days after each applicable month and with such monthly statement remit payments to the Licensor; such statement shall include:

(i)     Copies of all purchase orders;
(ii)    Copies of all QC reports and gallons produced;
(iii)   Voice listings setting forth the:
   a.   Names and addresses of customers;
   b.   Price paid by each customer;
   c.   Goods returned and the reasons therefore.

7.    <u>Infringement</u>. In the event the Licensee shall become aware of any infringement by any third party of any right licensed under this Agreement, it shall promptly notify the Licensor in writing of such infringement or use, and shall do such acts and assist and supply such information as are reasonably necessary or desirable in relation thereto. The Licensor shall take only those steps which, in its sole discretion, are necessary to enforce its rights, including the engagement of legal counsel of its own choosing. The Licensor's obligation to defend the rights of this Agreement hereunder shall be made at its sole and exclusive discretion; provided however, if the Licensor elects not to enforce the Patents licensed hereunder within thirty (30) days of notice of such infringement or use, (i) the Licensor hereby assigns all rights in such cause of action to the Licensee, (ii) the Licensee may take those steps which, in its sole discretion, are necessary to enforce its right, and (iii) the Licensor shall do such acts and assist and supply such information as are reasonably necessary or desirable in relation thereto. Regardless of the party enforcing the Patents, (a) the Licensee shall be entitled to all damages related to any infringement of the Patents in the Territory, less the cost of prosecution paid by Licensor along with any royalty fees related to the infringing sales and (b) the Licensee may elect to engage legal counsel of its own choosing, at the Licensee's sole expense.

8.    <u>Indemnity</u>.

A.    The Licensor shall defend, indemnify, and hold harmless the Licensee and the Licensee's officers, employees, agents and direct or indirect customers, from and against any claims, suits, losses, liabilities, damages, court judgments and/or arbitral awards and the reasonably related costs and expenses (including reasonable attorneys' fees incurred by the other or for which the other is judged liable), incurred because of actual or alleged infringement or misappropriation by (i) the Products, (ii) the Technology, or (iii) the use of the apparatuses and methods claimed in the Patents, of any patent, copyright, trade secret, trademark, mask work right or other proprietary right(s) of a third party which was in effect on or prior to the date which the last to issue of the Patents, including any improvements thereon, was issued by the USPTO. Upon receipt of notice of such claim, suit or action, the Licensee shall promptly tender notice of the same to the Licensor, and thereafter, upon the Licensor's request, the Licensee shall render reasonable assistance to the Licensor for defense of the same. Each party shall execute

any and all papers which may be found necessary or desirable in any suit or suits brought under and pursuant to this Agreement; and the each party further agrees that it will testify in any interference or litigation, whenever requested to do so by the other party.

B.     Each party shall maintain, at its own expense, product liability insurance in full force and effect at all times during the Term, with a responsible insurance carrier reasonably acceptable to the other party, of a minimum of One Million ($1,000,000.00) Dollars, with a deductible of no more than Twenty Five Thousand ($25,000.00) Dollars. Product liability insurance shall be for the benefit of each party as an additional insured and each party shall provide for at least ten (10) days prior written notice to the other party of the cancellation or any substantial modification of said policy.

C.     The Licensor or the Licensee may, as the case maybe, from time to time, upon reasonable request by the other party, promptly furnish or cause to be furnished to the other party evidence in form and substance satisfactory to the other party, of the maintenance of the insurance required by paragraph "B" of this Section 8 of this Agreement, including, but not limited to, originals or copies of policies, certificates of insurance (with applicable riders and endorsements) and proof of premium payments.

D.     If in any action involving either the Patents, Technology, or any other intellectual property under and pursuant to which the exclusive rights and licenses have been granted under this Agreement or the Manufacturing Agreement, results in any Patent, Technology, or other such intellectual property being declared to be invalid by any court or other tribunal or be construed by the court as not to cover the Products, then the Royalties agreed to be paid under this Agreement shall afterwards be waived, and the Licensee shall be immediately released of and from any and all obligations under this Agreement.

9.     No Waiver. Except as otherwise provided herein, no waiver of any covenant, condition, or provision of this Agreement shall be deemed to have been made unless expressly in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provisions, covenants, or conditions of this Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment in the future of any such provisions, covenants, or conditions, (ii) the acceptance of performance of anything required by this Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another party shall be construed as a waiver with respect to any other or subsequent breach.

10.     Independent Contractors. The Licensee is an independent contractor and not an agent, partner, joint venturer, franchisee, affiliate or employee of the Licensor. No fiduciary or franchise relationship exists between the parties. Neither party shall be liable for any debts, accounts, obligations or other liabilities of the other party, its agents or employees. The Licensee shall have no authority to obligate or bind the Licensor in any manner. The Licensor has no proprietary interest in the Licensee and has no interest in the business of the Licensee, except to the extent set forth in this License Agreement.



11.     Further Assurances. Each party agrees to sign any and all other papers which may be required to effectuate the purpose and intent of this Agreement. Without limiting the foregoing, each party also agrees to execute any and all papers, documents or other instruments which may be found necessary or desirable to effect the exclusive right and license granted to the Licensee hereunder.

12.     Notice. Notices permitted or required to be given hereunder shall be deemed sufficient if given by (i) email; (ii) facsimile; or (ii) registered or certified air mail, with postage prepaid, return receipt requested, and addressed to the respective addresses of the parties written below or at such other addresses as the respective parties may designate by like notice from time to time. Notices so given shall be effective upon (a) receipt by the party to which notice is given, or (b) on the next business day, in the case of notice given by email or by facsimile, and on the fourteenth (14th) business day following the date notice was posted by registered or certified air mail, whichever occurs first:

> If to the Licensor: Heartland Energy Group, Ltd
> > c/o John MacDonald @ jmac@heartlandenergygroup.net
> > OR @   Heartland Energy Group, Ltd.
> > > Suite 15, 1st Floor Oliaji Trade Center, Francis Street,
> > > Victoria, Mahe, Seychelles

> If to the Licensee: Fluid Energy Group. LTD.
> > c/o Clay Purdy @ clay@fluidenergygroup.com
> > #140,214- 11Th Avenue Calgary, Canada T2G 0X8

13.     Binding Effect. The parties hereto acknowledge, agree and declare that this License Agreement is a legal, valid and binding agreement enforceable against each party in accordance with its terms and that this Agreement has been duly executed and delivered on behalf of the parties. Each party represents and warrants that it shall use best efforts in good faith to consummate the transaction.

14.     Successors and Assigns. The parties hereto acknowledge, agree and declare that this Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

15.     Severability. In the event that any of the terms of this Agreement are in conflict with any rule of law or statutory provision or are otherwise unenforceable under the laws or regulations of any government or subdivision thereof, such terms shall be deemed stricken from this Agreement, but such invalidity or unenforceability shall not invalidate any of the other terms of this Agreement and this Agreement shall continue in force, unless the invalidity or unenforceability of any such provisions hereof does substantial violence to, or where the invalid or unenforceable provisions comprise an integral part of, or are otherwise inseparable from, the remainder of this Agreement.

16.     Captions and Headings; Definitions. The captions and headings appearing in this

Agreement are solely for convenience and do not in any way define, limit or describe the scope of this Agreement or the intent or content of any provision thereof. Any capitalized terms not defined in this Agreement will have the meanings given to those terms in the Amended and Restated Manufacturing Agreement between the parties, dated 06/18/2013 (the "Manufacturing Agreement").

17.    Gender and Number. Whenever the context of this Agreement requires, the masculine gender includes the feminine and neuter, and the singular number includes the plural and vice versa.

18.    Assignment. Neither party shall have the right to assign or otherwise transfer its rights and obligations under this Agreement except with the prior written consent of the other party, which consent may not be unreasonably withheld; provided, however, the Licensor shall be entitled to assign any or all of its rights and obligations hereunder to any of its subsidiaries, provided that the Licensor shall remain fully liable for the performance of all its obligations hereunder; and further provided that a successor in interest by merger, by operation of law, assignment, purchase, or otherwise of the entire business of either party shall acquire all rights and obligations of such party hereunder without requirement of the consent of the other party. Any prohibited assignment shall be null and void.

19.    Amendment. This Agreement shall not be deemed or construed to be modified, amended, rescinded, cancelled, or waived, in whole or in part, except by written amendment signed by the parties hereto.

20.    Governing Law. This Agreement shall for all purposes be governed by and construed in accordance with the laws of the State of Florida.

21.    Settlement of Disputes. All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC") by three arbitrators appointed in accordance with said rules. Any arbitration administered by the ICC shall be held in the ICC's Florida, USA office, unless otherwise agreed to by the parties hereto. The award of the arbitrators shall be final and binding and may be confirmed and entered in any court, state or federal, having jurisdiction.  The arbitration shall be conducted in the English language.

22.    Trade Secrets and Competition. In consideration of the execution of this agreement by the Licensor, the Licensee covenants and agrees that it shall not, during or following the term of this agreement, sell, disseminate, disclose, lecture upon, or publish in any manner any confidential information relating to design or manufacturing techniques employed by the Licensor in the production of its products or confidential information relating to research, development, marketing, or sales of products of the Licensor.

The Licensee further covenants and agrees that for two (2) years following the expiration or termination of this Agreement for any reason other than the Licensor's breach, the Licensee will not engage in selling or manufacturing, whether directly or in association with other persons or firms, of any product, process or service, which competes with any Products covered by the

Patents in the Territory.

The Licensor further covenants and agrees that for the Term and for two (2) years following the expiration or termination of this Agreement for any reason other than the Licensee's breach, the Licensor will not engage in selling or manufacturing, whether directly or in association with other persons or firms, of any product, process or service, which competes with any Products covered by the Patents in the Territory, except as permitted by the Manufacturing Agreement.

Any confidential or propriety information disclosed pursuant to this Agreement will be treated as Supplier Information or Manufacture Information, as applicable, and as defined in the Manufacturing Agreement.

23.     Ownership. The Licensor shall own all existing and future right, title and interest in the Patents and all other intellectual property rights inherent therein and all tools, molds and equipment related to the Licensor's products. The Licensee shall own all existing and future right, title and interest in all changes and improvements requested or suggested by the Licensee in the support and maintenance of the Patents with no duty to account.

24.     Prior Agreements. This Agreement supersedes any and all previous license agreements between the parties, whether written or oral, covering the subject matter of this Agreement. Any such previous agreements are null and void.

25.     Force Majeure. If by reason of any act of God, war, strike, walk-out, or other labor trouble, riot, or unavoidable accident, delay of common carrier, embargo, illness of or accident to the principal artists or any of them or senior technicians. or any other causes beyond the parties' control (whether such causes be of a similar or dissimilar nature), the parties or any of the parties' agents or distributors shall be delayed in or prevented from performing any of the provisions of the Agreement, then such delay or failure shall not be deemed to be a breach of this Agreement and no loss or damage shall be claimed by the parties by reason of the delay or failure.

26.     Entire Agreement. This Agreement, including Exhibit A attached hereto and incorporated as an integral part of this Agreement, constitutes the entire Agreement of the parties with respect to the subject matter hereof, and supersedes all previous distributorship agreements by and between the Licensor and the Licensee, as well as all proposals, oral or written, and all negotiations, conversations, or discussions heretofore had between the parties related to this Agreement. The Licensee acknowledges that it has not been induced to enter into this Agreement by any representations or statements, oral or written, not expressly contained herein. There may be other signed, written agreements between the parties and those signed, written agreements are not invalidated by this Section.

27.     Counterparts. This Agreement may be executed in counterparts and may be delivered by facsimile or electronically scanned form. Each such counterpart shall be deemed an original hereof, and all executed counterparts taken together shall constitute one agreement.

IN WITNESS WHEREOF, The parties have executed this Agreement as of the day and year first above written.

Licensor, John MacDonald
Heartland Energy Group, Ltd.

Licensee, Clay Purdy
Fluid Energy Group, Ltd

## Amended and Restated Manufacturing Agreement

THIS MANUFACTURING AGREEMENT (this "**Agreement**"), made this 10th day of October 2012 and AMENDED AND RESTATED this 18th day of June 2013 , by and between Heartland Energy Group Ltd., an entity duly organized under the laws of Seychelles and having its principal place of business at Suite 15, 1st Floor Oliaji Trade Center, Francis Street, Victoria, Mahe, Seychelles, (hereinafter "**SUPPLIER**"), and Fluid Energy Group Ltd, a Limited company duly organized under the laws of Alberta, Canada, and having its principal place of business at #104, 214-11th Avenue SE Calgary, Alberta T2G 0X8 (hereinafter "**MANUFACTURER**").

WHEREAS, SUPPLIER manufactures and markets certain Products and desires to increase the sales of such Products (as defined below);

WHEREAS, MANUFACTURER has represented that it possesses the necessary expertise and marketing organization to promote, market, manufacture, and blend such Products; and

WHEREAS, SUPPLIER is willing to appoint MANUFACTURER and MANUFACTURER is willing to accept such appointment as the exclusive manufacturer of the Products in the Territory defined herein;

NOW, THEREFORE, in consideration of the mutual premises and covenants hereinafter set forth, the Parties agree as follows:

### ARTICLE 1
### DEFINITIONS

For purposes of this Agreement, the following words, terms and phrases, where written with an initial capital letter, shall have the meanings assigned to them in this Article 1 unless the context otherwise requires:

1.1    **Effective Date.** "Effective Date" shall mean the date first above written.

1.2    **Field Test.** "Field Test" shall mean to try-out, experiment with or otherwise test the application and saleability of the Products in jurisdictions outside the Territory, including the Expansion Territory, **for** the purpose of territory expansion.

1.3    **Fiscal and/or Calendar Year.** "Fiscal and/or Calendar Year" shall mean the twelve-month period commencing on January 1st of each year following the Effective Date of this Agreement and each consecutive twelve-month period thereafter.

1.4    **Manufacture.**  "Manufacture" shall mean the ability to take raw and/or concentrated materials to create proprietary blends exclusive to MANUFACTURER for the Territory.

1.5    **MANUFACTURER Information.**  "MANUFACTURER Information" shall mean all non-public information, other than information in published form or expressly

Initials
Clay Purdy
John MacDonald

designated by MANUFACTURER as non-confidential, which is directly or indirectly disclosed to SUPPLIER, regardless of the form in which it is disclosed, relating in any way to MANUFACTURER'S markets, customers, products, patents, inventions, procedures, methods, designs, strategies, plans, assets, liabilities, costs, revenues, profits, organization, employees, agents, distributors, or business in general.

1.6 **MANUFACTURER Wholesale Prices.** "MANUFACTURER Wholesale Prices" shall mean the fixed prices quoted by SUPPLIER for sales of Products to as set forth in Exhibit 0 hereto, which fixed prices may be adjusted by SUPPLIER once per Calendar Year by no more than [2%] upon thirty (30) days' prior written notice to MANUFACTURER and which are deemed confidential and trade secret.

1.7 **New Products.** "New Products" shall mean [any product created, conceived or developed by SUPPLIER after the Effective Date.]

1.8 **Market.** "Market" shall mean to sell and/or promote, advertise, distribute, or market for the purposes of a sale, and "Marketing" shall have a corresponding meaning.

1.9 **Parties.** "Parties" shall mean MANUFACTURER and SUPPLIER, and "Party" shall mean either one of them.

1.10 **Products.** "Products" shall mean those products described in Exhibit A hereto, which will be deemed, as and when applicable, to include New Products, as that term is defined in Section 2.3.

1.11 **Purchase Order.** "Purchase Order" shall mean the document required to process orders for Products under Article 4, which is substantially in the form attached in Exhibit G hereto.

1.12 **Quota.** "Quota" shall mean the minimum quantities of Products that MANUFACTURER and its subsidiaries shall be expected to purchase from SUPPLIER in accordance with the terms and conditions of Article 5 of this Agreement.

1.13 **SUPPLIER Information.** "SUPPLIER Information" shall mean all non-public information, other than information in published form or expressly designated by SUPPLIER as non-confidential, which is directly or indirectly disclosed to MANUFACTURER or embodied in Products provided hereunder, regardless of the form in which it is disclosed, relating in any way to SUPPLIER'S markets, customers, products, patents, inventions, procedures, methods, designs, strategies, plans, assets, liabilities, costs, revenues, profits, organization, employees, agents, distributors, or business in general.

1.14 **Territory.** "Territory" shall mean the area specifically described in Exhibit B hereto.

Initials:
Clay Purdy
John MacDonald

## ARTICLE 2
## APPOINTMENT

2.1   **Scope.**  SUPPLIER hereby appoints MANUFACTURER and any Fluid owned facility, and MANUFACTURER hereby accepts appointment, as exclusive manufacturer of the Products during the term of this Agreement in the Territory. As the exclusive manufacturer, MANUFACTURER shall have the right to Manufacture and Market Products in the Territory, under SUPPLIER'S and/or MANUFACTURERS name, logotypes and trademarks, subject to all the terms and conditions of this Agreement, for **oil and gas industry** applications exclusively; and non-exclusively for the following applications (a) industrial and municipal water treatment; (b) mining; (c) agriculture; (d) pulp & paper; (e) retail markets; (f) industrial applications; and (g) food processing. MANUFACTURER agrees not to Manufacture or Market Products for any other application unless approved by SUPPLIER. The term "exclusive" as used in this Section 2.1 means that the rights granted to MANUFACTURER in this Section 2.1 are to the exclusion of all other persons and entities, except SUPPLIER in respect of those customers listed in Exhibit C hereto. SUPPLIER represents and warrants to MANUFACTURER that (i) except for the exclusive appointment granted in this Section 2.1 and the option applicable in Section 2.3, SUPPLIER has not granted any other license, right or appointment to import and/or Market the Products in the Territory, and (ii) SUPPLIER has not granted, and will not grant, to any other entity any license, right or appointment to import and/or Market the Products in the Expansion Territory.

2.2   **Prior Agreements.**   This Agreement supersedes any and all previous manufacturing agreements between the Parties, whether written or oral, covering the subject matter of this Agreement. Any such previous agreements are null and void.

2.3   **New Products.**  MANUFACTURER shall have first right of refusal to the exclusive rights to Manufacture and Market all and any New Products of SUPPLIER and shall exercise such right within 45 days of notice to MANUFACTURER, by SUPPLIER if MANUFACTURER so chooses to obtain said rights.

2.4   **Sub-Distributors.**  MANUFACTURER shall have the right to retain and appoint affiliates and/or sub-distributors ("**Agents**") to Market the Products for use solely within the Territory, and MANUFACTURER shall cause such Agents to perform the applicable obligations of MANUFACTURER under this Agreement or shall otherwise ensure that such obligations are performed by MANUFACTURER. Further, notwithstanding any such appointments, MANUFACTURER shall at all times remain fully liable for the performance of its Agents and MANUFACTURER hereby agrees to indemnify and hold harmless SUPPLIER from all damages, losses, costs, or expenses arising in any manner from any act or omission on the part of its Agents in performing MANUFACTURER'S obligations under this Agreement, excluding the right for agents to manufacturer said Products, so long as MANUFACTURER provided SUPPLIER written notice 45 days prior to appointing such said sub and SUPPLIER granted MANUFACTURER the said rights to MANUFACTURER'S sub, in writing and made a part hereto.

Initials:
Clay Purdy
JohnMacDonald

2.5   **Sales outside the Territory**.   MANUFACTURER shall not Market Products outside the Territory without the prior written consent from SUPPLIER, provided however that SUPPLIER'S consent shall not be required by MANUFACTURER in order to Field Test the Products, for a period of not more than six (6) months.

2.6   **Reserved Sales Rights**.   Notwithstanding any other provision of this Agreement, SUPPLIER reserves the right to Market Products under SUPPLIER'S name, logotypes and trademarks directly to any of the customers listed, as of the Effective Date, in Exhibit C hereto. No amendment to Exhibit C shall be made without the prior written consent of MANUFACTURER.

SUPPLIER agrees not to knowingly make any direct sale or to Market any Products to any entity based in the Territory that is not listed in Exhibit C, and SUPPLIER will work to prevent channel conflict. However, MANUFACTURER hereby acknowledges that SUPPLIER and its authorized distributors are Marketing, or are or attempting to Market, products other than the Products to entities that conduct business nationally and internationally. Accordingly, SUPPLIER may now, or may in the future, conduct business in the Territory, provided such business does not include Marketing Products to any entities that are not listed as customers in Exhibit C hereto.

2.7   **Unauthorized Marketing**.   SUPPLIER shall take all reasonable and prudent actions to ensure that Products do not enter the Territory, and shall include in any contracts with distributors outside the Territory terms and conditions that (i) prohibit the import of Products into the Territory and (ii) prohibit the sale of Products to third parties known to participate in the import into the Territory of competing products ("**Prohibited Sales**"). MANUFACTURER shall have the right to an indemnity claim for damages in the event (i) SUPPLIER does not cure such Prohibited Sales within thirty (30) days of MANUFACTURER'S written notice of the Prohibited Sales, or (ii) that such Prohibited Sales cannot be cured within such thirty (30) day period and SUPPLIER has commenced good faith efforts to cure such Prohibited Sales within such period, the Prohibited Sales are not cured within two (2) months of MANUFACTURER'S written notice of the Prohibited Sales. If SUPPLIER fails to remedy the Prohibited Sales, SUPPLIER shall quantify the volume of Product sales that MANUFACTURER has lost due to such Prohibited Sales (the "**Lost Sales**"), and the quantum of damages that MANUFACTURER is entitled to claim hereunder as indemnity will be equal to the Lost Sales in the Territory multiplied by the difference between the MANUFACTURER Wholesale Price and the average price otherwise paid by customers in the Territory under the Prohibited Sales.

2.8   **Manufacturer Certification**.   MANUFACTURER hereby certifies and warrants to SUPPLIER that neither it nor any of its officers, directors, or senior officials have ever been indicted or convicted for violation of any felony criminal law of the Territory, and that it and its officers, directors, and senior officials are or will be eligible to represent SUPPLIER in the Territory and to deal with any agency or instrumentality of the Canadian government and the government of the Territory.

2.9   **SUPPLIER'S Assistance**.   SUPPLIER will, at least one time during each twelve-month period if requested by MANUFACTURER, send a representative to MANUFACTURER

Initials:
Clay Purdy
JohnMacDonald

to assist in training MANUFACTURER and/or its employees in regard to the Products, to verify quality control measures and to offer assistance protecting the Manufacturing process through the registration of specific country patents held by either Party.

2.10   **No Unauthorized Testing.**   SUPPLIER hereby agrees that it shall provide necessary test results from third-party laboratories approved by SUPPLIER as deemed necessary by SUPPLIER for the Marketing of the Products. SUPPLIER shall provide this data to MANUFACTURER as needed to perform its duties under this Agreement.

Costs associated with any testing requested by MANUFACTURER and approved by SUPPLIER shall be borne exclusively by MANUFACTURER, unless otherwise agreed to in writing by SUPPLIER. Costs of testing conducted at the instance of SUPPLIER shall be borne exclusively by SUPPLIER.

### ARTICLE 3
### GENERAL OBLIGATIONS OF MANUFACTURER

3.1   **Marketing.**   MANUFACTURER shall have the following obligations with respect to the Marketing of SUPPLIER Products:

(a)   To use commercially reasonable efforts to further the Marketing of Products in the Territory;

(b)   Subject to SUPPLIER'S timely delivery of Products or raw manufacturing products, to maintain an adequate and balanced inventory of Products;

(c)   To promptly respond to all inquiries from customers, including complaints, process all orders, and effect all shipments of Products;

(d)   To diligently investigate all leads with respect to potential customers referred by SUPPLIER;

(e)   Upon prior written notice, to permit SUPPLIER to visit MANUFACTURER'S place of business and inspect its inventories, service records, quality control measures, and other relevant documents during regular hours on regular business days; including but not limited to raw material purchases and/or product sales records.

(f)   To maintain throughout the Territory an adequate sales force to Market SUPPLIER'S Products, as determined solely by MANUFACTURER.

3.2   **Competitive Goods.**   During the term of this Agreement, neither Party shall Manufacture or Market, directly or indirectly, any products within the Territory that are an alternative to, or compete directly or indirectly with, the Products listed in Exhibit **Error! Reference source not found.** hereto. SUPPLIER acknowledges that acids and bases are common in MANUFACTURER'S existing business lines and while these products are not a focus for ongoing sales efforts of MANUFACTURER, they may be sold as part of ongoing business.

Initials:

Clay Purdy
John MacDonald

3.3   **Expenses**.   Except where otherwise indicated herein, MANUFACTURER assumes full responsibility for all costs and expenses it incurs in carrying out its obligations under this Agreement, including but not limited to all equipment, materials, rentals, salaries, commissions, advertising, demonstration, samples, travel, and accommodation expenses without the right to reimbursement for any portion thereof from SUPPLIER.

## ARTICLE 4
## ORDERS FOR PRODUCTS

4.1   **Purchase Orders**.   MANUFACTURER shall submit Purchase Orders for the Products to SUPPLIER in writing by mail, email or facsimile. SUPPLIER shall have the right to reject any Purchase Order that is not in a form substantially similar to the form currently in use.

4.2   **Acceptance of Orders**.   All Purchase Orders from MANUFACTURER are subject to acceptance in writing by SUPPLIER at its principal offices in the U.S.A., which acceptance shall be delivered to MANUFACTURER by mail to a regularly established post office, or by email or facsimile. Each Purchase Order shall be deemed to be an offer by MANUFACTURER to purchase the Products pursuant to the terms of this Agreement and, when accepted by SUPPLIER as hereinabove provided, shall give rise to a contract under the terms set forth herein to the exclusion of any additional or contrary terms set forth in the Purchase Order.

4.3   **Delivery Terms**.   MANUFACTURER shall bear all costs and obligations regarding freight, delivery, shipping and logistics responsibilities

4.4   **Modification of Orders**.   No accepted Purchase Order shall be modified or cancelled, except upon the written agreement of both Parties. MANUFACTURER'S Purchase Orders or mutually agreed change orders shall be subject to all of the provisions of this Agreement, whether or not the Purchase Order or change order so states.

4.5   **Product Changes**.   SUPPLIER reserves the right, in its sole discretion and without incurring any liability to MANUFACTURER, to:

      (a)   Alter the specifications of any Product;

      (b)   Discontinue the development of any New Product, whether or not such product has been announced publicly; or

      (c)   Commence the manufacture of New Products having features that make any Product wholly or partially obsolete and if so commenced, MANUFACTURER will be granted rights in respect of such New Products in accordance with Section 2.3 above.

      Notwithstanding the above, SUPPLIER shall provide MANUFACTURER with twelve (12) months' prior written notice for discontinued or obsolete products of such decisions and shall fill all accepted Purchase Orders from MANUFACTURER for any such altered Products of which manufacturing and commercial deliveries have commenced (**"Placed Orders"**). In respect of any Placed Orders, MANUFACTURER shall have the option to substitute any New Product for an altered Product, to the extent New Products are available and

Initials:
Olay Purdy
JohnMacDonald

are appropriate substitutes for any such altered Products.  MANUFACTURER may reject any alteration made pursuant to Section 4.5(a) to the extent such alteration results in altered Product that is not substantially equivalent to the previous Product or increases MANUFACTURER'S expenses in any way.

## ARTICLE 5
## MINIMUM PURCHASE REQUIREMENTS

5.1    **Achievement of Quota.**  MANUFACTURER understands and agrees that the establishment and achievement of the Quota is one of the key terms of this Agreement. MANUFACTURER and its affiliates agree to use reasonable commercial efforts to meet the Quota for each Calendar Year. The Parties agree the Quota for the total Products purchased by MANUFACTURER under this Agreement and the Amended and Restated Manufacturing Agreement between Fluid Energy Group Ltd and SUPPLIER, dated 06/18/2013, shall be one million United States dollars (US$1,000,000.00).

5.2    **Failure to Meet Quota.**  In the event MANUFACTURER fails to meet the Quota for any Calendar Year, MANUFACTURER may, within forty-five (45) days of the end of such Calendar Year, either (a) make a payment to SUPPLIER equal to the shortfall of such Quota to maintain the exclusive rights with respect to oil and gas industry applications as set forth in Section 2.1 or (b) notify SUPPLIER that MANUFACTURER no longer desires exclusive rights with respect to oil and gas industry applications as set forth in Section 2.1.    If MANUFACTURER provides SUPPLIER with such notice, the Quota shall be reduced to zero for the remainder of the term and MANUFACTURER will have non-exclusive rights with respect to oil and gas industry applications as set forth in Section 2.1 for the other non-exclusive applications. If MANUFACTURER fails to make an election within forty-five (45) days of the end of a Calendar Year in which MANUFACTURER has failed to meet the Quota, MANUFACTURER will be deemed to have chosen option (b) set forth in this Section 5.2.

5.3    **Year three (3) and until any related Patents expire or are deemed to be invalid, MANUFACTURER and SUPPLIER will negioate and agree upon the new years annual Quota, within 30 days of the prior years end.**

## ARTICLE 6
## PRICES AND PAYMENTS

6.1    **Prices.**  The prices to be paid by MANUFACTURER for Products purchased pursuant to this Agreement shall be MANUFACTURER Wholesale Prices, which are attached hereto as an Exhibit. All MANUFACTURER Wholesale Prices are D.A.T., named place of destination to be determined by MANUFACTURER and include packing in accordance with SUPPLIER'S standard commercial export practices in effect at the time of shipment. Special packing or handling shall be at the sole expense of MANUFACTURER and will be handled pursuant to Exhibit D hereto.

6.2    **Price Changes.**  Increases to the MANUFACTURER Wholesale Prices for all Products shall not apply to Placed Orders made prior to the effective date of the

Initials:
Clay Purdy
JohnMacDonald

MANUFACTURER Wholesale Price increase. Decreases in the MANUFACTURER Wholesale Prices for all Products shall be effective immediately upon written notice thereof to MANUFACTURER and such decreases shall be applied to all Placed Orders not yet filled or delivered. SUPPLIER shall give MANUFACTURER thirty (30) days prior written notice of any changes to the MANUFACTURER Wholesale Prices.

6.3     **Payment Terms.** All payments hereunder that are by open account shall be due net thirty (30) days from the date of arrival of the Products; payments in respect of such charges as taxes, duties, interest, or like special charges, shall be due net thirty (30) days from the date of invoice. All payments hereunder shall be payable to the bank or banks specified by SUPPLIER in writing from time to time and shall be made in U.S. dollars. In the event of any dispute arising over any part of an invoice or the total amount due under an invoice, all undisputed amounts shall be promptly paid by MANUFACTURER in accordance with this Section 6.3.

6.4     **Resale Prices.** MANUFACTURER may resell Products at such prices, as MANUFACTURER, in its sole discretion, shall determine.

6.5     **Overdue Payments.** If and for so long as any payment from MANUFACTURER to SUPPLIER under this Agreement shall be overdue, interest at the rate of eight percent (8.0%) per annum shall automatically become due on all overdue balances outstanding.

## ARTICLE 7
## ACCEPTANCE AND WARRANTY

7.1     **Acceptance of Products.** In the event of any shortage, damage, or discrepancy in or to a shipment of Products, MANUFACTURER shall promptly report the same to SUPPLIER and furnish any relevant documents or other evidence that SUPPLIER may deem appropriate. SUPPLIER shall not be liable for any such shortage, damage, or discrepancy unless SUPPLIER has received notice and substantiating evidence thereof from MANUFACTURER within thirty (30) days of MANUFACTURER becoming aware of such shortage, damage or discrepancy. If the substantiating evidence delivered by MANUFACTURER reasonably demonstrates that SUPPLIER is responsible for such shortage, damage or discrepancy, SUPPLIER shall promptly deliver additional Products (or substitute Products of the same type and quality) at no additional cost to MANUFACTURER in accordance with the delivery procedures set forth herein.; provided that in no event shall SUPPLIER be liable for any additional costs, expenses or damages incurred by MANUFACTURER, directly or indirectly, as a result of such shortage, damage or discrempancy in or to a shipment.

7.2     **Product Warranty.** SUPPLIER warrants for a period of six (6) months after the date of delivery in accordance with Section 4.3 hereof (the "**Warranty Period**") that the Products are fit for the use intended, and shall be free from defects in design, material and workmanship, and SUPPLIER shall provide MANUFACTURER with a certificate of analysis report for each delivery of Product. SUPPLIER'S sole obligation in the event of a breach of such warranty shall be to provide, at no charge to MANUFACTURER, replacement Products for all defective Products. SUPPLIER warrants, during the term of this Agreement and for six (6) months thereafter, that the Products and any specifications or instructions provided by

Initials:
Clay Purdy
JohnMacDonald

SUPPLIER do not infringe or misappropriate the intellectual property of any third party. All costs of shipment of the replacement Products to MANUFACTURER shall be borne by SUPPLIER. MANUFACTURER shall retain all replaced Products subject to the foregoing warranty for SUPPLIER'S inspection for a period of six (6) months after their replacement. All such replaced Products shall become the property of SUPPLIER upon their replacement and all costs of shipment of the defective Products back to SUPPLIER shall be borne by SUPPLIER.

7.3     **Notice.** Warranty claims hereunder must: (i) be made promptly and in writing; (ii) must recite the nature and details of the claim, the date the cause of the claim was first observed and the serial number of the Product concerned; and (iii) must be received by SUPPLIER no later than fifteen (15) days after the expiration of the Warranty Period provided for in Section 7.2 above. Provided the warranty claim complies with the provisions of this Section 7.3, such warranty claim can be made by MANUFACTURER via email correspondence to SUPPLIER.

7.4     **Excluded Claims.** SUPPLIER shall have no obligation under Section 7.2 above in the event that:

(a)     Repair or replacement of Products shall have been required through normal wear and tear or necessitated in whole or in part by force majeure as defined in Section 15.1 below, or by the fault or negligence of MANUFACTURER or its customers; or

(b)     The Products (i) have not been properly used, maintained or repaired in accordance with SUPPLIER'S applicable operating and/or maintenance manuals, whether by MANUFACTURER or its customers, or (ii) have been modified in any manner without the prior written consent of SUPPLIER and such modification is the sole cause of the defect that is the subject of the warranty claim.

(c)     All and any raw materials purchases by MANUFACTURER, and all and any products manufactured by MANUFACTURER.

7.5     **Limited Warranty.** The warranties set forth in this Article 7 are intended solely for the benefit of MANUFACTURER or any permitted assignees. All claims hereunder shall be made by MANUFACTURER and may not be made by MANUFACTURER'S customers. THE WARRANTIES SET FORTH ABOVE ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, UNDER COMMON LAW OR STATUTE, WHICH ARE HEREBY DISCLAIMED AND EXCLUDED BY SUPPLIER, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE AND ALL OBLIGATIONS OR LIABILITIES ON THE PART OF SUPPLIER FOR DAMAGES ARISING OUT OF OR IN CONJUNCTION WITH THE USE, REPAIR, OR PERFORMANCE OF THE PRODUCTS.

7.6     **International Sale of Goods.** Notwithstanding any other term or condition of this Agreement, the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

Initials
Clay Purdy
John MacDonald

## ARTICLE 8
## LIMITATION OF REMEDIES

MANUFACTURER understands and agrees as follows:

8.1    **Delay.**   SUPPLIER shall not be liable for any loss or damage caused by delay in furnishing Products and services or any other performance under or pursuant to this Agreement, except to the extent any loss or damage is due to SUPPLIER'S gross negligence or willful misconduct.

8.2    **Sole Remedies.**   The sole and exclusive remedies for breach of any and all warranties and the sole remedies for SUPPLIER'S liability of any kind (including liability for negligence) with respect to the Products covered by this Agreement and all other performance by SUPPLIER under or pursuant to this Agreement shall be limited to the remedies provided in Section 7.2, Product Warranty.

8.3    **Consequential Damages.**   In no event shall either Party's liability of any kind include any punitive and exemplary damages and any special, indirect, incidental, or consequential losses or damages, even if a Party shall have been advised of the possibility of such potential loss or damage.

## ARTICLE 9
## CUSTOMS & GOVERNMENTAL APPROVALS

9.1    **Duties.**   Notwithstanding any provision to the contrary in this Agreement, MANUFACTURER shall bear and pay directly to the relevant authorities any customs duties, tariffs, import taxes, or other charges, expenses or fees (including any interest or penalties, fines, fees resulting from MANUFACTURER'S failure to report or file any necessary documentation with the appropriate governmental authorities) relating in whole or in part to the importation of the Products.

9.2    **Compliance with Customs Regulations and Procedures.**   SUPPLIER, as the exporter of record, shall strictly comply with all applicable requirements and procedures of any governmental authorities, including relevant customs authorities, to obtain customs clearance for the exportation of the Products. SUPPLIER shall also, and without any extra cost, support MANUFACTURER with (including but not limited to) completing any necessary documentation and liaising with customs authorities as required to obtain customs clearance for the import of the Products into the Territory.

9.3    **Import and Export Licence Requirements.**   MANUFACTURER shall be, or, if MANUFACTURER appoints a customs broker or agent then Manufacturer shall cause such customs broker or agent to be, responsible for identifying and obtaining in its own name any import licences required. SUPPLIER shall, as and where necessary, support and assist MANUFACTURER by providing any information required to complete and obtain such licences. SUPPLIER shall be responsible for clearing the Products for export, including obtaining all export licences as may be required.

Page 10 of 26

Initials:
Clay Purdy
John MacDonald

9.4    **Customs Clearance into Territory**.    MANUFACTURER shall be, or, if MANUFACTURER appoints a customs broker or agent then MANUFACTURER shall cause such customs broker or agent to be, responsible for preparing and issuing the documents required for the importation of the Products and customs clearance therefor and shall submit in due time to customs authorities any documents so required.

9.5    **Co-ordination and Interface with Customs Authorities**.    As and where necessary, and without any extra cost, SUPPLIER shall assist MANUFACTURER with any requirements of customs authorities in order to complete the importation of the Products in the most efficient manner, and SUPPLIER shall make available to MANUFACTURER the country of origin or manufacture of foreign inputs included or to be included in the Products.

## ARTICLE 10
## CONFIDENTIALITY

MANUFACTURER acknowledges and agrees that all SUPPLIER Information is confidential and proprietary to SUPPLIER. MANUFACTURER agrees not to use any of such SUPPLIER Information during the term of this Agreement and for a period of twenty (20) years thereafter for any purpose other than as permitted or required for performance by MANUFACTURER hereunder.

Except in respect of disclosure made to a *bona fide* transferee or financier of MANUFACTURER, MANUFACTURER further agrees not to disclose or provide any of such SUPPLIER Information to any third party and to take all necessary measures to prevent any such disclosure by its employees, agents, contractors, or consultants during the term hereof and for a period of twenty (20) years thereafter. In the event MANUFACTURER is required to disclose SUPPLIER Information to a *bona fide* transferee or financier, MANUFACTURER shall cause such *bona fide* transferee or financier to execute a non-disclosure agreement, and receive prior written approval from SUPPLIER, the terms of which substantially comply with this Article **10**. Nothing herein shall prevent MANUFACTURER from using, disclosing, or authorizing the disclosure of any SUPPLIER Information that is, or hereafter becomes, part of the public domain or where such disclosure is required by applicable law or the rules of an applicable stock exchange.

SUPPLIER acknowledges and agrees that all MANUFACTURER Information is confidential and proprietary to MANUFACTURER. SUPPLIER agrees not to use any of such MANUFACTURER Information during the term of this Agreement and for a period of twenty (20) years thereafter for any purpose other than as permitted or required for performance by SUPPLIER hereunder or where such disclosure is required by applicable law or the rules of an applicable stock exchange.

Except in respect of disclosure made to a *bona fide* transferee or financier of SUPPLIER, SUPPLIER further agrees not to disclose or provide any of such MANUFACTURER Information to any third party and to take all necessary measures to prevent any such disclosure by its employees, agents, contractors, or consultants during the term hereof and for a period of twenty (20) years thereafter. In the event SUPPLIER is required to disclose MANUFACTURER

Initials:
Clay Purdy
JohnMacDonald

Information to a *bona fide* transferee or financier, SUPPLIER shall cause such *bona fide* transferee or financier to execute a non-disclosure agreement, and receive prior written approval from MANUFACTURER, the terms of which substantially comply with this Article 10. Nothing herein shall prevent SUPPLIER from using, disclosing, or authorizing the disclosure of any MANUFACTURER Information that is, or hereafter becomes, part of the public domain or where such disclosure is required by applicable law or the rules of an applicable stock exchange.

Notwithstanding anything to the contrary in this Agreement, the obligations set forth in this Article 10 do not apply to any information that (a) was publicly available, or that subsequently becomes publicly available, except by the wrongful disclosure by the receiving party; (b)` was in the receiving party's possession prior to receipt of such information pursuant to this Agreement; (c) was received from a third party who was not known by the receiving party to be under any obligation of confidentiality with respect to such information; (d) has been independently developed by the receiving party; (e) is furnished by the disclosing party to a third party without restriction on the third party's right of disclosure; (f) is approved in writing for release by the disclosing party; or (g) is required to be disclosed by law. This Article 10 shall survive any termination of this Agreement.

## ARTICLE 11
## INTELLECTUAL PROPERTY

11.1   **Use of Intellectual Property**.  SUPPLIER hereby grants to MANUFACTURER (and any approved Agent) an exclusive (in respect of the Territory), non-transferable, and royalty-free right and license to use SUPPLIER'S trademarks, trade names, designs, logos, and copyrights that relate to the Products in connection with the Marketing and maintenance of the Products for so long as they are used by MANUFACTURER in accordance with SUPPLIER'S standards, specifications, and instructions, but in no event beyond the term of this Agreement.

Upon five (5) days' prior written notice, which notice may be made by email correspondence, MANUFACTURER shall afford SUPPLIER reasonable opportunities during the term hereof to inspect and monitor the activities of MANUFACTURER in order to ensure MANUFACTURER'S use of the trademarks, trade names, designs, logos, and copyrights are in accordance with SUPPLIER'S standards and instructions. MANUFACTURER shall acquire no right, title, or interest in SUPPLIER'S trademarks, trade names, designs, logos, and copyrights other than the limited license granted in this Section 11.1, and MANUFACTURER shall not use any of SUPPLIER'S trademarks, trade names, designs, logos, and copyrights as part of MANUFACTURER'S corporate or trade name or permit any third party to do so without the prior written consent of SUPPLIER

11.2   **Patent(s)/Technology**.  SUPPLIER shall attach hereto as Exhibit 0 and marked as *__HIGHLY CONFIDENTIAL__*, an Amended and Restated License Agreement pursuant to which SUPPLIER licenses certain patents and technology to MANUFACTURER (the "**License Agreement**"). The License Agreement shall be bound by the Territories contained herein and that may be attached hereto as an Exhibit. MANUFACTURER and SUPPLIER agree that due to the Highly Confidential nature of the contents of the License Agreement, Exhibit 0 shall be held in the **Highest Confidential** nature and shall not be provided to, discussed in whole or part with

Initials:

Clay Purdy
JohnMacDonald

any persons, entity, or party to this Agreement except for those direct officers of MANUFACTURER and SUPPLIER as initially set forth in Exhibit 0 and that may be amended, from time to time, in writing and agreed to by both MANUFACTURER and SUPPLIER.

11.3   **Registration.** SUPPLIER shall use its best efforts to register its trademarks, trade names, designs, logos, patents, and copyrights in such jurisdictions within the Territory in which SUPPLIER determines that registration is necessary or useful to the successful distribution or proprietary protection of the Products. In addition, in the event SUPPLIER believes that it is advisable to affect any filing or obtain any governmental approval or sanction for the use by MANUFACTURER of any of SUPPLIER'S trademarks, trade names, designs, logos, patents, and copyrights pursuant to this Agreement, the Parties shall fully cooperate in order to do so. All expenses relating to the registration of SUPPLIER'S trademarks, trade names, designs, logos, patents, and copyrights in the Territory, as well as the making of any filing or obtaining any governmental approvals for the use by MANUFACTURER of SUPPLIER'S trademarks, trade names, designs, logos, patents, and copyrights shall be borne by SUPPLIER.

11.4   **Infringements.** MANUFACTURER shall promptly notify SUPPLIER of any use of which it becomes aware, by any third party (which does not include any approved Agent) of SUPPLIER'S trademarks, trade names, designs, logos, patents, and copyrights or any use by such third parties of similar marks which may constitute an infringement or passing off of SUPPLIER'S trademarks, trade names, designs, logos, patents, and copyrights. SUPPLIER reserves the right, in its sole discretion, to institute any proceedings against such third party infringers and MANUFACTURER shall refrain from doing so; provided, however, if SUPPLIER elects not to institute such proceedings within thirty (30) days of notice of such infringement or use, (i) SUPPLIER hereby assigns all rights in such cause of action to MANUFACTURER; (ii) MANUFACTURER may take those steps which, in its sole discretion, are necessary to enforce its right; and (iii) SUPPLIER shall do such acts and assist and supply such information as are reasonably necessary or desirable in relation thereto. Regardless of the party instituting such proceeding, (a) MANUFACTURER shall be entitled to all damages related to any infringement of such intellectual property in the Territory, less the cost of procecution paid by Licensor along with royalty fees related to the infrindging sales and (b) MANUFACTURER may elect to engage legal counsel of its own choosing, at MANUFACTURER'S sole expense. Each Party agrees to cooperate fully with the Party that has taken action or instituted a proceeding against such third parties, provided that all expenses of such action shall be borne by the Party instituting the proceeding.

## ARTICLE 12
## PATENTS

SUPPLIER shall have no liability whatsoever to MANUFACTURER with respect to any patent infringement or claim thereof which is based upon or arises out of: (i) the use of any Product in combination with an apparatus or device not manufactured or supplied by SUPPLIER, if such combination causes or contributes to the infringement; (ii) the use of any Product in a manner for which it was neither designed nor contemplated; or (iii) any modification of any Product by MANUFACTURER or any third party which causes the Product to become infringing. This Article 12 shall survive the termination of this Agreement. The patent owner (s)

Initials:
Clay Purdy
John MacDonald

will take all appropriate action against any infringements brought to its attention by MANUFACTURER to protect MANUFACTURER'S Territory and interests under this Agreement to the best of its ability.

## ARTICLE 13
### TAXES

MANUFACTURER shall be solely responsible for and shall pay for all taxes, duties, import deposits, assessments, and other governmental charges, however designated, which are now or hereafter imposed under or by any governmental authority or agency, that relate to the import and sale of the Products in the Territory in accordance with then prevailing local laws or regulations of the Territory.

Each Party shall be liable for and shall indemnify and hold the other Party harmless from and against: (i) any and all taxes on income, profits or gain imposed by any governmental or taxing authority in respect of this Agreement; and (ii) any and all claims (including payment of taxes, interest and penalties) that may be brought against or suffered by a Party or that a Party may sustain, pay or incur in conjunction with the foregoing as a result of the failure by the other Party to pay any and all taxes imposed as stated herein.

All payments to be made by MANUFACTURER to SUPPLIER pursuant to this Agreement represent gross amounts SUPPLIER is entitled to receive and may be subject to required governmental deductions. In the event any payments owed to SUPPLIER under this Agreement become subject to withholding for taxes, duties, assessments, or fees of whatever kind or nature levied outside the United States, MANUFACTURER shall have the right to make such withholding and to pay SUPPLIER the net amounts without application of a gross up.

## ARTICLE 14
### TERM AND TERMINATION

14.1    **Term.**  This Agreement shall be for a twenty three (23) year term beginning on the date listed in the first line of this Agreement. The Parties may, by mutual agreement in writing, agree to renew this Agreement at the end of its term.

14.2    **Termination.**  Notwithstanding the provisions of Section 14.1 above, this Agreement may be terminated in accordance with the following provisions:

(a)    Either Party hereto may terminate this Agreement at any time by giving notice in writing to the other Party, which notice shall be effective upon dispatch, should the other Party file a petition of any type as to its bankruptcy, be declared bankrupt by a court of competent jurisdiction, become insolvent, make an assignment for the benefit of its creditors, go into liquidation or receivership, or otherwise lose legal control of its business, or should the other Party or a substantial part of its business come under the control of any third party receiver (each such event hereinafter a "**Bankruptcy Event**");

Page 14 of 26

Initials

Clay Purdy
JohnMacDonald

(b)     Either Party may terminate this Agreement by giving notice in writing to the other Party should an event of Force Majeure, as provided in Section 15.5 below, continue for more than six (6) consecutive months;

(c)     Either Party may terminate this Agreement by giving notice in writing to the other Party in the event the other Party is in material breach of this Agreement and shall have failed to cure such breach within thirty (30) days of receipt of written notice thereof from the notifying Party;

14.3    **Partial Termination.**  In the event (i) MANUFACTURER shall have the right pursuant to Section 14.2(a) above or (ii) either Party shall have the right pursuant to Sections 14.2(b) or 14.2(c) above, to terminate this Agreement in its entirety, such terminating Party may elect to terminate this Agreement solely as it applies to any specific country or countries within the Territory upon providing the other Party with the notice required by the applicable termination provision or **30 days** prior written notice, whichever is greater.

14.4    **Termination for a Bankruptcy Event.**  In the event MANUFACTURER terminates this Agreement under Section 14.2(a) above due to a Bankruptcy Event of SUPPLIER, MANUFACTURER shall be entitled, at its option, to either or both of the following rights:

(a)     MANUFACTURER shall, to the extent permitted by law, have the first right and option to purchase any or all of the trademarks, trade names, designs, logos, patents, and copyrights related to the Products at fair market value;

(b)     MANUFACTURER shall have the right to continue to use and benefit from the license granted by SUPPLIER under Section 11.1 of this Agreement, which right shall continue in accordance with the terms of this Agreement and shall not otherwise be affected by any Bankruptcy Event proceeding against SUPPLIER.

14.5    **General Rights and Obligations on Termination.**  In the event of termination of this Agreement, the Parties shall have the following rights and obligations:

(a)     Termination of this Agreement shall not release either Party from any obligations then due;

(b)     SUPPLIER shall have the right, at its option, to (i) cancel any or all accepted Purchase Orders which provide for delivery after the effective date of termination, and/or (ii) repurchase any part or all of MANUFACTURER'S inventory of Products in MANUFACTURER'S possession as of the termination date at SUPPLIER'S invoiced price to MANUFACTURER for such Products, plus freight to the original D.A.T. named place of destination. SUPPLIER shall exercise its option under this subsection by notifying MANUFACTURER in writing no later than thirty (30) days after the effective termination date. Any and all inventory of Products that SUPPLIER does not elect to repurchase upon termination shall remain property of MANUFACTURER and MANUFACTURER shall have the right to

Page 15 of 26

Initials:
Clay Purdy
John MacDonald

Manufacture and Market such Products. For clarity, such Product inventory may be sold after the effective date of Termination;

(c)    MANUFACTURER'S obligations pursuant to Article 9 shall survive termination of this Agreement, as shall SUPPLIER'S obligations pursuant to Section 7.2 in respect of all Product, including Product that it does not elect to repurchase in accordance with Section 14.5(b) above;

(d)    The obligations and rights of both Parties as provided in Section 18.9 below shall survive termination of this Agreement; and

(e)    Upon termination, MANUFACTURER and SUPPLIER shall at their own expense use reasonable commercial efforts to ensure that the continuity **of** customer care is not disrupted. MANUFACTURER will remain responsible to any of its customers for Product sold after termination of this Agreement, subject to any warranty claim MANUFACTURER may be entitled to make per Section 7.2 above.

14.6    **No Compensation.** In the event either Party terminates this Agreement for any reason in accordance with the terms hereof, the Parties hereby agree that, subject to the provisions of Section 14.5(a) hereof and without prejudice to any other remedies which either Party may have in respect of any breach of this Agreement, neither Party shall be entitled to any compensation or like payment from the other as a result of such termination, with the exception of any outstanding invoices and or royalty fees; provided, however, if SUPPLIER terminates this Agreement in whole or in part, for any reason other than the default or bankruptcy of MANUFACTURER, then SUPPLIER shall pay MANUFACTURER all fees related to issued Purchase Orders.

### ARTICLE 15
### FORCE MAJEURE

15.1    **Definition.** Force Majeure shall mean any event or condition, not existing as of the date of signature of this Agreement, not reasonably foreseeable as of such date and not reasonably within the control of either Party, which prevents in whole or in material part the performance by one or both of the Parties of its obligations hereunder or which renders the performance of such obligations so difficult or costly as to make such performance commercially unreasonable. Without limiting the foregoing, the following shall constitute events or conditions of Force Majeure: Acts of State or governmental action, riots, war, strikes, lockouts, prolonged shortage of energy supplies, epidemics, fire, flood, hurricane, typhoon, earthquake, lightning, radiation, and explosion. In particular, it is expressly agreed that any refusal or failure of any governmental authority to grant any export/import license legally required for the fulfillment by SUPPLIER or MANUFACTURER of its obligations hereunder shall constitute an event of Force Majeure.

15.2    **Notice.** Upon giving written notice to the other Party, a Party affected by an event of Force Majeure shall be released without any liability on its part from the performance of its obligations under this Agreement, except for the obligation to pay any amounts due and

Initials:
Clay Purdy
JohnMacDonald

owing hereunder, but only to the extent and only for the period that its performance of such obligations is prevented by the event of Force Majeure. Such notice shall include a description of the nature of the event of Force Majeure and its cause and possible consequences.

15.3 **Confirmation.** The Party invoking Force Majeure shall provide to the other Party confirmation of the existence of the circumstances constituting Force Majeure. Such evidence may consist of a statement or certificate of an appropriate governmental department or agency where available, or a statement describing in detail the facts claimed to constitute Force Majeure. The Party claiming Force Majeure shall take all reasonable steps to remove or avoid or overcome such event of Force Majeure and shall take commercially reasonable efforts to continue performance hereunder with reasonable dispatch when such causes are removed or overcome.

15.4 **Suspension of Performance.** During the period that the performance by one of the Parties of its obligations under this Agreement has been suspended by reason of an event of Force Majeure, the other Party may likewise suspend the performance of all or part of its obligations hereunder to the extent that such suspension is commercially reasonable.

15.5 **Termination.** Should the period of Force Majeure continue for more than six (6) consecutive months, either Party may terminate this Agreement, for the specific jurisdiction affected only, without liability to the other Party, except for payments due and owed to such date, upon giving fifteen (15) days' prior written notice to the other Party. If this Agreement is terminated by either Party in accordance with this Section 15.5, SUPPLIER shall immediately refund all amounts paid by MANUFACTURER pursuant to Article 6 for Purchase Orders that have not been filled or delivered at the time of such termination.

**ARTICLE 16**
**ARBITRATION**

16.1 **Disputes.** All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("**ICC**") by three arbitrators appointed in accordance with said rules. Any arbitration administered by the ICC shall be held in the ICC's Florida, USA office, unless otherwise agreed to by the Parties hereto. The award of the arbitrators shall be final and binding and may be confirmed and entered in any court, state or federal, having jurisdiction. The arbitration shall be conducted in the English language.

16.2 **[Indemnification.** This Article 16 provides the sole recourse for the settlement of any dispute arising under or in connection with this Agreement. MANUFACTURER shall and hereby agrees to indemnify SUPPLIER, and SUPPLIER shall and hereby agrees to indemnify MANUFACTURER against any award or judgment, which relates to this Agreement, made by any arbitral panel of any kind, in any jurisdiction, except as provided in this Article 16.]

16.3 **Governing Law.** This Agreement shall for all purposes be governed by and construed in accordance with the laws of the State of Florida.

Initials:
Clay Purdy
John MacDonald

## ARTICLE 17
## TRANSITION PERIOD

17.1   **Transition Period.** Transition period is hereby waived

## ARTICLE 18
## MISCELLANEOUS

18.1   **Independent Contractors.**   MANUFACTURER is an independent contractor and not an agent, partner, joint venturer, franchisee, affiliate or employee of SUPPLIER. No fiduciary or franchise relationship exists between the Parties. Neither Party shall be liable for any debts, accounts, obligations or other liabilities of the other Party, its agents or employees. MANUFACTURER shall have no authority to obligate or bind SUPPLIER in any manner. SUPPLIER has no proprietary interest in MANUFACTURER and has no interest in the business of MANUFACTURER, except to the extent set forth in this Agreement.

18.2   **Assignment.** Neither Party shall have the right to assign or otherwise transfer its rights and obligations under this Agreement except with the prior written consent of the other Party, which consent may not be unreasonably withheld; provided, however, SUPPLIER shall be entitled to assign any or all of its rights and obligations hereunder to any of its subsidiaries, provided that SUPPLIER shall remain fully liable for the performance of all its obligations hereunder; and further provided that a successor in interest by merger, by operation of law, assignment, purchase, or otherwise of the entire business of either Party shall acquire all rights and obligations of such Party hereunder without requirement of the consent of the other Party. Any prohibited assignment shall be null and void.

18.3   **Notices.** Notices permitted or required to be given hereunder shall be deemed sufficient if given by (i) email; (ii) facsimile; or (iii) registered or certified air mail, with postage prepaid, return receipt requested, and addressed to the respective addresses of the Parties as first above written or at such other addresses as the respective Parties may designate by like notice from time to time. Notices so given shall be effective upon (a) receipt by the Party to which notice is given; or (b) on the next business day, in the case of notice given by email or by facsimile and on the fourteenth (14th) business day following the date notice was posted by registered or certified air mail, whichever occurs first.

18.4   **Entire Agreement.** This Agreement, including Exhibits **Error! Reference source not found.** through 0 attached hereto and incorporated as an integral part of this Agreement, constitutes the entire Agreement of the Parties with respect to the subject matter hereof, and supersedes all previous distributorship agreements by and between SUPPLIER and MANUFACTURER as well as all proposals, oral or written, and all negotiations, conversations, or discussions heretofore had between the Parties related to this Agreement. MANUFACTURER acknowledges that it has not been induced to enter into this Agreement by any representations or statements, oral or written, not expressly contained herein. There may be other signed, written agreements between the Parties and those signed; written agreements are not invalidated by this Section.

Page 18 of 26                                        Initials:
                                                        Clay Purdy
                                                        JohnMacDonald

18.5   **Amendment.** This Agreement shall not be deemed or construed to be modified, amended, rescinded, cancelled, or waived, in whole or in part, except by written amendment signed by the Parties hereto.

18.6   **Publicity.** This Agreement is confidential and neither Party shall issue press releases or engage in other types of publicity of any nature (including interviews) dealing with the commercial and legal details of this Agreement without the other Party's prior written approval, which approval shall not be unreasonably withheld. However, approval of such disclosure shall be deemed to be given to the extent such disclosure is required to comply with governmental laws, rules, regulations, or other governmental requirements. In such event, the publishing Party shall furnish a written copy of such disclosure to the other Party prior to making such disclosure.

18.7   **Severability.** In the event that any of the terms of this Agreement are in conflict with any rule of law or statutory provision or are otherwise unenforceable under the laws or regulations of any government or subdivision thereof, such terms shall be deemed stricken from this Agreement, but such invalidity or unenforceability shall not invalidate any of the other terms of this Agreement and this Agreement shall continue in force, unless the invalidity or unenforceability of any such provisions hereof does substantial violence to, or where the invalid or unenforceable provisions comprise an integral part of, or are otherwise inseparable from, the remainder of this Agreement.

18.8   **Counterparts.** This Agreement may be executed in counterparts and may be delivered by facsimile or electronically scanned form. Each such counterpart shall be deemed an original hereof, and all executed counterparts taken together shall constitute one agreement.

18.9   **No Waiver.** Except as otherwise provided herein, no waiver of any covenant, condition, or provision of this Agreement shall be deemed to have been made unless expressly in writing and signed by the Party against whom such waiver is charged; and (i) the failure of any Party to insist in any one or more cases upon the performance of any of the provisions, covenants, or conditions of this Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment in the future of any such provisions, covenants, or conditions; (ii) the acceptance of performance of anything required by this Agreement to be performed with knowledge of the breach or failure of a covenant, condition, or provision hereof shall not be deemed a waiver of such breach or failure; and (iii) no waiver by any Party of one breach by another Party shall be construed as a waiver with respect to any other or subsequent breach.

18.10   **Compliance with Law.** Each Party represents and warrants that it and its affiliates have not made, offered, or authorized and covenants that it and its affiliates shall not make, offer, or authorize with respect to the matters which are the subject of this Agreement, any payment, gift, promise or other advantage, whether directly or through any other person or entity, to or for the use or benefit of any public official (*i.e.*, any person holding a legislative, administrative or judicial office, including any person employed by or acting on behalf of a public agency, a public enterprise or a public international organization) or any political party or political party official or candidate for office, where such payment, gift, promise or advantage

Initials:

Clay Purdy
John MacDonald

would violate (i) applicable law; (ii) the laws of the country of incorporation of such Party; (iii) the *U.S. Foreign Corrupt Practices Act*; or (iv) the principles described in the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, signed in Paris on December 17, 1999, which entered into force on February 15, 1999, and the Convention's Commentaries. Each Party shall defend, indemnify and hold the other Party harmless from and against any and all claims, damages, losses, penalties, costs, and expenses arising from or related to, any breach by such first Party of the covenant made under this Section. Such indemnity obligation shall survive termination or expiration of this Agreement. Each Party shall in good time respond in reasonable detail to any notice from any other Party reasonably connected with the above-stated warranty and furnish applicable documentary support for such response upon request from such other Party.

18.11   **Further Assurances**. Each Party agrees to sign any and all other papers which may be required to effectuate the purpose and intent of this Agreement.

18.12   **Binding Effect**. The Parties hereto acknowledge, agree and declare that this Agreement is a legal, valid and binding agreement enforceable against each Party in accordance with its terms and that this Agreement has been duly executed and delivered on behalf of the Parties. Each Party represents and warrants that it shall use best efforts in good faith to consummate the transaction.

18.13   **Successors and Assigns**. The Parties hereto acknowledge, agree and declare that this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

18.14   **Captions and Headings**. The captions and headings appearing in this Agreement are solely for convenience and do not in any way define, limit or describe the scope of this Agreement or the intent or content of any provision thereof.

18.15   **Gender and Number**. Whenever the context of this Agreement requires, the masculine gender includes the feminine and neuter, and the singular number includes the plural and vice versa.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed on the date first above written.

MANUFACTURER:                                SUPPLIER:
**Fluid Energy Group, Ltd.**                 **Heartland Energy Group, Ltd.**


Signature: _____               Signature: _____
By:        Clay Purdy                        By:        John MacDonald
Title:     Director                          Title:     President

Initials:
Clay Purdy
JohnMacDonald

## Exhibit A

## Products

SUPPLIER shall grant MANUFACTURER the rights as set forth in the Manufacturing Agreement to manufacture-blend, Market and otherwise sell the following Products that SUPPLIER manufacturers, distributes and/or supplies:

The Products consist of:

(a)    raw    products:   All    raw    products/materials    are    deemed    **HIGHLY CONFIDENTIAL** and shall be listed in the body of patent/technology agreement

(b)    concentrated products, derived from the reaction and blending of raw products:

- Hydrochloric replacement;

- Sulfuric replacement;

- Hydrofluoric replacement;

- Caustic replacement;

- Associated surfactants & applicable additives;

- Anti-Microbial Replacements; and

(c)    derivatives of any of the above products and any products co-developed at the request of MANUFACTURER *(e.g.,* H2S Scavenger, Friction Reducer, etc.) using the applicable base chemistry, including all and any new future products

SUPPLIER may amend this list from time to time at its sole discretion. SUPPLIER shall give MANUFACTURER six (6) months' prior written notice of any such amendment.

Page 21 of 26

Initials:
Clay Purdy
John MacDonald

## Exhibit B

### Territory Definitions

SUPPLIER shall grant to MANUFACTURER the **EXCLUSIVE TERRITORY** as set forth:

- Canada

- The **EXCLUSIVE TERRITORY** includes the products listed in Exhibit A.

Initials
Clay Purdy
JohnMacDonald

**Exhibit C**

**Reserved Sales Rights**

SUPPLIER reserves the joint right to sell Products under SUPPLIER'S name, logotypes and trademarks directly to the following but not limited customers located in the Territory:

Mud Masters, Optifrac, Teek Resources Limited and all/any of it's subsidiaries

Initials:
Clay Purdy
JohnMacDonald

**Exhibit D**

**License Agreement**

*HIGHLY CONFIDENTIAL*  The License Agreement shall be provided under separate cover as **Exhibit "D"**. MANUFACTURER and SUPPLIER agree that due to the **Highly Confidential Nature** of the contents of the License Agreement, Exhibit D shall be held in the **Highest Confidential Nature** and shall not be provided to, discussed in whole or part with any persons, entity, or party to this Agreement except for those officers of MANUFACTURER and SUPPLIER as initially set forth below and that may be amended, from time to time, in writing and agreed to by both MANUFACTURER and SUPPLIER.

Page 24 of 26

Initials:
Clay Purdy
John MacDonald

**SUPPLIER OFFICERS:**          John MacDonald, President

**MANUFACTURER OFFICERS:**

- Clay Purdy, Director

Initials:
Clay Purdy
JohnMacDonald

## Exhibit E

## Initial Freight & Sample Terms — Policy

*Freight Terms — Policy:* MANUFACTURER shall bear all costs and obligations regarding freight, delivery, and shipping and logistics responsibilities

No discounts will be offered for MANUFACTURER pick-up, nor will drop ship policies apply for SUPPLIER shipped orders. MANUFACTURER understands and agrees that SUPPLIER is not in the freight hauling business, and thus SUPPLIER does not control cost of freight increases; accordingly, SUPPLIER reserves the rights to amend the above freight terms-policy with fifteen (15) days' prior written notice to MANUFACTURER. MANUFACTURER shall also have the right to advise and assist SUPPLIER with the logistics and shipment details so as to ensure the most cost effective and timely process is undertaken.

*Sample Terms - Policy:* SUPPLIER hereby agrees to provide MANUFACTURER with sample Products in accordance with the terms and conditions as stated herein:

Samples will be provided on a case-by-case basis at the mutual agreement of both Parties.

Initials:
Clay Purdy
John MacDonald

# TORYS
**LLP**

1114 Avenue of the Americas
New York, New York
10036-7703
Tel.  (212) 880-6000
Fax  (212) 682-0200
www.torys.com

April 11, 2014

Heartland Energy Group Ltd.
1042 West End, OBB Grand Bahama
Grand Bahama
Bahamas

Heartland Energy Group Ltd.
c/o John MacDonald at jmac@enviromfg.com

Environmental Manufacturing Solutions LLC
7705 Progress Circle
Melbourne, FL  32904

Mr. John MacDonald
jmac@enviromfg.com

Mr. Stephen Rowley
steve@heartlandenergygroup.com

Re: Fluid Energy Group

Dear Sirs:

We represent Fluid Energy Group Ltd. and its affiliates (collectively, "Fluid"), which are parties to licensing and manufacturing agreements with Heartland Energy Group Ltd. ("HEG") dated October 12, 2012, and amended and restated June 18, 2013, and manufacturing and shipping agreements with Environmental Manufacturing Solutions LLC and Environmental Manufacturing Solutions – East Coast (collectively, "EMS") dated November 1, 2012 (the "Agreements").

Under the Agreements, HEG licenses certain patented technology to Fluid and authorizes Fluid to manufacture and market products based on the patented technology. The patents relate to cleaning methods and compositions that are said to be "non-corrosive to metals" and to have been "shown to reduce corrosion levels to well below [U.S. Department of Transportation] corrosion limits of 6.25 mmpy." (U.S. Patent No. 8,163,102.)

John MacDonald, who is a Director of HEG, and Manager of EMS and Stephen Rowley, who is President of HEG, repeatedly assured Fluid before the Agreements were signed that the patented

36310-2001 16898035.2

THIS IS EXHIBIT ___D___
referred to in the _Affidavit_
___of Clay Purdy___
Sworn before me this ___20th___
day of _August_ ___A.D. 2014___

_____
A Commissioner for Oaths in and for the
**HARVEY JAMES BERGER** Province of Alberta
Barrister & Solicitor

- 2 -

technology was not corrosive to steel or aluminum and was not regulated for purposes of domestic and international transportation. Those assurances were made orally and in writing, including in the following documents that MacDonald and Rowley provided to Fluid (copies of which are enclosed herewith):

• The label for a product called Oil Safe AR, which MacDonald and Rowley represented was a commercial embodiment of the patented technology. This label bears the logos of EMS and Heartland Solutions Inc. (Heartland Solutions"), of which Rowley is the registered agent. It states that the product is non-D.O.T. regulated. . . and will not corrode or rust metals" and "will not harm oil field equipment or promote corrosion."

• An EMS Material Safety Data Sheet dated March 13, 2009, for Oil Safe AR – Non Regulated Material, which states that the product is "not regulated as hazardous" by the U.S. Department of Transportation, Transport Canada (under the Transportation of Dangerous Goods Act) or international maritime and air transport agencies.

• A description of Oil Safe AR bearing the logos of EMS and Heartland Solutions, which states that the product "is 20 times less corrosive than even the 6.25 mmpy rating that would classify it as corrosive on a label."

• A Technical Data Sheet on Oil Safe AR bearing the Heartland Solutions logo, which states that the product's corrosion rates on steel and aluminum are "0.59 mmpy" and "3.96 mmpy," respectively, which is "NON-CORROSIVE."

• An Oil Safe AR PowerPoint presentation stating that the product is "non-D.O.T. regulated," "will not corrode or rust metals," "[r]equires no additional corrosion inhibitor addition" and "is 20 times less corrosive than even the 6.25 mmpy rating that would classify it as corrosive on a label."

In addition, MacDonald and Rowley provided Fluid with purported independent laboratory reports on the corrosion rates of Oil Safe AR and Mud Safe CR, which they represented was another commercial embodiment of the patented technology. The Oil Safe AR Immersion Corrosion test report is on the letterhead of "NASA Support Labs," and states that the corrosion rate of the product "does not exceed 6.25 millimeters per year" on "SAE C1020 Steel" or "7075-T6 non-clad Aluminum." The Mud Safe CR Immersion Corrosion test report is on the letterhead of "Del Tech Laboratories Ltd." and it likewise states that the corrosion rate of the product does not exceed 6.25 mmpy on steel or aluminum.

The representations by MacDonald and Rowley that the patented technology was non-corrosive and not regulated for transportation purposes were material inducements to Fluid entering into the Agreements. Non-regulated status was crucial to Fluid's ability to market products to customers without incurring significant regulatory costs. In addition, having a non-corrosive and non-regulated product was a significant marketing advantage over competing products in the oil and gas industry.

36310-2001 168980352

- 3 -

Fluid relied on those representations and would not have entered into the Agreements without MacDonald's and Rowley's repeated and detailed assurances that the patented technology was non-corrosive and non-regulated.

Since it signed the Agreements, Fluid's customers have done corrosion testing of the patented technology and Fluid has confirmed that the technology does not come close to meeting a corrosion limit of 6.25 mmpy or the specific corrosion results stated in the documents referred to above. It has also learned that products embodying the technology are not exempt from applicable transportation regulations.

Fluid has also concluded that the supposed "NASA" and "Del Tech" laboratory reports are fabrications. There appears to be no "NASA Support Labs" at the address shown on the report or anywhere else; and no such laboratory is shown on NASA's Web site. The persons who supposedly signed the "NASA" report, "Luke Rothenburg" and "Dr. Pam Eglin Ph.D.," cannot be located. There also appears to be no "Del Tech Laboratories Ltd.," although there is a regulatory testing laboratory with a similar name, "Dell Tech Laboratories Ltd.," in London, Ontario. The "Del Tech" report provided to HEG is not signed, but the same report appears in a Heartland Solutions booklet of data bearing the purported signature of "Pam Eglin," the supposed signer of the "NASA" report.

The facts outlined above demonstrate that MacDonald and Rowley, individually and on behalf of HEG, fraudulently induced Fluid to enter into the Agreements. The claims made by MacDonald and Rowley that the patented technology was non-corrosive and non-regulated were false statements of fact; the fabrication of laboratory reports and other circumstances prove that MacDonald and Rowley knew the non-corrosion claims were false; the non-corrosion claims were material inducements to Fluid's entering into the Agreements; and Fluid has incurred significant damages as a result, including royalty payments under the Agreements, costs to develop non-corrosive products and lost profits.

Fluid's remedies for such fraud include:

- Rescission of the Agreements.

- Restitution of all royalty and other payments it has made under the Agreements.

- Damages, including recovery of Fluid's deposit payment to HEG for distribution rights in the U.S., its costs in developing non-corrosive products, and lost profits estimated to be several million dollars.

- Punitive damages.

- Attorneys' fees and other arbitration and court costs that may be incurred.

- Pre-judgment interest on the foregoing amounts.

36310-2001 16898035.2

- 4 -

Fluid hereby demands (i) that HEG and EMS acknowledge and agree that the Agreements are void and rescinded, and (ii) that HEG repay Fluid all royalties paid under the Agreements in the sum of $700,000 plus $100,000 that Fluid paid as a deposit for U.S. distribution rights.

If HEG and EMS do not comply with these demands by April 25, 2014, Fluid will pursue the remedies outlined above and any other legal or equitable remedies that may be available against HEG, EMS, MacDonald and Rowley.

Fluid also demands that HEG, EMS, MacDonald and Rowley (and all entities affiliated with them) retain without alteration all records, communications, notes, testing data and other recorded information in paper or electronic form that refers or relates to the patented technology or the Agreements. Failure to do so may constitute spoliation of evidence under applicable law.

Finally, if HEG, EMS, MacDonald or Rowley improperly interferes with Fluid's customer relationships, Fluid will vigorously pursue its remedies for such conduct.

Very truly yours,

David Wawro

David Wawro

Tel. (212) 880-6288
dwawro@torys.com


DW/rlf

cc: Mr. Clay Purdy

36310-2001 16898035.2

# BEUSSE WOLTER SANKS & MAIRE, P.A.

JAMES H. BEUSSE
JACKSON O. BROWNLEE
ERICA M. CIPPARONE
AMBER N. DAVIS
JOHN L. DEANGELIS
PATRICK D. HERRON
DAVID O. MAIRE
CHRISTINE Q. MCLEOD
CIAN G. O'BRIEN
FRED M. ROMANO
TERRY M. SANKS
TIMOTHY H. VAN DYKE
KEVIN W. WIMBERLY
ROBERT L. WOLTER

390 N. ORANGE AVENUE, SUITE 2500
ORLANDO, FLORIDA 32801
TELEPHONE (407) 926-7700
FACSIMILE (407) 926-7720
WWW.IPLAWFL.COM

PATENT AGENT
CHRISTOPHER D. BAYNE

WRITER'S DIRECT
DIAL/EMAIL
(407) 926-7716
ADAVIS@IPLAWFL.COM

June 12, 2014

*Via E-Mail*
David Wawro, Esquire
Torys, LLP
1114 Avenue of the Americas
New York, New York 10036-7703

Re:   *Termination of Manufacturing and License Agreements*

Dear Mr. Wawro:

As you are aware, this firm represents Environmental Manufacturing Solutions – East Coast, Environmental Manufacturing Solutions, LLC ("EMS") and Heartland Energy Group, Ltd. ("HEG") with respect to their intellectual property and other related matters. This letter will serve as **Termination of the Manufacturing and License Agreements** between HEG and Fluid Energy Group, Ltd. and HEG and Fluid Lux S.a.r.l respectively ("collectively referred to as "FLUID"). Such Agreements were previously attached as Exhibits A-F to my May 6, 2014 letter addressed to you and were also attached to your Request for Arbitration.

Although the License Agreements state that Notice of Termination must be sent to Clay Purdy directly that would not be appropriate, which is why the letter is being sent to you as their counsel. Based on our previous correspondence as well as the recently filed Request for Arbitration with the ICC, it is our understanding that you represent FLUID in this matter.

As discussed at length in my May 6, 2014 letter to you, which is attached hereto and incorporated herein, my client denies any and all liability for the alleged fraud in the inducement claimed by your client. Moreover, and as grounds for termination, your client has materially breached several provisions in the Agreements. Such provisions, include, but are not limited to the following:

THIS IS EXHIBIT ___E___
referred to in the __Affidavit__
___of Clay Purdy___
Sworn before me this ___20th___
day of __August__ A.D. __2014__
_____
**HARVEY JAMES BERGER** Commissioner for Oaths in and for the
**Barrister & Solicitor**      Province of Alberta

David Wawro, Esquire
Torys, LLP
June 12, 2014
Page 2 of 3

**License Agreements**

- **Paragraph 5 (A)** - failure to pay royalties for the months of January – May of 2014.
- **Paragraph 5(A)** – failure to meet the Sales Minimum by December 31, 2014.
- **Paragraph 6(A)** – failure to furnish Licensor written statements, under oath, specifying the total number of products sold during the preceding month for the months of October 2012-December 2013 and March- May of 2014.
- **Paragraph 6(B)** – failure to make Royalty Payments for the months of January – May of 2014.

**Manufacturing Agreements**

- **Paragraph 2.5** – for marketing and selling the Licensed Products outside of FLUID's territory and without written consent of HEG.
- **Paragraph 2.10** - for conducting unauthorized testing from third-party laboratories without the prior approval of HEG.
- **Paragraph 3.2** – for selling competitive goods during the term of the Agreements.
- **Paragraph 5.1** – for failure to meet the quota of $1,000,000 for 2013.
- **Paragraph 5.2** – failure to meet the quota as well as failure to amend its rights to non-exclusive rights as per 5.2(b) for 2014.
- **Paragraph 5.2** – for failure to meet the quota as well as failure to make payment to HEG equal to the shortfall of such quota to maintain exclusive rights as per 5.2(a) for 2014 in the amount of $1,000,000 while representing to investors, customers, dealers and in web presence Fluid maintained said exclusive rights.
- **Paragraph 6.3** – failure to make payments within 30 days of the date of invoice.
- **Paragraph 6.5.** – failure to pay 8.0% interest on all overdue balances outstanding.
- **Paragraph 11.1**- improperly and without authorization obtaining a trademark registration in Canada for ENVIRO-SYN as well as filing trademarks in the U.S. for ENVIRO-SYN.
- **Paragraph 11.2** – improperly telling investors and potential investors that FLUID was the owner of the Patents and Technology as well as attempting to sell and selling such Licensed Products outside of FLUID's licensed territory.

In addition to the above violations of the Agreements, as you are aware, your client has also committed securities and investor fraud, tortiously interfered with my client's business and

David Wawro, Esquire
Torys, LLP
June 12, 2014
Page 3 of 3

will soon be infringing on my client's trademarks (ENVIRO-SYN) and patents (referenced above) if such actions are not stopped.

As per paragraph 4(c) and 4(d) of the License Agreements and 14.2(c) of the Manufacturing Agreements, this termination is effective 30 days from today's date if your client fails to cure such breach. Based on the foregoing and pursuant to Paragraphs 4(b) and 22 of the License Agreement, HEG hereby demands that if FLUID fails to cure such breach within such 30 day period, on July 12, 2014, FLUID shall cease from all use of the Patents and technology claimed therein, including, but not limited to U.S. Patent Nos. 8,580,047, 8,430,971 and PCT Application WO 2012/075091. FLUID shall also cease from selling or manufacturing, whether directly or in association with other persons or firms, of any product, process or service, which competes with any Products covered by the Patents **for a period of 2 years** from July 12, 2014.

As per paragraph 23 of the License Agreements, HEG owns all tools, molds and equipment related to the Licensor's products. Therefore, please provide me with a date and time that representatives from HEG or a third-party can enter onto FLUID's facility to obtain all such tools, molds and equipment.

Finally, we were surprised to see the email dated June 2, 2014 from your colleague Mr. Mike Pedlow to the shareholders for Fluid Energy Group, Ltd. We were even more surprised to see the false statements and misrepresentations made in the Q1 Highlight and the alleged Audited Financials which show no mention of the $1,873,755.67 amount owed to HEG. Based on the foregoing, a copy of this letter will be sent to all shareholders so that the shareholders are aware of HEG's stance on Fluid's alleged termination of their relationship with their U.S. Supplier, who happens to be the owner of all right, title and interest to the Licensed Products, Patent, technology and trademarks, which your client failed to mention to its shareholders.

Please feel free to contact me should you wish to discuss this any further.

Very truly yours,

Amber N. Davis, Esq.

Encls: May 6, 2014 letter
cc:    Client

# BEUSSE WOLTER SANKS MORA & MAIRE, P.A.

JAMES H. BEUSSE
JACKSON O. BROWNLEE
ERICA M. CEPARONE
AMBER N. DAVIS
JOHN L. DEANGELIS, JR.
PATRICK D. HERRON
DAVID G. MAIRI
CHRISTINE Q. MCLEOD
GHRIQUE J. MORA
CIAN G. O'BRIEN
FRED M. RUKAIRI
TERRY M. SANKS
TIMOTHY H. VAN DYKE
KEVIN W. WIMBERLY
ROBERT L. WOLTER

390 N. ORANGE AVENUE, SUITE 2500
ORLANDO, FLORIDA 32801
TELEPHONE (407) 926-7700
FACSIMILE (407) 926-7720
WWW.IPLAWFL.COM

WRITER'S DIRECT
DIAL/EMAIL
(407) 926-7716
ADAVIS@IPLAWFL.COM

May 6, 2014

*Via E-Mail*
David Wawro, Esquire
Torys, LLP
1114 Avenue of the Americas
New York, New York 10036-7703

       *Re:  Heartland Energy Group, Ltd. vs. Fluid et. al.*

Dear Mr. Wawro:

As you are aware, this firm represents Environmental Manufacturing Solutions – East Coast, Environmental Manufacturing Solutions, LLC ("EMS") and Heartland Energy Group, Ltd. ("HEG") with respect to their intellectual property and other related matters. I have reviewed your letter dated April 11, 2014 and discussed its contents with my client. This letter will address your client's requested rescission of the Manufacturing and Licensing Agreements between HEG and Fluid Energy Group, Ltd. and HEG and Fluid Lux S.a.r.l respectively ("collectively referred to as "FLUID") as well as the false allegations of fraud against EMS and HEG. So there is no confusion as to which agreements I am referencing, I have attached copies hereto as Exhibits "A" – "F," will be referred to as "the Agreements."

First, I want to make it clear that HEG does not accept FLUID's rescission of the Agreements for three main reasons: (1) the notice was improper pursuant to the Notice and Termination provisions of the Agreements; (2) the allegations of fraud in the inducement are completely baseless and do not warrant a rescission of the Agreements by FLUID, which will be revealed in this response; and (3) FLUID is in direct violation of multiple provisions of the Agreements as well as a slew of other laws and is the party that actually committed the fraud, which will be discussed in more detail herein.

To begin, I think it is important for you to understand the history between the parties. Before HEG was incorporated there was a company called Heartland Solutions, Inc. ("HSI"). Stephen Rowley was the owner of HSI and had a Distributor Agreement with EMS pertaining to

Dir. 12. 2014 12:44PM    Mud Master Dr 'ling                              No. 9979   P. 6

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -2-

a number of different products relevant to the concrete industry. Beginning in 2009, in addition
to targeting the concrete industry, HSI also began targeting the Oil & Gas industry with EMS's
Barracuda 10K product. HSI, with the knowledge and permission of EMS re-branded and re-
labeled the products as Oil Safe Ar®. Around the same time, John MacDonald incorporated
Environment Manufacturing Solutions Oil and Gas Exploration Products, LLC for the purpose of
promoting its products to the Oil & Gas industry. At this time, since HSI was utilizing the name
Oil Safe Ar®, Mr. MacDonald decided to come up with a new name to brand his patented
synthetic replacement for acids and he and Tim Otto came up with the name ENVIRO-SYN® at
EMS's offices in Melbourne, Florida. Both Messrs. MacDonald and Otto will swear under
penalty of perjury and testify as such. The ENVIRO-SYN® name, as you can see, is a
combination of Environmental Manufacturing Solutions' name and their other trademark
registration, SYNTECH®. *See* Exhibit "G."

        We are aware of your client's trademark registration in Canada and applications in the
United States for ENVIRO-SYN and we want to make it very clear that not only do the
Agreements between the parties state that HEG is the owner of the ENVIRO-SYN® trademark,[1]
but EMS Oil & Gas was the first to use the trademark; EMS Oil & Gas then licensed the
trademark to HSI to use; and HSI eventually filed for and received a trademark registration in the
U.S. for ENVIRO-SYN®. *See* Exhibit "H." As you can see from the registration, the first use
date in the registration is December of 2011, which was when HSI shipped its first product to
FLUID, but the first use date could actually be amended to November of 2010 when EMS Oil &
Gas first shipped the ENVIRO-SYN products to NMX. A true and correct copy of the NMX
Distribution Agreement is attached hereto as Exhibit "I." As you can see from page 14 of the
Agreement, the Agreement pertained to the various Enviro-Syn products.

        Should your client seek to cancel the ENVIRO-SYN® trademark in the U.S., HEG will
vigorously defend its rights. More importantly, it is unclear how or why FLUID believes it has
trademark rights based on the fact that (1) FLUID did not come up with the name; (2) FLUID did
not use the name first; and (3) FLUID has an agreement which says HEG owns the trademark
and FLUID has a license to use the mark. In any event, that is an argument for another day, but
should the parties be able to come to a resolution on the Agreements, HEG will expect FLUID to
expressly abandon its applications and cease using its ENVIRO-SYN® trademark.

        To get back to the timeline, John MacDonald and Mr. Rowley determined that the
formula for Barracuda 10K (re-labeled as Oil Safe Ar® and ENVIRO-SYN®) was not strong
enough for the Oil & Gas industry and had certain chelating agents that needed to be removed.
Darren Thatcher, the current President and COO of FLUID was the V.P. of Operations and
Technology for the Optifrac Division of Mud Master and was aware of all of this because Mud
Master had a distribution agreement with HSI. Mud Master was, and still is, a valued customer
of HEG's. Stephen Rowley and Darren Thatcher worked together on a large frac job in Turner

---

[1] *See* Paragraph 11.1 of the Manufacturing Agreements.

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -3-

Valley, Alberta Canada in October of 2011. At the frac site there was a hot oiler truck that heats
and transfers the frac fluids on site. Mr. Thatcher and Mr. Rowley both forgot that the original
version of Oil Safe AR®, which was Barracuda 10K re-branded, was a truck washing product
and the newer version was much more active. Mr. Thatcher and Mr. Rowley proceeded to
transfer the Oil Safe AR® into the hot oiler truck and began to notice the aluminum fittings on
the truck begin to fail due to corrosion and Mr. Thatcher began to panic. Mr. Thatcher and Mr.
Rowley immediately contacted John MacDonald and Mr. MacDonald instructed Mr. Thatcher
and Mr. Rowley that chemical doubling takes place with heating and also reminded them that the
new version, which was created at Mr. Thatcher continued request, was far more active than the
original rebranded Barracuda 10K and that they needed to switch out the fittings to stainless steel
and/or to stop using the hot oiler truck and finish the job. Mr. Thatcher and Mr. Rowley chose to
complete the job with a vacuum truck that was equipped with stainless fittings. The job was
completed without error pumping in excess of 125,000 gallons of Oil Safe AR®.

So, for your client to say that HEG and EMS fraudulently induced FLUID into the
contract because they had no idea that the ENVIRO-SYN® products did not work well with
aluminum is a complete fabrication. Mr. Thatcher had first-hand knowledge and experience with
the problem and most importantly, knew about the issue far before FLUID was ever even
incorporated. In fact, after the frac job in Turner Valley, Alberta Canada, HEG and Mud Master
(at the behest of Mr. Rowley and Mr. Thatcher jointly) changed its labeling to include a warning
regarding Aluminum. A true and correct copy of a label prepared back in 2011 by Mr. Thatcher,
which has a warning pertaining to the use of aluminum fittings is attached hereto as Exhibit "J."

FLUID was readily aware of the problem when it first opened its doors because Mr.
Thatcher came with this knowledge based on his experience at Mud Master/Optifrac. Additional
proof that FLUID was aware of the problem with aluminum from the very beginning is as
follows:

(1) FLUID ENVIRO-SYN label wherein it clearly states "WARNING! When pumping
this product it is strongly recommended to use manufacturer approved hose couplings
and fittings. DO NOT USE ALUMINUM FITTINGS. *See* Exhibit "K."

(2) A PowerPoint presentation prepared by Darren Thatcher, along with the email
correspondence f/Mr. Thatcher on October 24, 2012 including a statement at page 7
of the presentation that certain precautions need to take place when pumping the
product because the product will react with certain soft metals such as Aluminum and
Magnesium. *See* Exhibits "L" and "M" respectively.

(3) Email correspondence between Kevin O'Donoghue and John MacDonald from June
of 2013 pertaining to labels for ENVIRO-SYN CSR and ENVIRO-SYN HCR,
created by FLUID, which include a WARNING regarding Aluminum. *See* Exhibits
"N," "O" and "P" respectively.

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page 4.

_____

With respect to the documents attached to your letter, please be advised that the first document attached was falsified by your client. Environmental Manufacturing Solutions, LLC has never sold Oil Safe Ar® and therefore would not have an MSDS sheet for the product. Upon information and belief, this is an MSDS sheet that has been falsified by your client and which was sent along with a product sample to ENOVO, here in the United States, which should be noted, is a clear violation of the Agreements in that FLUID has no right to sell or offer to sell the ENVIRO-SYN® products in the U.S. Correspondence pertaining to this violation of the Agreements is attached hereto as Exhibit "Q."

The literature pertaining to Oil Safe Ar® was not provided to FLUID by EMS or HEG. It was provided to Darren Thatcher by HSI back in 2010 when he was the V.P. of Operations and Technology for the Optifrac Division of Mud Master. Moreover, everything contained in the Oil Safe Ar® literature was completely accurate at the time it was printed and given to Mr. Thatcher. Therefore, it was not EMS and/or HEG who fraudulently induced FLUID into the contract. If there was any fraud, it was committed by Darren Thatcher.

Formula changes began to take place in late 3rd quarter of 2011. As stated, the Barracuda 10K was far less active. It was designed and remains designed and for sale in commerce at the world's leading ready mix truck wash and wax. It contains heavy detergents, surfactants, waxes, emulsifiers, chelating agents, uv deterrents and salt dispersants. All chemicals that are not needed in the fracing process thus we originally took those out and made the formula 30% stronger and it became a stand-alone formula. We continued to increase the strength of the product at the request of Mr. Thatcher.

As to the two testing reports attached to your letter, they are both genuine reports commissioned by HSI and HEG respectively. As I'm sure you are aware, there were some serious cutbacks at NASA in 2012, which resulted in many, if not all, of their testing labs to close, which is why you cannot find the lab on their website. I also think you should know that on or around March 20, 2013, Darren Thatcher, knowing that the ENVIRO-SYN® CSR/MudSafe, product was stronger because of continual requests by Mr. Thatcher and Mr. Purdy, ordered their own tests from Cormetrics, Ltd. to determine the pH and nmpy levels. The test was conducted by Cormetrics and a copy of the results are attached hereto as Exhibit "R" and relabeled as Heartland's MudSafe by Cormetrics at the request of Mr. Thatcher on behalf of HEG. We have contacted Cormetrics for a copy of the report that has FLUID's information on the front of the testing results, but it cannot be released to us without the express permission of FLUID. Your client, however, should have a copy in their records and we would request that you forward a copy to us at your earliest convenience. In any case, as seen in the test results, the nmpy levels were 6.3, which is just above the limit for DOT regulation and which is the lowest level in the oil industry. The only reason the level was above the limit is because your client requested a testing procedure outside the scope of the DOT testing protocol. The test requested by your client was targeted to the oil and gas industry and not to the transportation limits as

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -5-

---

HEG's corrosion limits clearly quote. This test has nothing to do with transportation on the road. Based on Cormetrics findings, the math would be simple to conclude that had the same tested material been tested as per the DOT protocols, the results would have been well below the 6.25 mmpy.

Furthermore, it was your client that was manufacturing the product outside the prescribed guidelines by increasing the levels of HCL from the prescribed 20 baume to 22 baume in the ENVIRO-SYN® HCR product in addition to using larger volumes of the HCL without HEG's knowledge and consent. True and correct email correspondence wherein Darren admits to adding in HCL, which would increase the corrosiveness of the products, are attached hereto as Exhibit "S." Such actions by your client in modifying the products without HEG's written consent void any warranties my client was required to make as per 7.4 of the Manufacturing Agreements. Additional correspondence where Mr. MacDonald expresses his concerns about the changes being made by FLUID and the corrosive effect of such changes, are attached hereto as Exhibit "T." As seen in the MSDS sheet and Mr. Thatcher's email correspondence, the product is corrosive at about 100° C, which would convert to 212°F, which is way above the acceptable DOT protocol at 55° C/131° F. *See* Exhibit "T".

Therefore, any issues as it relates to an increase in corrosiveness are a result of your client's actions, not HEG or Mr. MacDonald's. The product, as sold to FLUID was always considered Non-DOT regulated and below 6.25 mmpy contrary to your client's allegations, which can be easily substantiated by documentation provided hereto, additional documentation as necessary and sworn testimony if need be.

In the end, it is your client that has committed numerous violations of the Agreement and is simply attempting to claim fraud to try and avoid having to pay all of their outstanding invoices, interest, damages and attorney's fees as a result of their violations. As seen in the Audit Report dated January 22, 2014 and attached hereto as Exhibit "U," FLUID has continually violated the agreements by (1) failing to provide statements within fifteen (15) days after the last day of each month[2]; making late payments and underpayment throughout the 2013 calendar year[3]; failing to meet the minimum production levels for any quarter in the year 2013[4]; and by improperly selling competing goods (Matrix 100[5]).

Additional violations include, but are not limited to:

(1) Falsely stating "worldwide" rights on the www.fluidenergy.com website, when the Agreements between the parties were only for specified territories, not the entire globe. *See* Exhibit "V."

---

[2] *See* Paragraph 6(a) of the License Agreements.
[3] *See* Paragraphs 6.3 and 6.5 of the Manufacturing Agreement.
[4] *See* Paragraphs 5.1 and 5.2 of the Manufacturing Agreements.
[5] *See* Paragraph 3.2 of the Manufacturing Agreements.

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -6-

---

    (2) Falsely stating that FLUID had rights to the patented technology in the United States
when no such rights existed. *See* Exhibit "W."

    (3) Failing to pay past due invoices in the amount of $222,650.00. USD *See* Exhibit "X."

    (4) Attempting to sell the ENVIRO-SYN® patented products outside their territory in the
U.S. to ENOVO. *See* Exhibit "Q."

    (5) Entering into a Distribution Agreement with a company from Norway pertaining to
the ENVIRO-SYN® products, again, which is outside of FLUID's licensed territory.
*See* Exhibit "Y."

    (6) Falsely labeling products as DfE approved when the labels were never approved and
FLUID never asked HEG to obtain approvals on the labels. *See* Exhibits "O" and "P."

    (7) Falsely inducing investors to invest in FLUID for an amount close to or around $10
million dollars under the guise of an exclusive worldwide license with HEG for the
patented ENVIRO-SYN® products when no such worldwide license existed[6];

    (8) Failing to pay HEG royalties in the amount of $340,000.00 USD ;

    (9) Falsely stating in a post on the www.globalpetroleum.com website that the ENVIRO-
SYN® products were "developed and patented by Fluid Energy Group" when the
ENVIRO-SYN® products were developed and patented by HEG. *See* Exhibit "Z."

    (10)   Admitting in email correspondence that the technology is HEG's and
acknowledging that FLUID needed to get permission to send out news releases, but
then falsely stating in the proposed news release that FLUID has "exclusive oil & gas
industry manufacturing and distribution rights" in an attempt to garner more
investors under false pretenses. *See* Composite Exhibit "AA[7]."

    (11)   Falsely stating on Todem's website that "Enviro-Syn is the trade name of a line of
environmentally and HSE friendly acid and caustic replacements, developed and
patented by Fluid Energy Group." *See* Exhibit "BB."

    Based on the foregoing, I would ask that you discuss the contents of this letter and the
many exhibits with your client in detail so that we can have a meaningful discussion over the
phone sometime next week or the week of May 26 – May 30, 2014 as I will be away on business

---

[6] Upon information and belief, Clay Purdy blatantly misrepresented to investors that FLUID had worldwide rights to
the patent HEG technology in order to obtain investments in FLUID.
[7] It should be noted that John MacDonald never authorized FLUID to send out this news release.

David Wawro, Esquire
Torys, LLP
May 6, 2014
Page -7-

May 19 – May 23, 2014. It is my understanding that HEG's accounting department called last week to obtain statements for this past quarter and Mr. Purdy refused to provide such statements claiming that the Agreements were rescinded. Please advise your client that the Agreements have not been rescinded and that any continued offers for sale or sale of the ENVIRO-SYN® products by FLUID are not only a violation of the Agreements, but also constitute patent and trademark infringement and will not be taken lightly.

My client views this matter as serious and will take all steps necessary to protect their rights with respect to these and other legal issues surrounding their patent, trademark and other contractual rights. We expect your assurances, that no later than (10) business days from receipt of this letter you will either call or respond to this letter in writing setting up a time for us to discuss the issues raised herein. If you fail to do so by this date, we shall, without further notice to you, take such further action as we deem advisable to assert our clients statutory rights to obtain an injunction, recover damages, and to otherwise protect our client's interests.

I look forward to hearing from you.

Very truly yours,

Amber N. Davis, Esq.

Encls: Exhibits A-BB
cc:     Client
        James T. Swanson, Esquire



Progress Energy                                                                July 24, 2014

1200, 205 – 5th Avenue S.W.
Calgary, Alberta T2P 2V7

RE: Fluid Energy Group, Ltd

Dear Legal Department,

As customer of Fluid Energy Group, Ltd (Fluid) you are most likely aware, that Fluid was formed in 2011
on the technology backbone of Heartland Energy Group, Ltd. (Heartland). Until recently, under license
and manufacturing agreements, the products you have qualified and/or purchased have been based on
Heartland's technology, patents and trademarks.

On July 17th 2014 for multiple causes and contractual violations, Heartland chose to cancel all license
and manufacturing agreements with Fluid.  A copy of the termination letter is attached for your records.
Accordingly, Fluid is legally bound not to promote products for the same or similar use in the Oil and
Gas industry for two (2) years from the date of termination.

Upon information and belief, Fluid has chosen a dangerous path and is actively participating in the
marketing of products in the oil & gas industry.  Heartland believes Fluid is in violation of multiple
patents held by Heartland and we intend to pursue Fluid to the full extent of the law.

It is our legal obligation to inform you that any purchase, use, re-distribution or promotion of the said
product offered by Fluid would also put your company at risk of infringing on Heartland's patents
through your use of the infringing products.  For your reference, Heartland is the exclusive licensee to
several patents in this field, including, but not limited to U.S. Patent Nos. 8,430,971; 8,580,047; and
8,784,573.

Heartland has worked hard to maintain the highest reputation in the industry and intends on keeping
reputation.

If you are interested in purchasing the original, unadulterated, patented products you have tested and
qualified, you may purchase the Enviro-Syn® Branded, OilSafe Ar® Branded or OptiFrac Branded
products in Canada from Mud Masters by calling 403-237-8900.  For the US and all other countries call
Heartland Energy Group at 1-877-797-2811 and we will direct you to the nearest distributor.

THIS IS EXHIBIT ____ F ____

referred to in the Affidavit

of Clay Purdy

Sworn before me this 20th

day of August A.D. 2014

John MacDonald
President
Heartland Energy Group, Ltd.

HARVEY JAMES BERGER Commissioner for Oaths in and for the
Barrister & Solicitor        Province of Alberta

Heartland Energy Group, Ltd.                    www.heartlandenergygroup.net
Grain Valley, MO    Norfolk, VA                  Phone: 1-877-797-2811
Melbourne, FL    Victoria, Mahé-Seychelles       Fax: 1-816-867-2055

©2013 Heartland Energy Group, Ltd. All Rights Reserved.



Shell Canada Limited                                                                                July 24, 2014

400 – 4th Avenue S.W.
Calgary, Alberta
T2P 0J4 RE: Fluid Energy Group, Ltd

Dear Legal Department,

As customer of Fluid Energy Group, Ltd (Fluid) you are most likely aware, that Fluid was formed in
2011 on the technology backbone of Heartland Energy Group, Ltd. (Heartland). Until recently, under
license and manufacturing agreements, the products you have qualified and/or purchased have been
based on Heartland's technology, patents and trademarks.

On July 17th 2014 for multiple causes and contractual violations, Heartland chose to cancel all license
and manufacturing agreements with Fluid.  A copy of the termination letter is attached for your
records. Accordingly, Fluid is legally bound not to promote products for the same or similar use in the
Oil and Gas industry for two (2) years from the date of termination.

Upon information and belief, Fluid has chosen a dangerous path and is actively participating in the
marketing of products in the oil & gas industry.  Heartland believes Fluid is in violation of multiple
patents held by Heartland and we intend to pursue Fluid to the full extent of the law.

It is our legal obligation to inform you that any purchase, use, re-distribution or promotion of the said
product offered by Fluid would also put your company at risk of infringing on Heartland's patents
through your use of the infringing products.  For your reference, Heartland is the exclusive licensee to
several patents in this field, including, but not limited to U.S. Patent Nos. 8,430,971; 8,580,047; and
8,784,573.

Heartland has worked hard to maintain the highest reputation in the industry and intends on keeping
reputation.

If you are interested in purchasing the original, unadulterated, patented products you have tested and
qualified, you may purchase the Enviro-Syn® Branded, OilSafe Ar® Branded or OptiFrac Branded
products in Canada from Mud Masters by calling 403-237-8900.  For the US and all other countries call
Heartland Energy Group at 1-877-797-2811 and we will direct you to the nearest distributor.

John MacDonald
President
Heartland Energy Group, Ltd.



MultiChem Production Chemicals                    July 24, 2014

3000 N. Sam Houston Pkwy E.
Houston, TX 77032 U.S.A.

**RE: Fluid Energy Group, Ltd**

**Dear Legal Department,**

As customer of Fluid Energy Group, Ltd (Fluid) you are most likely aware, that Fluid was formed in 2011 on the technology backbone of Heartland Energy Group, Ltd. (Heartland). Until recently, under license and manufacturing agreements, the products you have qualified and/or purchased have been based on Heartland's technology, patents and trademarks.

On July 17th 2014 for multiple causes and contractual violations, Heartland chose to cancel all license and manufacturing agreements with Fluid. A copy of the termination letter is attached for your records. Accordingly, Fluid is legally bound not to promote products for the same or similar use in the Oil and Gas industry for two (2) years from the date of termination.

Upon information and belief, Fluid has chosen a dangerous path and is actively participating in the marketing of products in the oil & gas industry. Heartland believes Fluid is in violation of multiple patents held by Heartland and we intend to pursue Fluid to the full extent of the law.

It is our legal obligation to inform you that any purchase, use, re-distribution or promotion of the said product offered by Fluid would also put your company at risk of infringing on Heartland's patents through your use of the infringing products. For your reference, Heartland is the exclusive licensee to several patents in this field, including, but not limited to U.S. Patent Nos. 8,430,971; 8,580,047; and 8,784,573.

Heartland has worked hard to maintain the highest reputation in the industry and intends on keeping reputation.

If you are interested in purchasing the original, unadulterated, patented products you have tested and qualified, you may purchase the Enviro-Syn® Branded, OilSafe Ar® Branded or OptiFrac Branded products in Canada from Mud Masters by calling 403-237-8900. For the US and all other countries call Heartland Energy Group at 1-877-797-2811 and we will direct you to the nearest distributor.

John MacDonald
President
Heartland Energy Group, Ltd.

©2013 Heartland Energy Group, Ltd. All Rights Reserved.



**Calfrac Well Services**

July 24, 2014

411 - 8th Ave S.W.
Calgary, Alberta, Canada T2P 1E3
RE: Fluid Energy Group, Ltd

Dear Legal Department,

As customer of Fluid Energy Group, Ltd (Fluid) you are most likely aware, that Fluid was formed in 2011 on the technology backbone of Heartland Energy Group, Ltd. (Heartland). Until recently, under license and manufacturing agreements, the products you have qualified and/or purchased have been based on Heartland's technology, patents and trademarks.

On July 17th 2014 for multiple causes and contractual violations, Heartland chose to cancel all license and manufacturing agreements with Fluid.  A copy of the termination letter is attached for your records. Accordingly, Fluid is legally bound not to promote products for the same or similar use in the Oil and Gas Industry for two (2) years from the date of termination.

Upon information and belief, Fluid has chosen a dangerous path and is actively participating in the marketing of products in the oil & gas industry. Heartland believes Fluid is in violation of multiple patents held by Heartland and we intend to pursue Fluid to the full extent of the law.

It is our legal obligation to inform you that any purchase, use, re-distribution or promotion of the said product offered by Fluid would also put your company at risk of infringing on Heartland's patents through your use of the infringing products.  For your reference, Heartland is the exclusive licensee to several patents in this field, including, but not limited to U.S. Patent Nos. 8,430,971; 8,580,047; and 8,784,573.

Heartland has worked hard to maintain the highest reputation in the industry and intends on keeping reputation.

If you are interested in purchasing the original, unadulterated, patented products you have tested and qualified, you may purchase the Enviro-Syn® Branded, OilSafe Ar® Branded or OptiFrac Branded products in Canada from Mud Masters by calling 403-237-8900.  For the US and all other countries call Heartland Energy Group at 1-877-797-2811 and we will direct you to the nearest distributor.

John MacDonald
President
Heartland Energy Group, Ltd.

Heartland Energy Group, Ltd.
Grain Valley, MO     Norfolk, VA
Melbourne, FL     Victoria, Mahé-Seychelles
www.heartlandenergygroup.net
Phone: 1-877-797-2811
Fax: 1-816-867-2055

©2013 Heartland Energy Group, Ltd. All Rights Reserved.



RECEIVED

AUG 0 6 2014

All Points Energy Inc

Suite 1500-140 4ᵗʰ Ave SW

Calgary, Alberta

T2P 3N3

RE: Fluid Energy Group, Ltd

Dear Legal Department,

As customer of Fluid Energy Group, Ltd (Fluid) you are most likely aware, that Fluid was formed in 2011 on the technology backbone of Heartland Energy Group, Ltd. (Heartland). Until recently, under license and manufacturing agreements, the products you have qualified and/or purchased have been based on Heartland's technology, patents and trademarks.

On July 17ᵗʰ 2014 for multiple causes and contractual violations, Heartland chose to cancel all license and manufacturing agreements with Fluid. A copy of the termination letter is attached for your records. Accordingly, Fluid is legally bound not to promote products for the same or similar use in the Oil and Gas industry for two (2) years from the date of termination.

Upon information and belief, Fluid has chosen a dangerous path and is actively participating in the marketing of products in the oil & gas industry. Heartland believes Fluid is in violation of multiple patents held by Heartland and we intend to pursue Fluid to the full extent of the law.

It is our legal obligation to inform you that any purchase, use, re-distribution or promotion of the said product offered by Fluid would also put your company at risk of infringing on Heartland's patents through your use of the infringing products. For your reference, Heartland is the exclusive licensee to several patents in this field, including, but not limited to U.S. Patent Nos. 8,430,971; 8,580,047; and 8,784,573.

Heartland has worked hard to maintain the highest reputation in the industry and intends on keeping reputation.

If you are interested in purchasing the original, unadulterated, patented products you have tested and qualified, you may purchase the Enviro-Syn® Branded, OilSafe Ar® Branded or OptiFrac Branded products in Canada from Optifrac Chemical Services by calling 403-257-8900. For the US and all other countries call Heartland Energy Group at 1-877-797-2811 and we will direct you to the nearest distributor.

John MacDonald
President
Heartland Energy Group, Ltd.

THIS IS EXHIBIT    G
referred to in the Affidavit
of Clay Purdy
Sworn before me this    20ᵗʰ
day of August    A.D. 2014

HARVEY JAMES BERGER
Barrister & Solicitor

A Commissioner for Oaths in and for the

**Heartland Energy Group, Ltd.**       www.heartlandenergygroup.net
Grain Valley, MO    Norfolk, VA       Phone: 1-877-797-2811
Melbourne, FL      Victoria, Mahé-Seychelles       Fax: 1-816-867-2055

©2013 Heartland Energy Group, Ltd. All Rights Reserved.

# BEUSSE WOLTER SANKS & MAIRE, P.A.

JAMES H. BEUSSE
JACKSON O. BROWNLEE
ERICA M. CIPPARONE
AMBER N. DAVIS
JOHN L. DEANGELIS
PATRICK D. HERRON
DAVID G. MAIRE
CHRISTINE Q. MCLEOD
CIAN G. O'BRIEN
FRED M. ROMANO
TERRY M. SANKS
TIMOTHY H. VAN DYKE
KEVIN W. WIMBERLY
ROBERT L. WOLTER

390 N. ORANGE AVENUE, SUITE 2500
ORLANDO, FLORIDA 32801
TELEPHONE (407) 926-7700
FACSIMILE (407) 926-7720
WWW.IPLAWFL.COM

PATENT AGENT
CHRISTOPHER D. BAYNE

WRITER'S DIRECT
DIAL/EMAIL
(407) 926-7716
ADAVIS@IPLAWFL.COM

June 12, 2014

*Via E-Mail*
David Wawro, Esquire
Torys, LLP
1114 Avenue of the Americas
New York, New York 10036-7703

      *Re:   Termination of Manufacturing and License Agreements*

Dear Mr. Wawro:

As you are aware, this firm represents Environmental Manufacturing Solutions – East Coast, Environmental Manufacturing Solutions, LLC ("EMS") and Heartland Energy Group, Ltd. ("HEG") with respect to their intellectual property and other related matters. This letter will serve as **Termination of the Manufacturing and License Agreements** between HEG and Fluid Energy Group, Ltd. and HEG and Fluid Lux S.a.r.l respectively ("collectively referred to as "FLUID"). Such Agreements were previously attached as Exhibits A-F to my May 6, 2014 letter addressed to you and ███████████████████████████████████

Although the License Agreements state that Notice of Termination must be sent to Clay Purdy directly that would not be appropriate, which is why the letter is being sent to you as their counsel. Based on our previous correspondence as well as ██████████████████████
████████████████████ it is our understanding that you represent FLUID in this matter.

As discussed at length in my May 6, 2014 letter to you, ██████████████████████
██████████████████. Moreover, and as grounds for termination, your client has materially breached several provisions in the Agreements. Such provisions, include, but are not limited to the following:

David Wawro, Esquire
Torys, LLP
June 12, 2014
Page 2 of 3

**License Agreements**

- **Paragraph 5 (A)** - failure to pay royalties for the months of January -- May of 2014.
- **Paragraph 5(A)** -- failure to meet the Sales Minimum by December 31, 2014.
- **Paragraph 6(A)** -- failure to furnish Licensor written statements, under oath, specifying the total number of products sold during the preceding month for the months of October 2012-December 2013 and March- May of 2014.
- **Paragraph 6(B)** -- failure to make Royalty Payments for the months of January -- May of 2014.

**Manufacturing Agreements**

- **Paragraph 2.5** -- for marketing and selling the Licensed Products outside of FLUID's territory and without written consent of HEG.
- **Paragraph 2.10** - for conducting unauthorized testing from third-party laboratories without the prior approval of HEG.
- **Paragraph 3.2** -- for selling competitive goods during the term of the Agreements.
- **Paragraph 5.1** -- for failure to meet the quota of $1,000,000 for 2013.
- **Paragraph 5.2** -- failure to meet the quota as well as failure to amend its rights to non-exclusive rights as per 5.2(b) for 2014.
- **Paragraph 5.2** -- for failure to meet the quota as well as failure to make payment to HEG equal to the shortfall of such quota to maintain exclusive rights as per 5.2(a) for 2014 in the amount of $1,000,000 while representing to investors, customers, dealers and in web presence Fluid maintained said exclusive rights.
- **Paragraph 6.3** -- failure to make payments within 30 days of the date of invoice.
- **Paragraph 6.5.** -- failure to pay 8.0% interest on all overdue balances outstanding.
- **Paragraph 11.1-** improperly and without authorization obtaining a trademark registration in Canada for ENVIRO-SYN as well as filing trademarks in the U.S. for ENVIRO-SYN.
- **Paragraph 11.2** -- improperly telling investors and potential investors that FLUID was the owner of the Patents and Technology as well as attempting to sell and selling such Licensed Products outside of FLUID's licensed territory.

In addition to the above violations of the Agreements, as you are aware, your client has also committed securities and investor fraud, tortiously interfered with my client's business and

David Wawro, Esquire
Torys, LLP
June 12, 2014
Page 3 of 3

will soon be infringing on my client's trademarks (ENVIRO-SYN) and patents (referenced above) if such actions are not stopped.

As per paragraph 4(c) and 4(d) of the License Agreements and 14.2(c) of the Manufacturing Agreements, this termination is effective 30 days from today's date if your client fails to cure such breach. Based on the foregoing and pursuant to Paragraphs 4(b) and 22 of the License Agreement, HEG hereby demands that if FLUID fails to cure such breach within such 30 day period, on July 12, 2014, FLUID shall cease from all use of the Patents and technology claimed therein, including, but not limited to U.S. Patent Nos. 8,580,047, 8,430,971 and PCT Application WO 2012/075091. FLUID shall also cease from selling or manufacturing, whether directly or in association with other persons or firms, of any product, process or service, which competes with any Products covered by the Patents **for a period of 2 years** from July 12, 2014.

As per paragraph 23 of the License Agreements, HEG owns all tools, molds and equipment related to the Licensor's products. Therefore, please provide me with a date and time that representatives from HEG or a third-party can enter onto FLUID's facility to obtain all such tools, molds and equipment.

Finally, we were surprised to see the email dated June 2, 2014 from your colleague Mr. Mike Pedlow to the shareholders for Fluid Energy Group, Ltd. We were even more surprised to see the false statements and misrepresentations made in the Q1 Highlight and the alleged Audited Financials which show no mention of the $1,873.755,67 amount owed to HEG. Based on the foregoing, a copy of this letter will be sent to all shareholders so that the shareholders are aware of HEG's stance on Fluid's alleged termination of their relationship with their U.S. Supplier, who happens to be the owner of all right, title and interest to the Licensed Products, Patent, technology and trademarks, which your client failed to mention to its shareholders.

Please feel free to contact me should you wish to discuss this any further.

Very truly yours,

Amber N. Davis, Esq.

Encls: May 6, 2014 letter
cc:    Client



TORYS
———————— LLP

79 Wellington St. W., 30th Floor
Box 270, TD South Tower
Toronto, Ontario M5K 1N2 Canada
P. 416.865.0040 | F. 416.865.7380
www.torys.com

Theresa Fauconnier, Ph.D., J.D., Patent Agent
tfauconnier@torys.com
P. 416.865.7534

**DRAFT**

July 22, 2014

**VIA EMAIL AND CONFIRMATION COPY BY MAIL**

Fluid Energy Group Ltd.
104, 214 - 11th Avenue S.E.
Calgary, AB  T2G 0X8

Attention:    Clay Purdy

Dear Sirs:

**Re:    Canadian patents (Our Ref. 36310-2001)**

You asked us to determine whether John T. MacDonald, or either of Heartland Energy Group, Ltd. and Green Products & Technologies, L.L.C., is the named inventor, applicant, or owner, as the case may be, of any Canadian published patent applications or active issued patents.

Conclusion

Subject to the Search Strategy and Search Limitations described below, there are no published Canadian patent applications or active issued Canadian patents naming John T. MacDonald, Heartland Energy Group, or Green Products & Technologies, L.L.C., as inventor, applicant, or owner.

Canadian Patents Rights

Generally, only patents issued and active in Canada can be enforced in Canada. For example, the owner of a U.S. patent generally cannot enforce the U.S. patent in Canada.

Search Strategy

To reach the conclusion above, we searched the publicly available, on-line database maintained by the Canadian Intellectual Property Office ("CIPO", and the database "CIPO Database") for published patent applications and active issued patents using the following search terms in the indicated field:

        macdonald <near/3> john    in the inventor, applicant, and owner fields;
        heartland                  in the applicant and owner fields;
        "green product*"           in the applicant and owner fields.

For the purpose of this letter, an active patent is a patent that has not lapsed or expired.

THIS IS EXHIBIT ___H___
referred to in the Affidavit
of Clay Purdy
Sworn before me this ___20th___
day of August A.D. 2014

**HARVEY JAMES BERGER** Commissioner for Oaths in and for the
**Barrister & Solicitor**        Province of Alberta

<u>Search Limitations</u>

Canadian patent applications filed after October 1, 1989 are available to the public eighteen months after their priority date. Such post-October 1, 1989 applications will not be uncovered prior to the expiry of eighteen months after their priority date. In addition, applications filed under the Patent Cooperation Treaty (PCT) typically enter national phase in Canada (i.e. become instruments of record at CIPO) 30 months, or even 42 months, after their priority date. Therefore, there can be significant gaps in availability of Canadian patent applications available through electronic searching of CIPO records. Canadian patent applications filed before October 1, 1989 are confidential while they are pending. Such confidential applications will not be uncovered by an electronic search or a manual patent search. The CIPO Database includes patents from 1869; however, the searchable indices are generally only enabled for patent applications filed after October 1, 1989 and so the tendency is to not place confidence in search results before this date.

It is possible for there to be errors in CIPO's records. Additionally, it often takes several weeks for information submitted to CIPO to appear in the CIPO Database, and therefore recently submitted documents may not have been uncovered by the search.

If the inventor/applicant/owner name is entered into CIPO's records in a different way to that searched, the entries may not come up in the search. Additionally, if an application or registration is recorded in the name of a predecessor, it may not come up in the search.

Our searches and conclusion were confined to the CIPO Database and above limitations. We have relied upon the accuracy and completeness of the CIPO Database as of the date of our searches, which was July 22, 2014.

Yours truly,

Theresa Fauconnier
*Ph.D., J.D., Patent Agent*

TF/