# EXHIBIT "U"

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

APR ENERGY, LLC, a Florida limited liability
company,

        Plaintiff,

v.                              Case No.  3:14-cv-575-J-34JBT

FIRST INVESTMENT GROUP
CORPORATION, a foreign corporation;
and FIRST ENGINEERING GROUP a/k/a
1st ENGINEERING GROUP, a foreign
corporation,

        Defendants.

_____/

## O R D E R

**THIS CAUSE** is before the Court on Plaintiff, APR Energy, LLC's Verified Motion

for Expedited Hearing and Preliminary Injunction Barring Defendant's from Pursuing

Libyan Proceeding in Contravention of Arbitration Agreement (Doc. 3; Motion) filed on

May 19, 2014; Defendants' First Investment Group Corporation's and First Engineering

Group's Verified Response Opposing Plaintiff's Motion for Preliminary Injunction (Doc.

15; Response) filed on June 6, 2014; APR's Reply in Support of its Verified Motion for

Expedited Hearing and Preliminary Injunction Barring Defendants from Pursuing Libyan

Proceeding in Contravention of Arbitration Agreement (Doc. 16; Reply) filed on June

11, 2014; Defendants First Investment Group Corporation and First Engineering

Group's Supplement to Verified Response Opposing Plaintiff's Motion for Preliminary

Injunction (Doc. 28; Supplemental Response) filed on August 1, 2014; and APR's

Supplemental Memorandum in Support of its Verified Motion for Expedited Hearing and

Preliminary Injunction Barring Defendants from Pursuing Libyan Proceeding in Contravention of Arbitration Agreement (Doc. 30; Supplemental Memorandum) filed on August 1, 2014.  At the preliminary injunction hearing held on August 21, 2014, the parties agreed that the Court should render final judgment in this case based on the current record.[1]

## I.    Background and Procedural History

Plaintiff APR Energy, LLC (APR) develops and operates energy-generating plants and provides electrical power to retailers or end-consumers of electric power. See Services Agreement at 1 (Doc. 1-1; Services Agreement).  Wishing to establish and operate a thermal power plant project in Libya, APR entered into the Services Agreement with Defendant First Investment Group Corporation (FIGCorp) and FIGCorp's subsidiary Defendant First Engineering Group (FEG) (collectively, Defendants) on or about February 1, 2013.[2]  Id.; Motion ¶ 3.  Under the Services Agreement, FEG agreed to provide consulting services to APR, and both FEG and FIGCorp were to receive payment for those services.  See Services Agreement 1, 17; see also Affidavit of Irene Dallas in Support of Defendants' Response Opposing Motion for Preliminary Injunction ¶ 12 (Doc. 28-1; Dallas Affidavit).[3]  According to Defendants,

---

[1] Pursuant to Rule 65(a)(2), Federal Rules of Civil Procedure, and with the parties' consent, the Court advanced the trial on the merits and consolidated it with the preliminary injunction hearing.

[2] The Services Agreement has an effective date of April 1, 2012.

[3] In the Complaint, APR alleges that under the Services Agreement, "FEG would provide APR certain specified consulting services" and "FEG's remuneration for the Services would . . . constitute '8% of the actual amount paid to APR by General Electricity Company of Libya ('GECOL')'." Complaint ¶¶ 12, 13. And in the Response, APR asserts that FEG was to provide the services and FIGCorp was to be the recipient of the payment for these services.  Response ¶ 4.  At the preliminary injunction hearing, the (continued...)

they helped APR reach an agreement with General Electricity Company of Libya (GECOL) to provide electric power capacity, and APR and GECOL entered into a contract for provision of such on or about March 14, 2013. Response ¶ 5; see also Services Agreement at 1.[4] The GECOL project contract included the installation, commissioning and operation of temporary power generation facilities by APR at four sites, and is purported to be valued at $147,780,100. Response ¶ 6. Under the Services Agreement, APR was to pay Defendants "an amount equal to 8% of the actual amount paid to APR by [GECOL]," and these payments were to be made "in installments fifteen (15) business days after APR receives payment from [GECOL]," provided that APR has provided an invoice to GECOL and APR has received payment of such an invoice from GECOL. Services Agreement at 17; Complaint ¶ 13.

On March 31, 2014, Defendants' counsel wrote to APR regarding APR's alleged failure to pay Defendants in breach of the Services Agreement (Doc. 1-2; March 31, 2014 Letter). The letter indicates that Defendants instructed their counsel to commence arbitration proceedings in accordance with Clause[5] 10(a) of the Services

---

[3](...continued)
parties agreed that the term Service Provider in the Services Agreement includes both FEG and FIGCorp. Thus, the Court will accept that definition.

[4] Defendants' counsel Irene Dallas testified that while the Services Agreement is a contract between FEG/FIGCorp and APR Energy, LLC, "the Contract which APR procured as a result of FIG/FEG's efforts is between GECOL and APR PLC." Dallas Aff. ¶ 9. APR Energy, LLC (the plaintiff in this action) is an affiliate of APR PLC. Id. APR's President, Laurence Anderson, testified that APR LLC and GECOL entered into the contract under which APR provided power generation services to GECOL, and GECOL was obligated to pay APR. See Declaration of Laurence Anderson ¶ 6 (Doc. 29-1; Anderson Decl.). As discussed below, this distinction is not material for purposes of resolving this Motion.

[5] Throughout this Order, portions of the Services Agreement are referenced interchangeably as "Clause" and "Section."

Agreement, and to make an application, pursuant to Clause 10(h) of the Services Agreement, to the Court in Tripoli "for an order to prevent the payment of any further sums to [APR] by GECOL until this dispute is resolved." See March 31, 2014 Letter. Clause 10 of the Services Agreement states: "Except as provided in Section 15 below,[6] any dispute which arises under this Agreement shall be resolved by submittal to binding arbitration pursuant to the International Arbitration Rules of the International Center for Dispute Resolution of the International Chamber of Commerce (the "ICC")[.]" Services Agreement at 5. Clause 10(h) of the Services Agreement provides a narrow exception to the parties' duty to arbitrate:

> The parties reserve the right to refer to a court of competent jurisdiction all preliminary injunction suits, if necessary to obtain legal measures intended to protect their rights prior to or during the arbitration, and such measures shall not be considered a waiver or violation of the arbitration; provided that, such judicial relief: (i) is limited to that which is required to prevent imminent damage to a party; and (ii) does not resolve the merits or substance of such Dispute. In the event that the Service Provider or the Principals shall commit or cause to commit a breach of this Agreement (including but not limited to the provisions of Sections 5-8 hereof), then in such event, each of the Service Provider and the Principals hereby consents to the granting of a temporary or permanent injunction against it, him or her by any court of competent jurisdiction prohibiting it, him or her from violating any provision of this Agreement, without the necessity of having to post any bond therefor. In any proceeding for an injunction and upon any motion for a temporary or permanent injunction, each of Service Provider and the Principals agrees

---

[6] Section 15 of the Services Agreement provides an exception to the arbitration clause "for any breach or threatened breach of any of Sections 5, 6, 7 or 8 of" the Services Agreement. Services Agreement at 9. Section 5 of the Services Agreement concerns "Ownership of the Project and Intellectual Property." Id. at 3. Section 6 provides that "the Service Provider and the Principals shall not engage in any acts or conduct and shall not make any statement which might damage the business of APR or any of its affiliates or which could reasonably be expected to have an adverse effect on the Project or the business, financial condition, goodwill or reputation of APR or any of its subsidiaries or affiliates or any of their respective officers, managers, directors, employees, or controlling persons." Id. Section 7 includes a covenant not to compete and a nonsolicitation provision. Id. at 3-4. Section 8 governs the parties' obligations regarding confidential information. Id. at 4.

> that its, his or her ability to answer in damages shall not be a bar or
> interposed as a defense to the granting of such temporary or permanent
> injunction against each of the Service Provider and the Principals. Each
> of the Service Provider and the Principals further agrees that APR will
> not have an adequate remedy at law in the event of any breach by the
> Service Provider or the Principals and that APR will suffer irreparable
> damage and injury if any of the Service Provider or the Principals
> breaches any of the provisions of this Agreement.

Id. at 6.

APR initiated the instant action on May 19, 2014, by filing a Complaint in which it alleges that Defendants breached the parties' Services Agreement through FEG's substandard and unsatisfactory performance of the agreed-upon consulting services. Complaint ¶ 14. APR acknowledges that Defendants told APR they intended to commence arbitration proceedings in accordance with the Services Agreement due to APR's alleged breach of the Services Agreement for non-payment, but also alleges that Defendants threatened to initiate litigation in Libya, seeking an order to prevent any further payment to APR by GECOL. Id. ¶ 16. Additionally, APR asserts that Defendants had not commenced arbitration proceedings, had no intent to do so, and instead intended to initiate legal proceedings in Libya, which APR alleges would be prohibited by the Services Agreement. Id. ¶¶ 17-20. In conjunction with the Complaint, APR filed the Motion in which it requests that the Court "(a) enter an Order compelling the Defendants to submit the dispute which Defendants have threatened to litigate in Libya to binding arbitration, as agreed upon in the Agreement, and (b) enjoin the Defendants from pursuing" legal proceedings in Libya. Motion ¶ 13; see also Complaint ¶ 22.

On May 22, 2014, the Court entered an order setting a hearing and briefing schedule for consideration of the Motion (Doc. 7).[7]  On or about May 22, 2014, Defendants initiated an ICC arbitration against APR,  Response ¶ 10,[8] and on or about May 23, 2014, FEG initiated legal proceedings in Libya (the "Libyan Proceeding") by submitting an application to the Libyan court requesting that 8% of the value of APR's contract with GECOL "remain on precautionary hold with GECOL," see Libyan Application at 10 (Doc. 15-3; Libyan Application); see also Response ¶ 12.  On June 2, 2014,[9] after Defendants had requested and received an extension of time to respond to the Motion (Docs. 10, 11), but before Defendants had responded, the Libyan court issued an order placing a "precautionary hold on APR's dues with GECOL, as fulfillment of the debts of the plaintiff company [FEG] representing 8% of the one hundred million US dollars paid to APR" and setting a hearing for June 17, 2014 (Doc. 15-4; Libyan Order).[10]  Also on June 2, 2014, Defendants' counsel informed APR that

---

[7] The Court set the matter for a hearing to be held on June 17, 2014, at 2:30 p.m.

[8] There was some confusion at the Telephonic Status Conference regarding whether both FIGCorp and FEG had paid the arbitration fee.  See Transcript from Telephonic Status Conference at 11-12 (Doc. 24).  However based upon Defendants' filings, it appears that both parties have paid the fee at this time.  See Dallas Affidavit at 10.

[9] Defendants assert that the Libyan court granted the Libyan Application on June 2, 2014.  See Defendants' First Investment Group Corporation's and First Engineering Group's Verified Response Opposing Plaintiff's Motion for Preliminary Injunction (Doc. 15; Response).  Albudery Shariha, APR's Libyan counsel, states in his declaration that the Libyan court granted the ex parte hold on June 5, 2014.  See Declaration of Albudery Shariha ¶ 6 (Doc. 29-2, Exhibit B; 7/31/2014 Shariha Decl.).  However, this discrepancy in the date the Libyan court granted FEG's Application is not material for purposes of the Court's resolution of the merits of this action.

[10] According to Shariha, "[a]s no judgment has been rendered in any proceeding finding that APR was indebted in any amount to FEG[,]" his understanding is that the "hold was the equivalent of a garnishment before judgment of sums due by GECOL to APR." 7/31/2014 Shariha Decl. ¶ 6.  The Libyan Order, which Shariha labels the "Writ," has been served upon GECOL and is still pending before the
(continued...)

-6-

Defendants "made an application to the Tripoli Court for an order that GECOL withhold USD 8 million[11] from their next payment to [APR,]" that they "are now in the process of arranging service of this Order on GECOL[,]" and that "a return date for the inter-parties hearing in Tripoli has been scheduled for 17 June 2014" (Doc. 12-2; June 2, 2014 Letter).

Defendants' June 2, 2014 Letter prompted APR to file APR's Emergency Motion for Temporary Restraining Order And/Or Preliminary Injunction with Notice to Defendants (Doc. 12; Motion for TRO). In the Motion for TRO, APR sought a temporary restraining order from this Court "to preclude the Defendants from taking any action pursuant to the Libyan proceedings, including serving GECOL with the alleged order, and directing Defendants to dismiss any such proceedings." Motion for TRO ¶ 6. The Court construed the relief sought by APR in the Motion for TRO as a request for an anti-suit injunction (Doc. 13; June 4, 2014 Order). Upon finding that APR failed to provide sufficient information to satisfy the threshold requirements for an anti-suit injunction, the Court entered an order denying the Motion for TRO without prejudice. Id. at 4-5.

On June 6, 2014, Defendants filed their Response to the Motion, and on June 11, 2014, APR filed the Reply. However, on June 16, 2014, APR and Defendants filed

---

10(...continued)
Libyan court. Id.

11 According to Defendants' counsel, the USD 8 million figure is "8% of the payment of USD100,000,000 which [APR] has received from GECOL[;]" however, Defendants' counsel also noted that APR "may have received additional sums but [Defendants have] not yet been provided with that information." June 2, 2014 Letter.

the Parties' Joint Stipulation and Agreed Motion for Postponement of Proceedings in Aid of Mediation (Doc. 17; Joint Stipulation), in which they informed the Court that they had agreed to mediate the dispute in London, England.  Joint Stipulation at 1.  As such, the parties requested that the Court postpone the June 17, 2014 hearing for thirty days.  Id. at 2.  Thereafter, the Court entered an Order staying the case until July 16, 2014 (Doc. 18).

On July 16, 2014, APR notified the Court that the parties' mediation was unsuccessful and requested that the Court reset the previously-scheduled hearing.  See APR's Request to Reset Previously-Scheduled Hearing on its Motion for Preliminary Injunction in Light of Mediation Impasse at 2 (Doc. 19; Request to Reset).  In light of APR's request, the Court held a Telephonic Status Conference on July 22, 2014, during which the parties consented to the entry of a preliminary injunction order compelling arbitration pursuant to the terms of the Services Agreement (Doc. 22; 7/22/2014 Clerk's Minutes).  Accordingly, the Court entered an order granting preliminary injunctive relief to the extent of the parties' consent and directing the parties to arbitrate all covered claims (Doc. 23; July 22, 2014 Order).  The Court then took the remaining issues, whether the Libyan Proceeding falls within the exception to the parties' agreement to arbitrate and APR's request for an anti-suit injunction, under advisement and set the matter for a hearing on August 21, 2014, at 2:00 p.m.  Id. at 2.  Having conducted the hearing, this matter is ripe for resolution.

## II.    Summary of the Arguments

APR contends that "the Libyan Proceeding constitutes a direct breach" of Clause 10 (the arbitration clause) of the Services Agreement.  Motion ¶ 8; <u>see also</u> Reply at 2-8.  As such, APR argues that the Court should enter an order compelling Defendants to arbitrate all of the parties' disputes, including Defendants' request for pre-judgment relief, and "issue an anti-suit injunction requiring the Defendants to immediately cease, desist and abandon the Libyan Proceeding because the parties have agreed that any and all disputes arising from the Agreement should be resolved by way of binding arbitration."  Motion ¶ 31; <u>see also</u> Reply 8-11.

APR argues that an anti-suit injunction is proper because both of the threshold requirements[12] for issuance of an anti-suit injunction are met: With regard to the first prong, which requires that the parties be the same in both the foreign and domestic actions, APR argues that "the real parties in interest are the same in the two actions." Reply at 9; <u>see</u> Supplemental Memorandum at 4-8.  Specifically, APR contends that FEG and FIGCorp are "sufficiently similar" for purposes of an anti-suit injunction.  As for GECOL, APR argues that its presence in the Libyan Proceeding is "solely as a nominal third party entity from which to 'attach' APR's property" and that there are no substantive claims asserted against GECOL in the foreign action.  Reply at 10; <u>see also</u> Supplemental Memorandum at 7-8.  Turning to the second prong, APR asserts that "[b]ecause the issue of pre-judgment remedies is within the scope of the arbitration

---

[12] APR denominates the two threshold requirements as "threshold factors[.]" Motion ¶ 33. Because both requirements must be satisfied before the Court may address the discretionary factors governing issuance of an anti-suit injunction, this Order will not reference these requirements as "factors."

clause in the Agreement and it does not present any issue of imminent damage [which would bring the Libyan Proceeding under the only exception to arbitration under the Services Agreement], this Court's arbitrability ruling has already resolved the issues raised in the Libyan Proceeding." Supplemental Memorandum at 11. Further, APR asserts that additional discretionary factors warrant an anti-suit injunction "to protect this Court's unquestionable jurisdiction and public policy favoring the enforcement of arbitration agreements." See Motion ¶ 39; see also Supplemental Memorandum at 12-19.

According to Defendants, APR is not entitled to an anti-suit injunction because APR's request rests on the "faulty premise that the Libyan action is intended to resolve this matter on the merits, in avoidance of arbitration" where, in actuality, "[t]he Libyan action was merely for an injunction to secure the funds that are due and payable" to Defendants under the Services Agreement. Response at 4-5. Defendants argue that APR's request for an anti-suit injunction should be denied because the Libyan Proceeding is "expressly authorized to be taken under Section 10(h) of the Service[s] Agreement." Id. at 1, 5, 6. Additionally, Defendants contend that the threshold requirements for an anti-suit injunction are not met because in the instant action, only APR, FIGCorp, and FEG are parties; whereas in the Libyan Proceeding, APR, FEG, and GECOL are the parties. Id. at 5-6. Last, Defendants contend that other factors beyond the gatekeeping inquiry counsel against an anti-suit injunction because to the extent Defendants have already commenced arbitration, "the foreign action is [not] vexatious to the movant" and "[t]here is no threat to this Court's jurisdiction[.]" Id. at 6.

Additionally, in the Supplemental Response, Defendants raise several affirmative defenses. Defendants contend that they have satisfied the prerequisites under Florida Statute section 77.031 to obtain a pre-judgment writ of garnishment in Libya, but argue that APR cannot establish the prerequisites to injunctive relief under Clause 10(h) of the Services Agreement because (1) APR has not demonstrated that it will be imminently damaged by the Libyan Proceeding in that APR's claims are tied to monetary relief, and (2) the relief APR seeks would effectively resolve the merits and substance of the Libyan Proceeding. Supplemental Response at 2-4. Next, Defendants contend that because APR has not initiated arbitration itself, APR has unclean hands, and thus "should be estopped from demanding the entry of an order to effectively compel the involuntary dismissal of the Libyan proceeding." Id. at 4-5. Further, Defendants argue that because FIGCorp and FEG have commenced arbitration, the Court's July 22, 2014 Order, which orders the parties to arbitrate, "should be vacated and the matter determined moot." Id. at 5. Defendants also assert that APR has admitted that it has received payments from GECOL but that APR has not remitted any money to Defendants, so APR has breached the Services Agreement and should not be allowed to pursue remedies under the Services Agreement. Id. at 5-6. Last, Defendants argue that if APR's request for an anti-suit injunction is granted, APR should be required to post a bond, despite the presence of a one-way bond waiver in APR's favor in the Services Agreement. Id. at 6-7.

III.     **Discussion**

   A.     **Count 1 - Request for Order Compelling Arbitration and Attendant Relief Pursuant to 9 U.S.C. § 206**

   In Count 1 of the Complaint, APR seeks an order compelling Defendants "to submit (1) all disputes between the parties under the Agreement, and (2) all matters raised or asserted in the Libyan Proceedings to binding Arbitration in accordance with the terms of the Agreement, and also enter an Order enjoining the Defendants from pursuing the Libyan Proceedings or any similar proceeding, and providing Plaintiff all other relief deemed just, proper, and equitable." Complaint ¶ 28. At the Court's July 22, 2014 Telephonic Status Conference, the parties agreed to preliminary injunctive relief ordering the parties to arbitrate their claims. As such, the Court's July 22, 2014 Order granted the Motion to the extent the parties were directed to submit all covered claims to arbitration. Indeed, Defendants have initiated an ICC arbitration against APR. Nevertheless, Defendants maintain that the claim asserted in the Libyan Proceeding is not subject to arbitration. As such, the Court must determine whether the Services Agreement requires the claim raised in the Libyan Proceeding to be submitted to arbitration.

   The arbitration clause in the Services Agreement is subject to enforcement pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, opened for signature June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "Convention"), and its implementing legislation, 9 U.S.C. §§ 202-208 (the "Convention Act"). In deciding a motion to compel arbitration under the Convention Act, a district court must order arbitration unless (1) the four jurisdictional

-12-

prerequisites are not met, or (2) one of the Convention's affirmative defenses applies.[13]

Bautista v. Star Cruises, 396 F.3d 1289, 1294-95 (11th Cir. 2005); see also Lindo v. NCL (Bahamas), Ltd., 652 F.3d 1257, 1276 (11th Cir. 2011). The four jurisdictional prerequisites require that:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

Bautista, 396 F.3d at 1294 n.7. Here, there is no dispute that the jurisdictional prerequisites are met,[14] and Defendants have raised none of the Convention's affirmative defenses to the validity of the arbitration agreement. Indeed, the parties agree that they must arbitrate the substance of their dispute. Their disagreement is over the question of whether the arbitration obligation extends to the pre-judgment relief sought by Defendants in the Libyan Proceeding. Notably, "under the Convention and Supreme Court and Circuit precedent, there is a strong presumption in favor of freely-negotiated contractual choice-of-law and forum-selection provisions, and this

---

[13] "The Convention requires that courts enforce an agreement to arbitrate unless the agreement is 'null and void, inoperative or incapable of being performed.'" Bautista v. Star Cruises, 396 F.3d 1289, 1301 (11th Cir. 2005) (citing Convention, art. II(3)). This provision limits the bases upon which international arbitration agreements may be challenged to standard breach of contract defenses. Id. at 1302.

[14] First, the parties have an agreement in writing within the meaning of the Convention. See Convention, art. II(2) ("The term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties[.]"). Second, the parties' agreement provides for arbitration in a territory of a signatory of the Convention because the agreement requires that the arbitration take place in Jacksonville, Florida. See Services Agreement at 5. Third, the agreement arises out of a commercial relationship. Last, since Defendants are both foreign entities and the commercial relationship concerns APR's power generation activities in Libya, the fourth jurisdictional prerequisite is satisfied.

-13-

presumption applies with special force in the field of international commerce." <u>Lindo</u>, 652 F.3d at 1275. As such, the Court approaches the issue of the arbitrability of Defendants' claim asserted in the Libyan Proceeding with the understanding that the Convention Act "'generally establishes a strong presumption in favor of arbitration of international commercial disputes.'" <u>Bautista</u>, 396 F.3d at 1295 (quoting <u>Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH</u>, 141 F.3d 1434, 1440 (11th Cir. 1998)).

Defendants argue that the Libyan Proceeding is not subject to the arbitration obligation because it is "merely for an injunction to secure the funds that are due and payable to FIG/FEG under the Service Agreement." Response at 5. Indeed, they contend that that the Libyan Proceeding is "expressly authorized to be undertaken under Section 10(h) of the Service Agreement." <u>Id.</u> Additionally, Defendants cite to Florida law governing pre-judgment writs of garnishment[15] and fraudulent transfers[16] contending that "[l]itigants are entitled, under Florida law and in Libya, to secure pre[-]judgment remedies." <u>Id.</u> at 6. APR responds by arguing that the "the remedy sought and obtained in the Libyan Proceeding has nothing to do with 'imminent damage', but with the ability to collect on a purported debt that Defendants claim is already outstanding." Reply at 2. Accordingly, APR asserts that "[n]o imminent damage can be shown under governing Florida law where the only 'damage' is the potential inability to collect a money judgment." <u>Id.</u>

---

[15] FLA. STAT. § 77.031.

[16] FLA. STAT. §§ 726.105-108.

Paragraph 10 of the Services Agreement states in pertinent part, "<u>any dispute</u> which arises under this Agreement shall be resolved by submittal to binding arbitration . . ." Services Agreement ¶ 10 (emphasis supplied). Nevertheless, Clause 10(h) provides an exception to the arbitration obligation in that it permits either party to seek a preliminary injunction "if necessary to obtain legal measures intended to protect their rights prior to or during the arbitration" so long as "such judicial relief . . . is limited to that which is required to prevent imminent damage to a party" and "does not resolve the merits or substance of such Dispute." <u>Id.</u> ¶ 10(h). This provision, like the remainder of the Services Agreement, is governed by, and must be interpreted in accordance with, Florida law. <u>Id.</u> ¶¶ 10(b), 24. Upon consideration of the record and the applicable authority, the Court concludes that the relief sought by Defendants in the Libyan Proceeding is not necessary to protect their rights under applicable law nor limited to that which is "required to prevent imminent damage."

Preliminarily, the Court observes that the Libyan Proceeding is not necessary to obtain legal measures intended to protect Defendants' rights prior to or during the arbitration. This is so because the arbitration agreement, which covers "any dispute which arises under [the Services] Agreement[,]" is broad enough to encompass the preliminary relief sought by Defendants in the Libyan Proceeding. <u>See</u> <u>Telecom Italia, SpA v. Wholesale Telecom Corp.</u>, 248 F.3d 1109, 1114 (11th Cir. 2001) (characterizing the arbitration clause as having "broad" language where it provided for arbitration of "any disputes arising out of or relating to" the contract).

Moreover, it is settled Florida law that "[i]njunctive relief may not be used to enforce money damages, or to prevent any party from disposing of assets until an action at law for an alleged debt can be concluded." Hiles v. Auto Bahn Fed'n, Inc., 498 So. 2d 997, 998 (Fla. 4th DCA 1986); see also Weinstein v. Aisenberg, 758 So.2d 705, 706 (Fla. 4th DCA 2000) (reversing trial court's grant of a temporary injunction to prevent defendants from withdrawing funds at two nonparty banks where the plaintiff had an adequate remedy at law in the form of money damages); Action Elec. & Repair, Inc. v. Batelli, 416 So.2d 888, 889 (Fla. 4th DCA 1982) (vacating trial court's grant of a temporary injunction because it amounted to use of injunctive relief as a substitute for a pre-judgment attachment). Indeed, Florida's Third District Court of Appeal recited this "basic rule" in upholding a trial court's order dissolving a temporary injunction which prohibited the removal of funds from a bank pending the conclusion of the case. See Barbouti v. Lysandrou, 559 So.2d 648, 650 (Fla. 3d DCA 1990). In place of the temporary injunction, the trial court permitted the plaintiff to secure a "freeze" of the bank account pursuant to a pre-judgment writ of garnishment under Florida Statute section 77.031. Id. at 649. In explaining the impropriety of the temporary injunction, the appellate court noted that "the relief attainable by the plaintiff through the use of the injunction . . . was as a practical matter fully provided by the use of the writ of garnishment[.]" Id. at 650. Similarly, the Eleventh Circuit has emphasized that "preliminary injunctive relief freezing a defendant's assets in order to establish a fund with which to satisfy a potential judgment for money damages is simply not an appropriate exercise of a federal district court's authority." Rosen v. Cascade Int'l, Inc.,

21 F.3d 1520, 1530 (11th Cir. 1994).[17] Thus, the Libyan Proceeding is not appropriate

to secure Defendants' rights under the applicable law.[18]

_____

[17] Indeed, similar to the Barbouti court's analysis contrasting temporary injunctive relief with a pre-judgment writ of garnishment, the Eleventh Circuit in Rosen explained that although the plaintiffs did not seek to invoke Florida attachment law, because "plaintiffs in Florida possess an adequate, exclusive pre[-]judgment remedy for the sequestration of assets under the attachment statute, . . . the use of injunctive relief as a substitute for the remedy of pre[-]judgment attachment . . . is improper." Rosen, 21 F.3d at 1531.

[18] Moreover, despite Defendants' contention to the contrary, Defendants failed to satisfy the statutory requirements to obtain a pre-judgment writ of garnishment under Florida Statute section 77.031 or relief against fraudulent transfer under Florida Statute section 726.108. Section 77.031 provides, in pertinent part, that:

> (2) To obtain issuance of the writ, the plaintiff, or the plaintiff's agent or attorney, shall file in the court where the action is pending a verified motion or affidavit alleging by specific facts the nature of the cause of action; the amount of the debt and that the debt for which the plaintiff sues is just, due, and unpaid; that the garnishment is not sued out to injure either the defendant or the garnishee; and that the plaintiff believes that the defendant will not have in his or her possession, after execution is issued, tangible or intangible property in this state and in the county in which the action is pending on which a levy can be made sufficient to satisfy the plaintiff's claim. The writ of garnishment shall set forth a notice to the defendant of the right to an immediate hearing for dissolution of such writ pursuant to s. 77.07. Upon issuance of the writ of garnishment, the clerk of the court shall provide by mail a copy of the writ to the defendant.
>
> (3) Except when the plaintiff has had an attachment writ issued, no writ of garnishment before judgment shall issue until the plaintiff, or the plaintiff's agent or attorney, gives a bond with surety to be approved by the clerk payable to the defendant in at least double the amount of the debt demanded, conditioned to pay all costs, damages, and attorney's fees that the defendant sustains in consequence of the plaintiff's improperly suing out the writ of garnishment.

FLA. STAT. § 77.031(2)-(3). FEG's Libyan Proceeding fails to satisfy the safeguards required by section 77.031: 1) FEG filed the action in Libya, not in the Middle District of Florida "where the action is pending"; 2) nothing was submitted to the Libyan court under oath; 3) FEG made no assertion that the Libyan Proceeding was not sought to injure APR or GECOL; 4) FEG failed to submit a sworn statement setting forth its belief that APR would not have property with which to satisfy an arbitration award or judgment; and 5) the Libyan court did not require FEG to post a bond.

Additionally, FEG's Libyan Proceeding is not authorized under Florida's fraudulent transfer statute. Although Defendants cite Florida Statute section 726.108(c)1., which affords "[a]n injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property[,]" GECOL is neither a debtor nor a transferee under this provision. As such, section 726.108(1) has no applicability here.

Additionally, Defendants' underlying claims against APR are legal, not equitable, in that Defendants ultimately seek to recover money damages for a past breach of the Services Agreement. See Rosen, 21 F.3d at 1526 (noting that the plaintiff's claims seeking to recover money damages for violation of federal securities law and state common law are legal, not equitable, in nature). In that regard, the Libyan Proceeding, which Defendants concede is intended to secure future payment of this disputed past debt is not "required to prevent imminent damage." Rather, it seeks to secure a remedy for the alleged breach of contract. Since Defendants have an adequate remedy at law in their claim for money damages which may be raised in arbitration, Defendants are not entitled to seek an injunction under Section 10(h), and have improperly asserted this claim in the Libyan Proceeding. See Ne. Florida Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."); see also De Leon v. Aerochago, S.A., 593 So.2d 558, 559 (Fla. 3d DCA 1992) ("[T]here is no likelihood of immediate and irreparable harm because the appellees have an adequate remedy at law.").

Accordingly, to the extent Defendants wish to obtain pre-judgment remedies in order to protect their rights during the arbitration, Defendants must seek these remedies under Florida law in arbitration. See Services Agreement ¶ 10 ("Except as provided in Section 15[19] below, any dispute which arises under this Agreement shall

---

[19] Defendants do not argue that any of the exceptions to the arbitration clause enumerated in Section 15 of the Services Agreement, see supra n.6, apply.

be resolved by submittal to binding arbitration[.]").   As such, the Court will enter judgment in favor of APR as to Count 1, and will compel Defendants to arbitrate all disputes arising under the Services Agreement, including the claim asserted in the Libyan Proceeding.[20]

## B.   Count 3 - Request for Issuance of Anti-Suit Injunction Against the Defendants

The Court next addresses APR's request for an anti-suit injunction.  "[F]ederal courts have some power to enjoin foreign suits by persons subject to federal court jurisdiction."  Canon Latin Am., Inc. v. Lantech (CR), S.A., 508 F.3d 597, 601 (11th Cir. 2007).  However, a district court may issue an anti-suit injunction only if two "threshold requirements" are met: "(1) 'the parties are the same in both [the foreign and domestic lawsuits],' and (2) 'resolution of the case before the enjoining court is dispositive of the action to be enjoined.'"  Id. (quoting Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 652 (2d Cir. 2004) (alteration in original));  see also S.E.C. v. Pension Fund of Am., L.C., 396 F. App'x 577, 580-82 (11th Cir. 2010) (vacating the district court's contempt order "[t]o the extent it rested upon [the] violation of the anti-suit injunction" because "neither of the threshold requirements for the issuance of an anti-suit injunction [had] been met").  Once this "gatekeeping inquiry" is satisfied the Court can proceed to "consider additional factors to determine whether an injunction is appropriate."  Canon Latin Am., 508 F.3d at 601;

---

[20] In Count 2 of the Complaint, APR requests an order compelling arbitration and attendant relief pursuant to Florida Statutes section 682.03.  See Complaint at 10.  Because the Court determines that APR is entitled to judgment in its favor as to Count 1, which seeks the same relief as Count 2, the Court will dismiss Count 2 as moot.

see also Paramedics, 369 F.3d at 654 ("Beyond the threshold criteria . . ., other considerations include whether the foreign proceeding threatens a strong public policy or the jurisdiction of the domestic forum."); Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, 361 F.3d 11, 18 (1st Cir. 2004) (stating that in "consider[ing] all the facts and circumstances in order to decide whether an injunction is proper . . . considerations of international comity must be given substantial weight").

Notably, "[t]he suitability of an anti-suit injunction involves different considerations from the suitability of other preliminary injunctions." E. & J. Gallo Winery v. Andina Licores S.A., 446 F.3d 984, 990 (9th Cir. 2006); see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 335 F.3d 357, 364 (5th Cir. 2003) ("Although both the district court and the parties discussed all four prerequisites to the issuance of a traditional preliminary injunction, the suitability of such relief ultimately depends on considerations unique to anti[-]suit injunctions."); but see Barnie's Coffee & Tea Co., Inc. v. Am. Mattress Co., No. 6:07-cv-1664-Orl-19UAM, 2008 WL 191019, at *2 (M.D. Fla. Jan. 22, 2008) (discussing the four traditional prerequisites to granting a preliminary injunction in conjunction with the requirements for an anti-suit injunction). Indeed, the Fifth Circuit has stated that "[t]o the extent the traditional preliminary injunction test is appropriate," the court "only need address whether [the plaintiff] showed a significant likelihood of success on the merits" where the merits are "whether [the plaintiff] has demonstrated that the factors specific to an anti[-]suit injunction weigh in favor of granting that injunction here." Karaha Bodas Co., 335 F.3d at 364 n.19. As such, the Court will not address the traditional

-20-

elements for a preliminary injunction, but will instead consider the analysis unique to an anti-suit injunction. Nevertheless, the Court is mindful that because an anti-suit injunction effectively restricts the jurisdiction of a foreign court, such an injunction should be "used sparingly" and granted "only with care and great restraint." China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 35-36 (2d Cir. 1987).

### 1. Gatekeeping Inquiry

#### i. Whether the parties are the same in both the foreign and domestic lawsuits

As the moving party, APR bears the burden of clearly establishing the threshold requirements for an anti-suit injunction. See MasterCard Int'l Inc. v. Argencard Sociedad Anonima, No. 01 CIV. 3027(JGK), 2002 WL 432379, at *10 (S.D.N.Y. March 20, 2002). Relative to the first threshold requirement, the parties to the instant action are APR Energy, LLC, FEG, and FIGCorp. The parties to the Libyan Proceeding are APR Energy, PLC,[21] FEG, and GECOL. See Libyan Application at 5. Because the parties in the two actions are not literally identical, Defendants argue that APR fails to satisfy this first threshold requirement. Response at 5.

In support of its request for injunctive relief, APR relies on the Second Circuit Court of Appeals' decision in Paramedics for the proposition that the first threshold factor does not require "absolute identity of the parties in both fora." Supplemental

---

[21] FEG named "APR Energy Ltd." in the Libyan Proceeding. See Libyan Application at 5. Although APR's Libyan counsel testified that the Libyan Proceeding was commenced by FEG against APR Energy, LLC, see 7/31/2014 Shariha Decl. ¶ 2, at the preliminary injunction hearing, APR's counsel informed the Court that FEG named "APR PLC," also referred to as "APR Limited Holdings," in the Libyan Proceeding because APR PLC, not APR LLC, had the contract with GECOL. As discussed below, the Court concludes that the distinction between APR LLC and APR PLC, which all parties agree are related entities, is not material for purposes of resolution of the Motion.

Memorandum at 4. In Paramedics, the Second Circuit affirmed a district court's order entering an anti-suit injunction despite the fact that the parties in the domestic suit and the foreign action were not identical. See Paramedics, 369 F.3d at 652. The parties to the domestic action were "Tecnimed" and "GEMS-IT," while the Brazilian lawsuit, which the district court enjoined, was brought by Tecnimed against GEMS-IT and a related company, GE Brasil. Id. at 648-49. In affirming the district court's order despite the addition of GE Brasil in the Brazilian lawsuit, the Second Circuit stated that "[t]he decisive point on this record is that GE Brasil is named in the Porto Alegre action chiefly on the basis of its aspects of identity with GEMS-IT." Id. at 652. Specifically, the court concluded that the facts that GEMS-IT and GE Brasil were both part of the General Electric group of companies and that GEMS-IT held at least 70% of GE Brasil's capital supported the district court's "ruling that the parties to the two actions [were] thus sufficiently similar to satisfy the first threshold requirement[.]" Id.

The Eleventh Circuit Court of Appeals has not specifically addressed the question of whether parties who are not literally the same may, nevertheless, be sufficiently similar or effectively the same in order to satisfy the identity of parties requirement for an anti-suit injunction. See Canon Latin Am., 508 F.3d at 601-602 (vacating and remanding the district court's entry of an anti-suit injunction on the grounds that the second threshold requirement was not satisfied where the district court determined that the "cases were 'sufficiently similar'") (emphasis added); see also Pension Fund, 396 F. App'x at 580-82. However, the court's analysis in the Pension Fund case is instructive.

-22-

In <u>Pension Fund</u>, the Eleventh Circuit considered the propriety of the district court's entry of an anti-suit injunction, and determined that the requirements for such an injunction had not been met. <u>Id.</u> at 582. With respect to the identity of parties, the court concluded that the record failed to show that the parties before the enjoining court were the same as those in the Costa Rican civil action. <u>Id.</u> at 580-81. In the case before the district court, the receivership estate claimant and the Pension Fund's court-appointed Receiver were the parties, but in the Costa Rican action, the receivership estate claimant and the Pension Fund's Regional Director were the parties. <u>Id.</u> at 581. The district court, relying on <u>Paramedics</u>, treated the Pension Fund's Receiver and the Pension Fund's Regional Director as one in the same based on its conclusion that the receivership claimant sued the Pension Fund's Regional Director as a representative of the Pension Fund, and that under Costa Rican law, the Pension Fund receivership assets would be liable for any damages determined to be owed by the Pension Fund's Regional Director. <u>Id.</u>; <u>S.E.C. v. Pension Fund of Am., L.C.</u>, 613 F. Supp. 2d 1341, 1345 (S.D. Fla. 2009). On appeal, the Eleventh Circuit first observed that the Pension Fund's Receiver and the Pension Fund's Regional Director were "obviously not literally the same party." <u>Pension Fund</u>, 396 F. App'x at 581. However, that did not conclude the court's analysis. Instead, the court next considered whether the evidence before the district court supported its conclusions that the parties were effectively the same. Ultimately the court determined that the record revealed no evidence that the receivership claimant sued the Pension Fund's Regional Director as a representative for the Pension Fund or that, under Costa Rican law, the receivership assets would be

potentially liable for any damages ultimately awarded to the claimant against the Pension Fund's Regional Director. Id. As such, the court found that the district court's conclusions were not supported by the record and thus, the movant had failed to satisfy the identity of parties requirement.

It is noteworthy that in reaching its decision, the Eleventh Circuit did not reject or otherwise criticize the district court's reliance on Paramedics for the proposition that the identity of parties requirement could be satisfied even where the parties were not literally the same. Instead, the court specifically left open the question of whether the circumstances identified by the district court, "if supported by the record, would be enough to make the Receiver and [the Pension Fund's Regional Director] effectively the same party for the purpose of satisfying the first prerequisite to the issuance of an injunction barring foreign litigation." Id. Thus, the Pension Fund decision contemplates that even when parties to a domestic and foreign action are not "literally" the same, the parties may be still be effectively the same for purposes of an anti-suit injunction. Indeed, the Court notes that in the earlier anti-suit injunction decision cited in Pension Fund, Canon Latin America, Inc., the Eleventh Circuit specifically relied on the Second Circuit's Paramedics decision in identifying the two threshold requirements for an anti-suit injunction. See Canon Latin Am., Inc., 508 F.3d at 601. As discussed above, Paramedics did not require exact identity of parties but rather affirmed the entry of the injunction because the parties to the foreign and domestic actions were "sufficiently similar." See Paramedics, 369 F.3d at 652. Upon consideration of these authorities, the Court concludes that to the extent Defendants contend that the first threshold

-24-

requirement mandates absolute literal identity of the parties, their interpretation of the requirement is too restrictive.

In the instant action, FEG is a subsidiary of FIGCorp and both FEG and FIGCorp are parties to the Services Agreement. See Services Agreement at 1. Indeed, as stated by Defendants at the preliminary injunction hearing, FEG and FIGCorp jointly serve as the Service Provider under the Services Agreement, and in their briefing before the Court, Defendants have consistently referred to FEG and FIGCorp together as "FIG/FEG." See generally Response; Supplemental Response.[22] Moreover, the obligation upon which FEG bases its claim to the funds held by GECOL in the Libyan Proceeding arises from FEG/FIGCorp's performance as the Service Provider. Thus, even though FEG and FIGCorp are not literally the same parties, they are effectively the same for purposes of both actions.[23]

The presence of GECOL in the Libyan Proceeding presents a different issue. APR contends that GECOL's presence in the Libyan Proceeding does not preclude the issuance of an anti-suit injunction because it is a "nominal, non-interested party." Supplemental Memorandum at 7-8.[24] Case law from the Southern District of New York

---

[22] Indeed, in the Response, Defendants state that "[o]n or about May 23, 2014, FIG/FEG applied for an order in Libya sequestering the disputed payments otherwise due to APR from GECOL." Response ¶ 12.

[23] For these same reasons, to the extent APR Energy, PLC, is named in the Libyan Proceeding, whereas APR Energy, LLC, is the party to instant action, these entities are also effectively the same parties. Indeed, although FEG named APR PLC in the Libyan action, the allegations underlying its request for relief relate only to the obligations of APR LLC, as it is APR LLC, not APR PLC, that is a party to the Services Agreement and that arguably owes the debt to FEG/FIGCorp.

[24] APR's Libyan counsel testified that "there are no substantive claims asserted against GECOL in the Libyan Proceeding." See Declaration of Albudery Shariha ¶ 4 (Doc. 16-2, Exhibit 2; 6/10/2014
(continued...)

provides support for the claim that GECOL's presence in the Libyan Proceeding does not stand as a bar to an anti-suit injunction. For example, in <u>MasterCard Int'l Inc.</u>, 2002 WL 432379, at *10, MasterCard sued in a New York district court, seeking injunctive relief allowing it to terminate Argencard's exclusive licensing rights. <u>Id.</u> at *1. Argencard sued in Argentina seeking a declaration of whether MasterCard had the right to terminate Argencard's exclusive licensing rights and one of Argencard's controlling shareholders, Credit Card Holding Co., intervened in that action. <u>Id.</u> MasterCard then moved for a preliminary injunction to prohibit Argencard from proceeding with the Argentine litigation. <u>Id.</u> Although ultimately declining to enter an anti-suit injunction because the Argentine litigation did not threaten either the jurisdiction of the domestic court or any important policies identified by the parties, the district court did find that the two threshold requirements to an anti-suit injunction had been met. <u>Id.</u> at *9-12. Specifically, the court first recognized that it was "undisputed" that the "primary parties" to both the domestic action and the Argentine action were MasterCard and Argencard. <u>Id.</u> at *10. Next, the court determined that "[a]lthough one of Argencard's controlling shareholders, Credit Card Holding Co., ha[d] intervened in the Argentine action, this party [was] not a necessary party to that action, and the present cases [were] sufficiently similar in terms of parties to meet the first threshold

---

[24](...continued)
Shariha Decl.); <u>see also</u> 7/31/2014 Shariha Decl. ¶ 4 ("GECOL is purely a disinterested party who is named in that proceeding solely for the purpose of preventing payment of monies owed by GECOL to APR."). Additionally, according to APR's Libyan counsel, "GECOL is not required to file an answer to the Writ under Libyan law nor has it filed any such answer with the Libyan [c]ourt." 7/31/2014 Shariha Decl. ¶ 8(e).

-26-

criterion for an anti-foreign-suit injunction extending to Argencard and MasterCard." Id.

Here, APR and FEG/FIGCorp are the primary parties to both the instant action and the Libyan Proceeding because they are the only parties to the underlying dispute which arises from the Services Agreement. Neither FEG nor APR have asserted substantive claims against GECOL in the Libyan Proceeding, and GECOL has not raised any substantive claims against any of the parties in this case. Instead, as noted by APR's Libyan counsel, "GECOL's presence is simply to facilitate payment to FEG should it prevail against APR." 6/10/2014 Shariha Decl. ¶ 4. By mandating that the parties in both the domestic and foreign actions be effectively the same, the first threshold requirement for an anti-suit injunction insures that a party to a foreign action is not unjustly barred from either defending a claim or obtaining relief. Here, as GECOL asserts no claim and defends no claim in the Libyan Proceeding, the issuance of an anti-suit injunction despite its presence threatens no injury to GECOL. To allow the presence of an additional party such as GECOL that neither adds nor detracts from the substance of the case to defeat an anti-suit injunction would elevate form over substance. Indeed, if the identity of parties requirement were interpreted so narrowly, a litigant could easily preempt an anti-suit injunction by the addition of any nonessential party. See Maroc Fruit Bd. S.A. v. M/V Almeda Star, 961 F. Supp. 2d 362, 365 (D. Mass. 2013) (finding that the "parties at the crux of this dispute" were parties to both proceedings and that "[t]o allow [the defendant] to avoid an injunction simply by adding an extra party would undermine the flexible approach [to the threshold requirements]

-27-

taken by the First Circuit"); <u>Storm LLC v. Telenor Mobile Commc'ns AS</u>, No. 06 Civ. 13157(GEL), 2006 WL 3735657, at *5-6 (S.D.N.Y. Dec. 15, 2006) (finding sufficient similarity among the parties where the party seeking the anti-suit injunction was deliberately left out of the foreign actions).

In this action, since the real parties in interest here and in the Libyan Proceeding are effectively the same, the undersigned concludes that APR has satisfied the first threshold requirement for an anti-suit injunction. <u>See</u> <u>In re Vivendi Universal, S.A. Securities Litigation</u>, No. 02 Civ. 5571(RJH)(HBP), 2009 WL 3859066, at *5 (S.D.N.Y. Nov. 19, 2009) ("Where the 'real parties in interest' are the same in two actions, even if all parties are not identical, [the] first threshold requirement will be satisfied."); <u>see also</u> <u>Motorola Credit Corp v. Uzan</u>, No. 02 Civ 666(JSR), 2003 WL 56998, at *2-3 (S.D.N.Y. Jan. 7, 2003) (same).

### ii. Whether resolution of the case before the enjoining court is dispositive of the action to be enjoined

APR has also satisfied the second threshold requirement for issuance of an anti-suit injunction - that the case before the enjoining court be dispositive of the action to be enjoined. For purposes of granting an anti-suit injunction "dispositive" means "to settle or finish the dispute." <u>Canon Latin Am.</u>, 508 F.3d at 601 n.8. APR argues that Defendants' legal action seeking pre-judgment remedies in the Libyan Proceeding involves "issues that must be arbitrated and an action that determines the arbitrability of a claim/remedy/issue sought to be pursued in a foreign tribunal is the quintessential dispute where courts have consistently found that a determination of arbitrability is

-28-

dispositive of the action to be enjoined." Supplemental Memorandum at 10. Defendants present no contrary argument with regard to this contention.[25]

The Second Circuit considered the question of whether an order compelling arbitration would be dispositive of a parallel foreign action in the Paramedics case. See 369 F.3d at 653. The court noted that "[t]he case before the enjoining court . . . concern[ed] the arbitrability of the parties' claims," and as such, recognized that the question was "whether the ruling on arbitrability is dispositive of the [foreign] litigation, even though the underlying disputes are confided to the arbitral panel and will not be decided by the enjoining court." Id. The court determined that "the district court's judgment disposes of the [foreign] action because the [foreign] litigation concerns issues that, by virtue of the district court's judgment, are reserved to arbitration." Id.; see also Alstom Chile S.A. v. Mapfre Compania De Seguros Generales Chile S.A., No. 13 Civ. 2416(LTS)(DCF), 2013 WL 5863547, at *3 (S.D.N.Y. Oct. 31, 2013) ("As to the second threshold factor, 'although this Court will not determine the outcome of the underlying dispute, an order by this Court compelling arbitration will result in a determination of the dispute in the arbitration.'").[26]   Thus, an order compelling

---

[25] Indeed, in the Supplemental Response, Defendants seem to acknowledge that an order compelling arbitration would satisfy the second prong of the threshold inquiry. See Supplemental Response at 3 (arguing that the relief APR is requesting here would violate Section 10(h) [of the Services Agreement] because it "would effectively resolve the merits and substance of the Libyan proceeding").

[26] In contrast to cases where the domestic court's arbitrability ruling was dispositive of the foreign action, the Paramedics court described "cases in which the domestic court speaks to the merits of a controversy under domestic law while an analogous claim under foreign law is pending in a foreign forum, and in which resolution of one action may not dispose of the other." Paramedics, 369 F.3d at 653 n.3. This latter type of case was at issue in Canon Latin America, Inc., in which the Eleventh Circuit determined that the second prong of the threshold inquiry was not met because the defendant's "Costa Rican action hinge[d] on statutory rights that are unique to Costa Rica and that cannot be resolved by (continued...)

-29-

arbitration would resolve and dispose of the foreign action, and satisfy the second requirement for an anti-suit injunction. Another court similarly noted:

> [t]he question of whether an action is dispositive of a foreign action has typically arisen when one party seeks to bring claims before a foreign court that a U.S. court has found must be submitted to arbitration. In this context, U.S. courts have readily held that decisions of U.S. courts that certain disputes must be submitted to arbitration are dispositive of parallel claims in foreign courts or arbitral tribunals relating to the same underlying disputes.

In re Vivendi, 2009 WL 3859066, at *5 n.10.

As discussed above, FEG's claim in the Libyan Proceeding is not a claim for preliminary injunctive relief which falls within the exception to the parties' arbitration agreement in Clause 10(h) of the Services Agreement. As such, FEG's claim for pre-judgment remedies must be resolved, if at all, in arbitration. Because the Court has granted APR's motion to compel arbitration and has determined that the FEG's claim asserted in the Libyan Proceeding is arbitrable, disposition of this action will dispose of the Libyan Proceeding. See Paramedics, 369 F.3d at 653. Thus, APR has satisfied the second threshold requirement for obtaining an anti-suit injunction against FEG.

## 2. Additional Factors

As APR has met its burden of satisfying the threshold requirements for issuance of an anti-suit injunction, the Court next considers whether additional, discretionary factors warrant such an injunction. See Canon Latin Am., Inc., 508 F.3d at 601. The

---

[26](...continued)
a judgment of the district court on [the plaintiff's] claims in Florida." Canon Latin Am., 508 F.3d at 602. FEG's Libyan Proceeding does not "hinge" on statutory rights or claims unique to Libyan law. Indeed, although Defendants assert that "[l]itigants are entitled, under Florida law and in Libya, to secure pre[-]judgment remedies," see Response at 6, in the Services Agreement, the parties agree that Florida law governs the contract and their disputes.

Eleventh Circuit has not addressed what factors a district court should consider once the party seeking an anti-suit injunction has satisfied the gatekeeping inquiry. The First Circuit has described both a "liberal" and a "conservative" approach to this portion of a court's analysis. See Quaak, 361 F.3d at 17 (collecting cases). The Fifth and Ninth, and likely the Seventh, Circuits follow the liberal approach, under which "an international anti[-]suit injunction is appropriate whenever there is a duplication of parties and issues and the court determines that the prosecution of simultaneous proceedings would frustrate the speedy and efficient determination of the case." Id. These courts "tend to define [the interest in considerations of international comity] in a relatively narrow manner" and "assign it only modest weight." Id. In contrast, the Second, Third, Sixth, and D.C. Circuits apply a "conservative approach" under which "critical questions anent the issuance of an international anti[-]suit injunction are whether the foreign action either imperils the jurisdiction of the forum court or threatens some strong national policy." Id. The First Circuit opined that the conservative approach "affords appreciably greater weight to considerations of international comity." Id. Nevertheless, that court, although rejecting the liberal approach, declined to adopt the precise restrictive construction of the conservative approach. See id. at 18. Instead, the court instructed that courts consider not only preservation of jurisdiction and protection of important national policies, but also any other equitable considerations surrounding a particular request for an anti-suit injunction. Id. at 18-19.

Under any of these approaches, discretionary considerations favor the issuance of an anti-suit injunction in the instant case. Under the most restrictive, the

conservative approach, "'an anti-suit injunction will issue to preclude participation in the litigation only when the strongest equitable factors favor its use,' and the granting of an injunction depends in part on the 'importance to the forum of the law allegedly evaded.'" Paramedics, 369 F.3d at 654 (quoting Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 931-32 (D.C. Cir. 1984)). Relevant to the instant action, "[t]he federal policy favoring the liberal enforcement of arbitration clauses . . . applies with particular force in international disputes." Id. (citing Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 638–40 (1985)). Indeed, "where a party initiates a foreign suit in 'an attempt to sidestep arbitration,' an anti-suit injunction may be particularly appropriate 'given the federal policy favoring liberal enforcement of arbitration clauses.'" Alstom Chile S.A., 2013 WL 5863547, at *4; see also id. ("The Porto Alegre action, filed 31 days after GEMS-IT filed a notice and request for arbitration with the IACAC, was a tactic to evade arbitration.").

Here, Defendants' claim asserted in the Libyan Proceeding does not simply preserve the status quo but actually sidesteps the requirement that FEG/FIGCorp arbitrate their request for pre-judgment relief. Indeed, under the Services Agreement and the Convention Act, if Defendants wish to pursue pre-judgment remedies against APR, they are required to seek this relief in an arbitration in Florida and applying Florida law. Thus, although Defendants have filed an application for arbitration with the

ICC, their refusal to arbitrate the claim for pre-judgment relief brought in the Libyan Proceeding threatens a strong public policy of this forum.[27]

Additionally, "[c]ourts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants." Laker Airways, 731 F.2d at 927. While anti-suit injunctions ordinarily "are not properly invoked to preempt parallel proceedings on the same in personam claim in foreign tribunals," id. at 915, "[t]he logical reciprocal of the parallel proceeding rule proves that there must be circumstances in which an anti[-]suit injunction is necessary to conserve the court's ability to reach a judgment." Id. at 929. As such, "where the foreign proceeding is not following a parallel track but attempts to carve out exclusive jurisdiction over concurrent actions, an injunction may be necessary to avoid the possibility of losing validly invoked jurisdiction." Id. at 930; see also Quaak, 361 F.3d at 19 (rebutting the presumption against the issuance of anti-suit injunctions involves, among other things, consideration of "whether [the two actions] are merely parallel or whether the foreign action is more properly classified as interdictory"). In the instant action, the Libyan Proceeding is not following a parallel track but is instead an attempt by Defendants to carve out an

---

[27] The case of LAIF X SPRL v. Axtel S.A. de C.V., 390 F.3d 194, 200 (2d Cir. 2004) is distinguishable on this point. There, the Second Circuit determined that the district court did not abuse its discretion in refusing to issue an anti-suit injunction where a question arose under Mexican law, and that question had been presented to a Mexican court. LAIF X SPRL, 390 F.3d at 200. Rather, the court determined that even though the defendant was seeking a ruling from a Mexican court, the Mexican lawsuit was not directed at sidestepping arbitration because the defendant had "submitted itself to the arbitral forum, exercised its right in that forum to assert a procedural defense, and invoked the discretion of the arbitral forum to stay proceedings in deference to the Mexican court on a point of Mexican law." Id. In contrast, in the instant case, although Defendants have submitted the overarching dispute to arbitration, they nevertheless seek to pursue pre-judgment remedies in Libya with the benefit of Libyan law despite the agreement to arbitrate and to apply Florida law. But the parties dispute presents no unique issue arising under Libyan law which must be addressed in a Libyan court.

exception to the parties' agreement to arbitration, choice of forum, and choice of law.[28]

On this record, the Court concludes that these factors outweigh countervailing considerations of comity, and APR's request for an anti-suit injunction must be granted.[29]

---

[28] Notably, an anti-suit injunction would deter forum shopping to the extent Defendants have sought pre-judgment remedies in Libya in an attempt to avoid the application of Florida law. See Alstom Chile S.A., 2013 WL 5863547, at *4 ("[E]quitable considerations favor enjoining Defendant from pursuing the Chilean Action, as the Court must deter forum shopping and it appears here that Defendant sought an alternative forum to avoid the application of New York Law.").

[29] In reaching this conclusion, the Court finds Defendants' various affirmative defenses raised in the Supplemental Response to be without merit. First, the Court rejects Defendants' argument that APR is not entitled to injunctive relief because the conditions in Clause 10(h) of the Services Agreement have not been satisfied. Supplemental Response at 3-4. Defendants argue that the first condition in Clause 10(h) is not met because "APR's claims are essentially tied to monetary relief, for which there is an adequate remedy at law." Id. at 3. However, the cases cited by Defendants apply the traditional, four-prong preliminary injunction analysis and are, thus, not applicable to APR's request for an anti-suit injunction. See, e.g., Family Oriented Cmty. United Strong, Inc. v. Lockheed Martin Corp., No. 8:11-cv-217-30AEP, 2011 WL 902626, at *1-2 (M.D. Fla. Mar. 8, 2011), report and recommendation adopted, 8:11-CV-217-T-30AEP, 2011 WL 899719 (M.D. Fla. Mar. 15, 2011) (denying plaintiff's motion for a TRO where the temporary relief sought did not address the ultimate right asserted by the plaintiff; and where plaintiff failed to show a threat of irreparable harm because plaintiff could recover monetary damages if it ultimately prevailed in the case). Moreover, APR's anti-suit injunction is not, in fact, tied to monetary relief. Rather, APR is seeking to enforce its rights to arbitration, venue, and choice of law by enjoining a foreign lawsuit comprised of an arbitrable claim. Defendants also contend the second condition in Clause 10(h) is not met because APR's Motion "is tantamount to a request for relief on the merits of the Libyan Proceedings." Supplemental Response at 4. While compelling arbitration will put an end to the Libyan Proceeding, APR's Motion does not resolve the merits or substance of the parties' dispute because the parties have submitted the underlying dispute to arbitration. Rather, APR is simply seeking to enjoin Defendants' attempts to litigate outside the confines of arbitration.

Defendants also argue that because APR has not attempted to initiate arbitration, APR has unclean hands and should be estopped from demanding entry of an anti-suit injunction compelling dismissal of the Libyan Proceeding. Supplemental Response at 4-5.

> For a defendant to successfully avail itself of the doctrine of unclean hands, it must satisfy two requirements. First, the defendant must demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted. . . . Second, even if directly related, the plaintiff's wrongdoing does not bar relief unless the defendant can show that it was personally injured by her conduct.

Calloway v. Partners Nat'l Health Plans, 986 F.2d 446, 450-51 (11th Cir. 1993) (internal citations omitted). Here, the fact that APR has not initiated arbitration is not directly related to APR's request for an anti-suit injunction because APR has not, itself, attempted to litigate an arbitrable claim in a foreign jurisdiction. Moreover, Defendants have failed to show any personal injury as a result of APR's failure to initiate arbitration.

(continued...)

## C.    Injunction Bond

Pursuant to Rule 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[30] However, the Services Agreement provides for a one-way bond waiver in APR's favor:

> In the event that the Service Provider or the Principals shall commit or cause to commit a breach of this Agreement . . ., then in such event, each of the Service Provider and the Principals hereby consents to the granting of a temporary or permanent injunction against it, him or her by any court of competent jurisdiction prohibiting it, him or her from violating any provision of this Agreement, without the necessity of having to post any bond therefor.

Services Agreement ¶ 10(h). Nevertheless, Defendants argue that some Florida courts have declined to enforce such waivers[31] and that APR should be required to post an injunction bond. See Supplemental Response at 6-7. The Eleventh Circuit has directed that "'the amount of security required by the rule is a matter within the discretion of the trial court ...[, and] the court may elect to require no security at all.'"

---

[29](...continued)
Last, Defendants assert that because APR has admitted that it has been paid by GECOL, and APR has not remitted any of this money to FEG or FIGCorp, APR has breached the Services Agreement. Supplemental Response at 5-6. As such, Defendants contend that APR is not entitled to pursue remedies under the Services Agreement. Id. This argument reaches the merits of the parties' underlying breach of contract dispute and as such is reserved for arbitration. Thus, the Court declines to consider this defense.

[30] Although the injunction bond requirement under Rule 65(c) applies to preliminary injunctions and temporary restraining orders, because Defendants raise the issue in the Supplemental Response, see Supplemental Response at 6-7, the Court will address the issue.

[31] Because the Court has determined for separate reasons that an injunction bond is not warranted in this case, the Court declines to address Defendants' argument regarding the enforceability of the parties' bond waiver.

BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 971 (11th Cir. 2005) (quoting City of Atlanta v. Metro. Atlanta Rapid Transit Auth., 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)[32]) (alteration in original).  Additionally "'[t]he burden is on the party seeking security to establish a rational basis for the amount of a proposed bond[.]'"  VAS Aero Servs., LLC v. Arroyo, 860 F. Supp. 2d 1349, 1364 (S.D. Fla. 2012) (citations and internal quotation marks omitted).

An injunction bond "is intended to afford security only for those damages, if any, that might be 'proximately caused by the [wrongful] issuance of [an] injunction.'"  Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd., 441 F. Supp. 2d 552, 565-66 (S.D.N.Y. 2006) (alteration in original).  Typically, a security bond is required when a court enters an injunction which prevents commercial, money-making activities.  See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers, 297 F.R.D. 633, 634 (N.D. Ala. 2014) (citing Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 426 (3d Cir. 2010)).  Here, the only damage the Defendants may suffer if the anti-suit injunction is wrongfully issued is that GECOL will have released to APR the funds Defendants seek to recover from APR.  But if the Defendants prevail in the arbitration, they will still be entitled to recover those funds from APR.  Thus, the only potential for damages to Defendants would be if the arbitration judgment were ultimately uncollectible.  Even if the Services Agreement did not include a bond waiver in favor of APR, under these circumstances, the Court would decline to require a bond.  Indeed the Court sees no

---

[32] In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

need to require APR to post an injunction bond solely to address Defendants' conclusory fears regarding the collectability of a future judgment against APR.

## IV.    Conclusion

In light of the foregoing, the Court finds that APR's requests for an order compelling arbitration and for an anti-suit injunction are due to be granted. The claim asserted by Defendants in the Libyan Proceeding is subject to arbitration under the Services Agreement, and does not fall within the narrow exception of Section 10(h). Thus, to the extent Defendants wish to seek pre-judgment relief, they must seek that relief in arbitration, and APR's request to compel arbitration of this and all disputes arising from the Services Agreement is due to be granted. Further, although the parties to the instant action and the Libyan Proceeding are not identical, they are effectively the same for purposes of the first threshold requirement for an anti-suit injunction. And, because Defendants' claim in the Libyan Proceeding is subject to arbitration, and the Court is granting APR's request to compel arbitration, resolution of this case is dispositive of the Libyan Proceeding. Additionally, discretionary factors warrant entry of an anti-suit injunction, particularly given Defendants' attempt to evade arbitration by seeking pre-judgment remedies in a foreign tribunal. Therefore, the Court will direct Defendants, their officers, agents, servants, employees, attorneys, and all others acting in concert with Defendants, to take all steps necessary to withdraw and cause to be dissolved the precautionary hold entered by the Libyan court on June 2, 2014, and the action on which it is premised, and enjoins Defendants from initiating any similar proceeding.

-37-

As noted above, at the request of the parties, the Court consolidated the preliminary injunction hearing with the trial on the merits in this case, see supra n.1, and at the hearing, the parties specifically agreed that the Court should enter judgment based on the current record. Accordingly, having found that Defendants are required to arbitrate all disputes arising under the Services Agreement, including the claim asserted in the Libyan Proceeding, and that an anti-suit injunction is warranted, the Court concludes that APR is entitled to the entry of Judgment in its favor as to Counts 1 and 3, and a permanent injunction. Pursuant to the foregoing, it is

ORDERED:

1.  Plaintiff, APR Energy, LLC's Verified Motion for Expedited Hearing and Preliminary Injunction Barring Defendants from Pursuing Libyan Proceeding in Contravention of Arbitration Agreement (Doc. 3) is **GRANTED**.

2.  The Clerk of the Court is directed to enter **JUDGMENT** in favor of Plaintiff APR Energy, LLC, and against Defendants First Investment Group Corporation and First Engineering Group a/k/a 1st Engineering Group as to Counts 1 and 3.

3.  Count 2 is **DISMISSED** without prejudice as moot.

4.  The parties are **DIRECTED** to arbitrate all disputes arising under the Services Agreement, including the claim asserted in the Libyan Proceeding.

5. Defendants First Investment Group Corporation and First Engineering Group a/k/a 1st Engineering Group, their officers, agents, servants, employees, attorneys, and all others acting in concert with Defendants who receive actual notice of this judgment, are **DIRECTED** to take all steps necessary to withdraw and cause to be dissolved the precautionary hold entered by the Libyan court on June 2, 2014, and the action on which it is premised, and **ENJOINED** from initiating any similar proceeding.

6. The Clerk of the Court is further **DIRECTED** to terminate any remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** at Jacksonville, Florida on September 29, 2014.

MARCIA MORALES HOWARD
United States District Judge

lc18

Copies to:

Counsel of Record

-39-